**ANCHOR SAVINGS BANK, FSB, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

No. 95–39 C.

United States Court of Federal Claims.

March 14, 2008.

Edwin L. Fountain, Jones Day, Washington, D.C., attorney of record for plaintiff, with whom were George T. Manning, C. Thomas Long, Joseph J. Migas, Adrian Wager–Zito, Debra L. Satinoff and Geoffrey S. Irwin.

Patrick T. Murphy and Tarek Sawi, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were Colleen Hanrahan, Brian J. Mizoguchi, John Todor, Ed Sullivan, Richard Evans, Luke Levasseur, Mark Pittman and Delisa Sanchez.

### Opinion And Order

BLOCK, Judge.

### I. INTRODUCTION

This case is one of the last of the *Winstar*-related progeny facing this court. It involves a series of contracts in which the government promised to allow the plaintiff, Anchor Savings Bank, FSB ("Anchor") to account for "supervisory goodwill" as a capital asset that would count toward Anchor's regulatory capital requirement and be amortized over a 25-to-40 year period. The contracts accompanied Anchor's acquisition in the 1980s of four failing financial institutions, at the behest and under the supervision of federal thrift regulators. The government hoped those "supervisory" acquisitions would prevent its contingent deposit insurance liability from maturing. Following a change in thrift regulatory policy, however, the 1989 Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") disallowed substantially all of Anchor's supervisory goodwill as a capital asset. As a consequence, Anchor immediately became a severely under-capitalized financial institution and was forced to make radical operational changes to avoid being seized and liquidated by its regulators.

In a series of earlier opinions, this court concluded that FIRREA breached the government's supervisory goodwill contracts with Anchor. The issue of damages, alone, remains.

Before trial, this court noted that the tales that the parties crafted harken back to Charles Dickens' A TALE OF TWO CITIES. Anchor portrayed its business and operations in the period leading up to the breach as the proverbial "best of times," with the bank poised for extraordinary success, but the government countered with a more pessimistic approach, challenging Anchor's performance as a quintessential "worst of times" in which Anchor was headed towards failure. *See Anchor Sav. Bank, FSB v. United States*, 59 Fed.Cl. 126, 128 (2003) (summary judgment decision). At the time, the court was in no position to weigh those arguments against one another and decide which version—the best of times, or the worst of times—was more credible.

Following an almost month-long trial, it is now more clear what is the real story in play. The extremist arguments proffered by both parties have given way to a truth that lies somewhat in the middle—it was neither the Dickensian "best" of times nor the "worst." It was, however, a time of remarkable change and innovation in both the savings and loan industry and its progeny, the mortgage-banking industry. Anchor appears to have been one of the institutions most prepared to respond to that change, as its management had deliberately positioned the bank to be a leading player in the evolving mortgage-banking industry. As that industry began to rely more heavily upon thrifts as intermediaries between borrowers and the secondary mortgage market's capital supply, Anchor was ready to be an industry leader.

The abrupt disallowance of most of Anchor's supervisory goodwill as regulatory capital was a near-fatal blow. It forced Anchor to fundamentally alter its business plan and, in so doing, to sacrifice substantial long-term profits in favor of one-time gains from the sale of assets to prop up the suddenly failing, capital-starved institution. In the aftermath of FIRREA, Anchor's manage-

ment was forced to operate the business in a defensive posture that could best be described as *triage*, with a singular focus on preventing the thrift from falling into receivership and maintaining a stripped-down platform from which a profitable enterprise might someday re-emerge, like a phoenix from its ashes.

After the breach, Anchor shrank by more than $1 billion in assets in just two years. It sold geographically diverse branch deposits in a depressed market and abandoned a twenty-year-old plan of geographic expansion and diversification. Anchor also sold a profitable subsidiary that was the leading private player in the secondary mortgage market. This subsidiary was poised for explosive, long-term growth precisely when Anchor was forced to sell it. Indeed, in just the first two years after Anchor sold its subsidiary, the subsidiary earned pre-tax income nearly equaling the entire forced-sale price; in only three years, its after-tax, net income exceeded the sale price. *See* PX 971 (demonstrative summarizing RFC financials, PX 258–265).

On January 13, 1995, Anchor sued the United States for breach of contract, alleging that the provisions of FIRREA and its implementing regulations that disallowed the inclusion of supervisory goodwill as regulatory capital contradicted the terms of Anchor's contracts for each of its supervisory mergers during the 1980s. According to Anchor, the breach left Anchor in a crippled, undercapitalized position that caused considerable losses and harm. In a series of opinions and orders, this court previously concluded that, consistent with the Supreme Court's decision in *Winstar*, the United States did in fact breach four contracts with Anchor corresponding to its supervised acquisitions of the Peachtree, Crisp, Sun, and Suburban savings and loan institutions. *Anchor*, 59 Fed.Cl. at 130–32.

Liability established, the government moved for summary judgment on whether Anchor sustained or could prove any compensable damages and the viability of some of Anchor's proffered damages theories. In a September 29, 2003 opinion, this court granted those portions of the motion addressing Anchor's restitution theory of recovery, but concluded that Anchor's expectation and "wounded bank" theories of recovery were legally viable and that genuine issues of fact remained. The government's motion was therefore denied with respect to the expectation and "wounded bank" damages. Between June 13 and July 20, 2005, the court conducted a trial in Washington, D.C. on the remaining damage issues.

This opinion, then, is all about damages. It is about lost profits (a type of "expectation damages") as a viable measure of damages in the *Winstar* context. It is about how the doctrines of "foreseeability" and "certainty" are applied in the lost profit context. It is about the economics of what is of value and exactly how that value is created. And once economic value is determined, it is about what constitutes harm to that economic value in order for a plaintiff to recover under a lost profits theory. The problem thereafter, of course—for both Anchor and other *Winstar* litigants—is how to quantify that harm in the form of damages. How might the court best account for harm suffered long ago, and apply the appropriate rule of damages law?

As the following makes clear, there was indeed harm suffered here. The opinion below constitutes the court's findings of fact in this case after weighing all the evidence proffered by the parties in light of the relevant context inexorably resulting from the history and the economics of the times, both exceedingly crucial because of the need to determine what factors are "foreseeable" as a matter of law in determining damages. Nevertheless, what is particularly essential are the actions of the main protagonists since "the actions of men," as John Locke opined, generally constitute "the best interpreters of their thoughts."[1] These findings make up the body of the opinion. The skeleton of that body is the law as applied by the court.

1. The Quotations Page, http://www.quotationspage.com/quote/8002.html. *See also* Paul Samuelson, *A Note on the Pure Theory of Consumers' Behaviour,* ECONOMICA 5:61–71 (1938)

(pioneering the concept of "revealed preference," the theory that consumers' actions and purchasing decisions, not their statements, are a superior guide to their actual preferences).

Thus the conclusions of law that the court renders serve as another level of context in which to view the facts of this case. *In toto,* it is the proper interpretation of relevant damages law, and especially that law as it has evolved through other *Winstar* cases, that the court must apply.

Due to the length of this opinion, the court provides the following table of contents:

| Topic | Page |
|---|---|

**II. BACKGROUND** ...... 6
    A. The Plight of the Savings and Loan Industry in the 1970s and 1980s: The Problem of Risk Reduction in a Heavily Regulated Business Model ...... 8
    B. The Federal Government Responds to the Industry's Problems: Risk Reduction through Deregulation and Encouraging Thrifts To Become More "Bank–Like" ...... 12
        1. *Accounting Forebearances* ...... 12
        2. *Asset Deregulation* ...... 14
    C. Market Responses: A Primer on the Secondary Mortgage Market ...... 15
    D. The Tale of Anchor Savings Bank before the Thrift Crisis ...... 21
    E. Anchor's Expansion ...... 22
    F. The Supervisory Mergers that Anchor Used To Grow: Benefits, Costs and Promises ...... 26
    G. Anchor's Performance in the 1980s and the Acute Impact of Anchor's Acquisitions ...... 29
    H. Anchor's Long–Term Business Plans in 1985–87 ...... 32
    I. Anchor Acquires Residential Funding Corporation ...... 33
    J. The Arrival of James Large As CEO and His Vision of a More Efficient Bank ...... 36
    K. FIRREA and Its Sudden Impact on Anchor's Capital Compliance and Operations ...... 41
    L. The Capital Plan and Anchor's Efforts To Stave Off Foreclosure: The Sale of the Branch Network and RFC ...... 43
        1. *Sale of Branches in Florida, Atlanta, Southern New Jersey and Northern New York* ...... 44
        2. *Sale of RFC* ...... 45
        3. *Conversion of Anchor's Preferred Stock Held by the FDIC and Other Capital Growth Activities* ...... 46
    M. Anchor Weathers the Squall ...... 47
    N. Anchor Focuses Once Again on Growing Its Business ...... 50

**III. DISCUSSION** ...... 51
    A. The Failed Hamilton Bank Merger Is Inapposite to Damage Issues in This Case ...... 52
    B. Plaintiff Is Not Precluded from Claiming Damages Merely Because Anchor Savings Bank Was Profitable after the Breach ...... 54
    C. Damages Attributable to the Forced Sale of RFC–The Legal Issue of Expectancy Damages in the Federal Circuit ...... 57
        1. *The Breaching Provisions of FIRREA Caused Anchor To Sell RFC* ...... 59
            a. Prior to the Breach, Anchor Did Not Intend To Sell RFC ...... 60
            b. The Sudden Effect of the Breach ...... 61
            c. The Impact of the Loan–to–One–Borrower Restriction ...... 63
            d. Anchor Did Not Sell RFC for Independent Business Reasons ...... 65
                i. *The Role of Defendant's Expert Witness* ...... 65
                ii. *Mr. Large's November 1989 Memorandum* ...... 67
            e. The Risk–Based Capital Provisions Would Not Have Caused Anchor To Sell RFC But For the Breach ...... 69
                i. *The Mechanics of the Risk–Based Capital Requirement* ...... 69
                ii. *The Impact of Risk–Based Capital on Anchor and RFC* ...... 70
            f. The Investment–in–Subsidiary Limitations Did Not Force Anchor To Sell RFC ...... 72

    2. *Anchor's Lost Profits Were Foreseeable at the Time of Contracting* ......75
    3. *Anchor Proved Its Damages with Reasonable Certainty* ..................84
       a. The Standard of Reasonable Certainty and Expectation Damages......85
       b. Theoretical Approaches to Lost Profits ............................86
          i. *The Irrelevance of Fair Market Value in This Case*..............86
          ii. *The Ex Post versus Ex Ante Approach*........................88
       c. Lost Profits from 1990–97........................................91
          i. *The Accounting Model*.......................................91
          ii. *The Regulatory Model*......................................98
             1. Testimony of Jess Lederman and Credit Enhancement
                Alternatives........................................98
             2. Testimony of P. Allan Schott and Anchor's But–For
                Capital Model ......................................109
          iii. *Quantum of Lost Profit Damages* ...........................118
          iv. *Reduced Stock Proceeds*.....................................122
          v. *Damages Attributable to the Acquisition of NAMCO* ..........124
          vi. *Tax Gross–Up Award*.......................................134
  D. Damages Attributable to Anchor's Branch Sales in Georgia, New Jersey
      and New York .......................................................135
    1. *Anchor's Pre–Breach Branch Philosophy* ............................136
    2. *The Immediate Impact of FIRREA* ..................................137
    3. *The Breach Caused the Atlanta Branch Sales* ........................138
    4. *Strategic Changes to Anchor's Capital Development and Branch*
       *Franchise Led to Sales of Remaining Branches* .....................139
    5. *Calculating Damages for the Georgia Branch Sales* ...................144
    6. *The Lincoln Acquisition Did Not Mitigate Damages from the*
       *Atlanta Branch Sales* .............................................146
  E. Wounded Bank Expenses .................................................147
    1. *Costs Associated with the Sale of RFC and Other Assets* ................147
    2. *Costs Associated with the Sale of Branches* ..........................148
    3. *Costs Associated with the Formation of a Holding Company and the*
       *Negotiated Exchange of the FDIC's Preferred Stock* ...................149
    4. *Increased FDIC Insurance Premiums* ...............................150

IV. CONCLUSION..................................................................153

## II. BACKGROUND

The history of the savings and loan crisis, as well as the responses of both the government and the financial services industry, were chronicled at length in the Supreme Court's *United States v. Winstar Corp.* decision. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In most subsequent *Winstar*-related opinions, it has been sufficient to briefly note this history and dive right into the case-specific facts. But it must be remembered that the law of damages is not based on an algorithmic certainty, instead being the product of the overlapping of a loose degree of empiricism and, at times, broad common sense. Thus, expert testimony is needed to establish some sort of verity in the amount of damages, but once liability has been established exactitude is not a necessity so long as the approximation does not become speculation. *See e.g., Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (reasoning that an innocent injured party need only prove an approximate, non-speculative, figure for damages); *Lam, Inc. v. Johns–Manville Corp.,* 718 F.2d 1056, 1065 (Fed.Cir.1983) (observing that plaintiff's burden of proof for lost profits is "not an absolute one, but rather a burden of reasonable probability"). *See generally* DAN B. DOBBS, LAW OF REMEDIES §§ 3.4, 3.5 (2d ed.1993) [hereinafter "DOBBS"].

What becomes transparent is the importance of context to these matters. This

should not be surprising since contract analysis—much like statutory construction—is a matter of interpretation and interpretation becomes an exercise in the determination of meaning, which is itself a search for context. *See Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 595, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) ("language must be read in context [since] a phrase gathers meaning from the words around it") (quoting *Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)) (alteration in original) (internal quotations omitted). *See generally* Felix Frankfurter, *Some Reflections on the Readings of Statutes,* 47 COLUM. L.REV. 527, 529 (1947) (noting that context is important because "unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision. If individual words are inexact symbols, with shifting variables, their configuration can hardly achieve invariant meaning or assured definiteness."); 2A NORMAN J. SINGER, SUTHERLAND'S STATUTORY CONSTRUCTION § 45.01 (6th ed.2000) (quoting Frankfurter, *Some Reflections* ).

■ And context is especially important in any lost profits case. This is because lost profits have been recoverable at common law only where such profits were foreseeable to the breaching party at the time of contracting, and such profits could be established with a reasonable certainty. *See Hadley v. Baxendale,* 156 Eng. Rep. 145 (1854). This rule with some modifications (as will be explained below) has been extended to suits against the government. *See, e.g., Cal. Fed. Bank v. United States,* 245 F.3d 1342 (Fed. Cir.2001) (recognizing that lost profits are an acceptable measure of damages in *Winstar* cases). The Federal Circuit has adopted a three-part test to determine lost profits: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of con-

tracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *See, e.g., Energy Capital Corp. v. United States,* 302 F.3d 1314 (Fed.Cir.2002); *Cal. Fed. Bank,* 245 F.3d at 1349. Clearly, the reliability of evidence showing foreseeability, special knowledge, and even proximate causation depend in large measure on context. Accordingly, the very history of the savings and loan crisis, including the market forces that contributed to it and the regulatory and market responses leading up to and including the enactment of FIRREA, are critical to understanding Anchor's long-term business plans and the impetus for the bank's diversification. Both of these, in turn, are essential to the court's subsequent lost profit analysis because each goes to the heart of Anchor's claim for damages. Shakespeare was indeed prescient when he wrote that the "past is prologue." [2]

Specifically, what underlay these issues were the inherent flaws in the savings and loan business model, which left the industry exposed to rapid interest rate fluctuation and acted as an impetus for Anchor's actions. As the government intervened to alleviate growing systemic problems through regulatory and statutory responses, some of the industry's problems were alleviated, others grew worse, and new ones appeared. Simultaneously, a secondary mortgage market emerged, predicated on securitizing mortgages (in so-called "mortgage-backed securities" or "MBS"), which offered savings and loan institution a hitherto unknown income stream, thereby helping them to eventually emerge from the crisis. The economic state of the industry, as well as the regulatory response to the perceived financial crisis facing thrift institutions, formed the stage on which both Anchor and its regulators acted. No discussion and analysis of the legal issues in this case can be divorced from this prologue.

That history in place, the history of Anchor itself follows, along with the tale of Anchor's expansion through the 1980s and its reaction

---

2. "Whereof what's past is prologue, what to come / In yours and my discharge." WILLIAM

SHAKESPEARE, THE TEMPEST act 2, sc. 1.

to the government's breach in 1989 and beyond.

## A. The Plight of the Savings and Loan Industry in the 1970s and 1980s: The Problem of Risk Reduction in a Heavily Regulated Business Model

Financial service institutions share many things in common with ordinary businesses. Nevertheless, financial services institutions have traditionally been extremely sensitive to risk. Consequently, risk reduction has been a mainstay policy of any financial institution, including commercial banks, savings banks, thrifts, credit unions, and the newer creations of the marketplace.[3] One reason this is true is that, unlike Europe and the rest of the world, where a government-controlled national bank regulated finance, and oligopoly was the present feature of the finance market, the United States traditionally has had thousands of financial institutions licensed and competing on both the state and federal levels. *See, e.g.,* DEP'T OF THE TREASURY, GEOGRAPHIC RESTRICTIONS ON COMMERCIAL BANKING—THE REPORT OF THE PRESIDENT 1 (1981) (noting that the American financial system encompassed roughly 42,000 depository institutions and 15,000 commercial banks in 1981). This multiplicity of American financial services institutions is the result of both the geographic immensity of this country and a longstanding strain of populism that distrusts centralized financial interests. *Id.; see also* ROBERT V. REMINI, ANDREW JACKSON AND THE BANK WAR: A STUDY IN THE GROWTH OF PRESIDENTIAL POWER (1967) (detailing Andrew Jackson's celebrated battle with Nicholas Biddle and the Congressionally-chartered Second Bank of the United States).

The latter led to pervasive regulation limiting both the geographic expansion of and the types of services that banking institutions could provide to consumers, thereby fertilizing the financial soil of the United States for a mushrooming of financial services institutions. *See* Symposium, *The Law of Corporate Groups, Transcript of Afternoon Session,* 13 CONN. J. INT'L L. 449, 451–53 (1999). Examples abound on both the federal and state levels. The most famous were the McFadden Act, 12 U.S.C. § 36 (as amended in 1933), which severely limited branching, and the Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* (1956), which in essence prohibited the use of bank holding companies to evade the McFadden Act's anti-branching provisions. The result of these regulations was to curtail competition and to foster a plethora of institutions that were free from local competition. One unintended consequence was the undercapitalization of American financial service companies, which made these institutions particularly susceptible to economic downturns (whether cyclical or not) and pressures from sustained competition and the perception of regulatory impediments to growth. *See* Donald R. Korobkin, *Vulnerability, Survival, and the Problem of Small Business Bankruptcy,* 23

---

**3.** Particularly when faced with advantageous economic conditions resulting from both "booms" and "busts," as well as regulation designed to bar or deter particular conduct, the marketplace has often responded by creating new products and business models. *See generally* Joseph A. Schumpeter, CAPITALISM, SOCIALISM AND DEMOCRACY (2nd ed. 1947) (arguing that the driving engine of capitalism is entrepreneurship, characterized by innovation, flexibility, and what Schumpeter called, the "creative destruction" process). Examples of new products are so numerous and obvious as to make a complete list onerous; prime representatives are railroads, automobiles, airplanes, computers, antibiotics, vaccines, and other medical advances, synthetic fibers, improved agricultural techniques and genetically engineered foodstuffs. Examples of business models include the Limited Liability Company (or LLC), which combines the tax attributes of a partnership with the limited liability of a corporation, and the bank holding company format, which entrepreneurs like A.P. Giannini, progenitor of what would become the Bank of America, used to create inter- and intra-state financial conglomerates as a way to evade the federal McFadden Act and the state anti-branching statutes, discussed below. *See generally* 1 LARRY E. RIBSTEIN & ROBERT R. KEATINGE, RIBSTEIN AND KEATINGE ON LTD. LIAB. COS. § 1:2 (Dec. 2007) (describing the historical origin of LLCs and related corporate forms in American history); Susan Pace Hamill, *The Origins Behind The Limited Liability Company,* 59 OHIO ST. L.J. 1459 (1998) (detailing the story behind the tax-motivated origins of the LLC); C. Singer, *Giannini's Dream,* 164 BANKERS MAG., No. 5, 61 (Sept.-Oct. 1981) (describing how Giannini used bank holding companies to get around the limitations of the McFadden Act and state anti-branching statutes).

CAP. U.L.REV. 413, 425–28 (1994) (observing that smaller businesses are more susceptible to, and less likely to survive, financial distress, in part because they are undercapitalized and less diversified).

Indeed, one can view the entire history of American banking as a search for a Holy Grail to insulate financial services institutions from financial risk. Historically, this Holy Grail was found in various devices of risk reduction, including the ability to offer various financial products to consumers (such as loans, mortgages, credit cards and other credit devices, automobile loans, investments, including savings accounts, etc.), devices intended to increase deposits (such as interest-bearing accounts), and the ability to expand geographically (whether through branches or by subsidiary banks or other financial services institutions).

Thus, risk reduction is of paramount importance because of its economic insulation properties. The greater the ability of financial services institutions to provide different types of products to consumers and to be insulated from the economic misfortunes of a particular geographic area, by being able to compete in a more prosperous region, the greater the financial health and profit-making ability of the financial services company and the industry as a whole. *See* Kris James Mitchener, *Are Prudential Supervision and Regulation Pillars of Financial Stability? Evidence from the Great Depression*, 50 J.L. & ECON. 273, 278 (2007) (observing that "[l]aws permitting branch banking are often cited as reducing financial instability by enabling banks to diversify their portfolios over a wider geographical area or customer base or by introducing competition into a previously geographically segmented market and removing inefficient banks from the system"). To be sure, a diversified financial institution has its proverbial eggs in many baskets; it is not nearly as susceptible to economic hardships in a particular industrial sector or geographical region. *Id.;* Douglas H. Ginsburg, *The Future of Interstate Banking*, 9 J. CORP. L. 655, 658–59 (1984) (noting that "diverse areas are affected differently by business cycles and turns in the fortunes of a particular industry or sector of the econ-

omy"). The concept of risk reduction, whether accomplished through the ability to offer various types of financial products to consumers, or by being able to expand geographically the sale of those products and the providing of deposit and other services to consumers, is at the heart of the instant case. That story began during the years of the Great Depression.

In the wake of the Great Depression, the heavily regulated savings and loan industry arose as the primary intermediary to finance local residential home ownership. Historically, the industry focused on facilitating home ownership through the pooling of local personal savings, which were then allocated in the form of residential mortgage loans. Initially, savings and loan institutions, or "thrifts," were circumscribed by regulatory geographic limitations that prohibited them from providing mortgage loans on homes more than fifty miles from the thrift's home office, and this at a time when most thrifts were single-office institutions. H. REP. No. 101–54(I), at 293 (1989), *as reprinted in* 1989 U.S.C.C.A.N. 86, 89. As a result, traditional thrift lending was severely geographically concentrated. In time, as thrifts engaged in branching the lending radius was extended to 100 miles, then statewide in 1970, and ultimately nationwide in 1983. *Id.*

In addition to the geographic concentration of their loan portfolios, thrifts historically suffered from restrictions on the types of financial products that they could offer and assets that they could hold. Thrifts primarily invested in long-term, fixed-rate, low-yield mortgage loans that generated steady, if unspectacular, rates of return. Throughout the period from the Great Depression until the 1970s, the heavily regulated thrift business model worked fairly well. *See Winstar*, 518 U.S. at 845, 116 S.Ct. 2432. Under the aegis of the Federal Home Loan Bank Board ("FHLBB"), the principal regulator for the federal thrift industry, and the Federal Savings and Loan Insurance Corporation ("FSLIC"), the insurer of federal thrifts, the industry mostly succeeded in supplying capital to the residential housing market and promoting the availability of affordable housing. H. REP. No. 101–54(I) at 294. Between

1940 and 1965, the assets controlled by federally insured thrifts increased from $3 billion to over $124.5 billion. *Id.*

Beginning in 1966, the thrift industry benefitted largely from the application of banking Regulation Q, promulgated by the Federal Reserve Board, which capped the interest rate that thrifts could pay for customer deposits and which kept thrifts' cost of deposit funds artificially low. At the time, thrift and commercial bank deposits were effectively the only high-liquidity investment options that consumers had. Federal commercial banks were also subject to Regulation Q, but were forced to pay lower interest rates than thrifts (25–50 basis points, or tenths of one-percent) on time and savings deposits. *Id.* at 295–96; Act of Sept. 21, 1966, Pub.L. No. 89–597, 80 Stat. 823 (1966). The interest rate difference gave thrifts a competitive advantage over commercial banks in attracting deposit funds.

Throughout this period, then, thrifts generated income by lending money for home mortgage loans at slightly higher interest rates than they paid for short-term deposits; they lent long and borrowed short. By the end of the 1970s, however, the confluence of rising interest rates and inflationary pressures began to unravel the business model upon which the entire thrift industry had been historically predicated. First, bouts of disintermediation caused capital to flee the thrift industry in search of market-rate returns-on-investment.

Thrifts had long been the primary destination for personal savings deposits. As noted above, however, interest rate returns on federally-insured thrift deposits were capped by Regulation Q. Throughout the 1970s, there was a volatile increase in inflation. In 1979, the Federal Reserve adopted a new monetary policy to curb inflation—choosing to control the growth of the money supply instead of stabilizing interest rates. H. REP. No. 101–54(I) at 295. The result was a dramatic increase in interest rates. Inflation, coupled with rising interest rates, "produced conditions ripe for disintermediation." *Id.* at 295; *see* Robert J. Laughlin, Note, *Causes of the Savings and Loan Debacle,* 59 FORDHAM L.REV. S301, S303–04 (1991). As non-banking firms such as securities firms and insurance companies came online with alternative investment vehicles, including money market accounts and mutual funds that paid market interest rates unrestricted by Regulation Q (and therefore higher rates than thrifts offered) to customers:

> Customers gradually became more sophisticated and realized that as long as the inflation rate was higher than the interest rate they earned on their deposits [in federally insured financial institutions regulated by Regulation Q], they were actually losing money by having major balances in depository institutions. In order to avoid losing money on their deposits, consumers periodically withdrew massive amounts of money from financial institutions, a phenomenon known as disintermediation.

H. REP. No. 101–54(I) at 295, U.S.Code Cong. & Admin.News 1989, pp. 86, 91. These periodic bouts of disintermediation, when market interest rates would rise above those offered on deposits by the thrift industry, caused liquidity problems for the thrifts that restricted their ability to fund new mortgage originations. *See* Richard C. Breeden, *Thumbs on the Scale: The Role that Accounting Practices Played in the Savings and Loan Crisis,* 59 FORDHAM L.REV. S71, S72 (1991) [hereinafter *Thumbs*].

In response to the disintermediation pressures, Congress initiated a corrective tide of interest rate deregulation (the abrogation of Regulation Q) so that thrifts could pay depositors market rate returns. This occasionally presented thrifts with an "interest rate gap," a scenario in which their cost of funds (primarily the interest paid on short term deposits) exceeded their revenue from long-term, fixed-rate mortgage assets acquired when interest rates were lower. Congress's goal was to return to thrifts the competitive advantage to attract consumer deposits, but the deregulation operated, in part, as a Pandora's Box for the thrift industry.

In 1980, the Depository Institutions Deregulation and Monetary Control Act ("DIDMCA"), Pub.L. No. 96–221, 94 Stat. 132 (1980), began to phase out the Regulation Q interest rate caps on federally regulated thrift and bank deposits and authorized de-

pository institutions to offer Negotiable Order of Withdrawal accounts that would compete for funding with money market mutual funds and other similar investment products. H. REP. No. 101–54(I) at 295. The DIDMCA also increased the federal deposit insurance limits from $40,000 to $100,000, giving investors further incentive to maintain savings in the thrift industry rather than in uninsured competing financial instruments. In effect free to compete for funds by offering market rate returns on deposits, thrifts were finally armed to deal with the problems of disintermediation. However, the industry was generally unprepared for how interest rate deregulation would expose the inherent flaws of the savings and loan business model.

Thrift assets consisted overwhelmingly of long-term, fixed-rate mortgages; at the time, adjustable-rate mortgages ("ARM") were largely prohibited by law and viewed skeptically by consumers.[4] This concentration of assets—a singular focus on long-term, highly illiquid investments—as the font of most thrift revenue was "the Achilles heel of the S & L industry." William K. Black, *Ending our Forebearers' Forbearances: FIRREA and Supervisory Goodwill*, 2 STAN. L. & POL'Y REV. 102, 103 (1990). When market interest rates rose rapidly, thrifts were forced to pay ever-increasing rates to attract and retain customers' deposits. Those rates, however, exceeded the interest revenue generated by the thrifts' assets, which increased only gradually as older mortgages were paid off and the capital was reinvested at new, higher interest rates. "By 1981 thrifts were paying an average of 11 percent for their funds while their mortgage portfolios were yielding only 10 percent—a negative 1 percent spread." H. REP. No. 101–54(I) at 296, U.S.Code Cong. & Admin.News 1989, pp. 86, 91–92. This negative spread, also referred to as the "interest rate gap," caused annual industry losses in excess of $4 billion in both

1981 and 1982. *Id.* It eroded industry capital, and caused scores of thrifts to fail: 81 in 1981, 252 in 1982, and 102 in 1983. *Id.*

The interest rate gap problems were caused in large part by the fact that thrifts' long-term, fixed-rate mortgage assets were illiquid and could not re-price (be liquidated with the proceeds subsequently re-invested at the new, higher interest rate) as quickly as interest rates rose. Since the mortgages were long-term, thrifts' capital investments in mortgages were tied up for several years.[5] To be sure, until the life of those mortgages ran, a thrift would be unable to re-invest its capital at the higher interest rates. As noted below, the secondary market for whole mortgage loans was still in its earliest stages; there was little opportunity for thrifts to sell these assets and immediately liquidate their investment. Moreover, as interest rates increased, the market value of an existing fixed-rate mortgage declined precipitously, because the fixed-rate mortgage delivered a lower return on investment than steadily rising market rates. One commentator explained the mechanics of these so-called "underwater" mortgages:

> A simplified example illustrates this reduction in market value. Assume that an S & L makes a 30–year, fixed rate mortgage loan of $100,000 at a 5 percent interest rate in 1978. By 1980 mortgage rates rise to 10 percent.... If the S & L sells the mortgage note in 1980, no purchaser will buy it for $100,000 because the market is offering a 10 percent return on similar mortgage loans made in 1980. To earn a market return the purchaser will pay only $50,000 for the 1978 mortgage note. At that price, the $5,000 per year of interest income provides an annual yield of 10 percent.

Black, *supra* note 5, at 103.

Clearly, the industry was in dire trouble. In the high-interest-rate environment thrifts

---

**4.** The FHLBB did not permit federally-regulated thrifts to offer ARM loan products until April 1981. *See* Laughlin, 59 FORDHAM L.REV. at S309 & n. 77. Some states, like California and Wisconsin, permitted state-chartered thrifts to offer ARM products. *See* Lawrence J. White, *The S & L Debacle*, 59 FORDHAM L.REV. S57, S64 (1991).

**5.** "It is critical to understand that the estimated life of a 30–year, fixed-rate mortgage loan is not 30 years. Because of prepayments (typical when a home is sold) and refinancings, the estimated life of a new 30–year fixed rate loan is approximately seven years." Black, *Ending our Forebearers' Forebearances*, 2 STAN. L. & POL'Y REV. at 105.

were simply unable to survive, so long as their investment authority was limited to long-term, fixed-rate mortgages. The FSLIC could hardly withstand a wave of thrift failures that would trigger its contingent deposit insurance liability.[6] To address the core flaws in the thrift industry's business model at this late stage—when blood was already in the water—Congress and regulators adopted a paradigm shift in the way that thrifts would be permitted to conduct business. The hope was that through broader investment authority and fewer regulatory restrictions on capital the entire industry might be able to grow out of its problems—or at least buy enough time until interest rates held steady or declined to sustainable levels at which thrifts could again be profitable through "traditional" means.

## B. The Federal Government Responds to the Industry's Problems: Risk Reduction through Deregulation and Encouraging Thrifts To Become More "Bank–Like"

### 1. Accounting Forebearances

Many in the government ascribed to the belief that the thrift industry's problems were only temporary, and that market corrections to the high interest rate environment would eliminate the interest rate gap and eventually resolve the industry's solvency problems. *See* History of the Eighties— Lessons for the Future 173 (Federal Deposit Insurance Co., 1997) [hereinafter History of the Eighties]. To this end, the thrift crisis was addressed, in part, through deregulation of the thrift industry's capital requirements and new accounting methods that temporarily overlooked solvency problems and helped prop up failing thrifts. *See Winstar*, 518 U.S. at 846, 116 S.Ct. 2432 ("The use of various accounting gimmicks and reduced capital standards masked the worsening financial condition of the industry, and the FSLIC, and enabled many weak institutions to continue operating with an increasingly inadequate cushion to absorb future losses.") (quoting H. Rep. No. 101–54(I) at 298, U.S.Code Cong. & Admin.News 1989, pp. 86, 93–94). The goal of these maneuvers was to buy time; if a regulatory seizure could be temporarily avoided, there was hope that market corrections would naturally bail out troubled thrifts.

"Capital requirements are the most powerful source of discipline for financial institutions" because they "reduce the incentive to take excessive risks[,] provide a cushion against loss," and "serve[ ] as a check against uncontrolled growth."[7] *Thumbs* at S75. In

---

**6.** The Court in *Winstar* cited government information regarding FSLIC's position:

> According to the General Accounting Office, FSLIC's total reserves declined from $6.46 billion in 1980 to $4.55 billion in 1985 ... when the [FHLBB] estimated that it would take $15.8 billion to close all institutions deemed insolvent under GAAP ... By 1988, the year of the last transaction involved in [*Winstar*], FSLIC was itself insolvent by over $50 billion ... And by early 1989, the GAO estimated that $85 billion would be needed to cover FSLIC's responsibilities and put it back on the road to fiscal health ... In the end, we now know, the cost was much more even than that.

> *Winstar*, 518 U.S. at 847, 116 S.Ct. 2432 (citations omitted).

**7.** As one commentator has noted, "banks and S & Ls, even healthy ones, are very thinly capitalized." White, *supra* note 4, at S59. The "capital" that was regulated by the FHLBB was akin to a thrift's net worth, alternatively thought of as the difference between assets and liabilities, the liquidation value of the thrift, or an owner's stake in the enterprise. *Id.* at S58. The capital reserve requirements were designed to serve two primary purposes. First, they provided a cushion against losses; a thrift with a high capital reserve could better absorb a loss before reaching the point of insolvency than could a thinly-capitalized thrift. Second, capital reserve requirements helped reduce moral hazard problems by limiting some of the incentives of risk-taking by thrift operators. *See id.* at S59; H. Rep. No. 101–54(I) at 94 ("Capital protects a depository institutions [sic] from insolvency by providing 'cushion' to absorb losses in times of poor performance.... If capital levels are too low, managers may be willing to take excessive risks because of the perception that the FSLIC insurance fund will pay a substantial portion of the costs if the gamble fails."); 301 ("We are in the situation we now face largely because institutions were able to gamble on risky investments with taxpayer dollars, in the form of federal deposit insurance, backing them up. In such a situation, the investor realizes any gain, but the government ... bears any loss. Investors will be more prudent only if they have their own funds [in the form of capital] at risk.") (Add'l Views of Rep. John J. LaFalce).

the wake of volatile interest rates, however, the "prevailing view was that S & Ls should be granted regulatory forbearance until interest rates returned to normal levels." HISTORY OF THE EIGHTIES 173. Accordingly, the FHLBB rolled back capital reserve requirements from five to four percent of assets in November 1980, and then from four percent to three percent in January 1982. *Winstar*, 518 U.S. at 845–46, 116 S.Ct. 2432 (citing 45 Fed.Reg. 7111 (Nov.1980); 47 Fed.Reg. 3543 (Jan.1982)).

In addition to more-relaxed capital benchmarks, Congress and the regulators also adopted regulatory accounting principles ("RAP") for calculating a thrift's regulatory capital compliance. RAP differed from generally accepted accounting principles ("GAAP"), and was considerably more lenient:

> [RAP] accounting gimmicks included permitting thrifts to defer losses from the sale of assets with below market yields;[8] permitting the use of income capital certificates, authorized by Congress, in place of real capital; letting qualifying mutual capital certificates be included as RAP capital; allowing FSLIC members to exclude from liabilities in computing net worth, certain contra-asset accounts, including loans in process, unearned discounts, and deferred fees and credits;[9] and permitting the inclusion of net worth certificates, qualifying subordinated debentures and appraised equity capital[10] as RAP net worth.

H. REP. No. 101–54(I) at 298, U.S.Code Cong. & Admin.News 1989, pp. 86, 93–94.

**8.** *See Thumbs* at S78 ("[T]he FHLBB ... permitted thrifts to book the entire amount of losses realized on the sale of mortgage loans as an asset for RAP [that could] be amortized over the remaining contractual life of the assets sold. For example, if a thrift sold a portfolio of mortgages with a $500 million face amount for $350 million, it could treat the realized loss of $150 million as an asset included in net worth.").

**9.** *See Thumbs* at S79 ("Beginning in 1979, thrifts were allowed to recognize income from construction loan origination fees .... immediately upon origination of a loan.... By contrast, GAAP allows immediate recognition of loan fee income only to the extent of costs incurred in

A final piece of Congress's regulatory capital forbearance initiatives involved special accounting treatment for those thrifts willing to assume ownership of insolvent, failed thrifts that threatened the FSLIC's contingent deposit liability. These so-called "supervisory mergers," which have been the catalyst of the *Winstar* litigation, included "an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." *Winstar*, 518 U.S. at 848, 116 S.Ct. 2432. Because the FSLIC did not have sufficient cash to "make up the difference between a failed thrift's liabilities and assets, the [FHLBB] had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations." *Id.* at 849–50, 116 S.Ct. 2432. This "cash substitute" came in the form of *supervisory goodwill*, an intangible accounting credit that captured the amount by which an acquired institution's liabilities exceeded its assets—essentially, the quantification of the institution's negative net worth. Under the purchase method of accounting, a thrift that acquired such a failed institution could count the full amount of the supervisory goodwill involved in that transaction as an asset towards the acquiring institution's regulatory capital reserve requirement.

> The [FHLBB] did not have sufficient resources to close all insolvent institutions, [but] at the same time, it had to consolidate the industry, move weaker institutions into stronger hands, and do everything possible to minimize losses during

originating loans.... The remainder of the fees are taken into income ratably over the life of the loan if it remains current, or upon sale.").

**10.** *See Thumbs* at S80 ("Appraised equity capital represented the amount that certain capital assets (*e.g.*, property and equipment) had appreciated above their recorded depreciated cost. The rule permitted thrift institutions to recognize appreciation in the value of buildings even where those assets had not been sold, with a corresponding increase in net worth for RAP purposes.... [T]hrifts were permitted to reflect market value on a totally selective basis. Only those adjustments that increased the value of certain assets were made....").

**14**

the transition period. Goodwill was an indispensable tool in performing this task. *Id.* at 850, 116 S.Ct. 2432 (quoting *Savings and Loan Policies in the late 1970's and 1980's: Hearings Before the House Committee on Banking, Finance, and Urban Affairs,* 101st Cong., 2d Sess., Ser. No. 101–176, p. 227 (1990) (Test. of Richard Pratt, former FHLBB Chairman)).

Supervisory goodwill allowed an acquiring institution to avoid immediate regulatory insolvency after taking on a failed institution's excess liabilities. *Id.* at 850, 116 S.Ct. 2432. Furthermore, it gave the acquiring institution the leeway to invest in more assets, with the hope that additional investment would generate future profits to help fill the balance sheet gap created when an acquiring institution assumed the failed institution's net liabilities. *Id.* at 851, 116 S.Ct. 2432 ("From the acquiring thrift's perspective, however, the treatment of supervisory goodwill as regulatory capital was attractive because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)."). Moreover, some transactions involving failed thrifts featured a further inducement, described as a "capital credit" that arose when the FSLIC "contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital." *Id.* at 853, 116 S.Ct. 2432. This additional asset, however, was not required to be subtracted out of the supervisory goodwill generated by the acquisition, so "regulators effectively permitted double counting of the cash as both a tangible and an intangible asset." [11] *Id.*

Thrifts were permitted to amortize the goodwill over an extended period of up to 40 years, consistent with GAAP. *Id.* at 851, 116 S.Ct. 2432. Amortization recognized that supervisory goodwill, as an intangible asset, had diminishing value over time. A thrift, therefore, must amortize, or "write down", a portion of any goodwill each year, reflecting that declining value. *Id.* The annual amorti-

zation was reflected on the thrift's financial statement as an operating expense. *Id.*

## 2. Asset Deregulation

The other half of Congress's solution to the industry's interest rate gap crisis focused on thrifts' asset management powers. Congress deregulated the asset-side of a thrift's balance sheet, permitting investment in a broader range of assets with the intention of reducing the thrift industry's reliance on residential mortgages as a sole source of revenue. In other words, the ability to provide greater financial services was believed to reduce the overall risk that thrifts faced. The centerpiece for this deregulation was the Garn–St Germain Depository Institutions Act of 1982, Pub.L. No. 97–320 (Oct. 15, 1982) ("Garn–St Germain"), which was broadly considered "the most significant piece of thrift legislation since the Great Depression." H. REP. No. 101–54(I) at 296, U.S.Code Cong. & Admin.News 1989, pp. 86, 91–92. Simply put, Garn–St Germain expanded thrifts' investment powers considerably, permitting the industry to engage in entire new lines of business and commit greater resources to already existing lines of business that had previously been subject to more restriction. The goal of Garn–St Germain's asset deregulation was to allow thrifts to expand out of the residential mortgage niche to which the industry had been relegated. "[T]hese actions gave thrifts far greater flexibility in deciding how their money could be invested." *Id.* at 297. It was "a rapid expansion in the scope of permissible thrift investment powers." *Winstar,* 518 U.S. at 845, 116 S.Ct. 2432 (quoting H. REP. No. 101–54(I) at 291, U.S.Code Cong. & Admin.News 1989, pp. 86, 87). In other words, thrifts were becoming much more like commercial banks, which had not been as adversely affected by rising interest rates in the late 1970s because they were able to invest in a wider range of commercial loans and other

---

11. This practice of "double counting" effectively ended in 1983 when the Financial Accounting Standards Board (the source of the GAAP) promulgated Statement of Financial Accounting Standards No. 72 ("FAS 72"), which required

that any financial assistance contributed by regulatory authorities (such as a "capital credit") be deducted from the cost of the acquisition before the amount of goodwill created in the acquisition was determined. *Id.* at 855, 116 S.Ct. 2432.

assets that repriced faster than fixed-rate mortgages.

Among others, federally-chartered thrifts were authorized to invest up to 40% of their assets in nonresidential real estate lending, up to 30% of their assets in consumer loans, and 100% of assets in state or municipal securities. H. REP. No. 101–54(I) at 297. These broader investment authorities were "consistent with recently enacted state laws granting state-chartered thrift institutions broader powers," as well. S.REP. No. 97–536 at 18 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3054, 3071–72. Some states, such as Texas, Florida and California, had already removed essentially all portfolio and business activity restrictions for their state-chartered savings and loan institutions. *See generally* HISTORY OF THE EIGHTIES 176–77.

One result of this deregulated environment was that thrift institutions were gradually becoming more "bank-like." Beginning with the DIDMCA in 1980, the long-established regulatory differences between thrifts and banks became blurred. After 1980, both were permitted to provide checking account services and negotiable order of withdrawal accounts. *Id.* at 92–93. "Moreover, thrifts were granted many powers that had been available only to commercial banks. For example, S & Ls could enter consumer loan and credit card businesses, and mutual savings banks could make business loans and accept demand deposits." *Id.* at 93.

Some feared that the thrift industry, with its new commercial lending powers and an aversion to fixed-rate mortgage investments, would withdraw from its traditional niche as a residential mortgage lender and that capital might then flee the residential mortgage business, thereby driving up the costs of residential mortgage loans. This was not the case, however, as a burgeoning mortgage-banking industry that began to emerge in the 1970s helped channel capital to the residential mortgage market through both thrifts and mortgage-banking enterprises. Furthermore, the growth of a secondary mortgage market, where whole mortgages and mortgage-backed securities ("MBS") are sold to both depository institutions and general investors, enabled thrifts to escape the bur-

dens of their fixed-rate mortgage portfolios and recycle capital into new ARM loans. This dynamic secondary market proved to be one of the primary means by which thrifts were able to remedy their maturity gap problems and better respond to interest rate gap problems.

### C. Market Responses: A Primer on the Secondary Mortgage Market

A detour into the roots of the secondary mortgage market is essential here for two reasons. First, it was a prevailing market response to many of the lending problems thrifts faced in the 1980s. The emerging secondary market provided liquidity to the mortgage industry reducing risk by helping make mortgages more fungible and, therefore, tradable. Second, during the 1980s, Anchor and other thrifts became major players in the secondary mortgage market, using it as a tool to correct balance sheet problems. Anchor eventually acquired Residential Funding Corporation ("RFC"), which was *the* leading issuer of so-called "private-label" MBS, discussed below.

Until the 1970s, the residential mortgage market was dominated primarily by "portfolio lenders"—depository institutions (primarily thrifts) that lent money and held the loan in their asset portfolios for the life of the mortgage. Within this capital structure, there was very little turnover of investment capital; the availability of investment capital was determined primarily by a thrift's deposit structure and the retirement of existing mortgages. Historically, private investment capital was not attracted to the housing market because whole mortgages were not an appealing investment outside the thrift industry. Mortgages themselves are not a liquid asset, so an investor would be committed to either holding one for the life of the loan or incurring substantial transaction costs to sell it. Furthermore, prudent investment in individual mortgages required extensive information on myriad issues, including a borrower's creditworthiness, a property's appraisal and local housing market trends. Moreover, the owner of an individual mortgage would be subject to the inherent risk of default on the underlying note, forcing the investor to re-

sort to costly and cumbersome measures, including foreclosure and sale, to recover the investment. These prohibitive investment concerns left the mortgage market largely unable to attract investor-based capital. KENNETH G. LORE & CAMERON L. COWAN, MORTGAGE-BACKED SECURITIES § 3.01 (2001 ed.).

This dynamic became a national concern as population shifts and homebuilding demand moved cross country to the west and southwest, and the demand for local mortgage capital was geographically separated from the concentrated sources of capital in the east. *See* Secondary Mortgage Market Act of 1984, Pub.L. No. 98–440 at 2, *reprinted in* 1984 U.S.C.C.A.N. 2809, 2810. What was needed to help eliminate the alternating, temporary regional shortages and gluts of available housing capital (which made the highly volatile housing finance market more or less expensive for the borrower) was an efficient secondary market for residential mortgages that would evenly distribute available capital, attract investor capital independent of thrift organizations, and allow lenders to sell mortgages out of their portfolio to recycle housing capital.

In 1938, Congress had established the Federal National Mortgage Association ("Fannie Mae") to create a rudimentary secondary mortgage market. *See generally* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 3 (5th ed.2001) [hereinafter FABOZZI] ("The market where [mortgage] funds are borrowed is called the *mortgage market,* which comprises the primary and secondary market. The primary market provides the actual loan to a borrower, whereas the secondary market channels liquidity into the primary market by way of purchasing packages of loans from lenders."). Fannie Mae was authorized to purchase "unconventional" mortgages—those insured by the Federal Housing Administration ("FHA"), and later, the Veterans Administration ("VA")—from local lenders and hold them in portfolio, thereby replenishing the supply of lendable housing capital available to local lenders. In 1972, Fannie Mae began to purchase conventional mortgages, for the first time absorbing mortgage capacity that did not involve FHA or VA insurance.

Notwithstanding Fannie Mae's secondary market purchases of FHA-and VA-insured mortgages up to 1972, the secondary mortgage market remained rudimentary in nature and, until the 1970s, "the capacity to attract investor based capital to the mortgage market had not developed to any great degree." Pub.L. No. 98–440 at 2. In turn, Congress created the Government National Mortgage Association ("Ginnie Mae") in 1968 and the Federal Home Loan Mortgage Corporation ("Freddie Mac") in 1970, with the designated goal of enhancing the availability of capital to lenders through a more sophisticated secondary mortgage market relying in principal part on *mortgage-backed securities* to bridge the gap between the investment community and the residential mortgage market. Fannie Mae itself began issuing MBS in 1981.

MBS use a pool of mortgages as collateral for the issuance of securities in the secondary market, each of which represents a fractional, undivided interest or participation in the underlying pool. FABOZZI at 26. As the mortgages within the pool are repaid, including principal and interest payments, all of those payments are channeled through a party that "services" the pool of securities and distributes a *pro rata* share of the proceeds to holders of the securities, minus a small servicing fee.

The evolution of MBS backed or issued by the three government-sponsored entities ("GSEs")—Ginnie Mae, Fannie Mae and Freddie Mac—was a key solution to the mortgage industry's liquidity problems of the 1960s and 1970s. The principal payments on the mortgages in these pools were guaranteed by the GSEs, and therefore there was no risk of default to the security holder. As a consequence, agency MBS could be rated as "investment grade" securities by the major credit-rating agencies.[12] The strong

12. Ginnie Mae securities are guaranteed by that agency, which is wholly-owned by the federal government, and carry the full faith and credit of the United States. FABOZZI at 28. Fannie Mae and Freddie Mac, by contrast, are effectively quasi-private corporations. While subject to a number of federal constraints, and chartered by Congress, the institutions are publicly traded entities (Fannie Mae was converted to a public corporation in the same 1968 legislation that

credit rating, in turn, permitted institutional investors to become active participants in the secondary mortgage market, purchasing and trading MBS just as they might other securities. By converting whole mortgages into more fungible securities, the GSEs succeeded in eliminating the traditional risks associated with investing in whole mortgages. So long as the MBS were rated properly, and the underlying pool met certain needs or requirements of the investor (such as expected return on investment, average maturity of pool mortgages, geographic diversity of pool mortgages, etc.), the investor could safely acquire the MBS without concern for the characteristics of individual mortgages within the pool, or the risk of prepayment of any one mortgage.[13] Such was essential to attracting investor capital to the mortgage market.

By the nature of their congressional charters, however, the three government-sponsored entities did not serve the entire housing market, and the success of the secondary market activities that the agencies inspired notwithstanding, a significant sector of the housing market could not benefit from the federal secondary market initiatives. All three GSEs were established to improve the afford ability of homes and home finance to lower- and middle-income Americans. The mortgage pools that comprise Ginnie Mae MBS consist entirely of *unconventional* mortgage loans insured by the FHA or guaranteed by the VA. *Id.* at 3, 28. Fannie Mae and Freddie Mac, on the other hand, issue

securities comprised primarily of *conventional* mortgages, but those mortgages must conform to certain underwriting standards to qualify for the Fannie Mae or Freddie Mac guarantee. Among the three underwriting standards for a conventional mortgage, a *conforming mortgage* must not exceed maximums for three categories, including: (1) payment-to-income ratio, measuring a borrower's capacity to make monthly payments; (2) loan-to-value ratio, measuring the amount of the mortgage loan *vis-a-vis* the appraised property value; and (3) loan amount, the maximum amount of which typically increases each year to keep pace with inflation. *Id.* at 5–6.

By virtue of the GSEs operating in only a portion of the secondary mortgage market—that of conforming loans—there remained a need for a sophisticated secondary market for nonconforming loans that did not meet the GSEs' strict underwriting criteria. In adapting to this need—a characteristic that has been a hallmark of the mortgage industry since the 1970s—a niche evolved for private companies to issue their own MBS featuring pools of loans that could not qualify for the GSEs' MBS pools. Beginning with the first privately issued MBS by Bank of America in 1977, the market for so-called "private-label" MBS has continued to evolve and mature. *See* KENNETH G. LORE & CAMERAON L. COWAN, MORTGAGE–BACKED SECURITIES: DEVELOPMENTS AND TRENDS IN THE SECONDARY MORTGAGE MARKET 1–2 to 1–3

---

created Ginnie Mae) that do not receive federal subsidies or appropriations. *Id.* at 29. Nonetheless, when Fannie Mae and Freddie Mac guarantee MBS that they issue, those guarantees bear the implicit backing of the federal government because they are backed by emergency drawing rights on the U.S. Treasury. *Id.* at 27. Accordingly, the rating agencies consider all three government entities' MBS to be "triple-A" quality securities. *Id.*

13. A homeowner may typically prepay a mortgage at any point without penalty. "The uncertainty about the cash flow [of a mortgage] due to the prepayment option granted the homeowner is called *prepayment risk.*" *Id.* at 9. Any security backed by a pool of mortgages is subject to prepayments risks, which is typically the greatest risk to a MBS investment, and might arise for one of many reasons:

First, homeowners prepay the entire mortgage when the sell their home. The sale of a home

can result from (1) a change of employment that necessitates moving, (2) the purchase of a more expensive home ("Trading up"), or (3) a divorce in which the settlement requires sale of the marital residence, among other reasons. Second, in the case of homeowners who cannot meet their mortgage obligations, the property is repossessed and sold. The proceeds from the sale are used to pay off the mortgage in the case of a conventional mortgage, and for those that are insured the balance is paid by the insurer. Third, if property is destroyed by fire, or if another insured catastrophe occurs, the insurance proceeds are used to pay off the mortgage balance. Finally, the borrower may refinance the loan if the current mortgage rate falls by a sufficient amount below the contract rate.
*Id.*

(2001). "Beginning in the 1980s, the housing finance sector generated innovation on a scale unseen in the housing industry for years. New ideas, new instruments, new methods, new participants, and new competitors served as the catalysts for the explosive growth of the private secondary mortgage market." *Id.* at 1–11. In the 1980s, private-label MBS were routinely issued by private entities, including banks, thrifts, homebuilders, and mortgage-banking companies called "conduits" that specialize in buying mortgages, pooling them, and issuing MBS. *See* FABOZZI at 5–6, 31; *see also* H. REP. NO. 98–994 at 38, 39 (Statement of Preston Martin, Vice Chairman, Board of Governors of the Fed. Reserve Sys.), *reprinted in* 1984 U.S.C.C.A.N. 2827, 2843 (noting that "a fair number of banks, thrift institutions, mortgage companies, insurance companies and so-called conduit organizations have issued private pass-throughs").

Because it is typically more profitable for the originator of a conforming loan to package it in a GSE MBS, private-label MBS mortgage pools tend to consist primarily (if not exclusively) of the leftovers—non-conforming loans. Most of these non-conforming loans fail to satisfy a GSE's underwriting criteria solely because the amount of the loan exceeds the agency maximum. *Id.* at 31–32. These loans (commonly called "jumbo loans") are traditionally geared towards the affluent homebuyer, who is not a target of the GSEs' housing initiatives. *Id.*

Other than the composition of the mortgage pools, one primary difference between agency-issued and private-label MBS involves the credit rating of the securities. As noted above, mortgages, and even pools of mortgages, are susceptible to the risk of default on the underlying loans. For the purchaser of an agency-issued MBS this risk of default is reduced by the agency guarantees that attach to the underlying loans, which bear the full faith and credit of the United States (Ginnie Mae MBS) or the implicit backing of the United States Treasury (Fannie Mae and Freddie Mac MBS). By contrast, private-label MBS have no such federal guarantee and must be *credit enhanced* by the issuer as a condition to the

securities receiving an "investment grade" (AA or AAA) rating by one of the nationally recognized credit rating agencies. *See id.* at 267–68.

Credit enhancement is the process by which the issuer provides some protection from the inherent risks of the underlying mortgages in a given pool and thereby improves the investment quality of the security. Credit enhancement for private-label MBS takes one of two forms; it is either "external" or "internal." *Id.* External credit enhancement refers to the process in which an issuer of the MBS obtains the favorable credit rating of some third party to envelop the pool of securities underlying an MBS. It comes in the form of a third-party guarantee that provides protection against losses up to a specified amount; typically these guarantees include corporate guarantees, letters of credit, and pool insurance offered by a corporation, financial institution, or insurance company with a strong credit rating. *Id.* In contrast, internal credit enhancement requires no third-party involvement and primarily involves either a special allocation of the proceeds from the sale of a MBS issuance or the special structure of the security that allows for senior and subordinated classes. *Id.* at 268–69. For a "reserve fund," the issuer will set aside a portion of the issue proceeds into a designated account that is used to offset any pool losses up to the reserve amount. *Id.* In the case of a "senior-subordinated structure" the security is divided into two or more classes, with the subordinated classes absorbing a disproportionate share of any pool losses, so that the senior class of the security is insulated from loss and may qualify for the higher credit rating. *Id.* at 269.

In the Secondary Mortgage Market Act of 1984, Congress recognized the explosive growth of the secondary mortgage market and its ever increasing role in providing liquidity to residential mortgage lenders. Congress noted that the federal agencies "have served well, and made mortgage-backed securities acceptable to investors by standardizing products and procedures and by developing a range of investment instruments." S.REP. NO. 98–293 at 2, *reprinted in*

1984 U.S.C.C.A.N. 2809, 2810. Nevertheless, it was clear that "the existing Federal agencies simply [would] not be able to provide all the liquidity for mortgages that [would] be required" in the future due to the projected demand for mortgage credit. *Id.* Instead, it became imperative for Congress to "broaden the number of participants channeling investor capital to the homebuyer" and create an environment in which "the private sector [could] assume a more significant market role." *Id.* Paying homage to the financial services deregulation in Garn–St Germain, Congress noted that:

> Almost two years ago, an important procedural deregulation trend began, complementing the structural changes occurring in the financial services industry. For the first time, it became economically attractive for private sector actors to form conduit operations through which they could pass ownership in pools of mortgages to investors in the form of "pass-through" securities.

*Id.*

The Secondary Mortgage Market Act of 1984 implemented several changes designed to foster the growth of the private-label secondary mortgage market and, particularly, to encourage federal thrifts to become more active participants in the private-label market. Among these changes, the Act broadened the transactional exemption from the security registration requirements of the Securities Act of 1933, a change "designed to expedite the sale by mortgage originators (essentially financial institutions supervised by either state or federal agencies) of securities backed by pools of mortgages to sophisticated institutional investors." *Id.* at 5 (parenthetical in original); *see* Pub.L. No. 98–440 Sec. 105(c). Furthermore, and critical to thrifts' investment power and their ability to participate in the secondary mortgage market, the Act preempted state laws that restricted thrift ownership of private-label MBS, authorizing any thrift to "purchase, hold, and invest" in any MBS, including private-label MBS, provided the security is appropriately rated by one of the national credit-rating organizations. Pub.L. No. 98–440 Sec. 106. In effect, the 1984 Act granted the authority to expand their portfolio holdings of MBS.

As the secondary mortgage market evolved throughout the 1970s and into the 1980s, the roles of different market players— each serving unique market needs, yet markedly intertwined—became more defined, along with the manner in which each party in the process could generate income, either through fees or interest-rate movements. The first entity involved in the MBS process is the "mortgage originator," the original lender that extends the loan to a residential borrower. S. Rep. No. 98–293 at 4, *reprinted in* 1984 U.S.C.C.A.N. 2809, 2810. When a lender obtains a mortgage by extending a home loan directly to the borrower, it is referred to as a "retail origination." Among the ranks of retail originators are thrifts, mortgage bankers, and commercial banks. The retail originator generates income on the mortgage in three ways. First, the retail originator generally charges a loan origination fee, along with certain application or processing fees. Second, the retail originator may retain the right to service the mortgage for the life of the loan, collecting payments from the borrower and making annual insurance or tax payments before forwarding the proceeds on to the buyer of the mortgage. This type of servicing is called "primary servicing," and the party performing primary servicing charges a fee. As an ancillary benefit of the primary servicing, the retail originator often can earn interest revenue on the "float" due to any permitted delay between when individual mortgage payments are received and when the payments must be forwarded on to insurers, tax authorities, or mortgage owner. *Id.* at 7. Finally, depending on interest rate movements between when the loan is originated and when it is sold into the secondary market, the retail originator may recognize a gain on sale.[14]

---

14. For example, if interest rates decline during the interim between origination and sale into the secondary market, the mortgage may be worth more than its face amount, based on its higher-than-market rate of return. Conversely, should rates rise, the loan would be worth less than its face amount; to protect against such a situation

*Id.* Of course, if the mortgage is originated by a thrift that prefers to hold the whole mortgage in its investment portfolio, the mortgage is not sold on the secondary market.

Once the mortgage originator closes the loan, it will either (1) hold the loan in portfolio, (2) securitize the loan,[15] or (3) sell the mortgage to an investor that will either hold the mortgage in portfolio or securitize it. Often, if the mortgages are insured by the FHA or VA and qualify for a Ginnie Mae guarantee, the retail originator may simply pool the mortgages into an issue of "Ginnie Mae" securities.[16] Typically, however, the originator sells the mortgage to Fannie Mae or Freddie Mac, or to one of several private *conduit* companies. The agencies and private conduits specialize in acquiring a large "warehouse" of mortgages and then selecting mortgages from that inventory to pool together into securities offerings. Conduits typically obtain their mortgage inventory not through *retail originations* (in which the conduit loans money directly to the borrower), but instead through *wholesale originations,* in which the mortgages are purchased on the secondary mortgage market from brokers or correspondents that conduct the retail originations. *Id.* at 6–7.

Given the large inventory of mortgages in their warehouses, conduits are able to tailor a security offering to the needs of a particular institutional investor or market demand. The conduits earn income through gains-on-sale and servicing fees. Gain-on-sale occurs when the conduit is able to sell the securities for more than the face amount of the mortgages in the pool, as a type of value-added fee for the service of pooling the loans and issuing the securities. The servicing that the conduit provides, referred to as "master servicing," requires the conduit to collect the loan payments for all mortgages within a pool and then distribute the *pro rata* shares of the collection to the security holders. Just like the primary servicing that an originator

may perform, the conduit charges a fee for its master servicing.

Ultimately, it was the continued development of the secondary mortgage market and the introduction of ARMs that helped the thrift industry work through the troubles that the heavily regulated industry's business model had imposed on it through the 1970s. By creating liquidity in the market and providing thrifts a constant source of secondary market demand for their whole mortgages, thrifts were finally able to recycle money and match the maturities of their asset and risk portfolios. This freedom, for those thrifts that properly managed this maturity gap, reduced risk by permitting a them to deal more successfully with changing interest rate environments and made thrifts less prone to the inherent dangers of the financial services industry.

Notwithstanding the dramatic relaxation of thrift capital requirements, accounting principles and asset management powers in the early 1980s and the emerging secondary mortgage market that relieved some pressures in the industry, the thrift crisis persisted. In order to prevent an industry collapse, Congress resorted to what was, in effect, a retrenchment of thrift regulatory policy and enacted FIRREA. *Winstar,* 518 U.S. at 856, 116 S.Ct. 2432. FIRREA changed the mechanism of thrift regulation. It eliminated the FSLIC and created the Federal Deposit Insurance Corporation ("FDIC") to insure thrift deposits in its stead. *Id.* The Office of Thrift Supervision ("OTS") replaced the FHLBB as the regulator of federally insured savings associations, and the Resolution Trust Corporation ("RTC") was created to liquidate or dispose of failed thrifts and their assets. *Id.*

The most significant retrenchment of FIRREA, for the purposes of this case, was a new core capital requirement of 3% and a new definition of "core capital" that excluded "unidentifiable intangible assets," such as su-

---

the originator will often take up inverse positions in hedge instruments. *Id.* at 4–5.

**15.** "When a mortgage is used as collateral for the issuance of a security, the mortgage is said to be *securitized.*" Fʌʙᴏᴢᴢɪ at 5.

**16.** *See generally* http://www.ginniemae.gov/about/about.asp?Section=About.

pervisory goodwill. *Id.* at 857, 116 S.Ct. 2432. Stricter capital requirements reflected a belief in Congress that "the size of the thrift crisis resulted from utilization of capital gimmicks that masked the inadequate capitalization of thrifts." *Id.* (citation omitted). OTS specifically noted that FIRREA eliminated the capital and accounting forebearances previously promised to certain thrifts by the government—including the right to count amortized supervisory goodwill as a capital asset—and directed "[a]ll savings associations presently operating with these forebearances [to] eliminate them in determining whether or not they comply with the new minimum regulatory capital standards." *Id.* (citation omitted). In addition to implementing stricter capital accounting standards, FIRREA also introduced new risk-based capital provisions that created heightened capital requirements based on the relative risk of loss inherent in a thrift's assets.

FIRREA's impact on institutions that had acquired failing thrifts in exchange for special supervisory goodwill treatment was swift and severe. Many institutions immediately fell out of capital compliance, became insolvent and were subject to seizure by thrift regulators. *Id.* at 858, 116 S.Ct. 2432 (citing Black, *supra* note 5, at 107 ("FIRREA's new capital mandates have caused over 500 S & Ls ... to report that they have failed one or more of the three capital requirements.")).

As a consequence of FIRREA, many thrifts that lost the privilege to specially account for supervisory goodwill sued the government for both a taking and breach of contract. In *Winstar*, the Supreme Court concluded that in some circumstances the government had an express contractual obligation to permit thrifts to count supervisory goodwill as a capital asset to be included in core capital. *Id.* at 864–68, 116 S.Ct. 2432. The Court held that FIRREA deprived the plaintiffs of that bargained-for benefit and, therefore, breached the supervisory merger agreements between the government and certain thrifts. *Id.* at 909–10, 116 S.Ct. 2432.

## D. The Tale of Anchor Savings Bank before the Thrift Crisis

With an introduction to the thrift industry, the risks it faced, and the mortgage-banking industry through the 1980s firmly in place as a backdrop, it is appropriate to finally turn towards the history of the plaintiff in this case, Anchor Savings Bank, and review the manner in which Anchor attempted to weather the storm of the thrift crisis.

The relevant history of Anchor Savings Bank begins in Brooklyn, New York, in the 1960s. It was a state-chartered, single-branch institution that operated in the Bay Ridge neighborhood as Bay Ridge Savings Bank. Bay Ridge Savings Bank was a community-centric institution whose presence was limited, both geographically and operationally, primarily to its surrounding community. As a New York state-chartered institution, the bank was restricted to eight branches, and could not open more than one new branch in any one-year period. *See* Tr. at 2621–22 (Test. of George Schneider). As one of Anchor's regulators testified at trial, "Bay Ridge Savings Bank was one of the most sound mutual savings banks in the State of New York.... It was very, very stable." Tr. at 4127 (Test. of Robert Gough).

In 1966, Mr. Donald Thomas came to Bay Ridge Savings Bank as its new president. PX 989 at 6 (Depo. of Donald Thomas, May 12, 1997).[17] With him, Mr. Thomas brought a vision for a new, more dynamic institution that would—in his opinion—be better suited to accommodate change and weather squalls in the savings and loan industry. Mr. Thomas was primarily concerned that Bay Ridge Savings Bank might suffer from its geographic isolation in Brooklyn: "Brooklyn has 4 million people, and if you had economic downturn in that one area or even in that one section of that area, you could be in severe economic problems with loans. And at that time most of those loans made by savings banks were within local areas." *Id.* at 9.

---

17. Mr. Thomas' testimony in this case was received by the court in the form of his recorded deposition testimony under RCFC 32(a)(3)(C) and FED.R.EVID. 804 because Mr. Thomas was "unavailable" for trial due to his age and health. *See* Order Granting Motions to Admit the Deposition Testimony of Donald L. Thomas as Evidence (filed April 25, 2005).

Other senior officers at Anchor echoed this sentiment. "[Bay Ridge] was an older community, 1–to–4 family attached ground houses, four-story walk-ups, a lot of apartment buildings, and all the real estate was basically developed. So there was ... no place to lend the money within the community." Tr. at 2622–23 (Test. of George Schneider).

The first substantive step that Mr. Thomas instituted at Bay Ridge was a name change in 1968. Mr. Thomas hoped that adopting "Anchor Savings Bank," a more generic title not identified with a specific local community, would be a first step towards greater geographic diversity. *Id.* at 9. Soon after Mr. Thomas' arrival, Anchor embarked upon a long-term strategic plan of expanding the bank's base. In 1969, Anchor merged with Bushwick Savings Bank, a four-branch Brooklyn institution that complemented Anchor's base. *Id.* at 9–10. Anchor also expanded into Long Island, opening a *de novo* branch in Carle Place, "a thriving community with a good economic base." *Id.* at 9. Later, in 1977, Anchor acquired the North New York Savings Bank, which gave Anchor a presence in the Bronx borough, "bordering on Westchester which is a very prestigious area in the New York community." *Id.* at 13. One upshot of the geographic expansion within the New York metropolitan area was that it allowed Anchor to maximize marketing efficiencies, reducing what Mr. Thomas called "waste marketing." *Id.* at 15.

In 1980, Anchor converted to a federally chartered savings institution. Mr. Thomas "perceived greater freedom" in the ability to open new branches as a federally chartered institution. *Id.* at 16; PX 1 at 003 (Annual Rep. to the Trustees, 1980). Federally chartered institutions also had access to borrowed funds from the Federal Home Loan Bank, which gave Anchor flexibility in acquiring mortgages. PX 989 at 17; PX 1 at 005. Borrowings from the FHLB helped Anchor weather some of the pressures brought on in the late 1970s and early 1980s by the inverted interest rate yield curve that gave rise to the interest rate gap discussed

above. As noted, this phenomenon was not isolated to just Anchor or other New York savings institutions, but was instead endemic to the entire thrift industry.

## E. Anchor's Expansion

As alluded to above, Mr. Thomas and Anchor's senior management seemed to be acutely aware of the problems that would eventually plague the thrift industry. From his arrival at then Bay Ridge Savings, Mr. Thomas committed Anchor to a strategy of deliberate growth outside its Brooklyn community: "I felt it was absolutely necessary to get out of one area of investment. And I also knew that you couldn't survive and get new deposits forever in one area. So you had to expand to different market areas." PX 989 at 21 (Depo. of Donald Thomas, May 12, 1997).

The driving force behind this goal of geographic expansion was the diversification of risk. *Id.* at 23. Operating within one small market like Brooklyn, or even the metropolitan New York area, exposed Anchor to the kind of event risk that could be catastrophic because most of its mortgage assets and deposit base were so geographically concentrated. Even after Anchor began to expand outside of Brooklyn, it felt the pains of this kind of event risk when thrift deposits began to leave the state of New York in favor of California through both market forces [18] and disintermediation. *Id.* at 19–21. Anchor's original core market of Brooklyn was particularly affected by the outflow; in the early 1980s, Anchor's Brooklyn branches experienced a net deposit outflow that was more acute than other branches in the New York region. *See* PX 1 at 014 ("Anchor's 1980 deposit experience continued to show a trend of net deposit outflows from our New York City offices and, in particular, our Brooklyn-based locations."); PX 2 at 017 (1981 Annual Report to the Trustees); PX 3 at 012 (1982 Annual Report to the Trustees) ("Our three oldest offices, located in Brooklyn—Bay Ridge, Boro Park and Bushwick—experi-

---

18. "[W]e had usury rates in New York state which were very stringent as opposed to California.... But what happened is we had a situation where the usury rate became *the* rate.... [G]reat flows of money left New York state, massive flows went out to California to get the higher interest rates." PX 989 at 19–20 (Depo. Test. of Donald Thomas).

enced a combined net deposit outflow of $18.2 million."). Moreover, officials within Anchor viewed the Brooklyn market as one of limited growth potential that may not have been able to sustain a growing enterprise over time. Mr. Cody Sickle, a senior officer for Anchor who oversaw the bank's branch network through most of the 1980s, noted that in the early 1980s "Anchor's structure . . . had a lot of very sound, stable branches, but we had a lot of that stability in neighborhoods that were very old. And by 'old,' I mean a lot of our Brooklyn branches, while they were viewed at that time as the crown jewels of the company, they were neighborhoods that were not going to see—not likely to see dramatic growth over the next 20 years." Tr. at 844.

Mr. Thomas also seemed to anticipate the industry flaws associated with systematically borrowing short and lending long. He realized the perils of holding illiquid 1–4 family home mortgage assets in a period where interest rates rapidly fluctuated and outstripped the interest revenue derived from the mortgages. To this end, in the 1970s he gradually moved Anchor towards the nascent mortgage-banking industry to take advantage of the growing secondary mortgage market and promote Anchor's liquidity. "[T]he whole idea was to make mortgages . . . bundle them, sell them, [so that] you get your money back, but then you service them and you have the fees. So that made you more liquid, and that's how you met some of the challenges of being locked in" at interest rates below the costs of deposits. PX 989 at 29. The first step towards this goal was the acquisition in 1979 of Anchor Mortgage Resources, a mortgage-banking enterprise that originated mortgages in the Atlanta, Georgia area. *Id.* at 61–63.

Mr. Thomas had long planned to diversify geographically within the state of New York, and this was evidenced by the Bushwick and North New York acquisitions in 1969 and 1977. He also grew the bank in northern New York, opening new branches in Niagra County, near the Canadian border. *Id.* at 23. Beginning in 1981, after Anchor had converted to a federal charter, the Federal Home Loan Bank in New York presented Anchor with opportunities to pursue its expansion within New York through the acquisition of troubled thrifts. In 1981, Anchor acquired Guardian Federal Savings & Loan with offices in Nassau and Suffolk counties and later the New York & Suburban Federal Savings and Loan Association with offices in New York and Richmond counties. PX 2 at 41 (1981 Annual Report). Each of these supervisory transactions were completed with cash assistance from the FSLIC and FDIC. *See id.* at 23–24. In 1982, Anchor acquired three small thrifts in upstate New York; the acquisitions were accounted for as "pooling" arrangements in which no goodwill was created. PX 3 at 32 (1982 Annual Report); PX 6 at 22 (1985 Annual Report).

For all of its growth within the New York market, however, Anchor's interstate expansion was restricted by federal regulation that generally prohibited interstate branching. Without the opportunity to develop branches in other states, Anchor was geographically limited to growth in only the state of New York. That restriction changed in 1982, however, with the passage of Garn–St Germain. Under Garn–St Germain, the FSLIC was authorized to arrange mergers of institutions across state lines, notwithstanding interstate branching prohibitions. *See* S.REP. No. 97–536 at 49 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3054, 3103. Anchor seized this opportunity to finally extend its geographic reach beyond the borders of New York and enter new, growing markets.

In 1982, Anchor became the very first savings bank in the country to boast an interstate branch network when it completed supervisory mergers arranged by the FHLB with Peachtree Federal Savings and Loan Association in Atlanta, GA ("Peachtree") and First Federal Savings and Loan Association of Crisp County in Cordele, GA ("Crisp"). PX 3 at 003. By the year's end, the Georgia franchise accounted for nearly $140 million in deposits. *Id.* At the time, "Atlanta was the fastest growing major city in the United States" and Anchor "looked at that market as a terrific long-term market." Tr. at 844 (Test. of Cody Sickle). For Anchor, the opportunity to extend the bank's branch system outside of its home state into emerging mar-

kets was viewed as a long-term business plan, designed to hedge against future stagnation in Anchor's traditional New York markets. *See id.* at 845 ("[The Atlanta branches] were going to grow for the long term so that they would position the bank when and if the older neighborhoods that we were in New York started not to grow at all; we would be in a position of growing in rapidly growing communities."). When Anchor's metropolitan New York branches were suffering deposit outflows in 1982, its Georgia-based branches increased deposits for the year. *See* PX 3 at 012.

In 1983, Anchor continued to expand its branch network in both the Georgia and New York markets. Anchor merged with Standard Federal Savings & Loan and Tri City Savings & Loan in Georgia, adding 16 branches and nearly $250 million in deposits to the thrift. PX 4 at 004 (1983 Annual Report to the Trustees). Anchor also merged with Heritage Federal Savings and Loan, which added nine branches and over $260 million in deposits to the bank's Long Island branch system. *Id.* The following year, Anchor would also merge with United Federal Savings and Loan Association in Waycross, GA and add five branches in the southern portion of Georgia, along with $68 million in deposits. PX 5 at 004 (1984 Annual Report to the Trustees).

Far and away the largest expansion that Anchor undertook in 1983, though, was directed towards the New Jersey market—a market that was, in large part, geographically and financially contiguous with Anchor's existing metropolitan New York franchise. In August of 1983, Anchor acquired Suburban Savings and Loan Association, adding 27 branches in New Jersey and $1.8 billion in deposits to the bank's base. *Id.* at 003–004. This acquisition alone increased the size of Anchor's deposit base by nearly 75%; along with Anchor's other mergers in 1983, the bank nearly doubled in size. *See id.* Anchor's officials viewed the Suburban transaction as a *coup,* of sorts: "New Jersey clearly being right next door to New York, a significant portion of the New Jersey market is a suburb of New York City. So our name recognition was very strong in New Jersey to

begin with. It's an adjoining market. Population density is terrific. So the opportunity there was terrific." Tr. at 846 (Test. of Cody Sickle). For metropolitan commuters, Anchor's expansion into New Jersey allowed the bank "to serve [its] customers with offices near their homes and places of business." PX 4 at 004.

In addition to the sizeable deposit base that Anchor acquired in the Suburban transaction, it also acquired one of Suburban's subsidiaries, Suburban Coastal Corp., which was a major mortgage-banking enterprise. *Id.* "Anchor's acquisition of Suburban Coastal Corp .... positioned the Bank as a major mortgage banker with a nationwide origination network and a servicing portfolio of $6.4 billion, ranking Anchor as the sixth largest mortgage banking institution in the nation." *Id.* Anchor would eventually rename Suburban Coastal Corp. as "Anchor Mortgage Services, Inc." ("AMS") and use that subsidiary to position the bank as a major player in nationwide mortgage origination and secondary market activity. *Id.* at 021. As Anchor's expert Jess Lederman, an industry insider explained, Anchor's "acquisition of one of the largest mortgage banking companies in the country" was "a significant expansion [by Anchor] into the secondary [mortgage] market." Tr. at 1407–08 (Test. of Jess Lederman).

As a mortgage-banking enterprise, AMS was in the business of acquiring whole mortgage loans through one of two means. First (and primarily), as a retail originator of mortgages, AMS had a nationwide system of offices through which AMS could originate loans directly with customers, the home buyers seeking mortgages. AMS conducted its retail originations through a network of branch offices across the nation. Second, as a wholesale originator, AMS had the capability to purchase mortgages on the secondary market that had already been originated by other lenders. *See id.* at 1405–08; Tr. at 2307–08 (Test. of John Brull); Tr. at 2685 (Test. of George Schneider). AMS conducted its wholesale originations from a central location, relying on a cadre of correspondents who conducted the original, retail origination.

Anchor derived multiple benefits from AMS. First, AMS helped move Anchor towards Mr. Thomas' long-term goal of becoming less dependant on interest-sensitive income because the primary revenue that AMS produced was in the form of servicing fees. While AMS originated hundreds of millions of dollars in mortgages each year, it did not hold those mortgages in portfolio. Instead, AMS would sell the mortgages on the secondary market, either as whole loans to an institution that would hold the mortgages in portfolio itself or as part of Freddie Mac, Fannie Mae or Ginnie Mae mortgage backed securities. AMS, however, would retain the primary servicing rights to the individual mortgages—*i.e.*, it would continue to collect the monthly mortgage payments, coordinate appropriate insurance or tax payments, and distribute the monthly payments to the ultimate mortgage owners—and receive a fee for those services based on the size of the mortgage loan. *See* Tr. at 2642 ("When a borrower takes out a mortgage, every month he makes a principal [and] interest [payment], and payment of taxes and insurance. The mortgage servicer collects that money and then sends it to the ultimate investor, and for that service, it collects a fee. . . .") (Test. of George Schneider, President of Anchor).

The revenue generated from the servicing was therefore directly dependent not on the interest rate environment, but instead on the volume of servicing business that AMS could generate.[19] As Anchor's Senior Vice President and Chief Financial Officer testified, AMS's servicing fee revenue was typically more than 25 basis points, or slightly more than a quarter of one percent, of its servicing portfolio. *See* Tr. at 2292, 2303 (Test. of John Brull). "In addition to that, [Anchor] would have free use of escrow funds" for a limited period of time, "which [were] relatively free costing funds." *Id.* at 2303. Furthermore, AMS's servicing portfolio had inherent resale value, because a market emerged in which mortgage-banking companies could buy or sell servicing rights. *Id.; see* Tr. at 2647 (Test. of George Schneider) ("Servicing has value, like any other investment vehicle, and generally, it was considered servicing is worth 1 percent of the principal amount of the servicing. And like anything else, there were times when, for whatever reason, somebody is willing to pay more for servicing than Anchor would consider it would be worth.") (recalling that Anchor sold servicing rights for at much as a 2.8% premium).

The second substantial benefit that Anchor derived from its relationship with AMS was the ability to fill Anchor's own need for loans that the bank would hold in portfolio as interest-earning assets. *See id.* at 2305. For a time, AMS would become Anchor's "primary source for portfolio origination of both real estate related and consumer loans outside of the market areas served by [Anchor's] branch network." PX 34 at 15528 (Feb. 12, 1987 Common Stock Offering Circular); *see also* Tr. at 2700 (Test. of George Schneider) ("[I]n the 1985 fiscal year, 87 percent of the total dollar volume of [AMS's] closed loans were sold to Anchor Savings Bank.") (citing PX 7 at 799549). Furthermore, as Anchor tried to manage its asset portfolio in the mid–1980s and liquidate some of its long-term, fixed rate assets (mortgages), it was able to use AMS as a vehicle through which the bank could swap those assets for Freddie Mac MBS that provided better liquidity and, therefore, more flexibility to deal with interest rate issues. *See* PX 7 at 007 (1986 Annual Management and Operations Report to the Trustees). Anchor could also use AMS to originate ARMs that were interest-rate sensitive and that Anchor could hold in portfolio long-term without the same interest rate risk that attached to fixed-rate mortgages. *See* Tr. at 2695–96; 2700–01 (Test. of George Schneider).

In 1985, Anchor continued its geographic expansion by acquiring Sun Federal Savings and Loan Association ("Sun") of Florida (the acquisition became effective January 1, 1986).

19. Not that the two are entirely independent. Due to natural market forces, as long-term interest rates increase, there may be fewer new mortgages to originate because demand for new mortgages wanes. On the other hand, when interest rates decline, there is typically a sharp increase in new mortgages as new home buyers flood the market or existing mortgagors refinance. These natural conditions would, of course, indirectly affect the volume of servicing available to a company like AMS and, therefore, its revenue.

Again taking advantage of the new inter-state-banking provisions of Garn–St Germain by taking on a troubled thrift under the auspices of the FSLIC, Anchor acquired 16 branches spread across the northern panhandle of Florida and $338 million in deposits. *See id.* at 005. Once authorized to operate in the state, Anchor had a long-term plan to expand down the coasts of Florida into the wealthy areas of the state where Anchor felt it already had some name recognition. *See* Tr. at 844–45 (Test. of Cody Sickle). Anchor officials felt that expansion throughout Florida would make strategic sense because the expansion would allow the bank to track what it considered its "snowbird" customers-those New York residents that fled to Florida's warmer climate in the wintertime. *See id.* at 845; PX 989 at 26–27, 48 (Depo. of Donald Thomas).

All together, Anchor's expansion—both from its early geographic confines in Brooklyn and from its restricted "traditional thrift" business model—seemed consistent with a pervading plan that Mr. Thomas brought with him to then Bay Ridge Savings Bank. As Anchor noted in a 1987 stock subscription circular:

> Since the early 1980s, Anchor's strategic business plan has focused on: (i) expanding geographically to broaden and diversify its deposit base and access new markets for its lending products, (ii) diversifying operations to promote less interest-sensitive sources of income, primarily fee income from servicing by AMS and other service related fees and charges earned by the Savings Bank, (iii) stabilizing net interest income and reducing Anchor's sensitivity to interest-rate fluctuation while maintaining asset quality, and (iv) expanding the range of financial services offered to Anchor's customers to be directly competitive with those offered by other types of financial service organizations.

PX 34 at 15528. The focus of this plan, economic and product diversity, was aimed directly at overcoming the inherent flaws of the "traditional thrift" model in which institutions relied on borrowing short and investing long to generate revenue on the interest rate spread. By initiating the move to become more "bank like" and diversifying revenue production across a host of business interests, some of which acted independent of the prevailing interest rate, while at the same time gaining access to new, emerging markets, Anchor positioned itself to better handle the interest rate shocks that paralyzed most of its competitors in the industry. Ultimately, Anchor's strategies during the early 1980s grew the bank by nearly $4.3 billion in assets, expanded the branch network by 104 offices, included AMS offices in eleven states, and led to a full service operation in four states along the East Coast. *Id.*

F. **The Supervisory Mergers That Anchor Used To Grow: Benefits, Costs and Promises**

All of Anchor's mergers and acquisitions from 1980–85 that fueled the bank's growth were performed under the auspices of the FHLBB and the FSLIC. On par, the institutions that Anchor absorbed were failing or failed thrifts that had either been overwhelmed by the inadequacies of the traditional thrift business model or succumbed to mismanagement. These acquired institutions all shared a common characteristic that was synonymous with the hundreds of other thrift institutions under scrutiny in the *Winstar* litigation: the value of their liabilities far exceeded the value of their assets on a book basis.

As noted above, the FSLIC bore a contingent liability for each of the failing thrifts that Anchor acquired in the 1980s. That is, in the event any of those institutions failed, the FSLIC's deposit insurance liability would have matured and required cash payments to the depositors. Under the broad plan adopted by the FHLBB, federal officials attempted to shift the immediate risks of short-term thrift failures to healthy institutions like Anchor. The goal was to "buy time" so that the failing institutions might be temporarily propped up by the acquiring private institutions and, over time as the interest rate environment improved, become profitable again and prevent the FSLIC's contingent liability from ever maturing.

To be sure, for an acquiring institution like Anchor, there was very little about the failing

institutions that made them attractive targets on their face. They had underperforming assets and balance sheets that showed net liabilities. In a zero-sum world, these were institutions that not even a mother could love, and the FHLBB and FSLIC were unlikely to find suitors willing to assume the liabilities and risks of collapse that the institutions presented. Because the FHLBB had broad authority as a federal regulator of the thrift industry, however, it was able to favorably structure the transactions and offer additional benefits to an acquiring institution that helped reduce the financial and accounting burden that would otherwise be recognized by assuming the failing institution's net liabilities.

In some transactions, the FSLIC contributed cash or cash equivalents to the acquiring institution to help make up the difference between liabilities and assets; in others, it authorized creative regulatory accounting practices that blunted the negative impact of the assumed net liabilities and provided the acquiring thrift with time to make up the shortfall through enhanced profits.

When Anchor acquired the Guardian Federal and New York & Suburban thrifts in 1981 and 1982, the FSLIC sweetened the pot with direct cash assistance in both transactions. To help compensate Anchor for assuming the thrift's net liabilities, the FSLIC contributed $19.5 million to the Guardian Federal transaction, and over $210 million to the New York & Suburban transaction. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law at 5–6 (filed Mar. 1, 2005).

For eight of Anchor's acquisitions between 1982 and 1985, the FSLIC relied primarily on favorable regulatory accounting incentives—namely the long-term amortization of supervisory goodwill—instead of cash contributions to promote the transactions and create some sort of profitable business incentive for Anchor to assume the liabilities of the otherwise failing thrifts.

By regulation, thrifts were required to maintain a capital reserve measured as a percentage of the thrifts' total assets—typically in the range of 3–5%. Functionally, the capital requirement prevented thrifts from running too "hot," or investing every dollar at the thrift's disposal (be it through customer deposits or thrift borrowings) in profit-producing assets such as loans or securities. The allure of the supervisory goodwill generated from Anchor's acquisitions was that the total amount of supervisory goodwill could be counted as a capital asset to be applied against the bank's regulatory capital reserve requirements. For each dollar of supervisory goodwill that Anchor held, then, it could hypothetically grow its asset base by as much as 20–30 dollars.[20] The creation of supervisory goodwill was an avenue to explosive growth for thrifts like Anchor in terms of the volume and value of profit-earning assets that could be held.

Ultimately, the amount of supervisory goodwill that Anchor generated in its eight transactions from 1982–85 was staggering. In 1982, the Crisp and Peachtree transactions in Georgia netted Anchor $35.6 million in supervisory goodwill. PX 6 at 22–25. In 1983 and 1984, Anchor generated nearly $100 million in supervisory goodwill through the Standard, Tri–City, Heritage and United acquisitions. *Id.* The Sun acquisition in 1985 created $44 million in supervisory goodwill. PX 7 at 44. By far the most substantial creation of supervisory goodwill corresponded with the Suburban transaction in 1983. PX 6 at 27–28. That acquisition provided Anchor with a $50 million direct cash contribution, $469 million of supervisory goodwill, and an additional $150 million promissory

---

**20.** By way of an over-simplified example, assuming that Anchor had $100 of assets and operated under a 5% regulatory capital requirement, Anchor would be required to retain $5 of capital to support its assets. Or, expressed another way, if Anchor had $5 of capital then the maximum amount of assets it could retain would be $100. If Anchor were to receive an additional $5 of supervisory goodwill, it would have a total of $10 to count against its capital reserve requirement and would therefore be able to retain up to $200 in assets (because $10 is 5% of $200). In this scenario, the additional $5 of supervisory goodwill would allow Anchor to hold $100 in (ideally) profitable assets without running afoul of the regulatory capital requirements. This is effectively the concept of "leveraging" that has appeared so often in the *Winstar* cases. *See* generally Tr. at 2316–17 (Test. of John Brull) (explaining the benefits of supervisory goodwill and the manner in which a thrift could leverage that goodwill for profit-making purposes).

note from the FSLIC that Anchor could apply against its regulatory capital requirement, for which Anchor issued to the FSLIC an Income Capital Certificate ("ICC") that was a security the FSLIC held in Anchor. *Id.*

Before Anchor began participating in federally-sponsored acquisitions that gave rise to supervisory goodwill, it had a net worth of $124 million (or 4.6% of liabilities) and a capital surplus of $43 million. Pl.'s Proposed Findings of Fact and Conclusions of Law at 3. By 1982, prior to the Peachtree/Crisp merger, Anchor also exceeded its minimum regulatory capital reserve requirement by more than $120 million. Pl.'s Proposed Findings of Fact and Conclusions of Law at 9. Over the course of the eight supervisory acquisitions, however, it took on nearly $650 million in net liabilities and absorbed institutions with a combined regulatory net worth deficit of nearly $270 million; collectively, the eight institutions failed their regulatory net worth requirements by nearly $370 million. Pl.'s Proposed Findings of Fact and Conclusions of Law at 5–10. Without the regulatory forbearances that allowed Anchor to count accumulated supervisory goodwill as a capital asset for regulatory purposes, the bank would have failed its own regulatory requirements as a result of the acquisitions. *See* Tr. at 2630–31 (Test. of George Schneider).[21]

The supervisory acquisitions and the creation and use of supervisory goodwill were not without their costs, however, both direct and indirect. One of the direct "costs" of the supervisory goodwill was the fact that all of the goodwill Anchor generated in its acquisitions would be amortized over a period of 25–40 years. Each year during the amortization period, Anchor was required to claim the amortized goodwill as an operating expense, which was a persistent drag on the bank's earnings. *See, e.g.,* Tr. at 2314 (Test. of John Brull) ("[Anchor] had over 500 million in

goodwill on its books, and that was amortized over periods extending up to, I think, 35 or 37 years. It resulted in an annual amortization charge or expense of close to 25 million [dollars]."). Indirectly, and as discussed below, Anchor assumed the burden of trying to integrate eight new institutions into its existing franchise. For the most part, the newly acquired institutions were poorly performing, had underperforming assets and high cost structures. Invariably, there were growing pains associated with trying to bring the geographically diverse operations into the "Anchor family." *See id.* at 2315 ("We also had a huge array of administrative costs in trying to put our arms around these thrifts we acquired, and digest them and clean them up, clean up the books, clean up the policies, clean up the practices, change the procedures."). It would not be a seamless transition.

From Anchor's perspective, however, these growing pains were well worth the bank's investment in the long-run. Coupled with the long-term amortization contemplated by the FHLBB, FSLIC, and Anchor, the goodwill provided both Anchor and the government with long-term benefits. As Anchor's President, George Schneider, noted:

It was the understanding when the acquisitions were agreed to and the institutions acquired that this goodwill could be written off . . ., that it would be an item that would be charged through earnings, showing as an operating expense for these years [of amortization], the theory being that as the bank grew, the goodwill would become less of a percentage of total assets, and at the same time, the amortization is taking place. It would be reducing, so that in the future, growth of the bank with the amortization of goodwill, there would be a crossover point at which point the bank would be prospering and goodwill would be declining. And over a period of thirty-five

---

21. As Mr. Schneider, Anchor's President, testified at trial:

Q: Would Anchor have undertaken these supervisory mergers if it did not expect that it could amortize the goodwill resulting from them over periods from 20 to 40 years?
A: Never.
Q: Why not?

A: We would have been instantly insolvent. . . . We would have had to charge $679 million [the amount of the assumed net liabilities] against our capital.
Q: So you would have immediately failed your own regulatory capital requirements?
A: It would have been suicide.
Tr. at 2630–31.

years ... Anchor would become profitable. The goodwill would have been written off. And the government would have saved themselves an awful lot of money.

Tr. at 2629–30.

As has been recounted at length in the several *Winstar*-related cases in this court and the Federal Circuit, the special regulatory accounting treatment that was to be accorded to the supervisory goodwill, and the right to amortize that goodwill over an extended period of time, was frequently the subject of binding contracts between the FHLBB, the FSLIC and the acquiring institutions. *See Winstar,* 518 U.S. at 847–54, 116 S.Ct. 2432. The terms of the agreements were laid out in forbearance agreements in which the FHLBB and FSLIC agreed to allow an acquiring institution to apply the "purchase method" of accounting to the acquisitions and count the target institution's excess liabilities as a capital asset for regulatory purposes until the supervisory goodwill had fully amortized. In Anchor's case, this court previously concluded that Anchor acceded to these contractual rights in connection with four of its supervisory mergers, including the Peachtree, Crisp, Sun and Suburban transactions.[22] In both the Peachtree and Crisp acquisitions, the court concluded that the FHLBB had agreed to allow Anchor to amortize the goodwill associated with those transactions over a period of forty years. *Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. 126, 130 (2003). In the Sun acquisition, the court concluded that the government agreed to allow Anchor to amortize the goodwill associated with that transaction over a period of thirty-five years. *Id.* at 131. Finally, in the Suburban acquisition, the court concluded that the government had

agreed to permit the amortization of goodwill over a period of thirty-four years, and also that the $150 million ICC was an additional regulatory forbearance to which the government had contractually agreed to allow as a regulatory capital credit. *Id.* at 131–32. Collectively, it was these contractual agreements that the government breached with the passage of FIRREA.

### G. Anchor's Performance in the 1980s and the Acute Impact of Anchor's Acquisitions

Throughout the early 1980s, Anchor consistently outperformed its competitors. In 1980, as Congress first began to deregulate the thrift industry and permitted thrifts to pay increasingly phased-in market interest rate returns on deposits, thrifts began to hemorrhage cash because of the growing cost of funds. *See* Tr. at 2651–52 (Test. of George Schneider). Anchor, however, had a relatively strong "liquidity position"—that is, it had a relatively high percentage of its assets in the form of cash or short-term investments maturing within one year. *Id.* (citing PX 1 at 12) (1980 Annual Report to Trustees) ("Anchor maintains a liquidity position more than two and one half times the statewide average for all savings banks, at 5.74 percent, as of year-end."). The benefit of Anchor's strong liquidity position relative to its competition was that it was better positioned to both meet the demand for deposit withdrawals and to regularly reinvest its funds at higher interest rates. *Id.* at 2652 ("Interest rates were through the roof. Deposits were flowing out the door. [The high liquidity position] gave us two things. One, money to meet deposit withdrawals, and also money to invest at a much higher rate in order to

---

**22.** The specific mechanics of each transaction, and a summary of the court's analysis of each, is recounted in the summary judgment opinion on damages. *See Anchor Sav. Bank, FSB v. United States,* 59 Fed.Cl. 126, 130 (2003). As the court noted in the summary judgment opinion, the rulings about which transactions involved contractual agreements for the special accounting treatment of supervisory goodwill came in piecemeal fashion; the court first dealt with individual transactions, and later sorted through certain individual intangible assets. *See Anchor Sav. Bank, FSB v. United States,* 52 Fed.Cl. 406, 408–17 (2002) (Peachtree & Crisp transactions); Or-

der Memorializing Hearing on Dispositive Motions, No. 95–39C (filed Aug. 2, 2002) (Sun transaction); Order Ruling on "Capital–Credit/FCC" Issue Pertaining to the Suburban Transaction (filed Aug. 26, 2002) (Suburban transaction). The Heritage, Tri–City, United and Standard acquisitions, while giving rise to goodwill under generally accepted accounting principles ("GAAP") because the acquired institutions had net liabilities, did not involve any assistance agreements that contractually obligated the FHLBB and FSLIC to recognize supervisory goodwill as a capital asset for regulatory purposes.

offset the higher costs that our deposits were incurring.").

When Anchor converted to a federally-chartered thrift in 1980, the FSLIC concluded that "[t]he bank appears to be financially sound with good prospects for future earnings." PX 228 at 005 (FSLIC Report of Examination); Tr. at 681 (Test. of Angelo Vigna). The FSLIC report acknowledged that Anchor had been "operating profitably in a period of instability for area thrift institutions" and that it had a "good net worth position." *Id.* Angelo Vigna, the senior supervisory agent for the Second District of the Federal Home Loan Bank and later an acting director of the FSLIC, was one of Anchor's senior regulators when the bank converted, and he testified that Anchor was well managed under Mr. Thomas and George Schneider at that time. *See* Tr. at 679, 683–84. Anchor had traditionally been a conservatively run institution that did not have non-performing loan problems. *Id.* at 684.

As Anchor's annual financial reports reveal, the bank appears to have been better situated to absorb the perils of the sharply deregulated thrift industry in the early 1980s than was the industry at large. In 1980, the first year of the DIDMCA, Anchor posted a net profit as a percent of assets of 0.13%, while industry peers suffered an average loss of 0.15%. *See* Tr. at 2651 (citing PX 1 at 019). In fact, from 1975 through 1979, Anchor outperformed the industry averages in this measure of profitability for each year but one. *See* PX 1 at 019. This trend continued into 1981, when Anchor posted a very small net profit as a percent of assets of 0.01% in a year where all other savings banks averaged losses in excess of 0.9%. *See* Tr. at 2665; PX 2 at 022 (1981 Annual Report to Trustees). In 1982, the weaknesses of the thrift industry finally caught up with Anchor, too, as the bank posted a negative net income as a percent of assets of 0.38%, but this was barely more than half the losses of the national average for all savings banks. *See* PX 3 at 019 (1982 Annual Report to Trustees).

As Anchor expanded in the early 1980s, it faced the challenge of absorbing failing institutions while continuing to deal with a volatile interest rate environment. As Anchor's president noted, the acquired failing thrifts "were losing money. Their assets were worth less than their liabilities. And as time would go on, that problem would only get larger and larger and larger." Tr. at 2678 (Test. of George Schneider). The Suburban acquisition alone presented a daunting rehabilitation effort:

> [With] Suburban Savings and Loan, we ended up with 460 some odd million dollars of goodwill that had to be amortized over the 35–year period, which was a charge to earnings. At the same time, there was an asset [, the goodwill,] that was earning no money. So we were paying interest on deposits or other liabilities which was another additional expense. There were operational changes that had to take place within the bank, and most of Suburban Savings & Loan ... [had] mortgages [that] were 30–year fixed rate loans, which were under water, and until such time as the balance sheet can be restructured, we were going to continue losing money at Suburban. The projections that were provided to the Home Loan Bank in the acquisition went out 10 and 20 years, and for the foreseeable future, we projected we would be losing money because you could not turn around something—a two billion [dollar] bank with $460 million worth of goodwill. It was a monumental problem, and we assumed we had 35 years in which to absorb that $460 million.

*Id.* at 2694.

Anchor's own regulators expected the bank to take on losses in the years following its acquisitions, as the bank overcame many of the shortcomings associated with the failing thrifts it acquired, particularly Suburban. *See* Tr. at 704 (Test. of Angelo Vigna). The regulators noted that, among other ills, Anchor acquired a large number of underperforming or "problem" loans in its acquisitions, which caused Anchor's traditionally low rate of problem-loans, relative to the rest of its portfolio, to rise. *Id.* at 718–19. Nonetheless, at the time of the Suburban transaction in 1986 the regulators expressed confidence in Anchor, noting that it "appears financially healthy and well managed, and we have confidence in its ability to absorb Sub-

urban with little difficulty." PX 449 at 042 (FHLBB Supervisory Memorandum). Even after absorbing annual costs of amortizing the supervisory goodwill, prospective FHLB viability studies performed in conjunction with the Suburban transaction indicated that in just a few years Anchor would be able to grow the bank and improve earnings to sufficiently accommodate the amortization costs of the supervisory goodwill. *See id.* at 762–63; PX 441 at 2 (Aug.1983 Viability Analysis).

Anchor had hoped to alleviate the balance sheet problems it inherited by engaging in a longterm asset restructuring program that would allow it to better match its interest-rate maturities. That is, Anchor hoped to become more heavily invested in short term investments or interest rate-sensitive assets (like ARMs) that would leave the bank less prone to sharp, sudden increases in the market interest rates it paid for deposits. *See generally* PX 5 at 008 (1984 Annual Report to Trustees); Tr. at 686 (Test. of Angelo Vigna).

As Anchor's own officials appreciated, after the bank had acquired the several failing thrift institutions in the early 1980s, the new, larger Anchor enterprise had a number of problems and inefficiencies that needed to be corrected. As John Brull, Anchor's Vice President and Chief Financial Officer testified:

> [Anchor] truly did grow and grew very fast, and it had many problems from its growth. They were lacking in some levels of management. They were having a difficult time getting their arms around the businesses they acquired, and in certain cases, particularly in the case of Suburban Coastal, the company was devoid of some key talent, and they just had to try to redevelop the company.

Tr. at 2291 (Test. of John Brull). Moreover, Anchor was challenged by its new size; from 1984 to 1987, the bank's general and administrative expenses, measured as a percentage of its assets, increased by nearly two-thirds, from just under 1.5% in 1984 to just under 2.5% three years later. *See* DX 131 at 1344 (KPMG Peat Marwick report). This indicated that Anchor was struggling to reign in its

operating costs after the supervisory mergers. As John Brull colorfully noted, Anchor at the time was "just . . . too fat, we really were. . . . [W]e had a lot of bloat in us, and we really had to get rid of it." Tr. at 2341.

Moreover, some of Suburban Coastal's capabilities had eroded in the months prior to Anchor's acquisition of the Suburban franchise. During its final months as a subsidiary of the near-insolvent Suburban, the mortgage-banking company lost many branch offices and key employees, and its viability declined. *See* Tr. at 721–22 (Test. of Angelo Vigna). In fact, other institutions that had previously approached the FHLBB about acquiring Suburban had withdrawn their interest after due diligence revealed that Suburban was having significant problems of which even its regulators were not aware. *Ibid.*

Partially as a result of its acquisitions, Anchor posted net losses from 1982–85 of $7.4 million, $12.0 million, $21.1 million and $52.2 million, respectively. *See* PX 34 at 15529 (Feb. 27, 1987 Subscription Offering Circular) ("The losses, which commenced in fiscal 1981, were attributable in large part to losses arising from the operation of financially-troubled thrift institutions acquired by Anchor, in particular, [Suburban]. . . ."). In 1985, Anchor again battled an inverted yield curve, in which the interest rates for short-term funds (including deposits, Anchor's primary source of investment funds) exceeded the rates of return on long-term investments, which exacerbated the thrift's problems and heightened its annual losses. *See* Tr. at 2316 (Test. of John Brull).

In addition to the balance sheet issues brought on by the acquisitions, Anchor's new branch structure—suddenly spread out across four states, including some less-than-ideal branch locations—presented other new challenges. The branches seemed to have high cost structures, management inefficiencies, and excessive staffing. *See generally* PX 535, DX 103, DX 131 (KPMG Peat Marwick Profit Improvement Reports). Furthermore, many branches acquired in Georgia and Florida were either too small or did not have sufficient opportunity to develop into viable, profitable branches. *See* Tr. at

864–65 (Test. of Cody Sickle). This was particularly the case with several Georgia branches outside the Atlanta area, and several in Northern Florida—those outside Anchor's target markets of Atlanta and the Florida coasts. *Id.* In other words, Anchor's franchise became bloated and there was room for improved organizational and cost efficiencies. To this end, Anchor hired Peat Marwick as a consultant to help streamline procedures and increase profitability. Over the next three years, the consultants helped Anchor focus on eliminating overhead and reducing staffing, thereby reducing costs and bolstering profitability.

In 1986, the interest rate environment improved and Anchor posted a net income of $41.2 million. Anchor attributed the turn in primary part "to the effect of the general decrease in interest rates [that year] on [Anchor's] net interest income, which increased by $84.1 million in 1986 from 1985, and to the $45.5 million net gain on the sale in 1986 of earning assets, principally mortgage-backed securities...." PX 34 at 15529.

## H. Anchor's Long–Term Business Plans in 1985–87

Once Anchor wound down its geographical expansion plans through the FHLBB-supervised acquisition of troubled thrifts, the bank recognized that it needed to get its arms around its new, larger, more diverse franchise, reign in costs, and improve profitability. To this end, Anchor embarked on a long-term business plan that would strengthen the bank's operations and make it more resilient to negative market forces.

As early as 1985, Anchor identified "the risk of rapid escalation of the cost of funds" as "the single most significant factor to Anchor's future ability to generate earnings." PX6 at 011 (1985 Annual Report) ("Anchor's results of operations are dependent on the difference between interest income from loans, investments and other earning assets, ('interest earning assets'), and interest expense on deposit accounts and borrowings ('interest bearing liabilities')."). While Anchor had long been wary of a negative interest rate gap and used the bank's growth through the early 1980s to reduce its depen-

dence on interest rate income, the long-term plan for the latter half of the 1980s recommitted Anchor to expanding into diverse streams of revenue that were less interest-rate sensitive. *See* Tr. at 2299–300 (Test. of John Brull). As noted in the 1985 management discussion and analysis ("MD & A") section of Anchor's annual report, "Accordingly, Anchor has adopted a long term operating strategy, the principal objectives of which are to minimize the effect of interest rate risk on future operations, to increase non-interest income and to reduce reliance on traditional sources of funds." PX 6 at 011. Anchor planned to implement this plan through five distinct approaches, including:

> (i) continuing expansion into growth areas to provide a geographically diverse source of funds; (ii) expanding the range of financial services offered by other types of financial institutions; (iii) stabilizing net interest income and reducing Anchor's sensitivity to interest rate risk through asset/liability management designed to achieve a high degree of maturity and rate matching; (iv) expanding non-interest sources of income, for example fee income from origination and servicing by Anchor Mortgage Services and Anchor Mortgage Resources, and service charges in order to sustain earnings during periods of reduced net interest income; and (v) expanding customer service locations to areas that are currently reached by multimedia marketing programs within New York/New Jersey and Georgia.

*Id.* at 011–12.

One objective of this long-term plan was to rehabilitate the mortgage origination capacity of AMS. When Anchor acquired AMS in the Suburban transaction, Anchor's officers were concerned that AMS was a wounded subsidiary whose production capacity had all but collapsed prior to the acquisition. As Anchor's senior vice president John Brull noted, AMS's "prime business was originating whole loans. Unfortunately, before Anchor acquired it, I think it was in limbo for a year and a half or so when the regulators had taken over [Suburban Savings Bank]. And many, if not all, of the originators [that comprised AMS's staff] had left and the

branches were kind of left vacant. And [AMS] was not originating much." Tr. at 2304. As part of AMS's rejuvenation, Anchor had to rehire key employees and essentially rebuild the company. *Id.* at 2304–05. While Suburban Coastal had primarily been a retail originator of mortgages, Anchor repositioned AMS to acquire mortgages through both retail and wholesale originations. To the latter end, Anchor "attempted to build a correspondent network" as a "cheaper way of securing loans" for AMS's operations. *Id.* at 2307.

While an Anchor senior official testified that the bank was "never . . . fully successful in restarting AMS to the engine it was" before Suburban Savings Bank had deteriorated, and AMS did not produce the levels of loans or originations that Anchor expected, *id.* at 2336, Anchor's mortgage-banking activities increased markedly in 1986 and 1987. *See* PX 7 at 007; PX 16 at 006. In 1986, AMS "significantly expanded its mortgage banking activities," closing $592 million in mortgage loans. PX 7 at 007. In 1987, Anchor as a whole increased its loan originations by 35 percent ($308 million). PX 16 at 6.

In April 1987, Anchor converted to a federally-chartered stock savings bank and issued shares of stock in a public offering. *See* PX 34 at 15526 (Offering Circular). Anchor's offering circular hailed AMS as "Anchor's primary source for portfolio origination of . . . real estate related . . . loans outside of the market areas served by the Savings Bank's branch network and for the origination of 30–year, fixed-rate mortgage loans for sale in the secondary market." *Id.* at 15528. It stressed the value of AMS in Anchor's plan to develop "sources of income less sensitive to fluctuations in interest rates" through AMS's "mortgage banking operations," including "the origination of residential mortgage and consumer loans for sale in the secondary market and to the Savings Bank and the servicing of such mortgage loans for the Savings Bank and other purchasers." *Id.*

Furthermore, the offering circular stressed Anchor's "progress in reducing its sensitivity to interest rate fluctuations by shifting the emphasis of its loan portfolio from 30–year, fixed-rate mortgage loans to adjustable-rate mortgage loans." *Id.* Moreover, Anchor became an active purchaser of "high coupon" mortgage-backed securities that had short-term investment expectations, as part of its ongoing effort to reduce the bank's "one-year gap," or the "difference between interest-earning assets and interest-bearing liabilities repricing [*i.e.,* maturing] within one year." *Id.* By becoming more heavily invested in shorter-term investments with greater liquidity, Anchor hoped to become less vulnerable to the perils of the traditional thrift business model of lending long and borrowing short. In part, these efforts contributed to Anchor posting a net profit of $41.2 million in 1986.

### I. Anchor Acquires Residential Funding Corporation

On June 20, 1988, Anchor strengthened its position in the mortgage-banking industry by acquiring RFC from Salomon Brothers for $47 million. *See* Tr. at 1287–88; PX 531. Like AMS, RFC specialized in acquiring whole mortgage loans and reselling them in the secondary mortgage market. Unlike AMS, however, RFC served a niche market in which AMS did not routinely operate.

In the parlance of the mortgage-banking industry, RFC was known as a "conduit." It specialized in wholesale originations of jumbo mortgages for re-sale into the secondary mortgage market as private-label mortgage-backed securities. As a wholesale originator, RFC did not have a retail presence and, therefore, did not originate mortgages directly to homebuyers; instead, it purchased whole loans through an established network of nearly 400 retail originators that were affiliated with RFC (by contrast, AMS relied primarily on its 50 or 60 retail origination loan offices). *See* Tr. at 2706 (Test. of George Schneider). From Anchor's perspective, RFC's business model for originating loans was superior to AMS's because there was far less overhead involved in the wholesale operation. In a period of rising interest rates when mortgage origination production typically declined, RFC did not have to weather the risks and fixed-costs associated

with maintaining "brick-and-mortar" facilities during the lean times. *Id.* at 2707.

RFC's business dealt primarily with non-conforming loans that could not be packaged into government-backed MBS; for the most part, RFC's mortgages were non-conforming because the size of the loans exceeded conforming loan limits and, therefore, could not be part of a government-backed MBS. Essentially, RFC was "a private sector version of Fannie Mae or Freddie Mac" that "was focused on providing a secondary market for non-conforming mortgages." Tr. at 1148–49 (Test. of Mark Korell, CEO of RFC). RFC assembled several pools of mortgages that would each contain an homogenous collection of mortgages, such as a pool of 15–year fixed rate mortgages or a pool of 30–year fixed rate mortgages. *Id.* at 1153. Once a pool reached a critical mass—anywhere from $75 to $200 million in mortgages—RFC would securitize that homogenous pool and place the securities with investors. *Id.*

RFC's profits derived from two primary sources. The first was through gains-on-sale, or trading income, of the securities. The second came through fees charged for providing commitments to purchase mortgages from retail originators, and for performing "master servicing" of the securities that RFC sold. Compared to its other sources of revenue, RFC's gain-on-sale (or trading) income was relatively minor. *Id.* at 1205–06. When RFC sold a pool of securities, it would typically try to generate between one-quarter and one-half of one percent of the par value of the underlying mortgages as trading income by marking up the price of the securities. *Id.* The bulk of RFC's income was through fees. First, RFC charged its network of retail originators a fee for RFC's commitment to purchase mortgages that met RFC's underwriting criteria. *Id.* at 1156 ("There were advantages to the [retail originator] to know that there was an outlet, that they made a loan ... and they knew for 90 days, they could sell that loan to RFC, oftentimes at a price that was fixed. So they paid fees for that right."). Second, RFC charged a fee for performing the master servicing of its securities. As a master ser-

vicer, RFC aggregated mortgage payments from the primary mortgage servicers for all of the mortgages in an individual pool and then distribute the payments on a *pro rata* basis to the owners of the securities. In addition to the master servicing fee income, RFC was able to generate some investment income, as well, by taking advantage of the "float" between receipt of payments and distribution to investors. *Id.* at 1156–67. Finally, Anchor earned interest income on short-term loans it made directly to RFC to finance RFC's mortgage warehouse. *See, e.g.,* Tr. at 2337 (Test. of John Brull) ("We also expanded our balance sheet by providing them with the warehouse lines of half billion to a billion [dollars] from time to time.").

RFC was a big business—an industry leader. In the first quarter of 1988, for instance, it was the largest issuer of private MBS in the nation, when its $475 million in securities issuances comprised nearly 14% of the entire market. *See* PX 592 at 1352; Tr. at 1183–85. Each year, RFC issued nearly $2 billion in MBS. *See, e.g.,* PX 592 at 1335. By 1989, it serviced more than $7 billion in MBS, with a growing servicing volume. *Id.*

From Anchor's perspective, the RFC acquisition helped fill several needs and strengthened the Anchor franchise. The primary benefit Anchor expected was an increase in fee income that would enable the thrift to handle a rising interest rate environment which could limit or eliminate Anchor's other interest-sensitive income. *See* Tr. at 160–61 (Test. of James Large). In the years leading up to its RFC acquisition, Anchor had proven quite adept at squeezing the most profit out of mortgage servicing opportunities. Mortgage servicing, in which Anchor became heavily involved after its AMS acquisition in 1983, is a volume business. *See* Tr. at 2325 (Test. of John Brull). Simply put, the overhead and expenses required to service mortgage payments is relatively static whether a mortgage banker services $100 million in mortgages or $1 billion in mortgages. To this end, Anchor opened a large facility in Albion, northern New York, specifically to handle its mortgage servicing. *Id.* at 2326; PX 989 at 28 (Depo. of Donald

Thomas). The region had an educated and skilled workforce, yet operational costs remained low. Tr. at 2325 (Test. of John Brull). As a result, Anchor could service mortgages at a higher profit margin than other industry competitors. RFC, with its multibillion dollar servicing portfolio, fit Anchor perfectly, and allowed Anchor to apply its considerable organizational talents in servicing to benefit RFC.

RFC also supported Anchor in its operations. Tr. at 1167 (Test. of Mark Korell); Tr. at 2330–31 (Test. of John Brull). By 1988, Anchor was actively engaged in "swapping" long-term, fixed-rate mortgages out of its portfolio, preferring instead to hold either MBS or ARM products. RFC served this acute need well. First, RFC specialized in swapping fixed-rate mortgages for MBS, so it could help Anchor convert its existing portfolio of mortgages into fungible, more liquid MBS. Anchor's 1990 Annual Report indicated that Anchor had swapped nearly $1 billion in outstanding loans with investment-grade MBS. *See* PX 19 at 4. Second, prior to joining the Anchor franchise, RFC began to acquire ARM loans from its correspondents, but it did not at that time offer a MBS product that featured ARMs. As a consequence, RFC had some trouble locating buyers in the secondary market that were willing to purchase whole ARMs. *See* Tr. at 2330–31 (Test. of John Brull). In Anchor, RFC found a ready and willing buyer that had a near-insatiable appetite for these products, and Anchor used RFC to fill its portfolio with the very best ARMs that RFC originated—a strategy that made Anchor less susceptible to rising interest rates. *See, e.g.,* PX 19 at 4 (1990 Annual Report) (noting that Anchor acquired $1.6 billion in adjustable rate MBS prior to December, 1989); Tr. at 1360 (Test. of Mark Korell) (noting that under Anchor, RFC "had a billion dollars of loans coming in every quarter" and Anchor could "cherry pick the mortgages" it wanted to hold in its own portfolio, because it could look over RFC's warehouse and "say we want that, that, that, [and] that.").

Operating a mortgage conduit like RFC was not without its risks. As RFC was aggregating individual pools of mortgages to support an issuance of MBS, RFC was required to hold up to several hundred million dollars of mortgages in its "warehouse." *See* Tr. at 1201. During that time, Anchor waited for new mortgages to "season"—that is, to mature beyond the initial monthly payments in order to filter out early delinquencies. It also waited for market-timing purposes, in order to provide the right customer with a pool of the desired mix of securities at the highest available price. During this waiting period, however, RFC was exposed to two risks. First there was the need to finance the "warehouse" of mortgages. From the time it originated mortgages through its network of correspondents until the time it recovered its investment through the sale of an MBS issuance, RFC required between roughly $200 and $400 million in financing.

Perhaps even more onerous, however, was that while mortgages were warehoused RFC had to protect itself against interest-rate increases that would diminish the investment value of the fixed-rate mortgages RFC held. RFC obtained protection through sophisticated hedging techniques that required it to take up positions in capital markets that moved inversely to RFC's mortgage values when interest rates shifted. Proper hedging, then, required intimate and up-to-the-moment familiarity with the composition of RFC's warehouse. Before it was sold to Anchor, RFC had not always succeeded in properly hedging its warehouse. For example, in 1985 and 1986, RFC experienced losses of nearly $80 million, due primarily to large hedging and trading losses. *See, e.g.,* PX 236 at A–23.20 ("RFC incurred a pre-tax loss of $62.4 million in 1986 due to significant hedging and trading losses."). At trial, Mr. Korell attributed these losses in large measure to the fact that until 1987 RFC's hedging function was implemented by Solomon Brothers' New York office, rather than by RFC's office in Minnesota. *See id.* After those losses, however, Mr. Korell testified that RFC's hedging function was moved "in house" and became more sophisticated, and that afterwards RFC did not experience hedging problems like those that led to the earlier losses. Though the risk of trading losses remained, RFC managed that risk well

under Anchor's ownership. Tr. at 1159 (Test. of Mark Korell).

Indeed, under Anchor's flag, RFC provided strong profits and a healthy return on Anchor's investment. In its first year under Anchor, RFC generated over $10.5 million in net profit on $72.4 million revenue, exceeding profit expectations by more than 20%. *See* PX 826 at 415 (RFC Audited Financial Statement for FY 1989); Tr. at 1230–31. During the first seven months of the next fiscal year RFC posted a $7.8 million net profit, which would have translated to annual profits of between $10 and $13 million had Anchor not sold RFC. *See* DX 400 at 28; PX 617 at 34; PX 851 at 3.

Anchor's management was impressed with RFC's performance and viewed the subsidiary as a reliable growth engine, whose profits would support Anchor's bottom line and whose business would strengthen Anchor's core operations. Anchor realized that RFC's steady stream of servicing income was a reliable means of generating non-interest income, in keeping with the thrift's long-term plan to diversify its business model. *See* PX 542 (Jan. 19, 1989 press release) (noting RFC's quarterly performance helped offset the erosion of interest rate income). RFC also had an immediate impact on Anchor's loan production, nearly doubling Anchor's loan volume. *Id.* at 991 (noting Anchor's "total loan production for the quarter amounted to $882 million, up significantly from the $414 million produced in the second quarter of the previous year"); Tr. at 2342 (Test. of John Brull) (confirming that RFC was the primary impetus for Anchor's portfolio development). In all, RFC was a valuable asset that supported Anchor's objectives from both a profit and an operational perspective.

RFC's business plan, dated "May, 1989," entitled "Future Strategic Opportunities and Financial Development," succinctly shows the direction in which Anchor intended to take RFC. PX 791. While RFC's activities were to continue to focus on residential mortgages,

Anchor clearly intended to expand RFC into other financial areas such as securitizing co-ops, commercial mortgages and consumer debt. Moreover, this expansion was planned into areas other than asset securitization, thereby diversifying risk while adding new revenue opportunities. These areas included "real estate finance, warehouse financing, primary servicing activities, equity investment with selected customers and new capital markets ventures like securities trading and REIT development." PX 791 at 1, 16–17. *See also* Tr. at 2331 (Test. of John Brull). It is critical to note that it was not until later, when RFC was owned by GMAC, that RFC implemented much of its expansion pursuant to this business plan.

## J. The Arrival of James Large As CEO and His Vision of a More Efficient Bank

When Anchor converted from a mutual savings bank to a publicly-owned stock institution on April 1, 1987, its initial public offering shares sold out at $11.50 per share. From 1986–88, the bank posted annual profits. Nevertheless, after the October 19,1987 stock market crash, also known as "Black Monday," Anchor's stock price tumbled to around $4.50 per share. Tr. at 2320 (Test. of John Brull). As noted above, during this time Anchor's management began to appreciate that the franchise had become somewhat bloated with high operating expenses, high staffing levels, and operational inefficiencies. The bank's profits from 1986–88 were generated primarily through one-time gains on the sale of profitable assets and were not sustainable.[23] *See* Tr. at 489, 492 (Test. of James Large). In response, Anchor's management endeavored to refocus the organization's business model and develop an operating plan to guide the new, larger bank. Anchor also began the cost-cutting initiative in 1987 with the help of the Peat Marwick auditing firm.

---

**23.** Not, however, that Anchor's practice of selling assets during this time period was a poor business practice. At trial, Mr. Vigna (Anchor's chief regulator), noted that interest rates increased dramatically during 1987–88. In such an environment, Mr. Vigna conceded that it would be a good management strategy to sell assets in such an environment because the sale proceeds could then be reinvested in current higher-yielding investments. *See* Tr. at 759–62.

In 1989, after steering Anchor for nearly 20 years, Mr. Thomas retired. He was succeeded as CEO by James Large, a banking industry veteran widely regarded for his experience guiding wayward thrifts back towards sound practices and profitability. Mr. Large's previous banking experience involved heading up banks or divisions of banks that were beset with loan or balance sheet problems or high expenses. *See* Tr. at 116 (Everett Trust Co.), 117–19 (Central National Bank in Cleveland), 119–20 (First National Bank of Allentown), 121–24 (First Interstate Bank Corp.). He was the consummate industry "turn-around" expert. *Id.* at 123 ("I was beginning to develop a reputation [with the bank regulators] as somebody that knew how to manage banks that had difficulties. . . ."). Anchor's chief regulator Angelo Vigna concurred, noting that his initial impression of Mr. Large "was very positive." Tr. at 776. Mr. Vigna thought that Mr. Large had an "exceptional" track record and "over time, [Mr. Vigna] grew to have a great deal of respect and admiration for [Mr. Large's] skills as a banker." *Id.* at 777. Mr. Large would prove himself to be an ideal leader to guide Anchor through the storm that was about to engulf the institution.

At trial, Mr. Large testified about what he perceived to be both strengths and weaknesses of Anchor when he arrived in March, 1989. He began by describing what he found attractive about Anchor—a large, $10 billion savings bank in New York that had a strong reputation in the community and among its regulators. Tr. at 125–26. Mr. Large was impressed with the bank's "very good branch structure" and its "good people," all of which contributed to "a solid core operation." *Id.* at 126.

Nevertheless, Mr. Large was not blind to what he perceived to be "some obvious problems." *Id.* First, he noted that Anchor's "expenses were startlingly high," but attributed those high expenses in large measure to the fact that Anchor had absorbed several inefficient, high-expense institutions through its FSLIC-sponsored supervisory transactions and that Anchor had the unique and "rather large" annual amortization expense for supervisory goodwill. *Id.* at 126–27, 133.

Second, Anchor had what Mr. Large perceived to be a problem with its asset structure. *Id.* at 127. The interest rate yields on its earning assets were "lower than one would reasonably expect," and Anchor seemed to lack the necessary volume of assets to be profitable. *Id.* Mr. Large noted that typically a bank "only becomes seriously profitable when the loan to deposit ratio is such that . . . there would be almost as many loans in the bank as . . . deposits." *Id.* at 128–29. Upon Mr. Large's arrival, however, Anchor had only "half the number of loans that any other institution of [its] size would have." *Id.* at 129. This was due, in part, to the supervisory mergers, which netted Anchor far more deposits (liabilities) than assets (loans), *Id.* at 128, and to Anchor's engaging in a high volume of asset sales between 1986–88.

But despite these flaws, Mr. Large had a vision for the Anchor franchise: "It [had] a unique foundation which, if properly managed, could be built into . . . an East Coast bank with extraordinary potential." *Id.* at 129. This was so because in addition to Anchor's "extraordinary core banking capability of the greater New York area," Mr. Large thought that Anchor had "two absolutely unusual additional attributes" in RFC and Anchor's multi-state branch network. Mr. Large thought that RFC's profit potential was of unique value to Anchor, but perhaps more important was RFC's ability to generate loan volume to bulk-up Anchor's portfolio:

> [RFC's] extraordinary value to Anchor immediately, and we would have expected over the long term, was that it would provide a flow of mortgages that we very badly needed to set Anchor itself right. . . . [C]orrecting that loan problem was a matter of the greatest urgency, and the way to do it was Residential Funding Corporation with the volume that they could generate.

*Id.* at 128–29. As for the multi-state branch franchise, Mr. Large noted that no other savings bank or savings and loan had anything like Anchor's branch franchise, and he saw that as potential for building a large bank reaching the entire East Coast. *Id.* at 129.

Given Mr. Large's past experiences, and given the core strengths that he identified in Anchor, Mr. Large firmly believed that the bank's "troubles" were readily addressable. *Id.* at 133. When he arrived, Mr. Large embarked on a 90–day review period that he used as a period of discovery, to develop a relationship with Anchor's staff and to identify and develop approaches to deal with the bank's strengths and weaknesses.

During that period, Anchor received from its regulators an examination report following a six-month examination of the bank that culminated in October 1988, the fall before Mr. Large became CEO. *See* PX 236. The report expressed the FHLBB's concern over Anchor's lending practices in certain sectors, particularly its auto, boat, and mobile home lending. Some of these problem areas had led to losses. Moreover, the report expressed concern over the "trend and stability" of Anchor's operations and profits. *Id.* at 49. The report noted that the entirety of Anchor's net profits in 1987–88 was driven by the sale of assets, primarily high-yielding MB S (total sales approached $1 billion). *Id.* at 27, 49. Without those sales, Anchor would have posted net losses for the period. The implication was that profit-generation like this was not sustainable over long periods of time. Anchor's high operating expenses were also cited as a problem, with specific reference to the high amortization cost of Anchor's then-$586 million in supervisory goodwill. *Id.* at 49.

At trial, Mr. Large conceded that a "casual" reading of the examination report would lead one to believe that Anchor was "in serious trouble." Tr. at 142. From Mr. Large's vantage point, however, the report was welcome relief because it confirmed his initial assessment of the bank's problems and reassured him that he had not overlooked any of those problems. *Id.* Moreover, the problems cited in the report "while potentially serious if not addressed, in fact were addressable, and to some significant degree had already been addressed" during the six months since the examination had concluded, according to Mr. Large. *Id.* Some issues, like Anchor's high operating expenses, had been addressed by the Peat Marwick study and Anchor had

already begun to effect positive changes before the FHLBB's examination report was released.

By the time that Mr. Large's 90–day review of Anchor concluded, however, the imminent passage of FIRREA loomed as a problem that required Anchor's immediate attention. In July 1989, though, it was unclear to Anchor just how severely FIRREA might impact Anchor's operational capacity because the legislation had not yet been enacted (nor had its implementing regulations been issues). As Mr. Large testified at trial, by July 1989 it appeared that FIRREA would cause Anchor to be "seriously undercapitalized" and that such institutions risked regulatory closure unless they could demonstrate competent operations with a credible plan to regain capital compliance. Tr. at 168–69. Even then, however, Anchor hoped that it might obtain regulatory forebearances and be given time to achieve capital compliance, in part because it had cooperated with the FHLBB to take on the failing thrifts earlier in the decade, and because Anchor historically had proven itself to be a conservative institution with strong management. Tr. at 205, 230 (Test. of James Large); Tr. at 683–84 (Test. of Angelo Vigna). (Q: "And did you believe [Anchor] to be well managed when it came into the FSLIC system?" A: "It was well managed, yes." Q: "And did that continue throughout the 1980s?" A: "Yes, for the most part . . . my recollection is that they were generally well managed." Q: "And was it an institution that had been run conservatively before it came into the FSLIC system?" A: "Yes."). Moreover, at that time it was not at all clear just how severely FIRREA might impact Anchor's capital compliance. *See* Tr. at 169 (Test. of James Large) (noting that Anchor had no idea that the $157 million of cumulative preferred stock held by the FDIC would *not* count towards its post-FIRREA capital requirement).

It was against this backdrop of operational inefficiencies and looming capital problems, then, that Mr. Large completed his 90–day review and made an initial presentation to Anchor's board of directors outlining his findings and his proposals for constructive

change within the franchise. *See* PX 572 (July 1989 Progress Update to Anchor Board of Directors). As a starting point, Mr. Large noted that during the five prior years, Anchor's financial performance from continuing operations—what he called "core earnings" and which excluded gains from asset sales and other extraordinary income—had led to substantial losses in excess of $200 million. *Id.* at 3, 6; Tr. at 170–71. Nearly three quarters of those "core losses," however, were attributable to the amortization expense of Anchor's supervisory goodwill. PX 572 at 6; Tr. at 171–72.

The large amortization expenses did not startle Mr. Large, though, because the short-term losses were all part of the strategy agreed upon with the government, in which Anchor's performance would lag in the years following the supervisory transactions as Anchor worked to breathe life back in to the failing thrifts it acquired and sold assets (leading to "non-core earnings") during the interim to stay afloat. *See* Tr. at 171–73. As for the remaining factors contributing to these "core losses," such as Anchor's high operating expenses (excluding amortization costs) and its balance sheet deficiencies, Mr. Large was convinced that they "were all matters with which I had had previous experience [and] ... these matters could be addressed here at Anchor." Tr. at 171.

In turn, Anchor effected cost savings through an aggressive paring of the number of the bank's employees. Consistent with the staff reduction program suggested in 1987–88 by Peat Marwick, Anchor had by achieved significant staff reductions and cost savings by 1988. By July of that year, Anchor had reduced its staff from 3500 to 3126 personnel, despite adding RFC's 144 employees during the same period. PX 534 at 3; Tr. at 2335–36 (Test. of John Brull). By the end of 1988, Anchor trimmed its rolls by another 349 employees (11%), bringing its total employment down to 2777 employees. James Large continued these cost-cutting programs and proposed an organizational restructuring to the board that would further reduce employment costs. *See* PX 572 at 51–54, 64; Tr. at 189. In just the first quarter in which Mr. Large's plans were implement-

ed (the first quarter of FY1990 ending in September 1989), Anchor succeeded in eliminating more than 300 employment positions, reducing staffing levels to 2256—down more than 30% from Anchor's high just two years earlier. DX 353 at 4. These cuts made Anchor a leaner institution with lower operating expenses. Over the first quarter of FY1990 alone, Anchor's expenses declined by nearly $4 million over the same quarter a year earlier, which the bank attributed primarily to the staff cuts. *Id.* Mr. Large projected annual expense savings in excess of $10 million per year from the staffing changes alone. PX 572 at 65.

Operating expenses were just one side of Anchor's earnings problems, though. Mr. Large also set out to restructure the balance sheet so that Anchor would continue to improve its one-year gap and liquidity levels, and add volume to generate additional income. *Id.* As he noted at trial:

> With the help of Residential Funding Corporation and also, of course, from other sources, we were attempting to acquire more adjustable-rate assets, and we were selling fixed-rate assets, in some cases fixed-rate mortgages, in some cases by securitizing and selling them. The ... whole intent was to make our asset side of our balance sheet move more in concert with the liabilities side or the deposit side of our balance sheet in changing rate environments.

Tr. at 234–35. The influx of mortgage products to Anchor's portfolio through RFC was "absolutely essential" to Anchor's "critical need" to improve its loan-to-deposit ratio and put more interest earning assets onto the balance sheet. Tr. at 178–79. Here, too, Anchor recognized immediate successes in the first quarter following Mr. Large's arrival. During that time Anchor's total loan production increased nearly *fifty percent* over the same period in 1988, from $641 million to $947 million. DX 353 at 4 (Oct. 26, 1989 Press Release). Anchor attributed this increase in production "to the success of Residential Funding's mortgage purchase programs." *Id.* The balance sheet restructuring program also continued to improve Anchor's one-year negative gap (the ratio of

assets re-pricing within one year, and a measurement of the bank's sensitivity to interest rate swings). *Id.* at 2. As Mr. Large had projected in his status report to the board of directors, *see* PX 572 at 29, RFC was the driving force behind the balance sheet restructuring efforts almost by default, because "the banks that [Anchor] acquired [in the supervisory mergers] had virtually no mortgage origination capabilities" and the rest of the bank's retail origination capability had been allowed to "atrophy" after RFC was acquired. Tr. at 179.

Mr. Large also encouraged Anchor to part with some of its branch banks that were acquired through the supervisory acquisitions in Georgia and Florida. *See* PX 572 at 45. For strategic reasons, Mr. Large advocated the sale of all branches in northeast Florida, and the Georgia branches that were located outside the Atlanta area. *See id.* at 47–48. At trial, Mr. Large explained his process of "gardening" through an acquired bank's branch system and eliminating those branches that did not match the bank's strategic ambitions:

> If you go into a new bank and buy its branch structure, the first thing you do is go through those branches and see which ones, by your view of what's appropriate and your view of profitability and that sort of thing, simply don't fit. And as one of my associates used to say, do a little gardening and close an individual branch for those characteristics.

Tr. at 181. Mr. Large also noted that Anchor styled itself primarily as an "urban" and "suburban" bank that was "not very good at rural banking" because it had neither the reputation nor the skills to "work in a country way." Tr. at 182. Due to these factors, the sales in rural Georgia and Florida made strategic sense because they would enable Anchor to save costs associated with those branches and focus more on the franchise's core urban areas.

The "gardening" that Anchor performed was particularly effective because in making its inroads to Atlanta and Florida through the supervisory mergers in 1982 and 1985, its regulators had presented Anchor with branch opportunities that did not exactly match the bank's long-term business objectives. For instance, its entry into Florida was enabled through the Sun acquisition in northern Florida, even though Anchor's long-term goal was to open branches along the southern coastal region of Florida (which it did). Similarly, Anchor's goal in Georgia was to penetrate the Atlanta market. Its entree into the state, however, was enabled by the simultaneous acquisitions of both the urban Peachtree County branches *and* the rural Crisp County branches. Tr. at 1952 (Test. of Daniel Dooley); Tr. at 3990–91 (Test. of W. Barefoot Bankhead); PX 399; PX 404. By 1989, the time had come for Anchor to sort through the branch networks in those two states and, as Mr. Large termed it, "garden."

The most pressing issue that Mr. Large addressed in his status report to the board of directors, though, was the imminent effect of the FIRREA legislation then winding its way through Congress. The legislation's new capital regulations threatened to sweep across the thrift industry like a white squall, and Mr. Large urged the board to act quickly to steel the bank to avoid regulatory closure. While Anchor remained comfortably well-capitalized in the summer of 1989 (indeed, Anchor had a capital cushion of $186 million due to its large supervisory goodwill balance), Mr. Large's July status report warned that "all current versions of the thrift bill would find Anchor seriously undercapitalized." PX 572 at 4. It was not clear to Anchor at the time just how much of its then-capital might be disallowed by the eventual legislation, but Mr. Large speculated in his report that Anchor's capital deficiency could reach $160 to $225 million. *Id.* at 17, 66.

Anchor's management hoped that the bank might obtain temporary forbearance from its regulators if it could demonstrate current earnings, a safe and sound operational capacity, and an ability to correct the capital shortfall in a reasonable period of time. *Id.* at 17. Nonetheless, Mr. Large emphasized that drastic structural change to Anchor would be required to satisfy the new capital requirements. He informed the board that: "It is, however, abundantly clear that the *capital goals cannot be met without extensive asset sales.* This requirement drives much of the

subsequent Strategic Planning." *Id.* (emphasis original).

As a consequence of Anchor's perceived need to correct the expected capital deficiency, Mr. Large advocated asset sales to help build capital. *Id.* at 18, 66–67 ("It is clear that we cannot achieve even a small portion of [capital enhancement] without asset sales."). In part, the branch sales that he urged were intended to help fill the capital void. *Id.* Grasping the potential severity of the FIRREA legislation, Mr. Large implored the board to focus on "short term objectives" that he equated with "survival requirements." *Id.* at 20. Maintaining the safety and soundness of the bank, reducing core losses, and achieving capital compliance with the pending regulations were to be given absolute priority over all of Anchor's other business concerns. *Id.* ("Where necessary, subordinate all other activities to these strategies until success is achieved."); *see also* Tr. at 176 (Test. of James Large) ("[I]f it didn't have to do with coming into compliance with capital, we didn't want to talk about it. . . . If it didn't solve the capital problem and didn't help—if it didn't move towards solving the capital problem within the short-term time horizon, no matter how good the idea was, we couldn't do it."). Mr. Large's report conceded that some of the projected asset sales would harm the bank's long-term earnings capability, including the projected sale of nearly $1 billion in MBS, other whole mortgages, and mortgage servicing. PX 572 at 66. Moreover, his report warned that initial capital-raising plans and asset sales might not be sufficient to bring Anchor into capital compliance. As a result, Mr. Large indicated that "[b]ack-up plans are being developed for the sale of further assets such as Northern New York [branches], larger branches in our core areas, all of the remainder of the mortgage-banking servicing, RFC, etc. in the event these steps should become necessary." *Id.* at 67.

At trial, Mr. Large explained the exigencies that factored into his status report recommendations to the board in July 1989. "In Anchor's case, the apparent potential loss of this much capital literally put us in a deficit capital position and so far below regulatory requirements that the risk of closure appeared to be acute unless we were given some sort of relief. . . . [W]e were on the verge of . . . immediate shutdown." Tr. at 138.

Although Anchor had bargained for a period of 25–40 years in which to correct the balance sheet deficiencies of the acquired failing institutions it picked up in the early 1980s (the long-term amortization period for the supervisory goodwill), the pending FIRREA legislation would severely curtail the period in which corrective action could be achieved, "so a slower and more orderly longterm solution did not appear to be viable" at that time. Tr. at 173.

## K. FIRREA and Its Sudden Impact on Anchor's Capital Compliance and Operations

FIRREA was signed into law on August 9, 1989. On the eve of its passage, Anchor had $9 billion in assets, 126 branch offices in New York, New Jersey, Atlanta and Florida, nearly $6 billion in mortgage servicing volume through AMS, and about $7.5 billion (and growing) in master servicing through RFC. *See* Def.'s Resp. to PPFUF at 45–46. Due in large part to the supervisory goodwill that it carried, Anchor comfortably met its regulatory capital requirements at that time. As of September 1989, Anchor reported a regulatory capital *surplus* of $186 million—meaning that under the prior-existing FHLBB regulatory capital guidelines, Anchor could potentially support an additional $3 billion in assets on the bank's balance sheet without raising a single additional dollar of capital. *See* Tr. at 773 (Test. of Angelo Vigna); PX 57 at 5 (Anchor 8–K report).

Among other changes, FIRREA established three new, more stringent measures of regulatory capital for thrifts, including core capital, tangible capital, and risk-based capital requirements. Core capital compliance required a thrift to have capital equal to at least 3% of its adjusted total assets. Core capital could be composed of common stockholder equity, non-cumulative perpetual preferred stock, and qualifying supervisory goodwill, but in defining "qualifying supervisory goodwill," FIRREA severely circum-

42

scribed the amount of supervisory goodwill that could count toward the core capital requirement, and phased out those limits over a five-year period. For a thrift carrying as much supervisory goodwill as Anchor, FIRREA virtually eliminated supervisory goodwill as a component of core capital. Furthermore, tangible capital calculations excluded supervisory goodwill completely. Similarly—and from Anchor's point of view, surprisingly—the $157 million in cumulative preferred stock held by the FSLIC was also disallowed as capital.

It was the disallowance of substantially all of Anchor's supervisory goodwill and the cumulative preferred stock as regulatory capital assets that this court previously concluded was a breach of contract by the government. *Winstar*, 518 U.S. at 864–68, 116 S.Ct. 2432. In short, the court concluded that the government had contractually agreed to allow Anchor to amortize the goodwill over the 25–40 year period negotiated in each of Anchor's supervisory acquisitions, and count remaining goodwill as a regulatory capital asset for the life of that amortization. *Id.* at 857, 116 S.Ct. 2432. In creating legislation that prohibited such regulatory treatment of the supervisory goodwill, the government breached its contractual obligation to otherwise allow supervisory goodwill to be counted in full as part of Anchor's capital requirement. *Id.* at 909–10, 116 S.Ct. 2432. *See Wells Fargo*, 88 F.3d at 1022–23 ("if the profits are such as would have accrued and grown *out of the contract itself*, as the direct and immediate result of its fulfillment, then they would for a just and proper item of damages ...") (emphasis added); *see also California Fed. Bank, FSB*, 245 F.3d at 1349 ("profits on the use of the subject of the contract itself, here the supervisory goodwill as regulatory capital, are recoverable as damages.")

FIRREA's impact on Anchor was immediate. While Anchor had long held out hope that the final OTS implementing regulations would include grandfathering provisions or exceptions that would permit a thrift like Anchor to continue counting its supervisory goodwill as regulatory capital, it received no such courtesy. Instead, when the imple-

menting regulations were published on October 27, 1989, Anchor found itself prohibitively short of capital. Immediately upon the effective date of the regulations (Dec. 7, 1989), Anchor had a *negative* tangible capital balance of $205 million despite a tangible capital requirement of $124 million—a tangible capital deficit of $329 million. PX 57 at 6 (Anchor 8–K report). Anchor's core capital balance was a *negative* $81 million, despite a core capital requirement of $252—a core capital deficit of $333 million. *Id.* at 4–5.

These regulatory capital deficits were the immediate result of the government's breach. If Anchor had been allowed to continue counting supervisory goodwill as a component of its regulatory capital requirement, it would have continued to be a well-capitalized institution (for regulatory accounting purposes) after FIRREA, notwithstanding other more exacting (and non-breaching) provisions of the legislation, some of which are discussed below. *See, e.g.,* DX 1174 Ex. D at 1 (Expert Report of Defendant's Expert W. Barefoot Bankhead) (noting that Anchor would have exceeded all core and tangible capital requirements in December 1990 if Anchor had continued to count supervisory goodwill and the preferred stock as capital).

After FIRREA, the consequences for a thrift that fell out of capital compliance were severe. Anchor was required to submit a "capital plan" that would outline to OTS how Anchor planned to attain the required levels of regulatory capital within a very short time—five years or less. *Id.;* Tr. at 801–02 (Test. of Angelo Vigna); PX 325 at 3–4; Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, § 301,-103, Stat. 183 (1989); Department of Treasury, Office of Thrift Supervision, 12 C.F.R. § 567 (1989). Failure to adequately demonstrate to the regulators that Anchor could comply with the heightened capital requirements, or the inability to accomplish the benchmarks identified in the plan in a timely manner, exposed Anchor to the acute risk of regulatory closure by OTS and subsequent liquidation by the Resolution Trust Corporation. PX 57 at 13–14. In addition to the threat of imminent closure, as a capital deficient institution, Anchor was subject to regu-

latory sanctions that significantly restricted its operations. PX 57 at 13. The OTS restricted Anchor's asset growth, prohibited dividend payments, and limited compensation. *Id.* at 14; DX 403. Anchor was prohibited from extending loans to a single borrower in aggregate excess of $500,000. PX 57 at 17.

The threat to Anchor's future as a consequence of falling so severely out of capital compliance cannot be overstated. Unless Anchor could return to capital compliance—by either raising capital or shedding assets—it would be seized and liquidated by federal regulators. Tr. at 282–83 (Test. of James Large). The opportunities to raise capital, however, were few and far between. Since Anchor was undercapitalized after FIRREA, it was virtually impossible for Anchor to raise capital in the form of private equity. *See, e.g.,* Tr. at 778. As Anchor's own regulator testified, it wasn't until the mid–1990s that thrifts, in general, had any kind of success in raising capital in the market. *Id.* at 779. Anchor could have raised capital by retaining earnings, but that was a long-term strategy that could not satisfy OTS's requirement that capital deficiencies be resolved in less than five years. Anchor's franchise simply did not generate enough profit to remedy a capital deficiency of over $300 million in such short order.

Instead, Anchor would be forced to resort to asset sales to help remedy its capital deficiencies. The sale of an asset ideally generated a gain-on-sale that could be contributed to capital. On the other side of the balance sheet, asset sales also reduced the total mix of assets against which Anchor's regulatory capital requirements were measured—fewer assets required less regulatory capital to sustain those assets.

But, as Mr. Large testified, Anchor had to approach asset sales in a discriminating manner. The thrift's capital plan had to demonstrate to the liking of the OTS regulators that the Anchor franchise emerging from the capital plan would be a viable entity capable of continuing business and maintaining capital reserve levels over the long term. *See* Tr. at 280. Anchor could not arbitrarily sell assets that might help the institution tempo-rarily achieve its capital requirements, but leave the bank with no opportunity to survive financially afterwards. *Id.;* Tr. at 782 (Test. of Angelo Vigna). Instead, Anchor was forced to determine what was most valuable to the franchise and slowly whittle away at the rest of the institution until capital compliance could be achieved. Tr. at 280–81.

In the end, Anchor identified its branch operations in the greater New York metropolitan area as the "core" of the institution that management would try to salvage amid the jetsam in its capital plan. The ability to create and hold residential mortgages in the greater New York metropolitan area was where Anchor's roots ran deepest and where the bulk of its banking business was done, and management believed this New York core, above all else, needed to be protected in the capital plan. Tr. at 281. As Mr. Large noted, "basically, the idea was to keep that core as our last inner keep. The outer fortifications of the castle started to crumble, but we retreated to the inner fortifications, and we stopped there and held the line." Tr. at 282.

## L. The Capital Plan and Anchor's Efforts To Stave Off Foreclosure: The Sale of the Branch Network and RFC

On January 8, 1990, Anchor submitted its capital plan to Mr. Vigna, the document that would explain to regulators how Anchor expected to achieve capital compliance within the allowable five year period. PX 620 (cover letter to Mr. Vigna); PX 621 (capital plan). OTS conditionally approved Anchor's plan on April 18, 1990, and authorized Anchor to continue operations, provided that it could achieve the capital plan targets. PX 641.

The plan indicated that the only way Anchor believed it might come into capital compliance was "through the divestiture of various components of its franchise, including major components of its franchise acquired in various supervisory acquisitions." PX 620 at 2. Among other measures, the plan called upon Anchor to sell most of its branch franchise outside the metropolitan New York region and sell RFC. The plan also required Anchor to convert the $157 million preferred

cumulative stock then held by the FDIC into a capital asset, sell mortgage and MBS assets, sell real estate holdings, and close AMS retail mortgage origination offices outside the New York metropolitan area. PX 621 at 18–19, 21–22 (Anchor capital plan).

As an operational principle, the capital plan conceded that Anchor would be forced to maintain "an increasingly risk averse posture" so as to avoid any future losses or charges to earnings that would negatively impact capital. Mr. Large explained at trial that Anchor became "risk averse to an extreme" after FIRREA because the mere threat of losses was unacceptable while the institution was operating in the shadow of a deficit net worth. Tr. at 266. Similarly, given FIRREA's strict and short time period for the correction of Anchor's capital deficiency, Anchor was forced to ignore the long-term benefits of some of its investments, like RFC, in favor of an exclusive short-term focus on capital raising. The institution's entire focus fell upon immediate profits, immediate gains, and immediate contributions to capital. *See, e.g.*, Tr. at 269, 336.

### 1. Sale of Branches in Florida, Atlanta, Southern New Jersey and Northern New York

As part of the geographic repositioning dictated by the capital plan, Anchor sought to divest nearly $2 billion in deposits throughout its Florida, Georgia and southern New Jersey divisions. The plan would eliminate Anchor's presence in Florida and Georgia, and leave it without any of the branches that it acquired in the Sun and Peachtree/Crisp mergers. Anchor was also to abandon its presence in the southern portion of New Jersey, which is more contiguous with Philadelphia area than with the New York metropolitan area. Later, as Anchor continued to focus on its New York core, and after an unexpected increase in capital reserve requirements triggered by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Anchor eventually sold its branch franchise in northern New York as well. Federal Deposit Insurance Corporation Improvement Act, Pub.L. No. 102–242, § 543, 105 Stat. 2236 (1991).

Branch or deposit sales enhanced Anchor's capital position. They reduced operating costs and decreased Anchor's net liabilities. Furthermore, depending on the quality of the deposits or branches that Anchor sold—which included factors such as the size of the branch deposits, the tenure of the deposits, and the potential for deposit growth versus the risk of deposit outflow—Anchor would receive a "premium" for the transaction that would be contributed to capital.[24] *See* Tr. at 3283–84 (Test. of Nevins Baxter).

The capital plan envisioned that Anchor would receive premiums of 4–7% for most of the branches in Florida, Georgia and New Jersey that it would sell. *See* PX 621 at AB 700009–10, 700038–41. Anchor anticipated the branch transactions would contribute nearly $65–70 million to tangible capital in 1990. *Id.* at 700006. In the event that these sales and Anchor's other capital plan measures were inadequate to achieve capital compliance, the capital plan also identified "back-up plans" that called for the sale of nearly $1 billion in additional branch deposits in up-

---

**24.** The mechanics of a branch or deposit "sale" are counterintuitive. The "selling" institution is not selling an asset, but instead a liability. Tr. at 3012–13 (Test. of Nevins Baxter). It is transferring to the "buyer" the obligation to repay deposits. *Id.* As a consequence, in addition to transferring the deposits to the "buyer," the "seller" also transfers cash—enough cash to cover the amount of the deposits. *Id.* The concept of the "premium" involved in a deposit transfer, then, refers to the value that the "buyer" attaches to the deposits. *Id.* If the deposits have substantial value (for example, there may be a large concentration of long-term deposits that bear little risk of flight from the transferee institution, meaning the transferee will have a reliable, long-term use of those deposit dollars), then the transferee may demand something *less* than a dollar-for-dollar cash transfer along with the deposits. *Id.* For example, if the "seller" transfers $100 in deposits to the "buyer," the seller would also have to transfer $100 in cash. However, if the "buyer" attaches a 10% premium to these deposits, the "seller" would only have to transfer $90 in cash along with the $100 in deposits.

From the perspective of the "selling" institution, the above transaction would result in a $10 contribution to capital. The institution would be transferring $100 of liabilities (the deposits), but only $90 of assets (the cash). The net gain, therefore, is a $10 increase in capital (net assets minus net liabilities).

state New York and Anchor's metropolitan core, with a potential capital gain of an additional $50 million. *Id.* at 700027.

Implementing the branch sales program did not go as smoothly as Anchor's capital plan projected. The original capital plan proposals overestimated demand for Anchor's branch franchise. The sales proposed as part of the initial plan took longer than expected, and the premiums that Anchor received were far lower than anticipated. By January 1991, Anchor had succeeded in selling only its Georgia branches, and had realized premiums of only about 2% or $16 million, instead of the $65–$70 million anticipated in the plan. *See* PX 197, Att. A at 2. As a result, Anchor modified its branch sale strategy "to include better performing branches from our core markets in the list of branches being offered for sale." *Id.* at 7.

One of the problems Anchor encountered was the fact that the government, acting through the Resolution Trust Corporation ("RTC"), was actively engaged during this same time period in seizing and liquidating the branches and deposits of other failed thrifts. As a result, the market for branches and deposits in the geographic regions that Anchor was trying to peddle its own branches and deposits was flooded with supply. Tr. at 2970–71, 3092–94 (Test. of Nevins Baxter). The government's own involvement in glutting the market artificially depressed premiums that a thrift like Anchor could receive for its deposits, since any buyer could just as easily go to the RTC and acquire deposits through a government liquidation at cut-rate premiums. *Id.*

By the end of 1991, Anchor had sold or closed all of its branch offices in Georgia and shed all of the Georgia deposits. By contrast, it took nearly five years for Anchor to sell or close its branches in Florida and southern New Jersey, which the capital plan had expected to occur within only a year or two. *See* PX 968. In 1992, Anchor began to cut in to its New York branches, and sold six branches with $250 million in deposits in its "downstate" region. *Id.* In March, 1993 Anchor sold its franchise in western, or "upstate," New York.

## 2. Sale of RFC

The capital plan also called on Anchor to divest RFC, the profitable mortgage-banking subsidiary it had acquired just one year earlier and which had, until that time, performed beyond Anchor's expectations, producing better-than-expected profits and filling up Anchor's balance sheet with adjustable-rate mortgages and liquid MBS. Even though Anchor projected RFC to generate considerable profits from secondary market sales and servicing revenue, selling RFC in the wake of FIRREA made practical sense for Anchor on a number of levels, all of which will be discussed more thoroughly in the analysis discussion below.

RFC's "Strategic Plan" (PX 791, dated May, 1989) demonstrated its value to Anchor in a five-year financial performance projection in part predicated upon offering various new financial products discussed above. *See* PX 791 at 28.

First, from the perspective of Anchor's capital deficiency, RFC represented an asset that could immediately produce a healthy gain-on-sale that would contribute to Anchor's capital. The capital plan anticipated that the sale would produce a $17 million one-time capital gain. *See* PX 621 at 70013. Furthermore, because RFC required such a large inventory of mortgage loans to effectively operate (nearly 10% of Anchor's balance sheet), its sale would lighten Anchor's mix of assets and lower the amount of capital it was required to hold. *See* Tr. at 248–49 (noting that operating RFC required a "significant" level of capital).

There were also operational concerns facing Anchor and RFC after FIRREA. Since Anchor was not able to count its supervisory goodwill as regulatory capital and was therefore a capital deficient institution, it was subject to a $500,000 restriction on the amount of loans it could extend to any one customer. This restriction interfered with RFC's business, nearly 15% of which involved mortgages in excess of the $500,000 limit. Since RFC specialized in securitizing non-conforming mortgages that exceeded the conforming loan limits of the GSEs, all of its

product involved high-value mortgages. RFC often entered into agreements with its correspondent network of retail originators that RFC would take *all* of their non-conforming loan product, including those mortgages in excess of $500,000. For Anchor to restrict the types of loans that RFC could obtain through its network would undermine RFC's competitive advantage in the industry and harm its operations.

RFC also caused Anchor to run afoul of the new risk-based capital guidelines imposed by FIRREA. While these new guidelines themselves were not a breaching provision of FIRREA, Anchor's inability to count supervisory goodwill against its regulatory capital requirement caused Anchor to run a risk-based capital deficiency. Part of Anchor's problem was that RFC had issued many of its MBS using an internal form of credit enhancement that created a multi-class security involving senior and subordinated classes. As discussed earlier in this opinion, because the subordinated security bore a disproportionately high risk of loss relative to the senior security (it was akin to a high risk, or "junk" bond) and because the MBS market itself was rather new and still evolving, there was not much of a secondary market for subordinated MBS in 1989. As a result, RFC held many of these securities in its portfolio instead of selling them on the open market. Prior to FIRREA, these subordinated securities in RFC's portfolio only required Anchor to hold capital based on the face value of the securities themselves. The new risk-based capital requirement, however, required that capital be retained based upon the amount of risk that inhered in an asset. As a result, the subordinated securities no longer required capital as measured by the value of the *security,* but instead required capital as measured by the *amount of the entire pool of mortgages underlying the security.* For Anchor, this was a prohibitive requirement given its breach-induced capital deficiency. After the FIRREA implementing regulations were issued, RFC held about $66 million in subordinated MBS, but under the risk-based capital guidelines they had the relative weight of nearly $1 billion in risk-weighted assets against which Anchor was required to hold capital. *See* DX 358 at 3, 6.

Under this capital demand, it would have been next to impossible for Anchor to continue to operate RFC without its supervisory goodwill and adequate capital.

Because of these operational concerns, immediately after the implementing regulations were issued, Anchor decided that RFC would need to be sold. Mark Korell, RFC's president, advocated a quick transaction so that the effects of Anchor's wounded state would not trickle down to RFC and undermine the subsidiary's operational capacity or value any more than necessary. James Large agreed and, while lamenting the lucrative future servicing revenue that RFC was bound to realize as well as the opportunity to use RFC's wholesale origination capacity to fill Anchor's balance sheet with profitable assets, concurred that the sale of RFC was necessary given Anchor's capital constraints. *See* DX 358 at 1–2.

In March 1990, Anchor sold RFC to General Motors Automotive Corp. ("GMAC") for $64.4 million. The sale resulted in a net $63 million contribution to Anchor's capital. Pl.'s Proposed Findings of Fact and Conclusions of Law at 23.

### 3. Conversion of Anchor's Preferred Stock Held by the FDIC and Other Capital Growth Activities

The $157 million Income Capital Certificate that Anchor granted the FSLIC in conjunction with the Suburban acquisition had since been converted into cumulative preferred stock of like amount. Prior to FIRREA, and consistent with Anchor's contractual agreement with the government, this cumulative preferred stock had counted towards Anchor's capital requirement. Following FIRREA, however, the FSLIC's cumulative preferred stock was excluded from core capital. This was an unexpected capital shortfall that Anchor's management had not foreseen in the months preceding FIRREA's enactment. Part of the capital plan, then, called for Anchor to substitute some other instrument for the FSLIC's cumulative preferred stock that would qualify as capital. Anchor's capital plan projected that this exchange would occur by June 1990.

In practice, however, the conversion was not as easy as Anchor's management had anticipated. The FDIC, now the holder of the FSLIC's cumulative preferred stock, would not agree to the substitution of any other instrument for the stock. Instead, after two years of negotiations, Anchor and the FDIC could agree on only one solution to this problem, in which Anchor would form a holding company that would officially "own" Anchor Savings Bank. The FDIC, in turn, agreed to exchange the $157 cumulative preferred stock and $47.2 million in accumulated unpaid dividends for $71 million of senior notes and 4.75 million warrants to acquire Anchor Bancorp (the new holding company) common stock at $0.01 per share, under the condition that Anchor raise at least $50 million of common shareholder equity by July 1993. The capital of the holding company was "downstreamed" to Anchor Savings Bank in a manner that counted as qualifying capital under FIRREA. At trial, Mr. Large testified that the sole purpose that the holding corporation served was to hold stock in Anchor Savings Bank—that it performed no other operational function other than serving as a mechanism by which the FDIC's interest in Anchor could be counted as part of Anchor's regulatory capital. See Tr. at 352–53; see also PX 240 at 16 (1991 OTS Examination Report) ("The sole reason for the reorganization was to obtain inclusion of the amount of FSLIC preferred stock into regulatory capital.").

The capital plan also contemplated other sources of capital raising. Anchor expected to sell approximately $200 million in whole loans carried on Anchor's balance sheet at below-value that would generate a projected $42 million in capital. PX 621 at 700014. Anchor planned to modify its basic pension plan and effect changes that would produce a capital gain of $2.5 million and annual cost savings of $1.3 million. Id. at 700015. Anchor consolidated the space used for its administrative and operational activities and projected sales or leasing of excess real estate. Id. at 700016. Fifteen AMS branch offices were closed and the office space was either sub-leased or the leases were terminated, as Anchor rolled back the geographic scope of AMS's retail originations to focus on the New York metropolitan market. Id. Anchor also expected to sell nearly $1.5 billion in servicing rights, which the capital plan projected would add nearly $15 million to capital. Id. at 700020.

## M. Anchor Weathers the Squall

To the amazement of its regulators, and unlike so many other thrifts at the time, Anchor survived FIRREA's changes, the government's breach, and the fundamental changes to its business plan that grew out of both. Under Mr. Large's guidance, Anchor put on pause all of its long-term growth plans, sacrificed earning assets and potentially lucrative long-term investments, and redoubled its efforts to achieve heightened capital requirements at a breakneck pace.

Many of the operational improvements that Anchor began to implement before Mr. Large arrived at the bank, and before FIRREA was enacted, thrived. Since one large component of Anchor's capital plan relied on improved cost efficiencies, Anchor continued its cost-cutting programs that had been ongoing for several years. A June 1991 status report to the Anchor board of directors hailed the cost reduction plans a success, as Anchor reduced its full-time equivalent staffing to 1660 employees, down from a high of over 3344. Lower staff levels translated into direct cost savings: general and administrative expenses were down nearly $5 million per quarter over the same period a year earlier—an annualized cost savings of nearly $20 million. PX 679 at 020. By fiscal year 1991, Anchor had reduced its general and administrative expenses to nearly 1.5% of assets, down from 2.16% of total assets in FY1989, and this at a time when Anchor's total assets had declined. Id. Mr. Large testified that the general and administrative expenses expressed as a ratio of the bank's assets was a performance measurement that allowed Anchor to compare its operations with the industry best practices, and that Anchor's improved expense ratio made it among the best institutions in the country in this respect. Tr. at 363–64. Anchor's management intended to achieve future success by maintaining "the lowest cost operation possible," and making that "Anchor's single

most significant objective" in its quest for future profitability. PX 679 at 043.

Anchor continued to narrow its one-year gap, reducing its exposure to rapid interest rate fluctuations. Down from a high of nearly 25%, Anchor reduced its exposure to between 3% and 5% by 1991. *See id.* at 017; Tr. at 359. As a result, Mr. Large testified that Anchor was no longer concerned about the effects of interest rate fluctuations on Anchor's profits that might upset the bank's capital compliance, because over 95% of the bank's assets repriced with the fluctuations. Tr. at 359–60. Anchor also demonstrated a very low tolerance for nonperforming assets. As of 1991, less than 1% of the bank's assets were classified as non-performing, an indication of Anchor's strong performance and tight management and, as Mr. Large noted, "considerable progress." *See* PX 679 at 018; Tr. at 360–62.

Around this time in 1991, Anchor's focus under the capital plan shifted from generating capital and lowering capital requirements through asset sales to driving capital growth through "core earnings." The June 1991 report to the board captured this:

> Capital is king. Achieving regulatory capital targets will take precedent over all other activities. In fiscal 1992 the focus will shift from capital through asset and branch sales to capital accumulation through increased core earnings. Thus, decisions will be made primarily on their ability to enhance short term core earnings without damaging franchise value or future prospects.

PX 679 at 048. Core profits would not, however, come easily to Anchor. The capital plan and Anchor's efforts to develop immediate capital growth left it a battered institution with a large number of MBS relative to whole mortgages and very little capacity for mortgage originations. The relatively high number of MBS in Anchor's portfolio was helpful from a one-year gap point of view, because the MBS were liquid assets, but they also have the disadvantage of bearing lower rates of return than whole mortgages—a yield differential that Mr. Large characterized as "substantial." Tr. at 373–74 (noting that MBS generated a return on investment nearly 40% lower than a whole mortgage). Anchor's management believed that the route back to profitability was to replace the high volume of MBS in the bank's portfolio with whole mortgages. *Id.;* PX 679 at 42.

The problem, however, was that Anchor's origination capacity declined precipitously with the sale of RFC in 1990. RFC had been so good at originating mortgages and was so efficient at obtaining high quality mortgages at low cost that Anchor had allowed it to become the institution's primary means of developing the bank's mortgage portfolio. In the first year following the sale of RFC, Anchor's loan originations declined by more than $810 million, or 85.6%. PX 74 at 16. During that first year, between sales and run-off, Anchor's portfolio of whole mortgages shrank from $3.2 billion in assets to $1.9 billion. *Id.* at 15. As Mr. Large testified, as a result of these relative weaknesses in Anchor's portfolio, the bank "had a major catch-up to do." Tr. at 346. Revitalizing the bank's ability to generate mortgages, therefore, became an immediate priority for Anchor. Tr. at 376; PX 679 at 54. Anchor hoped to tap its branch banking customer base as a better source of mortgage originations, but also contemplated launching an "effective wholesale mortgage correspondent operation." Essentially, it seemed that Anchor hoped to develop something that was functionally similar to RFC that would channel mortgages toward the bank through the wholesale process. Tr. at 379–80, 386–88; PX 679 at 54.

Anchor's portfolio deficiencies notwithstanding, by virtue of the bank's aggressive geographic restructuring, cost cutting and asset sales, the bank succeeded in meeting the quarterly targets in its capital plan, and eventually regained its status as a capital compliant thrift. Once Anchor converted the $157 million cumulative preferred stock to a form that counted as regulatory capital, it managed to achieve minimal compliance with FIRREA's capital requirement as of September 30, 1991. *See* PX 240 at 1, 14 (1991 OTS Exam Report). For the first time, Anchor achieved FIRREA's regulatory targets of 1.5% tangible capital, 3.0% core capital, and 7.8% risk-based capital. Along with achiev-

ing capital benchmarks, Anchor was once again a profitable institution. Primarily as a result of a more favorable interest rate environment (in which the costs of deposit liabilities decreased) and Anchor's aggressive non-interest rate expense reductions, the bank achieved profits exclusive of asset sales for each of the first three quarters in calendar year 1991. *See* PX 240 at 22. On June 24, 1992, as a result of Anchor's performance and capital compliance, it was released from the capital plan by Mr. Vigna of OTS. PX 706 (Vigna Letter to Anchor).

Once Anchor achieved capital compliance, however, it was not yet time for the bank to rest on its laurels. Instead, Anchor remained under regulatory pressure to continue to raise capital. Regulators chastised Anchor for a minimally compliant capital position that, in the regulators' view, was insufficient to protect the institution from unforeseen losses. *See* PX 241 at 1–1 (July 1991 FDIC Exam Report) ("The present capital position is too limited to sufficiently cushion the bank from unexpected reversals.... Capital growth, therefore, must remain the primary focus of managements strategic plan."); PX 241 at 1 (March 1992 FDIC letter to Anchor) ("(T)he bank's level of capital continues to be wholly inadequate to protect the institution from unforeseen losses.... The directorate must continue its attention on augmenting the bank's capital position to a level that is significantly higher than the current minimums in order to provide a more reasonable level of protection to the bank from unforeseen losses."); PX 242 at 1 (July 1992 OTS Exam Report) ("The overall condition of Anchor remains marginal. Capital levels, while in compliance with regulatory requirements, are minimal."). Moreover, FIRREA mandated the periodic phase-out of what little qualifying supervisory goodwill that Anchor retained, forcing the annual write-down of a portion of Anchor's qualifying goodwill that had to be replaced in order to maintain its capital position. *See, e.g.,* PX 246 at 1 (September 1993 OTS Exam Report). Finally, effective January 1, 1993, FDICIA phased in a 1% increase in core capital requirements, from 3% to 4%, for a thrift to achieve an "adequately capitalized" standard, and an increase to 5% for

a thrift to achieve a "well capitalized" standard. Federal Deposit Insurance Corporation Improvement Act, Pub.L. No. 102–242, § 543, 105 Stat. 2236 (1991). One of the primary operational differences between an "adequately" and a "well" capitalized institution was the fact that after FDICIA, FDIC insurance assessments were risk-weighted, so that a "well capitalized" institution paid less money in insurance premiums than did a less well-capitalized institution. Anchor, therefore, had to achieve an even loftier capital requirement to both remain in capital compliance and to take advantage of a lower FDIC insurance premium (which, again, the bank would have had no trouble achieving if its contract to count its full complement of supervisory goodwill as regulatory capital had not been breached). *See id.* ("[C]apital compliance could suffer as core earnings might be insufficient to augment potentially increasing regulatory capital levels.").

As a result, Anchor remained vigilant over its capital position and committed to enhancing capital levels. Mr. Large testified that management continuously chased a growing capital requirement, because among the banking community and the regulators a minimum capital compliance was never "acceptable." Tr. at 392. Furthermore, Anchor's low capital compliance level restricted the types of investments it could make to all but the lowest risk categories, so Anchor was therefore unable to engage in many lines of business. Tr. at 398; PX 241.

To protect its capital position, Anchor finally moved forward with long-planned branch sales in Florida, exiting the state entirely over the course of several years (with the bulk of branch sales occurring in 1993–1995). Anchor retrenched even closer to its core market in the New York metropolitan area, finally effecting the sales of branches in southern New Jersey (in July 1993 and March 1994) that more closely corresponded to the Philadelphia market, branches in "downstate" New York (in March 1992) and branches in upstate New York (in March 1993).

Immediately after the FDICIA 4% capital requirement became effective on January 1,

1993, Anchor fell temporarily out of capital compliance because it phased out $19.6 million of qualifying supervisory goodwill on the same date. *See* DX 840 at 0020–21 (Capital Restoration Plan). In response, Anchor was required to submit and operate under a "Capital Restoration Plan" until it achieved the 4% "adequately capitalized" threshold, but regained capital compliance after just one quarter. *Id.*

## N. Anchor Focuses Once Again on Growing Its Business

By 1993, Anchor appeared headed toward prosperity once again, now adequately capitalized and operating on the heels of a string of quarterly core profits. However, notwithstanding Anchor's relative health, the FDIC's preferred equity position in Anchor's holding company following the holding corporation restructuring was an impediment to Anchor's ability to raise additional external capital through an equity offering. In June 1993, Anchor reached an agreement in which the FDIC exchanged its $157 million in holding company preferred stock and $47.2 million of accumulated unpaid dividends for $71 million of senior Anchor notes and 4.75 million warrants to acquire Anchor Bancorp common stock at $0.01 per share, on the condition that Anchor raise at least $50 million in common equity by July 1993. Thereafter, on July 7, 1993, Anchor returned to the capital market and sold 5.75 million shares of new common stock at $12.50 per share, producing gross proceeds of $71.9 million. Most of these proceeds were down-streamed to Anchor Savings Bank as common stock and aggregated to capital. *See* Def.'s Resp. to PPFUF at 72.

This capital infusion helped Anchor achieve "well-capitalized" status under FDICIA for the very first time. For the first time since FIRREA loomed on the horizon four years earlier, Anchor's management was free to expand its business plans and operations without the threat of an imminent capital crisis. One immediate goal of Anchor's management was to grow the bank through the acquisition of deposits as a source of low-cost funds for asset growth. This strategy was consistent with Anchor's business plans in the 1980s, when it expanded outside the New York market for the first time in search of new deposit resources. In August 1993, Anchor made a failed bid to acquire Crossland Savings Bank, an institution in the New York metropolitan market that Anchor's management considered an ideal match with Anchor's existing New York operations.

Not to be deterred, one year later, on August 15, 1994, Anchor acquired Lincoln Savings Bank of New York ("Lincoln") for $80 million. *See* Def.'s Resp. to PPFUF at 73. The Lincoln acquisition added $1.8 billion in deposits to Anchor's balance sheet that were largely geographically contiguous to Anchors existing deposit base. PX 23 at 6 (1994 Anchor Annual Report). The acquisition bore strong synergies, because Anchor was able to consolidate several of the new branches into existing branches, which reduced the ratio of those branches' expenses to deposits and eliminated local competition for deposits. Tr. at 953 (Test. of Cody Sickle); Tr. at 2488 (Test. of John Brull). Moreover, Anchor obtained high-quality deposits for a very low premium of less than 1%. Tr. at 1092 (Test. of Cody Sickle).

As a wave of bank and thrift mergers swept across the industry in the mid–1990s, Anchor—once again a $9 billion bank—merged with The Dime Savings Bank of New York ("Dime") in January 1995. The "merger of equals" (though it operated under the "Dime" name) created a $20 billion institution with a strong deposit base focused primarily in the metropolitan New York region. There were strong strategic and geographic synergies between the Anchor and Dime franchises, but neither Anchor nor Dime brought a significant sophisticated mortgage-banking operation to the table in the 1995 merger. Anchor had long since divested RFC in the wake of FIRREA. AMS had largely been left to lie fallow once Anchor first acquired RFC, and its business later eroded even further when Anchor closed AMS's offices outside the New York region and reduced staffing. At trial, Mr. Large routinely referred to Anchor's own efforts to jumpstart its mortgage origination capacity after the bank absorbed FIRREA's initial blows. As a $20 billion institution, the com-

bined Dime institution had a voracious appetite for a continuous stream of mortgage product to place on its balance sheet—an appetite that could not be satisfied by relying merely on retail originations generated through the institution's branch offices, which is what Anchor had to a large extent relied upon since it sold RFC.

In October 1997, Dime acquired the North American Mortgage Company ("NAMCO") for $351 million. Like RFC before it, NAMCO was a major player in the secondary mortgage market and was a wholesale originator of mortgages that it acquired through a network of correspondents. Unlike RFC, NAMCO operated primarily in the market for conforming mortgages that met the underwriting criteria of Ginnie Mae, Fannie Mae and Freddie Mac. Its wholesale product, then, was either sold to institutional purchasers in the form of bundles of whole mortgage loans or to investors (primarily institutional investors) in the form of agency-sponsored MBS. NAMCO's MBS issuances, therefore, bore the implicit backing of the United States government and required no additional credit enhancement to achieve investment grade status. In other respects though, such as size and volume of originations, NAMCO's operations were strikingly similar to RFC's.

Finally, on January 4, 2002, the combined Dime institution was acquired by Washington Mutual, Inc., one of the largest financial services corporations in the United States.

### III. Discussion

Plaintiff argues that it is entitled to recover lost profits, that is, expectancy damages, for three primary categories of harm that it alleges the breach to have caused. First, plaintiff claims the breach forced Anchor to sell RFC. If so, then plaintiff argues that it is entitled to damages for: (1) the lucrative stream of future profits that RFC would have generated; (2) the increased investor capital Anchor would have allegedly received in its 1993 public equity offering if the An-

chor franchise had included RFC at that time; and (3) the purchase price of NAMCO, which plaintiff argues was acquired as a functional substitute for the mortgage-banking capacity that RFC had previously provided Anchor. Second, plaintiff maintains that the branch sales in Florida, Georgia, southern New Jersey, upstate New York and downstate New York were caused by the breach, and that plaintiff received artificially-depressed premiums for most of those branches. Plaintiff seeks to recover what it alleges to be the replacement value of those branches so that the bank would be put in as good of a position as if the branch sales had never been forced. Third, plaintiff claims "wounded bank" damages attributable to costs it allegedly incurred because of the breach, including fees for professional services, transaction fees, and increased FDIC insurance premiums. Finally, plaintiff claims that it is entitled to have any damages award this court makes "grossed up" to account for the income tax effect on that judgment. Plaintiff's damages expert calculated the bank's total damages to be $972,137,000. *See* PX 979–B (demonstrative exhibit summarizing Dr. Baxter's Lost Profits Damages).

Surprisingly (or not, depending on how closely one has followed defendant's litigation strategy in the various *Winstar*-related cases in this court), defendant argues not only that plaintiff is not entitled to any damages, but also that plaintiff suffered no actionable harm as a result of the government's breach of contract. At the close of plaintiff's case-in-chief at trial, defendant filed a RCFC 52(c) motion[25] for judgment based upon partial findings. Defendant argued, in part, but primarily, that plaintiff was not entitled to any damages because (1) plaintiff's damages models improperly ignored the potential impact of a failed merger with another bank immediately before FIRREA, (2) that the sales of RFC and the branches actually *improved* Anchor's financial fortunes and did not harm

---

**25.** RCFC 52(c) provides:

> If during a trial a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated

> without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

the thrift, and (3) because RFC was not owned by Anchor at the time it entered into the relevant supervisory goodwill contract with the government and, further, because any hypothetical damages due to the sale of RFC were unrelated to any breach of that contract, controlling case law disallows recovery for the sale of RFC. Below, the court takes up these arguments first and finds, in essence, that the first two are preposterous, and the third is a matter of proof, making dismissal on RCFC 52(c) premature.

Thereafter, in turn, the court will evaluate each component of plaintiff's damages claims seriatim. First, the court will evaluate the damages claims related to the sale of RFC, followed by those associated with the branch sales. Finally, the court will review plaintiff's "wounded bank" expenses and the applicability of any tax "gross up" for the awarded damages.

## A. The Failed Hamilton Bank Merger Is Inapposite to Damage Issues in This Case

■ In 1988, before Mr. Large arrived at Anchor, the bank entertained an offer to be acquired by Hamilton Holding Co. ("Hamilton"), which at the time controlled Ensign Bank. In October 1988, Hamilton indicated that it was interested in acquiring 60% of Anchor for $6 per share (Anchor's stock was then trading at approximately $4.75). *See* Pl.'s Resp. to Def.'s Add'l Contentions of Fact at 17–18. Anchor's management did not approve of either the terms or the price of this offer. They were interested only in a sale of 100% of the institution, if at all, and believed that the sale price should be higher. *Id.* at 18. Hamilton ultimately increased its offer to include all of Anchor's stock at $9.75 per share. *Id.* Anchor's board of directors then approved a non-binding letter of intent on November 17, 1988, that provided that Anchor and Hamilton would continue to negotiate towards a possible merger. *Id.* at 18–19. At $9.75 per share, Hamilton's offer valued the Anchor franchise, including RFC, at approximately $170 million. *Id.* at 19–20.

On March 8, 1989, however, Hamilton withdrew its interest in Anchor, stating that it was unwilling to proceed with negotiations given the "uncertainty affecting the thrift industry" and the uncertain legislative environment at that time—ostensibly, the pending FIRREA legislation. *Id.* at 21. The next day, Anchor requested that the National Association of Securities Dealers suspend trading of Anchor's common stock. *Id.* Anchor thereafter duly notified its shareholders and the public through a letter and a press release that the Hamilton offer had been withdrawn. *Id.* A year after FIRREA became law, on August 31, 1990, Hamilton's Ensign Bank was seized by the OTS and placed into receivership. *Id.* at 22–23.

One of the issues that plaintiff's experts tried to confront at trial is what Anchor might have looked like in a hypothetical world where the government's breach never happened—*i.e.*, in a "but for" world in which Anchor continued to count supervisory goodwill as a regulatory capital asset. The model that those experts built, and the assumptions upon which they relied, are critical to plaintiff's ultimate damages claim. Nowhere, however, did any of plaintiff's experts attempt to account for the failed Hamilton merger. In other words, none of the assumptions on which plaintiff's experts relied contemplated that the Hamilton merger would have been consummated in the hypothetical, non-breach world. Defendant argues that this is a fatal omission that undermines all of plaintiff's damage models.

Defendant argues that "absent FIRREA's goodwill capital provisions (*i.e.*, the breach), Anchor most likely would have been acquired by [Hamilton] in March 1989." Def.'s Mot. for J. Based Upon Part. Findings at 6 ("Def.'s Mot."). According to defendant's logic, it is speculative for plaintiff to maintain that but for the breach, Anchor would have continued to operate as an independent institution that would have been more profitable than the actual breach-impaired institution was. *Id.* Defendant argues that if the breaching provisions of FIRREA had never come to pass then Anchor would have *certainly* been acquired by Hamilton instead, and therefore plaintiff's damage models must account for the merger. On the other hand, defendant argues that Hamilton's $170 million offer for Anchor bars plaintiff from seek-

ing damages here that exceed that offer, because "the fact that Anchor was willing and eager to sell everything, including RFC and the complained of branches, for $170 million, renders its claim that the phase-out of goodwill caused it $974 million in damages absurd on its face." Def.'s Proposed Conc. of Law at 9.

Defendant's argument is unpersuasive. It is in all respects a red herring because it assumes far too much. This argument is too speculative for several reasons, among them: (1) it assumes that the *breach* caused Hamilton to withdraw from the proposed merger; (2) it assumes that absent the breach the merger would have gone forward; and (3) it assumes that the $170 million offer Anchor received from Hamilton is probative of what Anchor's damages are in this case. None of these three assumptions, however, were demonstrated at trial or in the exhibits presented to the court.

First, and foremost, it is not at all clear that the Hamilton merger would have been consummated but for the breach. Defendant relies in primary part on two statements, one from the press release announcing Hamilton's withdrawal and the other from Anchor's 1989 Annual Report, to support its conclusion that the Hamilton merger was a foregone conclusion by the spring of 1989, and that only the government's breach derailed the merger proceedings. The press release announcing Hamilton's withdrawal noted that: "A Hamilton spokesman stated that the proposed offer was withdrawn because of the uncertainty affecting the thrift industry in general, caused by the Administration's proposals for reform of the industry." PX 942 at 1. Anchor's 1989 Annual Report echoed this sentiment, noting that FIRREA "had two serious effects on Anchor," the first of which was that "Hamilton Holding Company, which had entered into a letter of intent to purchase Anchor, withdrew its offer in

March, 1989, giving as a reason the uncertain legislative environment." PX 18 at 3. The government would have the court believe that these two statements indicate plaintiff's own belief that the Hamilton merger was a "sure thing" but for the breach, and that plaintiff's damages models must therefore take the merger into account.

The problem that the government has, though, is that none of the evidence presented at trial specifically indicates that it was the *breach* that caused Hamilton to withdraw from this merger, but rather the "uncertain legislative environment" that swirled around the proposed FIRREA legislation in March 1989—a full five months before FIRREA was even passed into law. As defendant painstakingly pointed out at trial in other contexts, FIRREA contained provisions that did not constitute a breach of contract, but nonetheless greatly restricted the operations of thrifts. Those other "non-breach" provisions that did not deal with supervisory goodwill were accounted for in plaintiff's damage models. But there is no indication that it was only the *breaching* provisions of FIRREA—those that dealt specifically with Anchor's supervisory goodwill—that caused Hamilton to rescind its offer. Instead, it appears to have been the general uncertainty permeating the entire thrift industry in the spring of 1989 that caused Hamilton to withdraw. Indeed, at the time that Hamilton withdrew from the merger, Anchor still had a fair reason to believe that FIRREA and its breaching provisions might not apply to it or that its contractual arrangement with the government regarding supervisory goodwill might be grandfathered into regulations that ultimately prevailed.

Defendant did not point to any cogent evidence at trial that specifically indicated that it was the prospective treatment of *supervisory goodwill* that led Hamilton to withdraw.[26] Quite the contrary, the record is

---

**26.** During the cross-examination of Mr. Eugene Brooks, there was some testimony to this effect:

Q: "Isn't it also true that, to your understanding, after FIRREA was introduced into Congress, Hamilton backed away from the acquisition of Anchor because of the proposed treatment of goodwill under FIRREA?"

A: "That was their announced reason, yes."

Q: "Was that your understanding?"

A: "That was my understanding, yes, that they had announced that. That was their public announcement, and that's what we understood."

Tr. at 2597–98. There is considerable ambiguity in this line of questioning because the "public announcement" to which Mr. Brooks seems to

conspicuously barren of facts, other than general statements cited above, that explain why Hamilton withdrew its offer for Anchor. It is, therefore, speculative for the government to argue that the *breach alone* caused Hamilton to withdraw its offer. Because the court is unable to find that the *breach* caused Hamilton to withdraw its offer, it is not an error for plaintiff's various experts to ignore the Hamilton merger in their models.

Moreover, there is no indication in the record that the Hamilton merger would have proceeded as a matter of course if Hamilton had not voluntarily withdrawn its offer. All of the facts presented at trial indicate only that Hamilton and Anchor had entered into a preliminary, *non-binding* letter of intent to pursue the merger transaction. Hamilton had received regulatory approval to *make an offer* to acquire more than 10% of Anchor's shares, but it had received no such approval for consummating the actual merger. Tr. at 2515–16, 2802–03. Given Hamilton's own weak capital position (Ensign Bank was closed and liquidated after FIRREA, *see* DPFUF at 21), there were no guarantees that such regulatory approval could or would be obtained. *See* Tr. at 3125–26 (Test. of Dr. Baxter) (explaining that Ensign Bank had troubled "classified assets" approaching 10% of its portfolio at the same time that its capital level approached zero). Although Anchor's board of directors had approved the nonbinding letter of intent agreement, it gave no such approval to any ultimate merger. The non-binding letter of intent was merely a first step in negotiations—an expression of the parties' intent to negotiate an ultimate transaction, if any. Moreover, Hamilton's proposal was strictly "conditioned on the accuracy and completeness of the available information respecting Anchor" that had been provided to Hamilton; due diligence and investigation on Hamilton's part remained. DX 196 at 337 (Anchor 8–K Report); Tr. at 2520–21 (Test. of John Brull). Anchor's shareholders never approved the merger proposal, and several shareholders challenged the proposed merger in state court; that litigation was never resolved.

Tr. at 2521–22. While defendant contends that "[i]n the absence of the proposed FIRREA legislation, Hamilton (Ensign) would have acquired Anchor," given all of these obstacles that remained to the merger there is no way that a rational factfinder, including this court, could reach that same conclusion. *See* DPFUF at 21.

Finally, there is little evidence to suggest that the $170 million Hamilton offered for the entire Anchor franchise was probative of the bank's value at the time. Any negotiations between Hamilton and Anchor were just beginning when the non-binding letter of intent to negotiate was signed by both parties. At that point, Hamilton had already increased it's initial bid from $6 to $9.75 per share—a 63% increase. The government did not present credible evidence that Anchor's directors would have been unable to exact even higher offers for the bank, or that Hamilton's offer would not have produced competing offers from other potential buyers. Contrary to what defendant argues, then, the fact that Hamilton *made an offer* of $9.75 per share for Anchor is not probative in any way of what Anchor's damages in this case should or should not be. It is merely evidence of what one bank was willing to offer Anchor in an attempt to acquire its shares in 1989.

**B. Plaintiff Is Not Precluded from Claiming Damages Merely Because Anchor Savings Bank Was Profitable after the Breach**

■ Defendant claims that "nothing harmful occurred to Anchor as a result of the [RFC and branch sales] for which it claims damages" because Anchor experienced a "dramatic turnaround" in the early 1990s involving "substantial profits and increasing stockprice" that was allegedly the result of steps Anchor took to deal with FIRREA, including the RFC and branch sales. Def.'s Mot. at 5. According to defendant, "the sales of RFC and the branches *improved* Anchor's financial fortunes; they did not harm the thrift." *Id.* (emphasis added). Defendant's argument relies primarily on the fact that in

---

refer does not contain any specific reference to the treatment of goodwill, which defendant's attorney questioned Mr. Brooks about, but only to

"the administration's proposals for reform of the industry." *See* Tr. at 2596–97; PX 942.

the four years leading up to FIRREA, Anchor sustained *core* losses (*i.e.,* losses from recurring operations, including interest rate income, exclusive of one-time gains-on-sale) in excess of $200 million, while in the four years immediately after the breach Anchor reported *total* profits of $182 million. *See* Def.'s Proposed Conclusions of Law at 11. Throughout trial, defendant referred to this turnaround as a "V," the graphical image of plaintiff's income chart, with the nadir of Anchor's earnings coming near the time that FIRREA was enacted. Def.'s Mot. at 5.

Defendant contends that plaintiff, itself, acknowledged the beneficial impact of its post-FIRREA changes, specifically the benefits of selling RFC and the branches. For example, in a 1993 SEC filing, Anchor noted: "The improvement in fiscal 1991 operating results over fiscal 1990 was primarily due to an increase in net interest income and a reduction in general and administrative expenses, which resulted from staff reductions, branch sales, and the full year impact of the sale of RFC in March 1990." Def.'s Mot. at 5 (quoting PX 35 at 28 (June 1993 Prospectus)); *see also* PX 20 at 18 (1991 Anchor Annual Report) (same language).

Defendant's argument, however, is a *post hoc, ergo propter hoc*[27] analysis of facts. For defendant to claim that the severe steps Anchor took in the wake of FIRREA—namely the branch sales and the divestment of RFC—produced an overall, long-term net benefit for Anchor ignores the facts of this case and grossly misconstrues the context of Anchor's performance. Simply because Anchor posted annual profits in the years after FIRREA does not in any way prove that FIRREA or Anchor's response to FIRREA produced those profits. Defendant's rationale ignores the possibility of how much greater Anchor's profits *might have been* had the bank not sold RFC and the branches. *See LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64, 90 (1999) ("As an initial matter, we must address defendant's contention that plaintiff is precluded from recovering any lost profits because its annual earnings after the breach exceeded those before the breach by a substantial degree. This argument has no merit because the quantum of plaintiff's actual earnings are irrelevant in a lost profits analysis-actual earnings serve solely as the baseline against which projected earnings are compared. Plaintiff is entitled to lost profits if it can show that its earnings would have been higher absent the breach, regardless of the comparative size of its post-breach actual earnings. Accordingly, plaintiff's claim for lost profits cannot be denied simply because [the thrift] enjoyed significant earnings in recent years. The question is: absent the breach, would those increases have been greater?"), *aff'd in relevant part,* 317 F.3d 1363 (Fed.Cir.2003).

First, defendant completely ignores market conditions and the prevailing interest rate environment from 1985–94 that had the single greatest impact on Anchor's core profits. Anchor's core income derived from the bank's ability to exploit interest rate income achieved when the bank loaned money at a slightly higher rate than it borrowed money. As explained thoroughly above, in a rising interest-rate environment, the entire thrift industry is susceptible to losses because it pays increasing rates for the money it borrows (primarily in the form of customer deposits), but realizes correlative interest-rate increases on its investments at a much slower pace. *See* Tr. at 2950–52 (Test. of Dr. Baxter). In short, the industry's costs increase faster than its revenue, either limiting or eliminating interest-rate income. From 1987 to 1989 the interest rate on one-year treasuries rose by nearly half, from just over 6% to just under 9%. In each of these years, Anchor suffered core losses because the inverted yield curve eliminated its interest-rate income. Not surprisingly, when interest rates started to ease after 1989, Anchor's core income increased dramatically. From 1990 to 1993, interest rates fell from a high over 8% to under 4%. *See, e.g.,* Appendices A and B. Over this same period, Anchor's core pre-tax income increased from an $11 million annual loss to a $22.5 million annual gain. Tr. at 3001–04. *See also* PX 1106; PX 1104.

---

**27.** Literally, "after this, therefore because of this." *See* Black's Law Dictionary 1186 (7th ed. 1999) ("Of or relating to the fallacy of assuming causality from temporal sequence; confusing sequence with consequence.").

Second, defendant ignores that many of the non-interest-related profit improvements that Anchor put into motion occurred well before FIRREA, and long before either the RFC or branch sales. For example, the cost reduction program that Anchor implemented in 1987 following the Peat Marwick study, and continued under the leadership of James Large, showed substantial cost containment and improvement at Anchor long before, and after, the breach. By June 1989, Anchor's management was claiming annual expense savings of nearly $16 million as a result of the Peat Marwick recommendations, with further cost savings to come under Mr. Large's cost-reduction plans. *See* PX 174 at 002 (June 29, 1989 Strategic Planning Committee minutes). By the quarter ending March 31, 1990—the final quarter for which RFC was still reflected on Anchor's books before its sale to GMAC—Anchor reported that quarterly losses (excluding exceptional one-time charges) had been cut from $12.3 to $3.0 million over the preceding six-month period, an improvement that Anchor attributed to "an aggressive cost control program," declining interest rates, and the completion of Anchor's balance sheet restructuring. PX 642 at 2–3 (Apr. 19, 1990 news release). In short, many of Anchor's improvements were attributable to an exceptional professional effort by the bank's management to consolidate operations and eliminate marginal expense, and those improvements were already well underway before FIRREA and the subsequent RFC and branch sales.

The timing of Anchor's improvement, then, belies the government's argument that the sale of RFC and the branches precipitated the turnaround. By the time Anchor sold RFC in March 1990 (and at a time when no breach-related branch sales had yet occurred), Anchor had already achieved the most significant financial improvement it would experience during the four years following FIRREA. *See* PX 1106; DX 870 at 32. Thus, much of the reversal of fortune that defendant boasts to be the *result* of the RFC and branch sales was actually already underway by the time either of the sales occurred. The facts of this case and the testimony at trial indicate that the timing of Anchor's turnaround, relative to the RFC

and branch sales, was really nothing more than coincidence. Indeed, it appears that Anchor's profit improvement would have been amplified by a large factor if it had been able to retain RFC and reap the benefit of the profits that RFC was capable of generating which, as discussed below, it did generate in the years immediately following the sale to GMAC.

While there is no doubt that the sale of RFC and the branches did to some extent improve Anchor's general and administrative expense reduction because they trimmed employee expenses and overhead, there is no rational explanation for how those same sales, in and of themselves, could drive the kind of dynamic turnaround that Anchor experienced after 1989. As defendant rightly points out, Anchor's management did partially attribute Anchor's improvement to these sales, but in every one of those circumstances it was in the *context* of helping Anchor reduce expenses—a plan already largely implemented before the sales occurred. *See* Def.'s Mot. at 5 (quoting PX 35 at 28 (June 1993 Prospectus)) ("The improvement in fiscal 1991 operating results over fiscal 1990 was primarily due to an increase in net interest income and *a reduction in general and administrative expenses, which resulted from staff reductions, branch sales, and the full year impact of the sale of RFC in March 1990.*") (emphasis added); *see also* PX 20 at 18 (1991 Anchor Annual Report) (same language). To give credence to defendant's argument to the contrary would be to ignore the primary impact on Anchor's core earnings of the improving interest rate environment (which had nothing to do with FIRREA, the breach, or the RFC/branch sales) and Anchor's ongoing expense reduction plan (which was largely completed before the RFC/branch sales).

Because there is little to suggest that the RFC and branch sales contributed anything more to Anchor's earnings improvement other than a modest expense reduction, defendant's argument that these sales *caused* Anchor's turnaround, and therefore, that Anchor can claim no damages for the harm realized from these sales, is utterly untenable. The sale of RFC and the branches

were absolutely essential to Anchor's capital plan in 1990, and without those planned sales it is doubtful that Anchor's capital plan could have been approved or that Anchor could have returned to capital compliance as quickly as it did. They were, therefore, beneficial to the thrift in its short-term goal of achieving capital compliance. *See* Def.'s Mot. at 5 (quoting PX 621 at 9959–60 (noting that sale of RFC, a "facilitating step," was beneficial to the thrift's capital plan); DX 870 at 06–08, 20, 26 (noting that the capital plan, including the sale of RFC, had been "generally successful")). That does not mean, however, that the sales were key to Anchor's profit turnaround, which was instead precipitated by the improving interest rate environment and Anchor's long-term expense reduction plan. The profit improvement would have occurred even if Anchor had been able to retain RFC and the branches. Unfortunately for Anchor, given the short time frame for coming into capital compliance imposed by FIRREA, retaining those earnings alone would not have created sufficient capital quickly enough to satisfy regulators and stave off regulatory closure. Hence, Anchor was forced to hew from its franchise any non-essential pieces that had salvage value.

## C. Damages Attributable to the Forced Sale of RFC–The Legal Issue of Expectancy Damages in the Federal Circuit

■ Generally, the common law of damages applies to suits against the United States. "When the United States enters into a contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration & Producing v. United States*, 530 U.S. 604, 607–08, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (citing *United States v. Winstar Corp.*, 518 U.S. 839, 870–71, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)). Damages based on expectation interest or lost profits are recognized as legiti-

mate measure of damages at common law. *See Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854). *See generally* DOBBS, § § 3.3(4), 3.4. Lost profits are recoverable at common law where such profits were foreseeable to the breaching party at the time of the contract[28] and where such profits can be established with some degree of reasonable certainty.[29]

This basic law is applicable to suits against the United States including *Winstar* cases. *See, e.g., California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001). Accordingly, the Federal Circuit has recognized that "one way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *California Fed.*, 245 at 1349 (quoting *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001)); *see also LaSalle Talman Bank, FSB v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003). These benefits—colloquially thought of as the loss of anticipated profits, but also including other incidental and consequential damage elements necessary to restore the plaintiff to the position he would have occupied absent the breach—are recognized by the Federal Circuit as a legitimate measure of damages "where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of profit can be made." *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961); *Glendale*, 239 F.3d at 1380 (citing RESTATEMENT § 347); *see generally* DOBBS §§ 3.3(4), 3.4.

Nevertheless, the Federal Circuit has indicated that expectancy damage theories, premised on recovery of lost profits, have generally proven "impractical" for *Winstar*-related cases, given the speculative nature of the claims that many plaintiffs have brought. *Glendale Federal Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed.Cir.2004). Notwithstanding the Circuit's comment that

---

**28.** RESTATEMENT (SECOND) OF CONTRACTS § 351(1) [hereinafter "RESTATEMENT"] ("Damages are not recoverable for loss that the party and breach did not have reason to proceed as a probable result of the breach when the contract was made.").

**29.** *Id.* § 352 ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty.").

"experience suggests that it is largely a waste of time and effort to attempt to prove such damages," it has "not, however, barred as a matter of law the use of expectancy/lost profits theory." *Id.* (citing *Cal. Fed.*, 245 F.3d at 1350). *See Globe Savings Bank,* 65 Fed.Cl. 330 (2005), *aff'd in relevant part,* 189 Fed.Appx. 964 (Fed.Cir.2006) (affirming in part the award of lost profit, but remanding to determine offset value of sale of branch bank). Accordingly, a *Winstar* plaintiff is entitled to recover expectancy damages— provided that it can demonstrate to the court's satisfaction that the unique circumstances of its particular case prove by a preponderance of the evidence that:

> (1) the loss was the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty.

*Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002); *see* RESTATEMENT §§ 347, 351, 352. This is such a case.

Anchor seeks to recover for the harm it suffered when the exclusion of supervisory goodwill and the FDIC preferred stock from regulatory capital forced it to sell Residential Funding Corporation in 1990. According to Anchor, the divestment of RFC was akin to a forced sale because Anchor had an immediate and insatiable appetite for capital after the breach (capital that the sale of RFC would provide) and because in its capital-starved position Anchor was unable to operate the enterprise effectively. According to Anchor's experts, in the years following the sale Anchor missed out on opportunities to generate profits from RFC's ever-growing servicing portfolio and its MBS sales. Moreover, because Anchor lost RFC's mortgage origination capacity, the thrift's loan production volume waned until 1997, when Anchor purchased NAMCO and revived its mortgage origination and servicing capacity. Anchor claims that NAMCO was a functional substitute for RFC and that acquiring NAMCO helped mitigate the harm imposed on Anchor

by the breach. Finally, Anchor argues that had it continued to own RFC in 1993, as it had planned but for the breach, it would have been a larger, more profitable enterprise and therefore its foray into the capital market would have been more lucrative because Anchor's stock would have been able to command a higher offering price.

To quantify its "lost profits" damages attributable to the divestment of RFC, Anchor's experts looked to RFC's actual performance during the 1990–1997 period under its subsequent owner, GMAC. According to fact witnesses, RFC operated during that period under the same management that Anchor had employed, and followed a business model that had been developed while Anchor owned RFC. These witnesses and Anchor's experts testified that RFC would have operated in a substantially similar manner under Anchor from 1990–97 as the subsidiary actually did perform under GMAC, and argue that RFC's profits during that time period are a reasonably certain proxy for what Anchor's lost profits were during that period. Anchor's expert damages witness testified at trial that he calculated Anchor's forfeited profits over this time to be $328.9 million. To this, Anchor adds the costs incurred to purchase the substitute enterprise, NAMCO, in 1997–$351 million. Finally, to account for the reduced stock offering proceeds Anchor realized in 1993, its expert calculated the hypothetical value of Anchor's franchise *with* RFC at that time, and concluded that Anchor would have raised an additional $42 million through its stock offering. From this total amount, Anchor's expert deducted the adjusted sale-price that Anchor received for RFC in 1990, reducing the claim by $87,611,000. As the final kicker, however, Anchor argued that all of its RFC-related damage calculations would be taxed at a 38.3 % effective tax rate, and that to make Anchor "whole" any award would have to include a tax adjustment, or "gross up," in the final calculation. Therefore, Anchor's expert added $204,846,000 to his ultimate RFC-related damages calculation, for a total of $839,135,000. *See* PX 979–B (demonstrative exhibit summarizing expert's damage calculations).

Not surprisingly, defendant argues that Anchor's damages model is fundamentally flawed for scores of reasons. Chief among these is defendant's steadfast adherence to the position that the sale of RFC was born out of a business decision that Anchor made independent of FIRREA's breaching provisions. According to defendant, the FIRREA legislation and other regulations presented Anchor with new hurdles that did *not* constitute a breach of contract but did force Anchor to sell RFC. It argues that these provisions—new risk-based capital reserve requirements and limitations on a thrift's investment in a subsidiary—provided the primary impetus for Anchor's divestment of RFC, *not* the thrift's immediate loss of more than $500 million of regulatory capital.

Second, defendant argues that even if the RFC sale was primarily the result of its breach, the type of harm and amount of damages was not foreseeable by the parties at the time of contracting. According to defendant, since Anchor did not acquire RFC until 1987—after the parties entered into agreements regarding the preferential regulatory treatment of supervisory goodwill—it could not have foreseen at that time that Anchor would later buy a subsidiary like RFC or that a breach of the agreement might cause Anchor to divest such an asset. Moreover, according to defendant, no other thrift ever owned a mortgage conduit business like RFC, and therefore it was unforeseeable that Anchor would ever become involved in the MBS conduit business in which RFC specialized. Even if the effects of the breach were foreseeable, though, defendant maintains that the amount of claimed damages is particularly surprising since Anchor paid only $60 million for RFC when it purchased it in June 1988 (less a $13 million dividend paid to Anchor immediately after the sale, reducing its effective investment to $47 million), less than two years before Anchor sold it to GMAC.

Finally, defendant challenges the credibility of Anchor's damages model. As an initial matter, defendant claims that Anchor received fair market value for RFC in its sale to GMAC in 1990, and that a fair market exchange obviates *any* damages. Even if there were damages, however, defendant argues that Anchor's model is an incredible measure of lost profits because it improperly assumes that Anchor could have continued to own and operate RFC on the same scale and with the same profitability that GMAC did from 1990–1997. For many reasons, defendant argues that an Anchor-owned RFC could not have engaged in the large volume of business that RFC did, and that Anchor's cost of funding RFC would have been much higher than GMAC's, cutting in to RFC's profits.

As for the NAMCO purchase, defendant argues that RFC and NAMCO engaged in fundamentally different lines of business and, therefore, it is impossible to consider NAMCO as a commercial substitute for RFC. Accordingly, defendant rejects any damages associated with the NAMCO purchase price. Similarly, defendant rejects the claimed losses associated with the 1993 stock offering on the theory that a sale of stock does not yield any gain to the seller. Finally, defendant challenges Anchor's "gross-up" theory as both legally and factually deficient.

### 1. The Breaching Provisions of FIRREA Caused Anchor To Sell RFC

The Federal Circuit recently articulated the standard of causation to be applied in a "lost profits" inquiry. As a point of departure, the Circuit has noted that causation is an "intensely factual determination." *California Fed. Bank v. United States*, 395 F.3d 1263, 1270 (Fed.Cir.2005). The breach must be more than just a "substantial factor" in the plaintiff's loss; "the causal connection between the breach and the loss of profits must be 'definitely established.'" *California Fed. Bank v. United States*, 395 F.3d 1263, 1267–68 (quoting *La Van v. United States*, 382 F.3d at 1351; *Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1379 n. 2 (Fed. Cir.2004); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed.Cir.2002); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001); *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961)).

In this case, there are other factors operating in confluence with the breach that has-

tened Anchor's actual, immediate need to sell RFC. The breach, however, need not be the sole factor or sole cause of the plaintiff's loss. *Id.* at 1268. While a plaintiff may only recover for those losses that would not have occurred but for the breach, "[t]he existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* (citing E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 12.1, at 150–51 (3d ed.2004)). The causation standard applied in a contracts case is not quite so rigid as the "proximate causation" standard often employed in tort cases.

Based on the evidence and testimony offered at trial, it is beyond peradventure that the breaching provisions of FIRREA, which deprived Anchor of more than $500 million in regulatory capital, were the direct cause of Anchor's divestment of RFC. Contemporaneous documents reveal that Anchor began to explore the sale of RFC only after the full extent of FIRREA's regulatory accounting changes became known. The highly credible testimony of James Large and Mark Korell, who ran the Anchor franchise and RFC, respectively, confirmed that Anchor never planned to part with RFC until it became absolutely necessary. Moreover, these same documents and testimony reveal how the breach made the sale of RFC absolutely necessary, painting a picture both of how the breach crippled Anchor's operational capacity and made it impracticable—if not impossible—to profitably operate RFC or preserve its value for any more than a few short months. This was due, in primary part, to a confluence of regulatory problems that grew directly from Anchor's loss of regulatory capital and subsequent capital deficiency. Conversely, if absent a breach Anchor had continued to count supervisory goodwill as regulatory capital to the fullest extent, Anchor would have continued to operate RFC and none of the factors which defendant cites as driving the RFC sale would have been anything more than routine business concerns that Anchor's management could have addressed in the normal course.

### a. Prior to the Breach, Anchor Did Not Intend To Sell RFC

As an initial matter, none of the documentary evidence produced at trial indicated that Anchor's management had any intention to willingly part with RFC at any point prior to November, 1989, when the full extent of the FIRREA implementing regulations, and Anchor's capital shortfall, first became known. Throughout 1989—in some circumstances, even after Anchor had reason to know of the risk-based capital guidelines that would come into play—Anchor publicly hailed RFC as a profitable cornerstone upon which James Large's vision for a more efficient, profitable bank was based. After Mr. Large's 90–day critical evaluation of the Anchor enterprise, he specifically noted in his report to the board of directors that RFC would continue to be a primary asset supporting the Anchor franchise, notwithstanding the host of other strategic changes that Mr. Large thought necessary to implement at Anchor. *See* PX 572 at 4921, 4946 (Rep. to Bd. of Dirs.). In the summer of 1989, as the proposed FIRREA legislation loomed large and Anchor appreciated that some asset sales might be required to preserve its capital compliance, the sale of RFC was identified as merely a "[b]ack-up plan," to be resorted to only in the event that the assets with which Anchor was more readily willing to part failed to stanch its capital shortfall. *Id.* at 4984. When asked why Anchor had bothered to develop a backup for its capital plan, Mr. Large responded candidly:

> Two reasons. One was we did not yet know what the actual capital requirements were going to be [because FIRREA had not yet been enacted], and secondly, we though it perfectly necessary to assume that our first efforts might be less than successful. And we wanted to make absolutely sure that when we—that we had a backup plan. And we wanted, as a matter of credibility with the regulators, to show them that alternative sources [of capital] were available, so if they were uncertain as to our ability to achieve the first round of capital-raising activities, they too would have comfort in the fact that there was more that could be done.

Tr. at 193.

Moreover, in his July 1989 letter to Anchor staff, Mr. Large noted that RFC "continues

to fly while meeting its profit objectives. As a result, it has been authorized to double its volume in 1990." DX 308 at 4; *see also* Tr. at 198–99 (Test. of James Large) (noting that proposed FIRREA capital restrictions were "not yet clear" when he wrote the July 1989 letter). This was consistent with his statement to Anchor's officers in September, celebrating RFC's "spectacular results" and declaring that Anchor was prepared to let RFC "run" because the company was "a winner." PX 583–C at 5, 18. That same month, Anchor's annual report noted that RFC would continue to be given "the opportunity to realize its potential as one of the nation's premier mortgage conduit operations," even though the same report conceded that the passage of FIRREA would severely affect Anchor's regulatory capital and that cuts and asset sales would be necessary.

Testimony at trial confirmed that Anchor's management was thrilled with RFC's performance while it was in the Anchor armada. RFC exceeded profitability expectations, generating between $12 and $15 million in net annual profits. Tr. at 2454–55 (Test. of John Brull). And as RFC's servicing volume accrued with the company's expected buildup of MBS volume, RFC would only become more profitable. Tr. at 160 (Test. of James Large). Beyond sheer profitability, however, RFC also supported a host of core business initiatives upon which Anchor relied to improve its own profitability and shore up its operational integrity. RFC's wholesale origination business attracted ARMs for Anchor's portfolio, which helped reduce Anchor's maturity gap and the risks of any interest rate gap. As Mr. Large testified, "One of the huge advantages of having RFC as our partner, our subsidiary, was that we could ask them to design products that fit what we thought we needed in the portfolio, both in terms of maturities and interests and details of the nature of the loan itself." Tr. at 156.

Moreover, Mr. Large testified that the quality of these loans that Anchor acquired through RFC was "spectacular," in part because Anchor insisted that RFC underwrite high-quality loans, in general, and then Anchor "cherry-picked the best of the best and kept them and sold the rest out in the sec-

ondary market." Tr. at 157. Anchor also used RFC as a destination for the fixed-rate mortgages it held in portfolio, swapping them for more liquid MBS and thereby improving the bank's maturity gap risks. *Id.* at 157–58. Ultimately, RFC became such a powerful source of mortgage originations for Anchor's own portfolio that the bank allowed the origination capacity of AMS, its other primary source of mortgage originations, to wane. Tr. at 2336 (Test. of John Brull). For the first quarter of FY1989, alone, RFC was credited with increasing Anchor's total loan production from $641 million to $947 million over the same quarter a year earlier. DX 353 at 4.

With these factors in mind, Mr. Large's testimony was unequivocal and credible: "[W]e didn't want to sell [RFC] if there was any way to avoid it." Tr. at 193–94. Other Anchor executives were equally candid; John Brull, Anchor's chief financial officer, testified that if the use of supervisory goodwill "wasn't eliminated, we would have continued with our plan. We had only bought RFC a year and a half before [and][i]t was performing beyond our expectations. There would be no reason to sell it" if Anchor had retained its supervisory goodwill. Tr. at 2354–55; *see also* Tr. at 1267–68 (Test. of Mark Korell) (Q: "At any time prior to the implementing regs, did you have discussions with anyone at Anchor about the potential sale of RFC?" A: "No."). Likewise, defendant's expert, Frederic Forster, who testified as to what he thought drove Anchor to sell RFC, was unfamiliar with any statements or documents that indicated Anchor had any pre-breach intention to sell the company. Tr. at 3626–35.

### b. The Sudden Effect of the Breach

After the FIRREA implementing regulations were released on October 27, 1989, Anchor's position with respect to RFC changed so suddenly and sharply that it would be implausible to argue that anything *but* the regulations crystallized Anchor's sea change of support for continued ownership of RFC. To be sure, the FIRREA regulations did include non-breaching provisions. Defendant pointed in principal part to the non-

breaching risk-based capital guidelines and the investment-in-subsidiaries limitations as factors driving the RFC sale. But, as plaintiff proved beyond question at trial, the breaching provisions altering the regulatory accounting for supervisory goodwill were such a blow to Anchor, and so fundamentally altered the way the thrift was forced to conduct business, that they overshadowed all else and were the singular causal force that drove Anchor to sell RFC.

Almost overnight, Anchor realized how severe its capital shortfall under the new regulations would be, how extensive its recapitalization efforts would need to be, and how such a significant capital shortfall would make operating RFC a near impossibility. Mark Korell's memo outlining the steps for a "[f]ast and quiet cash sale" followed the next business day. PX 597. Mr. Large's letter to the board of directors advocating the sale of RFC came just one week later, the opening paragraph setting the tone: "Anchor's capital problems and the new regulations are making it increasingly difficult to support RFC." DX 358 at 1.

The reality for Anchor was simply that, without the benefit of supervisory goodwill, RFC required far too much capital for Anchor to continue to operate it while retaining any realistic hope of achieving the newly imposed capital requirements. Even with all of the new (non-breaching) risk-based capital requirements, it appears that Anchor would have been able to comfortably manage RFC if it were permitted to count its supervisory goodwill and preferred stock as regulatory capital. Because of the breach, however, Anchor was without this swell of capital. Operating RFC would have required substantial risk-based capital, and Anchor was simply unable to accommodate those needs while facing a capital deficit, even without RFC.

Moreover, because the capital deficiency caused Anchor to focus its entire business model almost exclusively on immediate gains to enhance capital, it no longer had the luxu-

ry of waiting for long-term profit potential to mature. Similarly, the organization became inherently risk-averse as a means to preserve what precious capital the bank did have; after the breach, Anchor could ill afford to tolerate operating losses that would erode capital and exacerbate its capital deficiency. See, e.g., Tr. at 252 (Test. of James Large) ("And we became acutely aware of the fact that any depression in earnings as a result of increased credit losses, or as I already said, interest rate risk swings, was totally untenable."). Anchor "could not afford even the slightest blip in [its] performance" that would have drawn the regulators' ire and worsened its already poor capital position. Tr. at 259 (Test. of James Large). It was in this context that Mr. Large advocated RFC's sale, in part because:

> 2. The risks associated with RFC including profit instability, the ever present possibility of a major loss due to a change in market conditions, or credit deterioration are *no longer* acceptable given our tenuous profit and *capital situation.*
>
> . . .
>
> 4. The *immediate profits* from RFC that would be lost [due to sale] are modest, and can, in large measure, be achieved from alternate investments with less risk and capital drain. While *Anchor will be foregoing a growing future stream* from the servicing build up, the resultant profits attributable to RFC are only slightly greater than the capital build up equivalent to the gain on sale *within the available time under FIRREA.*

DX 358 at 1 (emphases added). This memorandum was testament to the paradigm shift Anchor underwent in light of its new capital position, in which the long-term profit potential that Anchor recognized in RFC was muted by its immediate needs.[30] While Anchor was originally drawn to RFC's long-term profit potential, by the end of 1989 that allure "simply was inadmissible in an argument to hold [RFC]." Tr. at 255, 260. That sacrifice was Anchor's price to pay for com-

---

30. Even Anchor's regulators appreciated that RFC was a leading contributor to Anchor's income and, particularly, its non-interest income. In an FDIC memorandum recommending that Anchor's proposed capital plan be rejected, the insurance regulators feared that the sale of RFC would hinder Anchor's earning potential because it was a profitable enterprise. See PX 638 at 3.

plying with the new regulations, and in that challenge it "didn't have a moment to lose." Tr. at 260. The bank was forced to concentrate solely on its short-term capital position, and Anchor's managers recognized that, for the benefit of the rest of the institution, they desperately needed whatever capital could be salvaged from selling RFC. Furthermore, while Anchor could comfortably tolerate the risks of loss that RFC's business presented when it was well-capitalized, after the breach Anchor was simply unable to bear that risk. *See* Tr. at 252 (Test. of James Large) (noting that RFC's mix of operational risk "while it was quite comfortable in the nonbreach world, was unacceptable in the breach world").

### c. The Impact of the Loan–to–One–Borrower Restriction

Anchor's capital shortfall also triggered other operational problems for RFC. Anchor—and, by extension, RFC—was subject to the $500,000 loan-to-one-borrower restriction that RFC's management thought might cripple RFC's origination capacity. While the loan-to-one-borrower restriction was not a breaching provision of FIRREA, it only applied to Anchor because of the thrift's capital deficit; armed with supervisory goodwill, Anchor and RFC would not have faced the $500,000 lending limit, which did not apply to well-capitalized thrifts. As plaintiff's expert Jess Lederman testified, the restriction on RFC's lending capability made it clear to everyone involved in the secondary mortgage market—including originators that sold mortgages to RFC, customers that purchased MBS from it, and competitors trying to woo business away from it—that RFC was not at all immune from the capital problems Anchor was facing, and that just as Anchor faced possible extinction, so too did its subsidiary.

Both Mr. Korell and Mr. Lederman testified about growing apprehension in the secondary mortgage market, including origina-

tors that sold mortgages to RFC, customers who purchased MBS, and competitors, that Anchor might not survive and RFC would be dragged down with it. The potential, of course, was that RFC's reputation as the leading private issuer of mortgage-backed securities could be undermined if RFC continued to operate under the albatross that FIRREA and the new capital regulations imposed on its parent, Anchor.[31] Both Mr. Large and Mr. Korell articulated this concern at trial:

> [O]nce the full implication of FIRREA became understood and potential buyers realized that this was a forced—"forced" might not be the right word, but an unavoidable and necessary sale that simply had to go forward, that the value of-that we might get for RFC would be entirely different.

Tr. at 245 (Test. of James Large); *see also* Tr. at 1254–55 (Test. of Mark Korell) ("And my feeling was that time was our enemy. Time was our enemy, and that employees would leave, customers would leave and our business could deteriorate very rapidly.... We would have lost more customers and lost more employees, in my opinion, if we would have delayed any longer than absolutely necessary [in selling RFC]."); Tr. at 1432 (Test. of Jess Lederman) ("[T]he taking away of regulatory capital, which triggered the loan-to-one-borrower half million dollar limit was particularly devastating. As a longtime competitor of RFC, I can say all of RFC's competitors were licking their chops. There was absolutely blood in the water."); Tr. at 1608–09 (Test. of Jess Lederman).

At trial, defendant introduced evidence showing that, despite the loan-to-one-borrower restriction, RFC's mortgage originations for December 1989 increased by $10 million over the prior month. *See* PX 617 at 35 (Dec. 1989 Anchor Board of Dirs. Rep.). According to defendant, this document is a veri-

---

**31.** Ironically, this same phenomenon occurred with Suburban Coastal (Suburban's mortgage-banking subsidiary) in the years immediately preceding Anchor's Suburban acquisition. Mr. Vigna, Anchor's chief regulator, conceded at trial that Suburban Coastal deteriorated because it was owned and operated by a nearly insolvent thrift. Tr. at 721. The FHLBB had previously encouraged Suburban to spin off Suburban Coastal to raise capital, but potential buyers were deterred by Suburban Coastal's declining business, high employee attrition rates, and evaporating branch structure. Tr. at 721–22.

table smoking gun that proves RFC could have continued to operate profitably notwithstanding the lending restriction, effectively impeaching the trial testimony of Messrs. Large, Korell and Lederman on this issue. *See* Tr. at 3207–10 (Test. of Dr. Baxter).

This effort to impeach the testimony was not persuasive, though. First, the document cited by defendant itself stated Anchor believed this monthly performance "was an excellent sales effort *because RFC had to overcome the reduction in the maximum individual loan from $1,000,000 to $500,000.*" PX 617 at 35 (emphasis added). Thus, the impeaching document paid homage to the fact that RFC's performance may have been extraordinary in light of Anchor's problems. Second, defendant never questioned any of Anchor's fact witnesses, including Messrs. Large and Korell, nor its leading expert on the secondary mortgage market, Jess Lederman, about this document. Instead, defendant introduced the exhibit through plaintiff's damages expert, Dr. Baxter, but he was unable to provide any context for RFC's December performance. *See* Tr. at 3207–10. Finally, the optimistic outlook in the December 1989 report was subsequently overtaken by events. Just one month later, in January 1990, Anchor's report to the board of directors noted that "[p]roduction fell a bit from last month to $271 million in loans purchased and $187 million in commitments for future purchases. *The $500,000 loan ceiling is beginning to have a more negative effect as seller/servicers prefer 'full service' investors for jumbo loans.*" DX 400 at 34 (Jan. 1990 Board of Dirs. Report.) (emphasis added). This analysis was entirely consistent with the industry circumstances to which Mrrs. Large, Korell and Lederman testified. Accordingly, the inference defendant tried to draw from the document, that the loan-to-one-borrower restrictions did not really affect RFC at all, is not persuasive.

Defendant also tried to downplay the significance of the loan-to-one-borrower restrictions by suggesting that Anchor and RFC could have continued to market loans exceeding $500,000 by finding partner lenders to enter into participation agreements for those loans. In defendant's hypothetical, RFC could have lent up to its $500,000 maximum, with the participating lender providing a loan for any overage. *See* DPFUF at 34–35. Mr. Lederman [32] explained, however, that such a practice would have been highly impractical for RFC. *See* Tr. at 1437. He noted that, while the secondary mortgage market is inherently innovative when it comes to managing around new challenges, it would have been highly unlikely that RFC would have been able to find market participants (in the form of "participation" lenders) to help it navigate around a problem that was unique to Anchor. None of the traditional lenders would have been able or interested to take on participation interests in the kinds of mortgages RFC was purchasing. Thrifts and banks were not logical investors because much of RFC's business involved fixed-rate mortgages, the very same mortgages from which financial institutions were distancing themselves. *Id.* at 1436. Other institutional investors "want[ed] securities, something more liquid, not loans." *Id.* Finally, other conduit organizations would have been natural competitors unlikely to have an interest in helping to prop up RFC, the industry leader. *Id.* at 1436–37. In sum, as Mr. Lederman explained:

> The reason I think it's impractical [for RFC to circumnavigate the loan-to-one-borrower restrictions through participation agreements] is not because I think that it's unusual in the mortgage market to have to innovate, create new structures to solve problems that come up, challenges that come up. That happens all the time. That's business as usual in the mortgage market to have to innovate, create new security structures to deal with a changing market environment. The issue is you have a very unique situation here. . . . So the issue here is it was normal in the

---

**32.** At trial, Mr. Lederman demonstrated that, as a trailblazer in the secondary mortgage market throughout the 1980s and early 1990s, he developed a substantial familiarity with the market, along with its quirks, innovations, and partici-

pants. His testimony as an expert on the secondary mortgage market, based in principal part on his own role in shaping the then-nascent industry as a competitor of RFC, was thoughtful and highly credible.

secondary mortgage markets to innovate, to create new kinds of securities to deal with risk. Happens all the time, to have to pioneer new markets, find new investors who have never before bought a particular type of instrument. This is done all the time, where the issue is involving an industry-wide problem. Where the issue is solving a problem that is unique to one wounded institution, that is impractical and certainly would have been impractical in a short time frame. RFC did not have time.

Tr. at 1436–37.

Defendant also suggested at trial and in post-trial briefing that documentary evidence from 1991 undermined Anchor's claim that FIRREA's loan-to-lone-borrower limitation partially caused the sale of RFC. According to defendant, Anchor explained in a prospectus and an SEC registration statement that one of the reasons it exited commercial real estate and construction lending was because of the loan-to-lone-borrower limitations. *See* Def.'s Mot. for J. Based Upon Partial Findings at 12 (citing PX 672A at 66 (1991 Anchor Prospectus); DX 577 at 91 (1991 Anchor S–4 Filing)). However, defendant notes that later in these same documents, Anchor attributed the sale of RFC "to significant risk-based capital requirements that would be imposed on Anchor by FIRREA with respect to operating a subsidiary of this nature." *Id.* (citing PX 672A at F–11; PX 577 at F–13). According to defendant, "Anchor's management knew how to explain their understanding of the effect of the loan-to-lone borrower limitation upon the thrift; that they did not with respect to RFC refutes plaintiff's litigation position today." *Id.* at 12–13; *see also* Tr. at 3202–06 (Test. of Dr. Baxter).

Simply put, this argument is unpersuasive and fails to undermine or impeach the very credible fact testimony offered by Messrs. Large and Korell and the expert opinion testimony of Mr. Lederman. Since defendant never presented these documents to those witnesses to obtain their response, it is extremely difficult for the court to evaluate the 1991 documents in any sort of relevant context. Certainly, there is no *inconsistency* between the extensive testimony and contemporaneous documents that explain that the

loan-to-one-borrower restrictions were a *significant* consideration in bringing about the sale of RFC; the 1991 documents merely fail to mention this restriction as a driving force, but do not indicate that the restriction was in any way *not* a significant consideration.

Accordingly, plaintiff presented credible, persuasive evidence tending to indicate that the breach of contract—the disallowance of supervisory goodwill and the FSLIC's preferred stock as regulatory capital—and the loan-to-lone-borrower restrictions that the ensuing capital deficiency triggered were substantial motivating factors that caused Anchor to sell RFC.

### d. Anchor Did Not Sell RFC for Independent Business Reasons

RFC's success under Anchor and the context of the RFC sale—with Anchor's severe capital deficiency, immediate need for capital, aversion to risk, and restricted lending ability as an ever-present backdrop—belies defendant's argument that RFC was sold for independent business reasons such as Anchor's general intolerance for risk, its fear that it could not manage RFC's operations properly, or that it could not efficiently fund RFC. *See* generally Def.'s Mot. for J. Based Upon Partial Findings at 10–12. Throughout the trial, and in all of its briefing, defendant routinely directed the court to statements culled from Mr. Large's November 1989 letter advocating the sale of RFC which, taken in complete isolation, could be read broadly to imply that Anchor sold RFC for business reasons independent of the breach. *See* DX 358. The problem with this tack, of course, is that by reading the selected statements out of context as defendant implicitly advocates, the real meaning of the statements is obscured. The court must not be steered off course so easily.

#### i. The Role of Defendant's Expert Witness

In trying to make its case that Anchor sold RFC for independent business reasons—*see, e.g., Cal. Fed.*, 395 F.3d at 1270—defendant relied primarily on the expert testimony of Frederic Forster, who had experience in the thrift industry and has appeared as an expert in other *Winstar* cases. According to Mr.

Forster, his role as an expert in this case was to review Anchor's documents—particularly Mr. Large's November 1989 memorandum—and bring his own experiences to bear on events so as to shed light onto Anchor's decision-making process during that period. Tr. at 3447. As Mr. Forster summarized, "I was asked to look at various documents and determine in my own mind, as a manager, what thought process would be utilized to deal with the problems that Anchor faced and to try to figure out what I would do." *Id.* At trial, plaintiff called the court's attention to two primary concerns that undermined the weight of Mr. Forster's opinion testimony.

First, to the extent that Mr. Forster relied on his background in the thrift industry, plaintiff pointed out that very little of Mr. Forster's experiences were comparable to Anchor's, which could undermine his frame of reference for forming helpful opinions about Anchor's experiences. For example, a good portion of Mr. Forster's thrift background came from his experience as CEO and director of Newport Balboa Savings and Loan ("Newport Balboa"), where he stayed in some capacity for fourteen years. Tr. at 3381. Newport Balboa, however, was a small operation that started as a $2 million thrift and ultimately grew to a $50 million thrift. *Id.* It was not even close to the scale of Anchor at the time of FIRREA, which by then was a nearly $10 billion operation. Newport Balboa operated exclusively as a mortgage-banking operation, similar in respects to AMS and RFC, but was acquired by ITT Financial Services shortly after its inception. While operating Newport Balboa under ITT's ownership, Newport Balboa had "access to ... *an unlimited supply of commercial paper funding.*" Tr. at 3386 (emphasis added). The thrift "got the advantage of ... levering off [ITT's] commercial paper borrowing capacity" and "had lots of choices as to how to raise funds." *Id.* As a result, Mr. Forster's thrift experience, particularly with regard to capital and funding issues, was not at all similar to Anchor's. While Newport Balboa was growing, Mr. Forster testified that the thrift could have grown its deposit base, added branches, purchased branches, or borrowed money from the FHLB—all of which Anchor did—but Mr. Forster's bank "didn't do any of those things, or hardly any." Tr. at 3386–87. Instead, the "vast majority" of his bank's flexibility to structure its balance sheet "came through advances of commercial paper from the parent company." *Id.* Mr. Forster also had experience as a director of the FHLB of San Francisco, but in that capacity he did not get involved in any regulatory issues because there was "a Chinese wall" that separated his role on the lending side of the institution from the regulatory side. Tr. at 3389.

Part of the government's problem, therefore, is that much of Mr. Forster's own experiences, which formed the basis for many of his expert opinions, were not at all comparable to the kinds of circumstances that Anchor was forced to deal with after FIRREA. For example, while he worked for ITT as CEO of Newport Balboa, Mr. Forster did not have to deal with any capital issues or any regulatory issues involving capital. Tr. at 3407–08; 3482 ("I was a manager exactly at this time period, and I lived through precisely these moments in time."). As Mr. Forster conceded, he did not have to deal with any of the capital or regulatory issues that other thrifts, including Anchor, were forced to confront after FIRREA. Tr. at 3410–11. While the court found Mr. Forster to be a thoroughly candid witness, the weight of his testimony was undermined considerably by his lack of experience with the specific issues that are at the core of this case, including thrift capital compliance, regulatory pressures, the impact of FIRREA on the thrift industry, and the effect of the breach on Anchor. Because the opinions Mr. Forster offered at trial were based on his own personal career experiences, *see* Tr. at 3419, the court is wary that the scope of those experiences did not provide Mr. Forster with an adequate frame of reference to allow him to evaluate in context the decisions that Anchor's management had made immediately after FIRREA. Indeed, throughout parts of Mr. Forster's testimony, he seemed to ignore that the breach or Anchor's capital constraints had any impact, at all, on Anchor's operations. *See, e.g.,* Tr. at 3636 ("Q: [T]here are 27 cites [to exhibits] in your demonstratives and 23 of them are to

Mr. Large's [November 1989 letter advocating the sale of RFC].... And in none of those cites and nowhere on any of those demonstratives do you mention the word 'capital' or 'the loss of capital.' A: I don't recall having done so.").

Second, Mr. Forster's testimony was not consistently in a form that was helpful to the court. Certainly an expert can be helpful to the court in explaining technical issues involved in the case. For example, in *Cal. Fed.*, the Federal Circuit noted that this court "was entitled to consider the government's expert testimony to the extent that it shed light on the economics of finance and banking and thus helped explain why CalFed sold [assets] following FIRREA's enactment." *Cal. Fed.*, 395 F.3d at 1270. In that case, the trial court had found the expert's testimony informative as to "why a bank such as CalFed might well have chosen to dispose of the [assets], even in the absence of the breach, rather than retaining them...." *Id.* The expert testimony satisfied the requirement of FEDERAL RULE OF EVIDENCE 702, permitting expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* To the extent that Mr. Forster's testimony conformed to this manner, such as in explaining why it might have been to Anchor's advantage to make certain decisions or become more or less involved in different lines of business, it was helpful to the court. To the extent that Mr. Forster testified in the abstract about the thrift industry, in general, his testimony assisted the court.

However, a substantial portion of Mr. Forster's testimony consisted of his "interpretation" of Anchor documents, in which Mr. Forster purported to explain to the court what Anchor's management "really meant" in the documents, as opposed to what the thrift's fact witnesses, including Mr. Large, testified to at trial. *See, e.g.,* Tr. at 3427–28 ("I think that my analysis was based upon contemporaneous documentation, and I view that as more reliable than recollections [of Anchor's fact witnesses] observed through the fog of 15 years. And I reached my conclusions based upon what I just described as a reality of the way people think things

through."); 3429 ("Q: You are not prepared to say that Mr. Large or any of the managers were lying, are you? A: I don't know. In some cases, the differences are so obvious and so dramatic, I can't explain why they testified the way they did."). In other words, Mr. Forster testified about why Anchor's management made the decisions it did, and parsed the bank's contemporaneous documents to explain those decisions. In many instances, however, Mr. Forster's testimony took on the role of rebuttal testimony to plaintiff's fact witnesses. *See, e.g.,* Tr. at 3636–37 ("Q: And you would agree that James Large is in a better position to explain what he meant in this letter than you are, correct? A: You would think so. Sometimes I have trouble believing that, however."). In this role, Mr. Forster's opinions were less helpful to the court, particularly because the court, itself, is better situated to evaluate the credibility of plaintiff's fact witnesses and determine what weight to give their own explanations of matters. Testimony about the credibility of a fact witness is not in the province of an expert witness. So, to the extent that Mr. Forster's testimony was geared toward presenting alternative approaches that Anchor's management might have considered at the time or the particular benefits of certain decisions, it was helpful. But to the extent that his testimony took on an air of clairvoyance to explain what Anchor's management was thinking, and how those thoughts are borne out in the documents before the court, it was not.

### ii. Mr. Large's November 1989 Memorandum

Mr. Forster focused on what he believed were the key reasons Anchor decided to sell RFC, which were outlined in Mr. Large's November 1989 memorandum to the board of directors advocating the sale. As discussed above, the memorandum itself, and Mr. Large's testimony explaining the memorandum, made clear that Anchor's breach-induced capital position was the pervasive context in which the memorandum was written. Nevertheless, the entirety of Mr. Forster's testimony on this issue disregarded Anchor's capital concerns and focused instead on what he perceived to be other, unrelated business reasons that drove the sale. *See* Tr. 3469–

538; 3473 ("Whether FIRREA was there or not, the hand that was dealt to him would have forced the divestiture of [RFC].").

First, Mr. Forster testified that, in his opinion, Anchor sold RFC because the nature of the risks involved in operating RFC were inconsistent with Anchor's institutional tolerance for risk. *See* Tr. at 3470–71. Mr. Large's memorandum had indicated that "RFC must routinely accept a higher level of risk (market and credit) than Anchor is used to." DX 358 at 2. According to Mr. Forster, this comment was a signal that Mr. Large perceived a "disconnect" between Anchor's business characteristics and RFC's. Tr. at 3480–81. Mr. Forster pointed out that Mr. Large seemed concerned with RFC's history of large, one-time losses before Anchor purchased it (and before RFC moved its hedging program in-house). *See* DX 358 at 7. Mr. Forster noted that Mr. Large feared that RFC's "associated risk grows more rapidly than Anchor's ability to absorb it," because at the time RFC was accumulating subordinate securities and had been unable to sell them. DX 358 at 7.

In light of these risks, Mr. Forster testified that Anchor decided to sell RFC because RFC provided inadequate returns. In his opinion, "the risk/reward relationship was out of whack." Tr. at 3470. He noted that Mr. Large cited, among others, a decline in RFC's expected annual profits, from $10 million in 1989 to only $8 million in 1990. Tr. at 3476; DX 358 at 5. Moreover, Mr. Forster pointed out that Mr. Large's memorandum considered RFC's profits "relatively modest given the risk involved" and indicated that those profits were "largely replaceable by alternate investment strategies." DX 358 at 5. Finally, Mr. Forster pointed to the memorandum's concession that RFC's profits are cyclical, and that they are "vulnerable to even modest [interest] rate changes." DX 358 at 7; Tr. at 3478.

Based on these comments in the memorandum, Mr. Forster testified that he believed Anchor sold RFC specifically because of this alleged imbalance of risk and reward. According to Mr. Forster, the references to these risks in the November 1989 memorandum demonstrated that Mr. Large was "someone who evaluated the world as he saw it, identified the risks that he saw, and concluded that this was an entity that ... should not be part of Anchor." Tr. at 3483. While Mr. Forster acknowledged the benefits that Anchor drew from RFC's servicing buildup, he believed that to obtain those benefits Anchor "found themselves engaged in a very large-scale business activity that came with it a collection of risks and managerial problems that were troublesome." Tr. at 3484.

Nevertheless, the tremendous emphasis that Mr. Forster placed on isolated comments included in Mr. Large's memorandum was not wholly persuasive to the court because he evaluated those comments out of context, and in some cases, disregarded qualifying language in the memorandum itself. For instance, the November 1989 memorandum lists the primary reason for selling RFC as the passage of FIRREA itself, although the memorandum also details a myriad of other reasons. To be sure, James Large, publicly commenting on the sale of RFC in a "News Release," dated February 9, 1990, confirmed that the "sale of RFC is consistent with Anchors strategic repositioning following the enactment of the [FIRREA]" and noted both that while "the new FIRREA capital rules made it extremely difficult for Anchor to continue to support RFC's growth" the "capital obtained from the sale will help Anchor meet its [new] capital requirements under FIRREA." PX 631.

In short, Anchor's entire enterprise was forced to react to an immediate and overwhelming capital shortfall that threatened the very existence of the bank. The situation was akin to triage, because Anchor's entire management and operational focus became singular: do whatever it takes, including sacrificing valuable assets, to raise capital and ensure the long-term viability of the franchise. Furthermore, as Mr. Large noted in his letter advocating the sale of RFC, all of the steps that Anchor took would have to focus on short-term gains because the capital raising would have to occur within a short time-period acceptable to the bank's regulators.

### e. The Risk–Based Capital Provisions Would Not Have Caused Anchor To Sell RFC *But For* the Breach

A third substantial factor motivating the RFC sale was another non-breaching FIRREA provision, the so-called "risk-based capital" requirement. There is no doubt that the risk-based capital requirement, in confluence with the breach and subsequent loss of regulatory capital, was a persuasive reason to sell RFC. Defendant argues, however, that the risk-based capital rules acted independent of Anchor's regulatory capital position as the single most important cause of RFC's sale, and that the sale would have taken place regardless of the breach. *See* Def.'s Mot. for J. Based Upon Partial Findings at 8–10.

As explained below, defendant's argument is not persuasive because it fails to consider the context in which Anchor was forced to accommodate the risk-based provisions: namely, Anchor was capital-starved because of the breach. Defendant cites to a host of statements from Anchor's management that are contemporaneous with the breach and the sale that identify the risk-based capital provisions as a primary factor motivating the sale. In nearly every one of these circumstances, however, the statements regarding the risk-based capital provisions are delivered in the context of the post-breach realities to which Anchor was forced to react. Accordingly, defendant's reliance on these statements as proof that the risk-based provisions and *not* the loss of supervisory goodwill forced the sale of RFC is flawed because the statements *must* be read in the context of Anchor's impaired-capital position.

Similarly persuasive, it seems that if Anchor had been permitted to count supervisory goodwill towards its risk-based capital provisions, consistent with its contractual promises, it would have had more than enough capital to satisfy the risk-based capital requirements in 1990 when Anchor sold RFC. Moreover, after Anchor decided to sell RFC, RFC was able to unload substantial, capital-hungry, subordinate securities to a secondary market buyer, creating new flexibility for Anchor that, in the "but for" world,

would have allowed the thrift to tolerate considerably more assets. In such a scenario there would have been no need for the "[f]ast and quiet cash sale" that Mr. Korell advocated in November 1989. Instead, Anchor's capital cushion would have given the bank the flexibility needed to continue operating RFC while devising a strategy to deal with the long-term implications of the risk-based capital provisions on RFC's operations. As Anchor's experts demonstrated at trial, alternative strategies were available to dampen any long-term impact that the risk-based capital requirement might have had on RFC.

### i. The Mechanics of the Risk–Based Capital Requirement

The risk-based capital provisions were designed to require thrifts to account for the level of relative risk inherent in their investment portfolios. For instance, while a treasury security bears almost zero risk of loss, a thrift investment in high-yield ("junk") bonds would be relatively risky. The risk-based capital provisions attempted to quantify a thrift's capital requirement as a function of this risk.

The regulations also tried to capture a thrift's exposure to risk that was not identified on its balance sheet. For Anchor and RFC, this off-balance sheet exposure came into play particularly because of the credit enhancement structure RFC used to issue MBS. As mentioned above, RFC had to credit enhance all of its MBS in order to obtain an investment-grade credit rating for the issue. For the period that Anchor owned RFC, it relied first on letters of credit (an "external" credit enhancement) and later primarily on a senior/subordinated security structure to "internally" credit enhance the MBS. Under the senior/subordinated security structure, the securities for an underlying pool of mortgages are divided into at least two classes, with an "A" security and a "B" security. The "B" piece, which for RFC typically comprised of 6–7% of an issuance, was the subordinate class and absorbed almost all of the risk of loss inherent to the entire pool of mortgages; in a pool of $1 billion in mortgages, RFC would create about $60–$70 million in "B" pieces so that

the remainder of the "A" piece senior securities would rate as investment grade.

By the end of 1989, a secondary market for subordinate securities had not matured. Most private MBS issuers that credit enhanced using the senior/subordinated structure, RFC among them, were forced to hold the subordinate security as an asset. While holding the "B" piece as an asset did not expose its holder to any loss greater than the face amount of the subordinated security (in the unlikely event of a total loss), under FIRREA's new risk-based capital guidelines, subordinate securities required a considerable amount of capital. Since the subordinate security absorbed the risk of loss associated with the entire pool of mortgages underlying both classes (senior and subordinate) of the security, and not just 6–7% of the pool (the relative ratio of "B" pieces to "A" pieces), regulators determined that the "B" piece was a "limited recourse obligation" that constituted an off-balance sheet risk for which thrifts must hold additional capital.

### ii. The Impact of Risk–Based Capital on Anchor and RFC

For Anchor, this capital requirement was prohibitive, given its capital impaired state. Projections that the thrift compiled based on its asset structure as of the end of September 1989 anticipated a risk-based capital deficit of some $362 million, without the benefit of $543 million in regulatory capital FIRREA forced it to write off. *See* PX 57 at 12. This moment was not lost on Anchor's management, and Mr. Large's November 1989 letter advocating the sale of RFC squarely recognized the impossible hurdle that the risk-based capital provisions presented Anchor; the provisions "heavily penalize[d] RFC's activities from a capital point of view." DX 358 at 6. At the time Anchor faced the capital deficiency, it was not in a position to hold "B" pieces "due to Anchor's capital constraints," but had nearly $66 million in "B" piece assets in portfolio. Tr. at 588–95 (Test. of James Large). This was due in primary part to the fact that up to that time RFC had been unsuccessful in selling any "B" pieces to other investors and, as Mr. Large noted, these subordinated securities were "unavoidably accumulating" in RFC's portfolio as a consequence of RFC's high volume of business and preferred senior/subordinated MBS structure. DX 358 at 3, 6. In addition, RFC had roughly $180 million in outstanding letters of credit from its earlier MBS that was subject to the same risk-based accounting. *Id.* at 6.

Defendant rightly points out that so long as RFC relied on the senior/subordinated credit enhancement structure, it was necessary for RFC to hold at least *some* quantity of "B" pieces in its portfolio at any one time. *See* Def.'s Mot. for J. Based on Partial Findings at 9–10. This is so because RFC felt that it was a "strategic necessity" to wait for appropriate market conditions in which to sell the subordinated securities—a concept identified at trial as "market timing." *Id.*; PX 587 at 2; Tr. 1302–04, 1308 (Test. of Mark Korell).

Without question, *given Anchor's impaired capital position*, the risk-based capital provisions prohibited Anchor from operating RFC in an efficient, or even profitable, manner. Without its capital cushion, RFC's existing limited recourse obligations—the outstanding letters of credit and the "B" piece subordinated securities—created an enormous capital requirement that forced Anchor into a capital deficiency. Moreover, faced with that deficiency Anchor could ill-afford any additional capital requirements that it would face as RFC continued to create more "B" pieces and hold them in the normal course of business until an appropriate time came to sell the subordinated securities in the secondary market (thereby relieving Anchor of any capital requirement associated with those securities).

Based on the evidence and testimony presented at trial, however, the court finds that the risk-based capital provisions required the sale of RFC *only* because of Anchor's capital deficiency resulting from the breach. In a hypothetical world in which Anchor could continue to count its contractual supervisory goodwill towards its risk-based capital requirement, there would have been no need to sell RFC in 1989–90, and Anchor could have continued to comfortably operate RFC without running afoul of any risk-based capital requirements. According to defendant's own expert, W. Barefoot Bankhead, but for the

breach Anchor would have been well-capitalized when the risk-based capital provisions went into effect and would have been able to absorb additional assets before facing a capital deficiency. *See, e.g.,* PX 1049 (Schott Demonstrative exhibit); DX 4019A (Lederman Demonstrative exhibit).

Furthermore, as Anchor's experts demonstrated at trial, the market for subordinated MBS was just beginning to emerge at the same time that the risk-based capital provisions went into effect. The very same "B" pieces that Mr. Large feared were "unavoidably accumulating" in November 1989 were very quickly becoming the target of savvy institutional investors. Indeed, the same $66 million of "B" pieces in RFC's portfolio that Mr. Large lamented in his November 1989 letter because of their attendant capital requirements were sold to an investor just a few months later, before Anchor sold RFC to GMAC. *See* Tr. at 1614–15 (Test. of Jess Lederman) (noting that Mr. Lederman's investment company, Asset Backed Capital Group, "participated in the purchase of all $66 million," consisting of Anchor's entire portfolio of subordinate securities). As Anchor's expert, Mr. Lederman, explained, the market for subordinated MBS evolved rapidly, and the opportunity would have existed for Anchor to sell a large volume of subordinated MBS had it continued to hold RFC. *See* Tr. at 1458 (Test. of Jess Lederman). While Anchor would not have been entirely relieved of the need to hold some level of subordinated MBS in RFC's portfolio—there would always be the need to accommodate a small warehousing of the "B" pieces to allow market timing—the court finds that Anchor's capital cushion with the contractual supervisory goodwill would have allowed it to comfortably absorb this risk within the ordinary course of its business.

Moreover, and as discussed more thoroughly later in this opinion, Mr. Lederman testified that to the extent that RFC's MBS volume exceeded Anchor's ability to absorb the risk associated with the "B" pieces in the future, RFC could substitute some other form of credit enhancement, such as pool insurance, to create securities with the same marketability but which did not require RFC to create any subordinated "B" pieces or bear any recourse that triggered the prohibitive risk-based capital requirement. Mr. Lederman noted that RFC had actually used pool insurance as an alternative credit enhancement tool for some of the issues it offered in 1989 after FIRREA was passed—in partial response to the looming risk-based provisions. Pool insurance is the classic "external" credit enhancement in which a third party insures the MBS issue, relieving the issuer (RFC) of any recourse, or risk exposure.

At trial, defendant's expert economist, Dr. Andrew Carron, argued that the risk-based capital provisions made it uneconomical for thrifts in general to own a conduit like RFC. *See* Tr. at 4257–64. As "evidence" of this charge, Dr. Carron pointed out that after FIRREA thrifts became a virtual nonentity as issuers of private-label MBS. *See, e.g.,* DX 1505. Dr. Carron attributed this exit from the market to the enormous risk-based capital requirement inherent to a conduit operation, noting that a thrift would need to employ its capital much more efficiently to generate a return for investors than having it tied up in substantial part to support the operations of a conduit like RFC. Dr. Carron testified that:

> Capital is valuable. You're going to need to earn a return on it because the investors who provide the capital demand a market rate of return or they will take their capital and put it somewhere else, to some other company. The returns—well, the amount of capital that a thrift has to hold against [RFC's] business is much higher than the capital that a nonthrift doing exactly the same business has to hold.

Tr. at 4260.

Dr. Carron's observation is not without merit, but its weakness is that it fails to take into account the role that supervisory goodwill played in Anchor's specific ability to own and operate RFC. Although other thrifts may well have found it impractical to operate a capital-hungry enterprise like RFC, Anchor's unique non-breach position, in which it had the benefit of more than $500 million in additional regulatory capital, made RFC an ideal investment opportunity for Anchor. As

Dr. Carron, himself, pointed out during his testimony, Anchor would have been hard-pressed to find investment opportunities that would take profitable advantage of its excess capital. *See* Tr. at 4232–40. He invoked the economic principle of diminishing marginal returns and pointed out that Anchor never "levered up" all of its capital and maintained a substantial regulatory capital cushion—ostensibly because it could not find enough profitable investment opportunities for all its capital. *Id.* That, however, is exactly the reason that RFC was such an ideal fit for Anchor, because it permitted the thrift to finally take full advantage of its supervisory goodwill, employing it in a profitable venture that generated both lucrative servicing rights and loan volume for Anchor's portfolio. Moreover, supervisory goodwill was essentially "free" capital, in the sense that there was no obligation for Anchor to generate a return on that capital for its investors beyond the annual amortization expense of the goodwill—it was substantially different from the investment capital with which a traditional thrift would operate and on which Dr. Carron focused in his testimony at trial. *See* Tr. at 4260. Therefore, the fact that *other* thrifts might have exited the private-label MBS market after FIRREA, in general, is irrelevant to whether RFC was a viable enterprise specifically for Anchor.[33]

All of this leads to the conclusion that the risk-based capital requirements would have been nothing more than an ongoing, but routine, business concern for Anchor to manage had it continued to hold RFC in the non-breach world. Accordingly, the court finds that Anchor, armed with its contractual supervisory goodwill and but for the breach, would have had a sufficient capital cushion such that RFC's limited recourse obligations would not have caused Anchor to be undercapitalized under the risk-based capital re-

quirements, and would not have interfered with Anchor's ability to own or operate RFC at historical volumes. Moreover, as the market for subordinated MBS matured—which occurred very quickly beginning in 1990—Anchor would have found a convenient market in which it could have sold its "B" pieces to relieve any accumulated buildup of limited recourse obligations. Furthermore, had Anchor continued to operate RFC throughout the 1990s, management would have had the opportunity to employ alternative methods of credit enhancement that were just as efficient as the senior/subordinated structure and actually turned out to be more profitable in the long run, but which had no capital requirement under the risk-based provisions. Accordingly, defendant's invocation of the risk-based capital rules does nothing to undermine Anchor's persuasive demonstration that the breach of contract was the causal force driving Anchor's divestment of RFC.

### f. The Investment–in–Subsidiary Limitations Did Not Force Anchor To Sell RFC

Similarly, defendant's argument that the investment-in-subsidiary regulations, another non-breaching FIRREA regulation, forced the sale of RFC is unpersuasive. *See* Def.'s Mot. for J. Based Upon Partial Findings at 11. On June 19, 1989, Anchor's regulators informed the thrift that it exceeded investment-in-subsidiary limitations by an estimated $312 million. PX 566 at 2. Anchor acknowledged that this violation was caused primarily by Anchor's loans to RFC to finance RFC's warehouse of whole mortgages. *See* PX 581 at 1 (Aug. 29, 1989 letter from Eugene Shultz, Anchor General Counsel, to Martin Lavelle, OTS).

---

**33.** Moreover, the court is inclined to draw a different inference regarding the exit of thrifts from the private-label MBS industry. In 1988, four of the top-ten issuers of private-label MBS were thrifts (including Anchor's RFC). RFC issued about $475 million in securities that year, Western Federal Savings and Loan issued $468 million, California Federal Savings and Loan issued $467 million, and Guardian Savings issued $106 million. At least three of these institutions, including Anchor, had substantial supervisory

goodwill balances when FIRREA became effective. *See, e.g., Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 140 (2002) (noting that transaction generated $116 million in goodwill); *Cal. Fed. Bank v. United States,* 43 Fed.Cl. 445, 448 (1999) ("At the time of FIRREA, $390 million in goodwill remained on Cal Fed's books."). The fact that these thrifts exited the private-label market may therefore be better explained in the context of those thrifts battling severe capital problems as a result of the government's breach.

Anchor took two approaches to deal with the regulators' concerns. First, in a June 29, 1989 letter Anchor disputed that the FHLBB had properly calculated the limits on its subsidiary investments. The gist of this dispute was that when Anchor had converted to a federal thrift charter in 1980, it had been grandfathered in with certain New York regulatory restrictions, including a less restrictive investment-in-subsidiary limitation. PX 569 (August 29, 1989 letter from Mr. Schultz to Mr. Lavelle). Essentially, the dispute focused on how Anchor's investment limitation should be calculated.

Subsequently, in a August 29 letter, Anchor informed its regulators that it believed it had successfully overcome any investment restrictions by reorganizing the funding structure for RFC's mortgage inventory. Originally, Anchor loaned RFC money to purchase whole mortgages from RFC's correspondents. Those loans would remain in RFC's own inventory for a brief period for "seasoning" before being pooled into an MBS. While the mortgages were in the RFC warehouse, however, they represented an outstanding loan from Anchor to RFC. As Anchor's general counsel, Eugene Schultz, noted,

> the major reason for [Anchor's] excess loans to subsidiaries came about as the result of funding of [RFC]'s warehousing line, since Anchor's ability to fund was the most cost-effective way of allowing [RFC] to acquire mortgage loans for the purposes of securitization.

PX 581 at 1. In response to the regulators' concerns involving investment-in-subsidiary limitations, Anchor organized a two-pronged change to RFC's financing model. First, RFC arranged for independent financing from third parties to partially fund its operations. *Id.* Second, Anchor entered into an "Agency Agreement" with RFC in which RFC would "act as Anchor's agent in the acquisition of mortgage loans for Anchor's trading account." *Id.* at 1; PX 576 (copy of signed Agency Agreement). Pursuant to the Agency Agreement, these loans would "either be repurchased by RFC for securitization, securitized by Anchor itself, or sold as individual loans to third parties or in the

secondary market." PX 581 at 1. RFC would continue to operate market hedging strategies on behalf of Anchor, but would no longer own its own mortgages prior to sale. By eliminating the need to fund an RFC warehouse of whole mortgages, Anchor believed it had likewise eliminated any investment-in-subsidiary concerns. *Id.*; Tr. at 2527 (Test. of Gene Brooks, Anchor General Counsel); PX 181 at 3 (Anchor Asset/Liability Mngt. Committee Mtg. Minutes) ("As of the end of September, Residential Funding Corporation is acting as agent for Anchor in originating loans. Much of the [RFC] pipeline has been transferred to Anchor which should place Anchor in compliance with regulatory limits on loans to and investment in subsidiaries.").

In November 1989, after Anchor had already decided to sell RFC, OTS replied to Anchor's June 1989 letter suggesting that Anchor's grandfathered New York thrift rights permitted a more flexible investment-in-subsidiary limitation. *See* PX 608. In an eight-page letter, OTS roundly rejected Anchor's more-flexible investment calculation, concluding that a calculation based on the federal regulation was the most flexible one that Anchor could apply. *Id.*

Nowhere in its November letter, however, did the OTS object to the agency agreement that Anchor had proposed in its August letter. In fact, Gene Brooks, Anchor's general counsel, testified that OTS never responded to Anchor's agency agreement argument. Tr. at 2528.

Plaintiff's expert, Eugene Katz, a former general counsel to OTS, testified about what he perceived to be the cause of Anchor's investment-in-subsidiary problems and potential solutions available to the thrift. First, Mr. Katz reiterated Mr. Schultz's conclusion that Anchor's loans to RFC were the primary cause of any of Anchor's investment problems. Mr. Katz reviewed the June 1989 letter from Anchor's regulators informing the thrift of the investment-in-subsidiaries violation and noted that of the two forms of investment captured by this regulation (including a thrift's equity investment in a subsidiary and any unsecured loans to it), Anchor's unsecured loans to RFC were sub-

stantially greater than it's equity investment. If Anchor eliminated its unsecured loans to RFC, Mr. Katz testified that Anchor would be comfortably within any applicable investment-in-subsidiary limitation. Tr. at 2219–24 ("It is apparent to me from these numbers, and understanding how these regulations work, that the real problem here was the amount of credit being extended by Anchor to RFC and not the equity investment by Anchor in RFC.").

Mr. Katz testified about practical solutions available to Anchor that he believed would have conveniently accommodated the investment-in-subsidiary restrictions without undermining Anchor's ability to operate RFC's lucrative business. At trial, he stated that he believed "that [the investment-in-subsidiary limitation] was certainly a problem that could have been reasonably easily taken care of by Anchor through one or more of those options." Tr. at 2215.

First, Mr. Katz noted that Anchor could have replaced its own credit to RFC with third party financing. Both Mr. Korell and Mr. Lederman testified that RFC had a solid reputation and that any number of financial institutions would have been interested in lending RFC money—even more so because Anchor maintained a strong equity position in RFC and RFC's financing could be secured by mortgages from its warehouse. Tr. at 2237 ("[B]oth [Mr. Korell and Mr. Lederman] alluded to the fact that that sort of outside financing was readily available to the bank."), 2238 ("[A]s long as Anchor was maintaining that equity position, which would have been subordinate to lenders, especially secured lenders, it strikes me that that is a structure that is more likely to attract funding, because they do have the cushion of that equity position of Anchor.") (Test. of Mr. Katz). As Mr. Katz pointed out, by August 1989 Anchor had already begun to implement this option to partially fund RFC's operations.

Second, Mr. Katz testified that Anchor could have consolidated RFC into Anchor and "conducted the activities that RFC was engaged in in-house ... they could have brought those activities directly into the bank and conducted them through the bank, it-

self." Tr. at 2215. The activities that RFC conducted "were permissible to Anchor itself" and could have been run out of the bank without the need for financing a subsidiary. Id. Mr. Katz was of the opinion that this type of reorganization could have been conducted with minimal regulatory involvement. Tr. at 2239–45. Functionally, Mr. Katz compared this potential solution with the Agency Agreement that Anchor and RFC actually entered into in August 1989:

> [T]he agency proposal that we saw here is really, as I said, a structure where the loans would be originated by and funded by the bank itself, so that the bank itself would make the loans and hold the loans. RFC would simply serve as an agent for the bank in going out and ... gathering [those loans].

Tr. at 2246. Essentially, then, Anchor had already moved towards two of Mr. Katz's proposed solutions to the investment limitations—in part by securing third party financing for RFC's operations, and in part by bringing some of those operations in-house and obviating the need for the subsidiary to hold a large mortgage portfolio of its own.

> In conclusion, Mr. Katz testified that he thought the investment-in-subsidiary issue was a very fixable problem. I think it was something that could have been handled, and it seemed to me that under the regulations at the time, there were the options that I pointed to, and it looked to me that Anchor was moving along those options and trying to deal with that problem.

Tr. at 2252. Defendant did not present any testimony that contradicted Mr. Katz's opinions. Ultimately, the court finds that Mr. Katz's testimony was credible, that the options he presented were well within the realm of possibilities that Anchor could have conveniently considered, and that the actions Anchor began to take in August 1989 reveal that the thrift was actively engaged in maneuvering around any investment-in-subsidiary limitations. If Anchor had continued to benefit from its contractual supervisory goodwill and retained RFC's operations, its managers would have successfully dealt with this limitation and it would not have separately caused Anchor to divest RFC.

In sum, the court finds that plaintiff has proven beyond a preponderance of the evidence that the causal connection between the breach of contract and the divestment of RFC—a profitable asset capable of imminent growth for Anchor if the supervisory goodwill contracts not been breached—has been "definitely established." *California Fed. Bank v. United States*, 395 F.3d 1263, 1267–68 (Fed.Cir.2005) (quotations omitted). Although there were other factors operating in confluence with the breach that may well have heightened the sense of urgency with which Anchor sold RFC, the breach alone was sufficient to force the sale. Defendant's various arguments regarding alternative causes for the damages, each of which seem to disregard the actual impact of the breach on Anchor's operational capacity, lack merit and are unpersuasive.

## 2. Anchor's Lost Profits Were Foreseeable at the Time of Contracting

The Federal Circuit has articulated its rule that, to be entitled to expectancy damages including lost profits, a *Winstar* plaintiff "must show that the lost profits were within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting." *California Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir.2005) (citing *La Van v. United States,* 382 F.3d 1340, 1351 (Fed.Cir. 2004); *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002); RESTATEMENT § 351(1)). This is, of course, the Circuit's refinement of the traditional common law rule of foreseeability in *Hadley v. Baxendale:*

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be (1) such as may fairly and reasonably be considered either arising naturally, *i.e.,* according to the usual course of things, from such breach of contract itself, or (2) such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

156 Eng. Rep. 145 (1854). "In other words, such losses [claimed for a breach of contract] must be either of the type usually resulting from breach of like contracts, or, if unusual, the circumstances creating the special hazard must have been communicated to the defaulter before he made the bargain." MCCORMICK ON DAMAGES § 138 at 562 (1935).

Expectancy damages are typically grouped into two categories, "general" and "consequential" damages. *See* DOBBS at 752. In the parlance of *Hadley,* general damages encompass those that arise "in the usual course of things" from a breach and are sometimes calculated by market measures. *Id.* For example, "[w]hen the defendant reneges on a promise to sell the plaintiff certain shares of stock for $10,000, the plaintiff's recovery can be measured by the difference between the contract price and the market price of the shares." *Id.* Consequential damages, or "special" damages, on the other hand, typically embrace damages measured "not by the value of the promised performance alone but by the gains such performance could produce for collateral reasons, or the loss that is produced by the absence of such performance." *Id.* It is these consequential or special damages, which often consist of "lost profits," to which the second prong of the *Hadley* analysis applies, and for which the foreseeability requirement obtains. *Id.*

In the *Winstar* context, general damages and the first prong of the *Hadley* analysis often do not apply because supervisory goodwill, in and of itself, was not a profit-generating asset. Although the preferential regulatory treatment of supervisory goodwill clearly had economic value because it allowed a thrift to lever-up its balance sheet with (ideally) profit-generating assets it could not otherwise hold, no thrift profited from goodwill, alone. Damages from the loss of supervisory goodwill, then, do not arise "according to the usual course of things, from such breach of contract itself," in the *Hadley* parlance—there is no market measure of the loss—but rather through an abstraction of the supervisory goodwill transactions in the form of consequential damages

or lost profits. The immediate effect of a thrift's loss of supervisory goodwill (for a thrift unable to generate replacement capital) was the inability to hold as many assets as before, and it is the loss of these assets—the institutional shrinkage—that is the root of the *Winstar* lost profits calculus.

Since *Winstar* lost profits claims are necessarily consequential in nature, the second prong of the *Hadley* analysis requires that those damages be "such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." This is a limiting concept designed to bring the unforeseeable risks and liabilities of entrepreneurship in line with those an entrepreneur originally supposed was involved in a transaction and the corresponding benefit that the entrepreneur stood to gain. E. ALLAN FARNSWORTH, 3 FARNSWORTH ON CONTRACTS § 12.14 at 255 (3d ed.2004) [hereinafter FARNSWORTH]. The Federal Circuit has, in part, reined-in this second prong of *Hadley* by invoking a general rule that recoverable lost profits may not emanate from "independent and collateral undertakings," apparently without regard to whether or not the government as defendant had any special knowledge of the potential for consequential damages emanating from such undertakings:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.... But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consider-

ation as a part of the damages occasioned by the breach of the contract in suit.

*California Fed. Bank, F.S.B. v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001) (quoting *Wells Fargo v. United States*, 88 F.3d 1012, 1022–23 (Fed.Cir.1996) (quoting *Ramsey v. United States*, 121 Ct.Cl. 426, 101 F.Supp. 353 (1951))). On its face, this limiting construct of *Hadley* might be interpreted to foreclose lost profits damages in the *Winstar* context, since any claim to lost profits requires an analytical abstraction from the supervisory goodwill—the subject of the supervisory agreements and the breach—to any forsaken assets that actually generated profits. *See* Def.'s Mot. for J. Based upon Part. Findings at 18 ("Anchor's decision to purchase RFC in 1988 is a classic example of an 'independent and collateral' undertaking that was completely unrelated to the thrifts and branch system Anchor acquired as part of the contracts at issue in this case.").

Notwithstanding this limitation on the traditional common law rule of *Hadley*, which one commentator has dubbed the "collateral undertakings rule," [34] the Federal Circuit has routinely recognized that lost profits are recoverable when those profits emanate from *"the use of the subject of the contract itself,"* regardless of whether independent or collateral undertakings are involved. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (Fed.Cir.2002) (quoting *Cal. Fed.*, 245 F.3d at 1349) (emphasis added); *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961). In *Winstar* precedent, the Federal Circuit has specifically acknowledged that the "continued use of supervisory goodwill as regulatory capital for the entire 35–40 year amortization period initially promised was ... a central focus of the contract and the subject of the government's breach." *Cal. Fed.*, 245 F.3d at 1349. Accordingly, in keeping with Federal Circuit precedent, lost

---

**34.** *See* Daniel P. Graham, *Departing from* Hadley, *Recovering Lost Profits on Collateral Undertakings in Suits Against the Government*, 35 PUB. CONT. L.J. 43 (2005) (tracing the lineage of the collateral undertakings rule and attempting to reconcile *Wells Fargo* with *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed.Cir.2002)). Interestingly, Mr. Graham views *Energy Capital's* allowance of lost profits that emanate from "the use of the subject of the contract itself," (*Cal. Fed.*, 245 F.3d at 1349) to be a cogent variation or exception to the collateral undertakings rule. Seen this way, this exception brings the Federal Circuit's lost-profits jurisprudence closer to the modern common law as developed in the various American states and other common law jurisdictions, including the United Kingdom. *Id.*

profits emanating from the loss of the contractual goodwill are recoverable in *Winstar* cases because "[p]rofits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages." *Id.* Those damages are *not* precluded simply because they might arise from independent or collateral undertakings.

The issue, then, is whether the damages claimed by Anchor from the sale of RFC are of the type that "may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." *Hadley,* 156 Eng. Rep. 145; *Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir.2005).

"Foreseeability is a question of fact." *Landmark Land Co. v. FDIC,* 256 F.3d 1365, 1379 (Fed.Cir.2001). Here, defendant argues that damages attributable to the forced sale of RFC were not foreseeable, and are therefore not recoverable, for two primary reasons. First, defendant maintains that at the time the FSLIC entered into the supervisory goodwill contracts with plaintiff, neither Anchor nor any other thrift owned a mortgage conduit and, therefore, "it is inconceivable that the Government could have foreseen that a breach of the goodwill contracts would result in damages from a purportedly forced sale of the type of business in which neither Anchor nor any of the thrifts regulated by FHLBB/FSLIC engaged." Def.'s Proposed Conclusions of Law at 17. Second, defendant argues that it was not possible to foresee the *magnitude* of the claimed damages attributable to the sale. *Id.* at 18. Both of defendant's arguments are off the mark.

The government tries to hitch its argument to the Federal Circuit's opinion in *Landmark,* in which the court denied *reliance damages* to the plaintiff for real estate contributions to an acquired thrift. *See* Def.'s Post Trial Br. at 34–35; Def.'s Mot. for J. Based on Part. Findings at 19–20. In *Landmark,* the plaintiff was a real estate business that had acquired a thrift in a supervisory transaction. One of the conditions of the supervisory agreement required the plaintiff to downstream real estate capital to the thrift any time the thrift's capital reserves dipped below 3%. *Id.* at 1374. In addition to its initial capital contribution, and without being required to do so because of the acquired thrift's capital position, plaintiff later downstreamed substantially all of its real estate assets to the thrift. *Id.* at 1375. The trial court found that these subsequent capital contributions were not required by the plaintiff's contract with the government, but were made instead for independent business considerations, namely to shelter income on later real estate sales from federal income taxation. *Id.* Subsequent to plaintiff's capital contributions to the thrift and the passage of FIRREA, the thrift was seized and plaintiff's real estate capital forfeited.

In *Landmark,* the Federal Circuit affirmed the Court of Federal Claims' finding of fact that the plaintiff's real estate capital contributions to the thrift that were not required by the contract were not foreseeable to the government at the time of contract formation. *Id.* at 1378–79 (citing RESTATEMENT § 344(b)). As a consequence, those contributions could not be recovered under the rubric of reliance damages. *Id.* In finding that the subsequent capital contributions were not foreseeable, the trial court had stated:

> The government was aware that Landmark was in the property development business, but it had no reason to foresee that Landmark would contribute essentially all of its assets to [the thrift]. It could not foresee at the time of contracting that a breach of the Assistance Agreement would cause Landmark to lose its entire business.

*Id.* at 1378–79 (quoting *Landmark Land Co. v. United States,* 46 Fed.Cl. 261, 270 (2000)). While the Federal Circuit conceded that the "issue of foreseeability is admittedly close in this case," it was unwilling to conclude that the trial court's findings of fact on foreseeability were clearly erroneous. *Id.* at 1379.

In turn, defendant argues here that the facts of this case are even more austere than in *Landmark,* and that since there was no finding of foreseeability in that case, there could be none here. Def.'s Post–Trial Br. at 34–35. Defendant's invocation of *Landmark,*

78

however, avails it of little in this case. This is primarily so because the *Landmark* opinion and the findings of fact it considered dealt with the issue of foreseeability entirely in the context of the reliance interest of damages. In awarding reliance damages, the court focuses on whether or not the plaintiff's claimed damages—often, costs and expenses—were made in reliance on the contract. *See* RESTATEMENT § 351, cmt. a. Given that scope, the *Landmark* trial court was implicitly concentrating on whether it was foreseeable, based on the contract between plaintiff and the government, that plaintiff would incur the kinds of costs that it did performing the contract, *i.e.,* whether it was foreseeable that plaintiff would contribute substantially all of its assets to the thrift even though the contract itself only required modest or measured contributions. But here, the focus is different. In the lost profit damages context of this case, the focus shifts to the range of harm that plaintiff might foreseeably suffer if deprived the benefit of its bargain, the use of the supervisory goodwill.

As a point of departure, it is helpful to revisit the goal of the supervisory goodwill contracts and to address the magnitude of the business transaction that those contracts accommodated. The special treatment of goodwill was very clearly borne of a profit motive in which both parties had an interest. From the government's perspective, an acquiring thrift needed supervisory goodwill as an immediate regulatory forbearance to avoid imminent insolvency after a supervisory acquisition. But over time, as the supervisory goodwill amortized, the government needed and expected an acquiring thrift to leverage its goodwill into profitable investments because retained earnings were essential to replace the regulatory capital that a thrift lost each year when its goodwill was amortized. If an acquiring thrift could not invest profitably, then the FHLBB/FSLIC would be in no better long-term position because it would ultimately stare down another capital deficient thrift facing regulatory shutdown and bailout.

For the acquiring institutions, the profit opportunity embodied in the special treatment of goodwill was the redeeming feature in each supervisory transaction that balanced the significant liabilities assumed in each. Without the opportunity to lever up the thrift's balance sheet and squeeze more profit out of the institution's investment opportunities, it is unlikely that any thrift would have participated in the supervisory transactions at all. In short, the very purpose of the supervisory goodwill agreements, aside from protecting the acquiring thrifts from *immediate* foreclosure, could be summed up in a single word: *profit.*

In turn, on several occasions the Federal Circuit and this court have recognized the basic equation embodied in the supervisory goodwill contracts in which, in the ideal environment, supervisory goodwill allowed increased thrift assets. Additional assets, in turn, enabled increased thrift profits, which were ultimately essential to replace the amortizing goodwill as regulatory capital. Given this circular interdependence, it was eminently foreseeable that a breach of the supervisory goodwill contracts would cause an acquiring thrift to sacrifice assets and forego the very profit opportunity that made the contracts appealing in the first place. *See, e.g., Cal. Fed.,* 245 F.3d at 1350 ("The trial court correctly observed that the government 'knew that breaching this agreement would cause [Cal Fed] to adjust its capital ratio. That is, it knew that [Cal Fed] would have to reduce its assets or increase its capital.' "); *LaSalle Talman,* 64 Fed.Cl. at 98 ("Both this court and the Federal Circuit have concluded in the context of *Winstar* litigation that government regulators expected thrifts to profit from the supervisory goodwill on their books."); *Commercial Federal,* 59 Fed.Cl. at 354 ("[I]t was foreseeable that as a result of the elimination of goodwill from regulatory capital, plaintiff would need either to replace the supervisory goodwill with another form of capital or shrink its assets to maintain its capital cushion.... These consequences were not only foreseeable, they were a basic reason for the enactment of the breaching provisions of FIRREA."), *Id.* at 354–55 ("[I]t is a part of the definition of a savings and loan institution to make a business of leveraging capital to create a portfolio of profitable assets. Defen-

dant could easily foresee that one consequence of its breach could be a decline in plaintiff's asset base, which is used for no other purpose than the generation of profits.... The expectation of these profits was relied upon by plaintiff and defendant alike to salvage [the acquired thrift] and achieve the long-run health of the combined institution. This expectation was in fact the essential purpose of the Agreement.... [T]he court finds it foreseeable that a breach causing a diminution of capital is likely to also cause a reduction in profits."); *Suess,* 52 Fed.Cl. at 230 ("[I]t was both foreseeable and actually foreseen that a breach of this commitment could very well devastate the non-breaching party and put its own economic net worth at risk."); *LaSalle Talman,* 45 Fed.Cl. at 89 ("It should have been equally foreseeable to the parties at the time they entered into these agreements that curtailment of supervisory goodwill could render the thrifts noncompliant with capital requirements, and, to the extent they could not mitigate by obtaining other capital, either put them out of business altogether or shrink their operations."), *aff'd in relevant part,* 317 F.3d 1363 (Fed.Cir.2003); *Glendale,* 43 Fed. Cl. at 399 ("[A] central purpose of the contract was to enable Glendale to survive and continue profitable business after the merger.... In light of the basic nature of the contract, it was necessarily foreseeable, by any reasonable regulator or banking official, that the goodwill promise was designed to protect Glendale's ability to use leverage after the merger.").

In Anchor's case, evidence at trial strongly showed that both the thrift and its regulators expected Anchor to take advantage of the special treatment of supervisory goodwill to acquire additional assets, grow the bank, and generate new profits that would fill the capital void created by the annual amortization of goodwill. *See* Tr. at 704, 762–63 (Test. of Angelo Vigna); PX 441 at 2; Tr. at 2694 (Test. of George Schneider). Moreover, and what was in part peculiar to Anchor, was the sheer volume of goodwill that the thrift accumulated and deployed by virtue of its supervisory agreements. In total, the FSLIC agreed to allow Anchor to amortize over $550 million in regulatory capital. At a 3–5%

capital requirement, the agreement would have hypothetically allowed Anchor to leverage between $11 billion and $18 billion in additional assets based only on its supervisory goodwill. The agreements that Anchor and the FSLIC entered into were big business. Collectively, these were not transactions involving small "mom and pop" thrifts or single-branch institutions that were little more than a blip on anyone's radar. The Standard acquisition in New Jersey alone involved $1.8 billion in thrift deposits and nearly $620 million in supervisory goodwill and capital credits. Anchor was expected to contribute more than $70 million in capital over a six-year period, and Standard was expected to generate substantial profits in excess of $50 million per year after causing nearly $100 million in losses in the first six years. *See* PX 441 at 1–2.

Against this backdrop, then, defendant's argument that damages of the type and magnitude sought by plaintiff were not foreseeable at the time of contracting is not persuasive. This is primarily because the government misconstrues the nature of the law of foreseeability. In urging the court to require plaintiff to prove that the government anticipated that Anchor would acquire an asset like RFC as a condition to any damages attributable to RFC's ultimate sale, the government seems to equate "foreseeability" with "prediction." The foreseeability standard, however, is not so wooden.

The standard of foreseeability in the lost profits or consequential damages context focuses on the reasonable range of potential consequences of a breach. The standard is an objective one. *See* McCORMICK ON DAMAGES at 565.

> The showing required is that the lost profits damages claimed must have resulted from a breach of contract under circumstances in which it may be reasonably assumed that loss of profits was within the contemplation of the parties as a probable result of the breach at the time of making the contract. Plaintiff need not prove that defendant actually knew of the likelihood of loss of profits.

1 ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.13 at 39 (6th ed.2005) [hereinafter DUNN]. Defendant's overly-narrow interpretation of what constitutes reasonable foreseeability distorts that standard. Professor Corbin captured the nuance of this distinction in his discussion rejecting the requirement of *actual foresight* that defendant invokes here:

> The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefor in case of breach. It is erroneous, therefore, to refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 CORBIN ON CONTRACTS § 1009 at 66 (Interim ed.); *see also* MCCORMICK ON DAMAGES at 565 ("This standard is in the main an objective one. It takes account of what the defendant who made the contract might then have foreseen as a reasonable man, in the light of the facts known to him, and does not confine the inquiry to what he actually did foresee."); 3 FARNSWORTH § 12.14 at 160–61 ("There is no requirement that the breach itself or the particular way that the loss came about be foreseeable.... [F]oreseeability has an objective character. When one makes a contract one takes the risk not only of those consequences that one actually did foresee, but also of those that one ought reasonably to have foreseen.").

The Federal Circuit echoes this nuance. *See Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) ("[E]xpectation damages are recoverable provided they are actually or reasonably foreseeable.") (citing RESTATEMENT §§ 347, 351, 352). It is well established in the Federal Circuit that the "foreseeability" prong of consequential damages more appropriately resembles the proximate causation analysis born out of tort law. As the Circuit reiterated in *Hughes Communications Galaxy, Inc. v. United States,* "[T]he damages must have been foreseeable at the time the parties entered the contract, *which requires that they*

*be the natural and proximate result of the breach.'"* 271 F.3d 1060, 1066 (Fed.Cir.2001) (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960)) (emphasis added).

Determining what was reasonably to have been in the contemplation of the parties at the time of contracting as the probable result of some breach requires resort to the contract, itself, as an analytic starting point. That is because frequently the foreseeability of lost profits can be inferred directly from the contract or the nature of the transaction. *See generally* 1 DUNN §§ 1.14–1.20.

In *Winstar* cases, the subject matter of the contracts was for the use of supervisory goodwill as regulatory capital. *Cal. Fed.,* 245 F.3d at 1349 ("The continued use of supervisory goodwill as regulatory capital ... was therefore a central focus of the contract."). Any lost profits growing out of the use of supervisory goodwill as regulatory capital, therefore, are recoverable as damages because such would be a reasonably-foreseeable result of a breach that disallowed the continued use of supervisory goodwill as regulatory capital. In this analytic framework, the question is not "Did the government foresee that Anchor would purchase RFC or something like it?" (which is the question defendant would have the court answer) but instead whether a reasonable person could have foreseen the type of use Anchor made of its supervisory goodwill and that a profitable enterprise would be sacrificed if Anchor lost its supervisory goodwill. Could a reasonable person have foreseen that Anchor would use its supervisory goodwill to free other tangible capital so that it could invest in RFC, a profitable mortgage-banking subsidiary—or any other profit-generating asset, for that matter?

The contracts for the use of supervisory goodwill were entered into for the simple reason that Anchor was expected to use that goodwill to generate profits (through investment opportunities) that over a period of years would fill the gap between the assets and liabilities of the failed thrifts Anchor acquired. *See, e.g.,* PX 441 at 1–2. It was certainly foreseeable to the government at the time of contracting that depriving Anchor of its regulatory capital would force the thrift

to adjust its capital ratio by selling assets. At its greatest abstraction, RFC was itself an asset, and it is enough here that the government could foresee the likely consequences of its breach—the divestiture of assets—to make it foreseeable that profits attributable to an asset like RFC would be sacrificed. There is no superior burden that the government had to *specifically* foresee the types or kinds of investments Anchor would make in reliance on its supervisory goodwill, or what specific use of the supervisory goodwill would give rise to potential lost profits. Accordingly, there is no condition to plaintiff's lost profits claim that the government foresee or have any special knowledge that Anchor would acquire RFC as one of the multitude of assets it added to the franchise in the wake of the supervisory agreements:

> What evidence will carry plaintiff's burden of proving that lost profits damages *should have been* foreseen as the consequence of defendant's breach of contract? Plaintiff may simply point to the nature of the transaction as inherently one in which the parties would necessarily assume lost profits to be the result of a breach of contract.

1 DUNN § 1.14 at 41. Here, the court finds that defendant had reason to foresee that a breach would cause lost profits when plaintiff was forced to divest assets. That is enough. There was no attendant need for defendant to *also* have reason to foresee *how* those lost profits would materialize, *i.e.,* specifically from the loss of RFC.

But even if there did exist a heightened standard of foreseeability of the type defendant seeks to impose here, the court finds that this standard, too, has been met. The record indicates that it was in fact reasonable at the time of contracting for defendant to foresee that Anchor might become heavily engaged in the type of business in which RFC specialized, and that a breach might force Anchor from that market. Similarly, it was foreseeable that a breach would lead to a lost profits claim of several hundred million dollars. After all, for every dollar of regulatory capital allocated to Anchor, it was the FSLIC's hope that Anchor would replace it with a dollar of capital earned through future profits. This fact effectively negates defen-

dant's argument that it had no reason to foresee the *magnitude* of plaintiff's current claim.

The thrift environment in 1982 through 1985, when the government entered into the breached contracts with plaintiff, was in a state of flux because Congress had substantially deregulated the industry to allow it to compete on more favorable terms with the rest of the financial services industry. *See* Garn–St Germain (permitting thrift industry to engage in new lines of business and products, and to commit greater resources to already existing lines of business, thereby becoming more competitive and more like commercial banks). As the Supreme Court noted in *Winstar,* "the treatment of supervisory goodwill as regulatory capital was attractive [to a thrift] because it inflated the institution's reserves, thereby allowing the thrift to leverage more loans (and, it hoped, make more profits)." *Winstar,* 518 U.S. at 850–51, 116 S.Ct. 2432. What *Winstar* did not address, however, was that by the time many of the supervisory agreements were entered into thrifts were engaging in far more, and more diverse, businesses than the old mono-line routine of merely acquiring mortgage assets. Thrifts were investing in commercial real estate, consumer and commercial lending, MBS and other financial instruments, service corporation subsidiaries, and more. The supervisory goodwill contracts, then, allowed the thrifts to leverage not just more *loans,* but more *assets* that the tide of deregulation in the early 1980s allowed them to hold. This, alone, defeats defendant's implicit argument that Anchor's lost profits attributable to the sale of RFC were not foreseeable because "RFC was not ... a thrift or banking business in any realistic sense" because it did "not gather 'savings' from depositors" or " 'loan' money to individuals for any purpose." Def.'s Proposed Conc. of Law at 17. The fact that RFC was not engaged in the "traditional" savings and loan business would not, in and of itself, preclude a finding of foreseeability in this case.

But far from defendant's assertion that RFC was engaged in an entirely new type of business in which no other thrift engaged at

the time the supervisory agreements were entered in to, the fact is that RFC's principal business—acquiring whole mortgages and selling either packages of mortgages or MBS on the secondary market—was substantially similar to the secondary mortgage market activity of other thrifts at the time. Furthermore, and significantly, it was substantially similar to the business of Suburban Coastal, the subsidiary of Suburban that Anchor acquired in its 1983 supervisory merger that later became Anchor Mortgage Services. Although key distinctions could be drawn between those traditional market activities and RFC's "private-label conduit" activities, the sum and substance of all were substantially similar. At least, the court declines to accept that the differences that did exist were so significant that they would preclude a reasonable man from foreseeing that Anchor might engage in business like RFC's after the supervisory mergers. Function prevails here over form. The reasons why this must be so follow.

The secondary mortgage market is remarkable in its ability to adapt and evolve to accommodate ever-changing market conditions. Historically, the market as a whole has proven adept at addressing the needs of the mortgage industry, providing liquidity, security, and fungibility to lenders and investors. At its most rudimentary level, the secondary mortgage market enables wholesale originations, in which an acquiring institution can purchase whole mortgages from a retail originator. Retail originators retain liquidity, and wholesale originators obtain a geographically diverse portfolio of mortgages without having a similarly diverse "bricks and sticks" retail origination capacity. In this sense, RFC was not at all different from any other thrift or mortgage-banking enterprise that existed in the early 1980s when the supervisory goodwill agreements were entered into. RFC acted as a wholesale originator of mortgages it acquired through a network of retail originators. Thrifts, on the whole, did the same thing to fill up their own balance sheets. In large part, Suburban Coastal (which defendant "sold" to Anchor) engaged in the same business. At this rudimentary level, there was no functional difference between RFC and any other secondary-mortgage-market participant.

The next level of sophistication at which RFC and the secondary mortgage market operated was the issuance of mortgage-backed securities to institutional and private investors. Here, too, thrifts and other mortgage-banking enterprises had long engaged in similar operations. When Congress created Ginnie Mae in 1968 with the authority to issue MBS, it also authorized the agency to guarantee MBS issued by approved private institutions. *See* Housing and Urban Development Act of 1968, Pub.L. No. 90–448 § 804, 82 Stat. 476, 542–43 ("[Ginnie Mae] is authorized ... to guarantee the timely payment of principal of and interest on such [MBS] as shall be issued by ... any other issuer approved for the purposes of this subsection by the Association ..."). Furthermore, Congress amended the Banking Act of 1933 and the Home Owners' Loan Act of 1933 to make it possible "for savings and loan associations and banks to issue and sell GNMA guaranteed securities." *Id.;* Conf. Rep. No. 1785, 1968 U.S.C.C.A.N. 3053, 3063. Although MBS issued by Freddie Mac and Fannie Mae (beginning in 1981) dominated the secondary mortgage market, thrifts and mortgage-banking enterprises routinely issued their own Ginnie Mae-guaranteed MBS when they could pool together sufficiently large groups of unconventional mortgages (those insured by the FHA or VA; see above). Def.'s Post–Trial Br. at 31–32. Anchor's 1983 Annual Report noted that "[d]uring the second half of the year, home builders, mortgage bankers and investment bankers issued nearly $3 billion of [Ginnie Mae] collateralized mortgage obligations," which were forerunners of MBS. *See* PX 4 at 19–20. At the same time, having just acquired AMS via the supervisory merger with Suburban, Anchor noted that it "is currently positioning itself for a major entrance into nationwide mortgage origination and secondary market activity through Anchor Mortgage Services, Inc." *Id.* at 21.

By and large, private issuances in the secondary market had been stunted by the virtual monopoly that Ginnie Mae and the two GSEs enjoyed due to the no-cost credit en-

hancement each enjoyed as a result of their affiliation with the federal government. *See generally Proposed Changes in the Charter of the FNMA, FHLMC, That Will Encourage a More Broadly Based and Resilient Housing Finance System: Hearing Before the Subcomm. on Housing and Urban Affairs of the S. Comm. on Banking, Housing, and Urban Affairs,* 98th Cong. (1983) [hereinafter *Secondary Mortgage Market Hearings].* By 1983, however, an "embryonic" private industry emerged—including RFC, then operated by Norwest Mortgage Inc.— that issued "private-label" MBS with the aid of credit enhancements. *See id.* at 254 (statement of Leon Kendall, President, Mortgage Insurance Cos. of America). Among those companies already issuing private-label MBS were RFC, Bankamerica, Home Savings and Loan Association, Glendale Federal Savings Bank, Crocker National Bank and Bank of America (which issued the first private-label MBS in 1977). *Id.* at 254, 364 (Mortgage Passthroughs Structure and Policy).

While defendant's general critique that thrifts were not actively engaged in issuing private-label MBS come 1983 is not too far off the mark, the main reason for this lack of activity was that very few organizations at all were "actively" issuing MBS. This was primarily attributable to the heavy hand that the federal agencies had in the market, using the advantages of federal sponsorship to monopolize MBS issuances. It is notable, however, that the few issuers of private-label MBS that had entered the market consisted almost entirely of financial institutions and mortgage-banking enterprises that were just like Anchor and its AMS subsidiary. This was the case primarily because the skills sets required to be an effective issuer of private-label MBS dovetailed with those required of any mortgage-banking enterprise, and thrifts in particular were long on the kind of experience that made them likely players in this burgeoning industry.

At this same time, however, there was a groundswell to limit the role in the secondary market of the federal agencies and create greater competition involving private issuers. *See generally Secondary Mortgage Market Hearings.* Private label issuers hoped to restrict the lending limits of a "conforming loan" that the federal agencies were authorized to include in their own pools of MBS, thereby leaving untouched the scope of "jumbo" loans over which the nascent private-MBS industry was competing. The industry's sentiment to expand the role of private-label MBS in the secondary mortgage market culminated with the Secondary Mortgage Market Enhancement Act of 1984. Pub.L. No. 98–440. After hearings in 1981–83, Congress declared its intent to "broaden the number of participants channeling investor capital to the homebuyer" through secondary market activity. S.REP. No. 98–293 at 1, 2, reprinted in 1984 U.S.C.C.A.N. 2809, 2810. Celebrating the federal agencies' success in establishing MBS and the secondary market, Congress declared that "the foundation is in place for the private sector to assume a more significant market role." *Id.* In the previous two years, regulatory changes had made it possible for private-label issuers to compete effectively in the secondary market. Among those changes, the Securities and Exchange Commission had relaxed its registration requirements for MBS allowing continuous—or "shelf"—registrations, eliminating costly registration and delay requirements for private-label MBS. *Id.* at 2–3. The 1984 Act, then, was "expressly designed to encourage this broadening of the market for mortgage-backed securities by encouraging more extensive involvement of the private sector in the formation of conduits for the flow of mortgage capital from investors to lenders and homebuyers." *Id.* at 3.

At the same time that Anchor was entering into its supervisory-goodwill agreements with the government, and at the same time that Anchor was making a formidable entry into the mortgage-banking industry through the supervised acquisition of Suburban Coastal, the role of private MBS issuers was emerging and blossoming. It was not only reasonable, but natural, to foresee that thrifts would gravitate toward this burgeoning industry, as thrifts were already intimately familiar with all aspects of this trade. For decades, thrifts had extended mortgage loans and evaluated the investment quality of a given mortgage. Since the 1970s, they had

been actively engaged in acquiring MBS for their own portfolio and in issuing Ginnie Mae-guaranteed MBS. Thrifts were familiar with the practice of wholesale originations, in which mortgages were acquired from a retail originator. To wit, most of the skills sets required of a private-label "conduit" were the same that thrifts had spent years developing. The only substantially new and different skill required of a private-label conduit, with which thrifts and traditional mortgage bankers did not have an existing familiarity, involved credit enhancing the MBS product to obtain favorable credit ratings. But that alone could not have foreseeably kept thrifts from entering the private-label market. Indeed, as plaintiff demonstrated at trial, over the course the 1980s, thrifts *did*, in fact, become major issuers of private-label MBS— all of which underscores the fact that it was reasonable to foresee that thrifts would naturally gravitate towards this industry. *See* Tr. 1182–85 (Test. of Mark Korell) and PX 592 at 1352 (establishing that by 1988, *four out of the top ten issuers of private-label MBS were thrifts or subsidiaries of thrifts* who combined to issue 44.1% of all private-label MBS that year).

All of the above demonstrates that it was eminently foreseeable to a reasonable person that, at the time the government entered into its supervisory agreements with Anchor allowing the thrift to amortize hundreds of millions of dollars of supervisory goodwill over an extended period of time, a breach of that contract might have given rise to a lost profits claim of the magnitude sought in this case. The court therefore finds that plaintiff has satisfied any foreseeability requirement imposed by the common law rule of *Hadley* and its iterations in this Circuit.

### 3. Anchor Proved Its Damages with Reasonable Certainty

The final step in evaluating plaintiff's lost profits claims related to the sale of RFC is to determine whether or not plaintiff has demonstrated the amount of its damages within a degree of reasonable certainty.

According to plaintiff, its damages related to the forced sale of RFC come in three measurable forms. First, plaintiff claims it is entitled to recover the profits that RFC would have generated for Anchor but for the breach. In order to quantify those lost profits, plaintiff simply points to the profits that RFC actually produced for its new owner, GMAC, from 1990 through 1997 as a yardstick. For RFC's lost profits, plaintiff claims $328.9 million. Second, plaintiff claims that but for the forced sale of RFC, its 1993 public offering of stock would have generated more proceeds than it actually did, because RFC would have made the company's stock more valuable to investors. For the diminished sale proceeds, plaintiff claims $42 million. Third, plaintiff maintains that it is entitled to recover the purchase price it paid for NAMCO in 1997, adjusted by the sale proceeds Anchor received for RFC in 1990, because NAMCO was a functional substitute for RFC that mitigated plaintiff's harm from the RFC sale in 1990, and that the NAMCO acquisition would have been unnecessary but for the breach because if Anchor still owned RFC it would have had no need to buy NAMCO. For this, plaintiff seeks $351 million.

Finally, in addition to each of the three individual measures of RFC's alleged damages, plaintiff claims that any damages award attributable to the reduced stock sale proceeds and the NAMCO purchase must be adjusted by a tax "gross-up" that will ensure that plaintiff is made whole after factoring in any tax implications of its damages award. Based on the damage claims above, that gross-up would allegedly require an additional $204,846,000, bringing Anchor's total claim for damages attributable to the forced sale of RFC to $839,135,000. *See generally* PX 979–B (demonstrative summarizing plaintiff's claimed damages).

Defendant, in turn, challenges each of plaintiff's damage claims on either factual or theoretical grounds. For the forced sale of RFC, defendant claims first and foremost that there could be no damages at all because Anchor allegedly received fair market value for RFC in 1990 from GMAC, and that the fair market value fully discounted the parties' then-current expectations about RFC's future profit potential. In short, defendant argues that to award plaintiff anything more

now would amount to a windfall, since there is allegedly no economic harm that results from a fair market exchange.

Second, even if the sale of RFC failed to produce a fair market exchange, defendant claims that it would have been factually impossible for Anchor to continue to own and operate RFC from 1990–97 at the same level of performance that GMAC did during that period, and that the profits RFC generated for GMAC from 1990–97 are therefore an inappropriate yardstick by which to measure Anchor's putative lost profits. Simply, defendant asserts that GMAC was bigger and better suited than Anchor to operate RFC, and was able to do so at a lower cost, with less regulatory oversight, and with better financial support.

As for plaintiff's reduced stock proceeds claim, defendant maintains that Anchor's 1993 stock offering effectively produced a wash transaction because "when an institution raises any amount of capital, the institution provides the investor with a claim on its future earnings that is exactly equal to the money it receives." Def.'s Proposed Concs. of Law at 27. Under this rationale, if Anchor had succeeded in raising an additional $42 million in 1993, then Anchor "would have had to provide the suppliers of that capital with a claim on its future earnings worth exactly $42 million" and such a reduction in Anchor's capital "would not constitute damage." *Id.* Furthermore, even if the reduced proceeds could be the substance of a damage claim, defendant maintains that this form of recovery "double counts" any other damages related to RFC because Anchor seeks both the profits generated by RFC itself "and an additional influx of capital premised upon its ownership of RFC's profits." *Id.* at 28.

Defendant argues that Anchor's cost to acquire NAMCO should not be viewed as mitigation for the forced sale of RFC because, according to defendant, RFC and NAMCO engaged in "two completely different businesses." *Id.* at 26. Defendant maintains that NAMCO operates primarily at the retail and wholesale origination end of the secondary mortgage market and does not issue MBS as a private-label conduit, as RFC primarily does. *See id.* Moreover, even if NAMCO were viewed as a proper mitigative asset, defendant claims that recovering the NAMCO purchase price would also amount to a "double counting" of damages if coupled with Anchor's lost profits claim.

### a. The Standard of Reasonable Certainty and Expectation Damages

"The principle of contract damages is that the non-breaching party is entitled to the benefits it reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1371 (Fed. Cir.2003). The Federal Circuit has acknowledged the difficult task the trial court confronts in calculating damages in the several *Winstar* cases: "A large part of the problem with which the trial court has had to wrestle has been finding a viable damages theory that fits the complex fact patterns of these cases, one that is fair to the damaged thrifts, but is based on real losses sustained so as not to overcompensate for the breach." *Glendale Fed. Bank, F.S.B. v. United States,* 378 F.3d 1308, 1312 (Fed.Cir.2004). The Federal Circuit has so far taken a dim view of expectation damage theories in these cases, in large part because typical loss models presented by the various plaintiffs have succumbed to the charge that they are too speculative. *Id.* ("Expectancy damages theory, based on lost profits, has proven itself impractical for these cases, and generally not susceptible to reasonable proof.... [E]xperience suggests that it is largely a waste of time and effort to prove such damages."). Nevertheless, the Federal Circuit has not barred expectation damage as a matter of law, and an individual plaintiff's claim must therefore stand or fall based on the unique facts of the individual case and the plaintiff's damages model. *Id.* (citing *Cal. Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1350 (Fed.Cir.2001)). *See also Globe Sav. Bank, FSB v. United States,* 65 Fed.Cl. 330 (2005), *aff'd in pertinent part,* 189 Fed.Appx. 964 (Fed.Cir.2006) (affirming expectation damages award and remanding for recalculation); *Slattery v. United States,* 69 Fed.Cl. 573 (2006) (awarding $276 million in expectancy

damages); *Fifth Third Bank v. United States,* 71 Fed.Cl. 56 (2006) (awarding $76.5 million in expectancy damages).

If a plaintiff's loss model clearly establishes a reasonable probability of damage, then "uncertainty as to amount will not preclude recovery." *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1356–57 (Fed.Cir.2001) (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931))); *Glendale,* 378 F.3d at 1313. In part, this is owing to the maxim that "when damages are hard to estimate, the burden of imprecision does not fall on the innocent party." *LaSalle Talman,* 317 F.3d at 1374. In such a case, where the reasonable probability of damage is clearly established, "the court's duty is to 'make a fair and reasonable approximation of damages.'" *Glendale,* 378 F.3d at 1313 (quoting *Bluebonnet,* 266 F.3d at 1356–57).

### b. Theoretical Approaches to Lost Profits

Before the mechanics of plaintiff's lost profits model can be examined, two initial inquiries into the theory of contract damages are required. First, the court must consider what, if any, relevance the fair market value of RFC at the time of its sale to GMAC has in the context of Anchor's damages claim. Second, the court must address whether or not information that developed *after* the RFC sale—here, the track-record of RFC's profits as a GMAC subsidiary from 1990–97—is relevant to whether or not Anchor sustained any damages from that sale. The two issues are not unrelated; at trial, defendant argued that the only relevant mix of information that the court should consider in determining plaintiff's damages—from an economic and financial perspective—should be whatever prospective information was available at the time of the sale transaction. According to defendant, that information, including the parties' expectations of RFC's future risks and profitability, would all be embodied in RFC's fair market value in March 1990. By this same theory defendant advances, then, facts about RFC's *actual* performance after the sale would all be largely irrelevant to this inquiry.

### i. The Irrelevance of Fair Market Value in This Case

Throughout the trial, one of defendant's main contentions was that Anchor received fair market value for RFC in 1990 when it sold the subsidiary to GMAC for $64 million, and therefore suffered no damages as a result of the sale. *See* Def.'s Mot. for J. Based Upon Partial Findings at 13–14; Def.'s Post–Trial Br. at 35–38 ("The evidence demonstrates that Anchor received a fair market price ... and, thus, was not harmed by selling the business."). The sale price, if considered a "fair market" exchange, would ostensibly discount to a then-present value RFC's entire "future" worth, including prospective profits. *See* Def.'s Mot. at 13 ("In arriving at a fair market price for a business, both the buyer and seller are deemed to have considered the business' prospects for future earnings and incorporated such into their agreed on price.") (quotation omitted). According to defendant's theory, if Anchor received a fair market value in March 1990 for RFC, it could demonstrate that Anchor was not harmed by the forced sale because Anchor would have received in the sale price the present value of RFC's then-expected future profit. *Id.* ("Anchor received fair market value when it sold RFC and thus could not have been harmed by effecting the sales transaction."); Def.'s Proposed Concs. of Law at 13 ("As a general matter of financial economics and damages law, a seller of an asset who receives at [sic] fair market price in an arm's-length transaction cannot be harmed by the sale of the asset and, thus, cannot receive a damages award related to the sale.").

One problem the court faces in any fair market valuation in this case, however, is that scant evidence was actually presented at trial regarding what a "fair market value" for RFC should have been at the time. This was in part due to the competing litigation postures of both parties. Defendant steadfastly maintained that the actual sale price *was* the fair market value, but presented little evidence (factual or expert) to support the assertion. Plaintiff, on the other hand, consid-

ered fair market value largely irrelevant since it was seeking damages for *lost profits* rather than a diminution in the market value of RFC, and therefore presented no affirmative evidence at trial about what RFC's fair market value in 1990 was or should have been.

What little evidence about fair market value that is in the record undermines defendant's argument that the actual sale price *was* the fair market value, but beyond that the court is unable to determine anything more, such as for how *much* below fair market value RFC was sold. On one hand, defendant pointed to Anchor's capital plan that tended to suggest that internal Anchor valuations placed RFC's value between $60 and $70 million. *See* PX 621 at 0013. Similarly, a valuation provided by the investment bank Goldman Sachs roughly echoed that number. *See* DX 394 at 123.

On the other hand, these valuations were conducted post-FIRREA, in an environment in which Anchor (and any potential buyer) knew that RFC *had* to be divested in order to help Anchor achieve its capital requirements and that Anchor could no longer effectively operate RFC on a permanent basis. Furthermore, they do not appear to take into consideration RFC's potential to double its output and servicing volume as Anchor indicated at the time it planned to do. At trial, Mr. Large conceded that the sale price received for RFC was "a fair value," but only "given the circumstances." Tr. at 607. The implication, of course, is that RFC was sold in a veritable fire sale, and that any price received was far below its "fair market" value. It is difficult to gauge, based on the evidence in the record, exactly what a fair market value for RFC might have been in March 1990. RFC's performance in the years immediately after its sale, however, seem to belie the contention that $64.4 million (plus the assumption of outstanding liabilities) was the fair market price: in just the first 22 months following GMAC's acquisition, RFC posted pre-tax income of $59.4 million. PX 258 at 3; PX 259 at 3. In only the first three years under GMAC (excluding January and February of 1990), RFC's after-tax profits exceeded $64.5 million. *Id.;* PX

260 at 3. In other words, GMAC recaptured its *entire* out-of-pocket investment in RFC in *less than three years.*

Regardless of the finances of the transaction, however, the court is loath to characterize the RFC sale as a fair market transaction because it is clear that after FIRREA's implementing regulations became effective Anchor was under considerable duress to consummate the sale before RFC's value eroded. As discussed above, the breach made it impossible for Anchor to continue to operate RFC, and the new post-breach realities ultimately forced the sale. "[F]air market value presumes conditions that, by definition, simply do not obtain in the context of a forced sale." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 538, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); *Yancey v. United States,* 915 F.2d 1534, 1542 (Fed.Cir.1991). This is so because:

> The market value of ... a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property.

*BFP,* 511 U.S. at 537–38, 114 S.Ct. 1757 (quoting BLACK'S LAW DICTIONARY 971 (6th ed.1990)) (alterations in original). However, as Mr. Large noted at trial: "If I ever had to sell [RFC] in a non-FIRREA world, it would have been years later, when its earnings would have been realized, and we would not be selling under pressure, and the price would have been hugely bigger than the one we got here." Tr. at 666.

The mechanics of a fair-market exchange simply were not present in the RFC transaction, so in this context the relevance of fair market value—especially as a limitation to the aggrieved party's recovery—is dubious because it "is the very *antithesis* of forced-sale value." *BFP,* 511 U.S. at 537, 114 S.Ct. 1757. At trial, defendant's expert economist,

Dr. Carron, agreed that "one could make the point that Anchor was under some degree of compulsion to act within some time frame, and for that reason, I would not look at the transaction and say 'Aha, it's a transaction between willing parties, therefore it must be fair market value.' "[35] Tr. at 4496 (Test. of Dr. Carron). Mr. Large confirmed that he felt RFC's sale price was lower than it should have been because of the circumstances of the sale:

> I strongly believe that if the bank had not been under the pressure it was to . . . exit RFC, we could have sold it in an orderly way as a viable, healthy organization and received more for it. . . . [I]f we had ever come to the decision that RFC should not be held over a prolonged time horizon, that if RFC had been given just another couple of years to demonstrate its viability, it would be vastly more valuable than it was at the moment of our sale. And, in fact, its earnings demonstrated the reality of that belief. But [in March 1990] we were selling in a distressed market, a . . . potentially damaged corporation owned by a potentially failing institution. And everybody knew we had just about no time to get [the sale] accomplished.

Tr. at 313 (Test. of James Large).

Yet another flaw permeates defendant's characterization of the RFC sale as a fair market transaction cutting off any additional damages. Defendant presumes that Anchor had the freedom to use the sale proceeds to invest in a similarly profitable venture: "Anchor had the benefit of the proceeds of that sale to invest in manners it believed would be profitable. As RFC reflected one invest-

ment, the investment of the cash equivalent of RFC's value reflected another business decision that Anchor viewed as similarly profitable." Def.'s Proposed Concs. of Law at 16 n. 3. The assumption, of course, is that assets and cash are fungible and that being forced out of one investment causes no harm provided the party is free to engage equally in another similar investment. Defendant's factual assertion is attributable in part to a statement Mr. Large made in his memorandum to the Board advocating the sale—and upon which defendant placed great emphasis at trial—which stated that "[t]he immediate profits from RFC that would be lost [because of the sale] are modest and can, in large measure, be achieved from alternate investment with less risk and capital drain." DX 358 at 1.

The problem with this assumption is that it overlooks the fact that, because of FIRREA, Anchor was unable to simply reinvest the RFC sale proceeds. Anchor was in dire need of capital because it had lost over a half billion dollars in contractual goodwill—the critical event that caused the sale of RFC in the first place. Anchor was not able to merely turn around and add additional assets to its balance sheet to make up for the shortfall in profits that the absence of RFC would generate.[36] Nay, it had to either hold the proceeds in the form of gain-on-sale capital, or else use the cash proceeds to finance the "sale" of its branch deposit liabilities so that other capital could be generated through deposit sale premiums.

### ii. The *Ex Post* Versus *Ex Ante* Approach

The argument that a fair market exchange took place here, and that such a transaction

---

**35.** Nevertheless, Dr. Carron concluded that the RFC sale *was* a fair market exchange, based on the two internal valuations conducted by Anchor and Goldman Sachs that he reviewed. The court is unable to adopt this ultimate conclusion, however, because Dr. Carron failed to take into consideration the context of the two valuations (*i.e.,* the fact that both were post-FIRREA), and because he was of the opinion that Anchor's loss of its supervisory goodwill had nothing to do with the sale of RFC given the FIRREA risk-based capital requirement. Tr. at 4496. The court found this failure of context—a theme that seemed to pervade defendant's entire factual argument at trial—a fatal flaw in Dr. Carron's otherwise helpful testimony.

**36.** Moreover, it became abundantly clear at trial that Anchor would have a difficult, if not impossible, job of replacing RFC with another subsidiary that engaged in exactly the same business or was just as successful as RFC was. As defendant's counsel conceded at trial, the market in which RFC competed "was very, very limited" and "the success rate was very, very small." This issue will be taken up in greater detail below in the discussion of Anchor's acquisition of NAMCO, but for now it is sufficient to note that even if it had the wherewithal to acquire a subsidiary like RFC with its sale profits, it could not have soon found a suitable replacement.

precludes the award of any damages attributable to the sale of RFC, is simply inappropriate in this case because it is inconsistent with the facts. It does, however, call into question a second issue dealing with relevancy, and that is whether the court is limited to evaluating the presence of any harm and quantifying any damages based solely on the market value of RFC at the time of the forced sale. In other words, if the market value of RFC was something greater than what Anchor received, are plaintiff's damages limited to recovering only the difference between that market value and the price it received from GMAC? Or, on the other hand, may plaintiff raise a claim for lost profits based entirely on the profits that RFC would have generated for Anchor during the years immediately after the sale?

Entwined in this theoretical analysis is the chronology of relevant information relative to the breach or the event giving rise to damages (here, the sale of RFC). At trial, defendant argued that the only mix of information relevant to measuring plaintiff's damages was that which existed at the time Anchor sold RFC. In other words, defendant encouraged the court to rely only on the kind of forward-looking, *ex ante* information that parties might consider in arriving at the sale price for a profit-producing asset. Or, alternatively, defendant's argument was that any lost profits plaintiff might have incurred by virtue of the sale would have been fixed at the moment of the sale. Dr. Carron explained that one of the reasons to focus on prospective, *ex ante* information is that "any [RFC] performance in the future, any actual performance, may not be relevant because there could be independent, unconnected, unforeseen future events that cause [RFC's] performance to differ" from what Anchor and GMAC projected at the time of the sale. Tr. at 4355.

The law of contract damages, however, seems to provide an aggrieved plaintiff broader latitude in proving its damages than mere market value approaches based on such *ex ante* information. Returning to the goal of contract recovery in *Winstar* cases, "[t]he principle of contract damages is that the non-breaching party is entitled to the benefits it

reasonably would have received had the contract been performed, that is, profits that would have been earned but for the breach." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003). Especially in the *Winstar* context, where the goal of the contracts was to enable the plaintiffs to generate *ongoing* profits that would, over time, fill the shortfall between the various acquired institutions' assets and liabilities, it seems especially and unreasonably static and wooden to limit the expectation interest to the then-present value of individual assets. In this case, had the contract been fully performed, Anchor would have had not only the static value of RFC (an asset), itself, but also the stream of profits that would have grown out of owning and operating RFC. Those profits are recoverable in the form of consequential damages.

The law distinguishes between *market* measures and *consequential* measures of expectancy damages. *See generally* DOBBS, § 12.2. Market measures, or "general damages," are not the exclusive remedy, and indeed may at times overlap or coexist with consequential, or "special damages," in any given breach:

> [B]oth [market and consequential] measures may be used in the same case to capture different elements of compensation. Readers of cases sometimes misunderstand this point because courts habitually refer to "the" measure of damages when they state a general damages measure. Yet to say that a general measure of damages is "the" measure does not ordinarily also mean that special damages are precluded. On the contrary, both general and special damages may be recovered so long as the two measurements do not duplicate elements of the recovery and so long as the special damages do not run aground on the limitations imposed on them.

*Id.* § 12.2(3) at 769. The limitations on consequential damages (reasonable certainty, foreseeability, causation) often make market damages an "easier" recovery for a plaintiff, but by no means do the extra hurdles foreclose a plaintiff from seeking consequential damages, including "lost profits." *Id.* at 770.

Consequential damages, in turn, "are not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence." *Id.* It is the elasticity of *consequential damages* in contract recovery that in part differentiates those damages from mere market damages:

Usually these consequential benefits are somewhat peculiar to the plaintiff individually and therefore not well reflected in the market price for the commodity. In the usual case, the use of consequential damages measures means that *the court is not measuring the plaintiff's net gain or loss in assets at a fixed date as it is with general damages.*

*Id.* (emphasis added). In the case at bar, defendant essentially argues that plaintiff's recovery (if any) should be limited to only a market recovery. However, that approach would be inconsistent with the remedies available at law and, as discussed below, would potentially undercompensate plaintiff for the breach. This is so because the market measure does not capture lost profits and other losses or expenses that emanate from the breach, which are "real losses not based directly on the market value" of the breached promise. *Id.*

Moreover, a market approach in this case would rely far too heavily on imperfect asset valuations. This is not a case in which the "asset" was a widely traded commodity or one in which there was an actively trading market. There was no auction process in which competing bidders pitched their own interests against one another. There were also few other reasonable competitors against which RFC's value could be compared—the experts at trial repeatedly discussed how RFC was among the very best of a small niche of established, successful mortgage conduits. The sale also took place at exactly the same time that Anchor was planning to ramp up RFC's volume of business, so the market value would be hard pressed to capture RFC's potential for broader trading and servicing revenue that Anchor would have recognized had it continued to own RFC.

In this scenario, to limit a plaintiff's damages to a market valuation invites the law to make decisions premised upon imperfect predictions and assumptions and only limited knowledge. This would be one case where "the 'market' is largely a construct, based on expert opinion and an amalgam of past sales and projections rather than a reality based on observations of many purchases." *Id.* at 769 & n. 41. Furthermore, it would ignore a wealth of actual, factual information that might develop in the period following the forced sale that might give some flesh to the plaintiff's lost profits claim. In such a circumstance, "[e]xperience is then available to correct uncertain prophecy," which acts as a "book of wisdom that courts may not neglect." *Sinclair Ref'g Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736, 77 L.Ed. 1449 (1933) (Cardozo, J.).

This sentiment was echoed by the Seventh Circuit, where the appellate court confronted head-on the alternative methods for calculating lost profits in *Fishman v. Wirtz*, 807 F.2d 520 (7th Cir.1986), an antitrust case. The court noted that it knew "of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain." *Fishman*, 807 F.2d at 553. The court concluded that there was "no requirement that damages must always be computed as of the time of the injury or, if not, reduced by some appropriate discount rate to produce a value as of that date." Furthermore, and in contrast to Dr. Carron's assertion at trial that a yardstick approach might saddle the breaching party with liability for values unknown at the time of the breach, the court noted that "[t]o correct uncertain prophecies ... is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to light the elements of value that were there from the beginning." *Id.* (quoting *Sinclair Ref'g*, 289 U.S. at 698, 53 S.Ct. 736).

Indeed, the law and the Federal Circuit both seem to embrace the type of consequential lost profits damages model that plaintiff has constructed here, in which an actual, historical accounting of profits garnered by some other party is employed as a yardstick

for evaluating the plaintiff's own harm. For example, in *Neely v. United States,* 152 Ct. Cl. 137, 285 F.2d 438 (1961), the Court of Claims concluded that the plaintiff was entitled to recover against the government for breach of a lease agreement authorizing plaintiff to mine coal deposits on public land. Plaintiff had intended to strip-mine the land he leased, and felt it was the only profitable way to mine the property. Later, and in violation of the lease terms, the government prohibited plaintiff from using the strip-mining technique. As a consequence, the plaintiff abandoned his plan to mine the land and assigned his lease rights to a third party. Subsequent to the assignment, federal officials allowed strip-mining on the same parcel of land, under plaintiff's original lease. On the issue of plaintiff's damages for breach of the mining contract, the court noted that:

> the market value of plaintiff's lease was $22,000, which was the commuted value of what plaintiff sold it for [under the assignment]; but plaintiff might have been able to secure a higher price for it, if the prohibition against strip-mining had not been imposed. We do not think plaintiff's damages are limited to this amount.

*Id.* at 443. Just like Anchor, the plaintiff in Neely eschewed a damages claim based upon the *value* of its asset, the lease, that was impaired by the breach.

Instead, like Anchor, the *Neely* plaintiff sought recovery "for loss of his anticipated profits" that plaintiff would have generated had he been permitted to stripmine the land, which the Court of Claims noted "is a recognized measure of damages." *Id.* at 443. The court lamented that in the typical scenario of a new business enterprise (which the plaintiff's mining would have constituted) "profits are uncertain [because] they depend on so many contingencies" and there is no "basis to determine what they might have amounted to." Nevertheless, the court proclaimed *Neely* to be different because "some four or five years after the breach, the leased lands were actually strip-mined [by the plaintiff's assignee] and 132,000 tons of coal were extracted." *Id.* Even though the parties contended that the assignee used slightly different methods (that were more lucrative) and

machinery (that was less efficient) to mine the land than plaintiff had planned to employ, the court was convinced that "the profit realized from [the assignee's] operations, if, indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff's profits would have been." *Id.* Not only did the court adopt this *yardstick* approach—the same functional model presented by plaintiff in this case—but also hailed it as "the best available proof on which to base an estimate of plaintiff's loss." *Id.*

### c. Lost Profits from 1990–97

Plaintiff's lost profits model is simple in concept, but sophisticated in detail. At its most rudimentary abstraction, plaintiff's model assumes that Anchor could and would have continued to hold RFC but for the breach. The model assumes that Anchor would have run RFC much the same as GMAC did during the seven year period it focuses on, given that RFC's management was largely the same as when Anchor owned the subsidiary and that RFC operated consistent with a long-term business plan that it developed under Anchor. Finally, the model assumes that the actual profits that RFC earned under GMAC during those seven years would have accrued to Anchor if it continued to own RFC, and therefore those actual profits are a reasonable proxy for what Anchor's lost profits damages should be in this case. With the conceptual framework of plaintiff's lost profits model in place, the court now turns to the mechanics of the model, along with defendant's specific criticisms and the court's ultimate conclusions.

### i. The Accounting Model

The first layer of assumptions involved in Anchor's damages model involve accounting alterations to the bank's actual balance sheets to try and hypothetically reverse the effects of the breaching provisions of FIRREA. For this exercise, plaintiff relied on the expert testimony of Daniel Dooley, a partner with PricewaterhouseCoopers LLP with substantial litigation and professional experience in matters of forensic accounting. The ultimate goal of Mr. Dooley's engagement was to present the court with a snapshot of what Anchor's financial position

would have looked like in a hypothetical, no-breach world. In turn, plaintiff's subsequent cadre of experts relied on the assumptions in Mr. Dooley's report and testimony to conclude that Anchor would have had sufficient capital but for the breach to own and operate RFC at performance levels on par with GMAC from 1990 to 1997. As a matter of course, to the extent that Mr. Dooley's own conclusions might be flawed, those flaws would permeate the rest of plaintiff's lost profits calculus.

The core of Mr. Dooley's model emanates from two key assumptions he employed regarding what Anchor may have looked like but for the breach. First, he assumed that Anchor would not have sold 50 of the 68 branches included in its capital plan, including those in Atlanta and along the Florida coasts. Second, he assumed that Anchor could and would have retained RFC and operated the subsidiary at profit levels consistent with RFC's actual performance from 1990 to 1997. Thus, the underlying theme of Mr. Dooley's testimony involved "bolting" various accounting changes on to Anchor's actual, real-world balance sheet during this period. The items bolted onto Anchor's actual balance sheet included RFC's balance sheet capturing its performance from 1990-97 and the deposits of the fifty branches that Anchor sold from 1990 to 1994. In addition, assuming that the RFC and branch sales would not have occurred but for the breach, Mr. Dooley's model reverses some accounting affects of those sales, such as crediting back gains-on-sale from RFC and reversing Anchor's write-off of goodwill attributable to the branches. See Tr. at 1791 (Test. of Daniel Dooley). For both Anchor's and RFC's balance sheet information, Mr. Dooley relied upon both companies' audited quarterly or annual financial statements. Tr. at 1791-92.[37]

To capture RFC's performance on Anchor's balance sheet, Mr. Dooley first reversed the actual sale proceeds of $60.8 million Anchor received.[38] Mr. Dooley reflected

this reduction in cash as an increase in Anchor's borrowed funds. Tr. at 1830. Second, Mr. Dooley backed out Anchor's $9.7 million gain-on-sale from the transaction and reflected this as a reduction in equity of like amount on the balance sheet from March 1990 onward. Tr. at 1830. Finally, Mr. Dooley added back to Anchor's balance sheet all of RFC's actual assets, liabilities and retained earnings from 1990 to 1997, based on RFC's audited financial statements. Tr. at 1830.

To reverse the sale of 50 branches that Mr. Dooley assumed would not have been sold but for the breach, he attempted to unwind the transfer of cash and liabilities that Anchor unloaded on an acquiring institution. See Tr. at 1794-96. By adding the deposit liabilities and the cash back on Anchor's balance sheet as of the date of each individual transaction, Mr. Dooley ultimately reduced Anchor's equity by $58.3 million, equal to its premiums from those transactions. He also added back the value of any fixed assets, such as furniture or office real estate that had been sold, though this was a small amount ($11.9 million). Tr. at 1796; PX 1035 (Dooley Demonstrative Exhibit summarizing reversal of branch sales).

Once the deposit liabilities were added back to Anchor's balance sheet, Mr. Dooley's model projected that those deposit levels would remain static. Although Mr. Dooley testified about industry data suggesting that deposit structures in the regions where Anchor sold its branches were increasing over this period, Mr. Dooley believed that holding the deposit levels static was "the most conservative way" to present his model because "there's no speculation in it." Tr. at 1797-98 ("I believe that it was conservative based upon my own experience with other institutions at this time."). Furthermore, Mr. Dooley did not project any de novo branch openings that might attract new deposits, even though Anchor's business plan—particularly in Florida—contemplated such growth.

<hr>

37. For 1995 through 1997, Mr. Dooley relied on the audited financials of Dime, which had acquired Anchor. For RFC, Mr. Dooley testified that only audited annual, rather than quarterly, information was available to him.

38. Although RFC's sale price was $64.4 million, not all of this price is captured in sale proceeds after expenses are deducted.

Since the deposits were added back to the balance sheet, Mr. Dooley also had to account for the costs of maintaining those deposits and the benefits derived from them. He measured Anchor's hypothetical interest expenses based on Anchor's actual deposit yields, with slight differentials built in based upon any regional differences in the average costs of deposit funds. *See* Tr. at 1833–34 ("[T]here were differences region-by-region between the cost of funds."). Finally, Mr. Dooley accounted for any fee income that would be attributable to the deposit structure and the general and administrative ("G & A") expenses required to maintain them. Again, the fee income and G & A expenses attributable to the 50 branch deposit groups were held static at their 1989 levels. Mr. Dooley testified that this was another conservative assumption, because the testimony and exhibits presented at trial clearly demonstrated that Anchor's overall efficiencies, and especially its G & A expenses, were improving throughout 1989 and into 1990. *See* Tr. at 1799–800.

The major task Mr. Dooley undertook was to reverse the accounting effects of Anchor's actual write-off of goodwill in 1990, 1992 and 1994. In 1990, Anchor wrote off $175 million related to the 68 branches whose sale was outlined in the capital plan. Tr. at 1801. In 1992, there was a $119.6 million write-down because Anchor elected to retroactively apply a new accounting standard relating to its income taxes. Tr. at 1802. Finally, in 1994 Anchor took an accelerated write-off of $93 million of goodwill related to Anchor's remaining supervisory goodwill, so as to avoid the unnecessary amortization expense of that supervisory goodwill. Tr. at 1802.

As for the write-down of $175 million of goodwill in 1990, Mr. Dooley testified that if Anchor had not sold the 50 branches it would have retained but for the breach, it would not have been required to write down any of the goodwill associated with the acquisitions of those branches. Mr. Dooley testified that, in his opinion, none of the goodwill would have been written down in the "but for" world, even though he assumed that several branches in rural Georgia and northern Florida acquired in the Peachtree/Crisp and Sun ac-

quisitions would have been sold anyway. Tr. at 1808–09. This conclusion was premised on Mr. Dooley's interpretation of Financial Accounting Standard # 72, which he testified did not require goodwill attributable to the 18 branches to be written down if Anchor's key operational assets acquired in the Peachtree/Crisp and Sun transactions remained. Tr. at 1809–10. As a consequence of the reversal of this goodwill, Mr. Dooley's model increased Anchor's assets and equity by $175 million from 1990 on, to be amortized consistent with the schedules Anchor and the government had agreed to in the supervisory agreements.

In 1992, Anchor adopted FAS # 109, a new accounting provision, on a voluntary retroactive basis to take advantage of an opportunity to decrease goodwill and create a deferred tax asset. In adopting FAS 109 retroactively, Anchor wrote off $119.9 million in goodwill, decreased its equity by $79.3 million, and increased its deferred tax assets by $40.6 million. In the "but for" world, however, Mr. Dooley concluded that Anchor's RAP (supervisory) goodwill would still have utility, so it would not have eliminated the corresponding GAAP goodwill then on its books and would not have retroactively adopted FAS 109. Tr. at 1811–14.

To reverse this accounting entry, Mr. Dooley's model increased Anchor's assets and equity by $119.9 million. Mr. Dooley did not, however, eliminate the deferred-tax asset that Anchor actually created in 1992. This was because, as Mr. Dooley testified, that asset was actually reduced and eliminated over time, reducing Anchor's actual retained earnings and equity. Tr. at 1815. Since time and events took care of reducing and eliminating the $40.6 million asset, Mr. Dooley did not want to adopt another assumption into the model "when the actual results take care of [themselves]." Tr. at 1815.

In 1994, Anchor took advantage of an option in FAS 72 to take an accelerated write-off of all of its goodwill to "clean up" the remaining GAAP goodwill associated with its remaining (and by then useless) supervisory goodwill. Tr. at 1816–17. But for the breach, Mr. Dooley testified that Anchor would have continued to value the superviso-

ry goodwill in order to meet its regulatory capital requirements, so it would not have prematurely amortized the related GAAP goodwill. Accordingly, Mr. Dooley's model increased Anchor's assets and equity by $92.9 million as of 1994 to reverse Anchor's premature reduction of its goodwill assets. Tr. at 1817.

Lastly, in order to tidy up certain accounting loose ends, Mr. Dooley's model made four additional changes. First, he decreased Anchor's equity to accommodate the amortization expenses of the additional supervisory goodwill added back to its books in his model. Tr. at 1837. Second, Mr. Dooley added back $9 million to account for certain expenses Anchor allegedly incurred because of the breach. (These are the same expenses that comprise Anchor's "wounded bank" damages discussed below.) Third, Mr. Dooley reduced Anchor's equity by $52 million to account for income tax payments that he concluded Anchor would have been responsible for in the "but for" world. Tr. at 1839. Finally, Mr. Dooley concluded that in the "but for" world, Anchor would not have suspended dividend payments to the government on its preferred stock. In reality, Anchor suspended those payments and ultimately had the accumulated dividend forgiven in exchange for warrants and debt issued to the government. In the "but for" world, Mr. Dooley concluded that Anchor would have simply paid dividends to the government in the regular course of business. Accordingly, he decreased Anchor's equity by $47.2 million. Tr. at 1839–41.

At the conclusion of his testimony, Mr. Dooley outlined several of what he believed were conservative assumptions built into his model. Among them, Mr. Dooley noted that his model presumed no additional growth of the bank beyond the branches and deposits sold in the capital plan. It presumed no additional leveraging of available deposits, other than for their use to support RFC. Furthermore, while Anchor's other expert, Dr. Baxter, concluded that Anchor's 1993 stock offering might have generated as much as $42 million in additional equity, Mr. Dooley's model did not presume such growth in equity. Finally, while Anchor's expert Mr.

Lederman testified that RFC could have recognized substantial cost savings of as much as $190 million (discussed below) by adopting an alternative credit enhancement structure for its MBS, Mr. Dooley's model presumed no such savings.

The government—aside from vociferously disagreeing with the two principle underlying assumptions that RFC and the 50 branches would have been retained but for the breach—pointed primarily to two criticisms of Mr. Dooley's model. First, defendant questioned Mr. Dooley's interpretation of FAS 72 and argued that Anchor would have had to write down any goodwill associated with the 18 branches Mr. Dooley assumed would have been sold in the "but for" model. Second, defendant questioned the integrity of the model's failure to offset the $40.6 million deferred-tax asset created by Anchor's 1992 retroactive adoption of FAS 109 against Anchor's supervisory goodwill. Defendant's expert accountant, Mr. Bankhead, testified that proper prospective application of FAS 109 would require a $15.4 million adjustment (write-down) of goodwill to offset the deferred-tax asset associated with Anchor's acquisitions.

Mr. Bankhead testified that if Anchor sold the 18 branches in the "but for" world that it had already planned to sell, then the bank would have been required to write down goodwill associated with those branches. Mr. Bankhead pointed out that among the 18 branches were all four of those that remained of the Crisp acquisition in Georgia. Tr. at 3846. In Florida, nine of the thirteen original branches involved in the Sun transaction were contemplated for sale in Mr. Dooley's model. According to Mr. Bankhead, "[i]f you're disposing of everything you acquired that created the goodwill, then you've got to write off the goodwill." Tr. at 3847.

Ultimately, the dispute over goodwill associated with the 18 branch sales in the "but for" world boils down to a professional disagreement over the application of FAS 72, which addresses accounting for certain acquisitions of banking or thrift institutions and the disposition of unidentifiable intangible assets (goodwill). Paragraph 7 of FAS 72

seems to state the general accounting rule applicable to branch dispositions:

[I]f a large segment or separable group of the operating assets of an acquired banking or thrift institution, such as branches, is sold or liquidated, the portion of the unidentifiable intangible asset attributable to that segment or separable group shall be included in the cost of the assets sold.

PX 330 at 727 ¶ 7 (FAS 72). In other words, if some portion of Anchor's goodwill were attributable to the branches it would have sold in the "but for" world, then it would have to write down that goodwill.

In describing the goodwill that is present in banking and thrift institution acquisitions, FAS 72 notes that those acquisitions "seldom, if ever, are consummated for the purpose of acquiring a portfolio of interest-bearing assets." *Id.* at 731 ¶ 29. Instead, "enterprises that acquire banking and thrift institutions pay a premium [quantified as the unidentifiable intangible asset or goodwill] *to gain entry into new markets, to acquire established branches with existing customer relationships, to acquire an existing deposit base, and for other factors.*" *Id.* ¶ 28 (emphasis added).

At trial, Mr. Dooley relied on paragraph 39 of FAS 72. While that provision deals literally with the disposition of "Interest–Bearing Assets" and not operating assets such as branches,[39] the rule counsels that "if a sale of a large group of interest-bearing assets is accompanied by the loss of a significant and valuable customer base, a reduction in goodwill likely would be appropriate," but "the sale of all or a portion of acquired interest-

bearing assets does not automatically require a reduction in goodwill." *Id.* at 733 ¶ 39. Ultimately, the "determination of whether a reduction in goodwill is appropriate should be based on the individual facts and circumstances." *Id.* The rationale behind this accounting principle applicable to interest-bearing assets would seem to apply with equal force to operating assets, or branches, even though that rule or application is not explicitly stated. This is so because just as a banking acquisition is seldom consummated for the purpose of obtaining a portfolio of interest-bearing assets, *see id.* at 731 ¶ 29, it is entirely possible that an acquisition might be consummated to gain something other than the operating assets or branches of the institution. *Id.* ¶ 28. As noted in FAS 72, the acquisition may be rooted in, among others, the acquirer's desire "to gain entry into new markets, to acquire established branches with existing customer relationships, to acquire an existing deposit base, and for other factors." *Id.*

Therefore, because the specific facts of an acquisition may reveal that goodwill was created for reasons other than the specific branch deposits acquired in the transaction, it would make sense to inquire into those specific facts to determine whether or not goodwill need be reduced when some—or in other cases, all—of the branches are later divested. It is entirely possible that the reason that gave rise to the premium or unidentifiable intangible asset (the goodwill) in the first place remains, even after the branches are gone.

---

39. FAS 72 seems to draw a literal distinction between branches ("operating assets") and interest-bearing assets in ¶ 7, implying that the two are not interchangeable:

[I]f a large segment or separable group of the operating assets of an acquired banking or thrift institution, such as branches, is sold or liquidated, the portion of the unidentifiable intangible asset attributable to that segment or separable group shall be included in the cost of the assets sold. If a large segment or separable group of the interest-bearing assets of an acquired institution is sold or liquidated and if the benefits attributable to the unidentifiable intangible asset have been significantly reduced, that reduction shall be recognized as a charge to income.

PX 330 at 727 ¶ 7. At trial, Mr. Bankhead criticized Mr. Dooley for equating branches, or "operating assets," with "interest-bearing assets" in the context of ¶ 39, which deals specifically with the subsequent disposition of "interest-bearing assets." *See* Tr. at 3849–51. The court is not persuaded that this is a distinction with a difference, however. The overall tenor of FAS 72 seems to impart a fair degree of discretion in the treatment of goodwill upon the subsequent disposition of an asset—be it an "operating" asset or an "interest bearing" asset—in the context of financial institution operations, since the goodwill associated with a financial institution is rarely tied to one of those specific assets. *See* PX 330 at 730–31 ¶¶ 28, 29.

While both Mr. Dooley and Mr. Bankhead testified credibly on this arcane issue, the court is ultimately persuaded that Mr. Dooley's model is not flawed simply because it did not write off any goodwill despite the 18 branch sales. First, in Georgia, it does not appear that FAS 72 would require any goodwill reduction for selling the four Crisp branches, so long as Anchor would continue to hold the Peachtree branches and enjoy the fruits of entry into Georgia. When Anchor acquired the Georgia branches, the government designated the Crisp acquisition as one in the same with the Peachtree acquisition despite calculating goodwill separately. *See* PX 399, 404; Tr. at 3990–91. Anchor's interest lay primarily in Atlanta's urban market, home of the Peachtree branches. The two acquisitions were completed simultaneously through a single assistance agreement. *See* Tr. at 3990–91; PX 399; PX 404. Anchor's primary goal in the Georgia acquisitions was its entry into the Atlanta market, and that is effectively the privilege for which Anchor "paid" in taking on the goodwill associated with both the Peachtree and Crisp branch structures. Consequently, the fact that the "but for" Anchor would remain in Atlanta and retain the Peachtree branches and other *de novo* branches in Atlanta counsels that goodwill would not need to be reduced, notwithstanding the sale of the Crisp branches. *See* PX 543 at 1 (Letter from Anchor attorney to FHLBB) ("The deposits for the Georgia branches proposed to be sold aggregate $115.8 million.... Anchor considers these branches to be peripheral to its primary operations in Georgia ... [and] the weak performance of these Georgia branches is detrimental to Anchor."). Mr. Bankhead even conceded that whether or not goodwill need be reduced from the sale of a series of branches "would depend upon the facts and circumstances of that disposition." Tr. at 3993. The plain fact was that the four Crisp County branches were but a small and largely irrelevant piece of Anchor's branch franchise in Georgia, and any sale of those branches, alone, would not have undermined Anchor's operations in Georgia in any way. *See* PX 543 at 2 (calling proposed branches involved in sale "*de minimus*" [sic] and not-

ing that the relevant deposits account for only 1.4% of Anchor's deposit base).

The same logic applies in relevant part to the Sun branches in Florida. The primary benefit Anchor achieved in that acquisition was the privilege of opening new branches in the state. Anchor long coveted the opportunity to open branches along the Florida coasts. *See* Tr. at 2731–32 (Test. of George Schneider) ("If we acquired Sun because of their branches, we would have had no interest in it. It was entree into the Florida market where we now could access any market within the state by virtue of our presence in the state."). After the Sun acquisition, Anchor did in fact move down along the coast and the "but for" bank would have retained these branches. *See* PX 537 at 67 (1988–89 Strategic Plan) (calling upon Anchor to "[e]xpand the Branch Network [in Florida] ... [in] markets where the potential for further growth is the greatest"); PX 575 (Press Release announcing sale of nine Florida branches) (noting that Anchor's "main branching focus has been towards Southern Florida" and that Anchor "fully expect[s] to further expand in these markets"). FAS 72, therefore, would not have required any reductions in goodwill attributable to the Sun acquisition since the "but for" Anchor would have continued to enjoy the most important fruit of that transaction, namely its presence in Florida along the coast.

In sum, it appears that FAS 72 would only require Anchor to write down goodwill from the Crisp or Sun acquisition if there were goodwill "attributable to that segment or separable group" of operating assets divested. PX 330 at ¶ 7. Nowhere in the record does it appear that Anchor ever accounted for its goodwill on a branch-by-branch basis, and the record clearly establishes that the branches that would have been sold in the "but for" world were peripheral to Anchor's operations and business plans. Moreover, at the time of the Sun and Crisp acquisitions, Anchor's motive in acquiring the branch structures—and the primary reason it was willing to pay a premium in the form of goodwill—was so that Anchor could enter the Florida and Georgia markets and establish a branch franchise in those states consistent

with Anchor's long-term goals. The specific branches Anchor acquired were merely a means to an end—an end that would not have been at all undermined if Anchor eventually sold the specific branches it initially acquired in each state. There was, therefore, no "unidentifiable intangible asset," or goodwill, attributable to those specific branches and no attendant need for Mr. Dooley's model to reduce Anchor's goodwill in the shadow of those peripheral branch sales.

Mr. Bankhead's second criticism of Mr. Dooley's model centered on the prospective application of FAS 109, which deals with accounting for income taxes and certain deferred tax assets. According to Mr. Bankhead, at least some of the $40.6 million deferred tax asset that would be created if Anchor were to prospectively adopt FAS 109 in 1992 would have to be offset against the like portion of Anchor's supervisory goodwill. Specifically, Mr. Bankhead testified that $15.4 million of Anchor's would-be $40.6 million deferred-tax asset would be attributable to Anchor's supervisory acquisitions giving rise to goodwill. Tr. at 3854–59. Therefore, Mr. Bankhead testified that, in his opinion, Mr. Dooley's model should have decreased "but for" Anchor's supervisory goodwill by $15.4 million to reflect a proper prospective application of FAS 109.

FAS 109 required prospective application, at least, but also permitted retroactive application to prior years, allowing an institution to restate financial statements for those years. Mr. Dooley conceded that the prospective application of FAS 109 to a future transaction would require just the treatment Mr. Bankhead invoked: "What it said was that if there is … a deferred tax asset … you have to take the dollar amount of the income tax benefit and apply it against goodwill first, until there is zero goodwill left."

Tr. at 1811. He explained, however, that a *prospective* application of FAS 109 would not require a write-down of Anchor's already-existing goodwill even though it would create a deferred tax asset because all of Anchor's goodwill was created prior to 1992, the year FAS 109 was implemented. FAS 109, itself, limited the write-down of any goodwill to only those transactions occurring *during* or *after* the year in which its provisions were applied:

> For a purchase business combination consummated *prior to the beginning of the year for which this Statement is first applied*, any balance remaining as of that date for goodwill or negative goodwill *shall not be adjusted* to equal the amount it would be if financial statements for the year of the combination and subsequent years were restated.

FAS 109 ¶ 54, *available at* http://www.fasb.org/pdf/faas109.pdf; PX 932 (OTS thrift bulletin adopting FAS 109 for regulatory reporting purposes) (emphasis added).[40] Therefore, since the "but for" model contemplates Anchor applying FAS 109 prospectively from 1992 onward, only, it would not have to adjust any existing goodwill balance resulting from acquisitions in prior years, as Mr. Bankhead advocated. Such a goodwill reduction would *only* be necessary if Anchor applied FAS 109 *retroactively* (as it actually did following the government's breach) and restated the bank's financial statements for those years including an acquisition ("business combination") giving rise to goodwill. *Id.; see also* Tr. at 1813 (Test. of Daniel Dooley) ("But all of [Anchor's] goodwill had arisen prior to 1989, most of it prior to 1985…. There was no obligation for GAAP purposes to have made a retroactive, prior-period adjustment, to have reversed that goodwill as though 109 had existed back in

---

**40.** Although both Messrs. Dooley and Bankhead referred to FAS 109 at length during trial and relied on it for the purposes of their expert reports, and both parties briefed the FAS 109 issue at the court's request in post-trial briefing, it does not appear that FAS 109 itself was actually introduced as an exhibit at trial, and that the standard was first quoted or directly cited in the plaintiff's post-trial response brief on page 17. As the Federal Accounting Standards Board, the organization responsible for FAS 109, is a trans-parent, reliable professional organization and the court has no cause to question the accuracy of the financial accounting standards posted on the organization's website, it is appropriate for the court to take judicial notice of FAS 109 pursuant to Federal Rule of Evidence 201 (Judicial Notice of Adjudicative Facts) and treat the text of FAS 109 as if it had been introduced as evidence at trial. *See also* Fed.R.Evid. 803(18); Fed.R.Evid. 902(5).

'85."). Therefore, the court finds no error in the accounting model Mr. Dooley presented or its critical underlying assumptions.

### ii. The Regulatory Model

With a financial snapshot of what Anchor might have reasonably looked like but for the government's breach in place with Mr. Dooley's model, plaintiff's experts relied upon that model to project what Anchor's regulatory capital position would have looked like from 1990 through 1997 if it had continued to own the 50 branches and RFC. Plaintiff's principal goal in modeling the bank's capital position was to demonstrate that Anchor could have successfully owned and operated RFC during that period at performance levels that compared with how GMAC operated the subsidiary, and rebut defendant's contrary allegations.

One of the government's primary contentions at trial was that RFC's operational structure required far too much regulatory capital, which made it prohibitive for a thrift like Anchor to own the subsidiary without running afoul of FIRREA's new (and non-breaching) risk-based capital requirement. That conclusion was driven primarily by the fact that a component of the risk-based capital provisions, the low-level recourse rule, imposed a near-draconian capital requirement for assets like the subordinated "B" piece securities or letter of credit structures that RFC used to credit enhance its MBS. Under Anchor, and later GMAC, RFC relied almost exclusively on a senior/subordinate security structure (discussed above) to create an internal credit enhancement for the securities it issued. Both Anchor and GMAC largely held the subordinated "B" piece created in the securitization process as an asset, but that continued practice would not have been sustainable for Anchor had it continued to own RFC. If "B" pieces accumulated in Anchor's asset portfolio, the attendant risk-

based capital requirement would have eventually outstripped Anchor's capital—even in the non-breach world where Anchor was able to count its supervisory goodwill as regulatory capital. Anchor, therefore, could not have operated RFC *exactly* as GMAC did because until 1994 GMAC retained the "B" pieces, but Anchor could not.

An initial hurdle for plaintiff, then, was to reliably demonstrate that a reasonable and practical solution existed for Anchor to deal with the operational restrictions imposed by the risk-based capital provisions. In other words, if the breach and immediate loss of regulatory goodwill had not forced Anchor to hurriedly sell RFC in 1990, would Anchor have had the capability to continue operating RFC by issuing mortgage-backed securities in a manner that avoided retaining recourse and would not trigger the risk-based capital requirements? Furthermore, in order for the court to rely on RFC's actual profits from 1990–97 as a reasonable proxy for what Anchor's lost profits in this case might be, plaintiff had to demonstrate that any potential credit enhancement alternatives would not have had a material impact on RFC's profitability.

### 1. Testimony of Jess Lederman and Credit Enhancement Alternatives

Plaintiff presented Jess Lederman, an expert on mortgage-backed securities and the secondary mortgage market, to testify about alternative credit enhancement options that were available to Anchor in the "but for" world and how those alternatives might have impacted RFC's operations. Mr. Lederman appeared before the court with excellent credentials that demonstrated a wealth of high-level experience in different sectors of the secondary mortgage market.[41] At trial he demonstrated expert familiarity with all as-

---

41. Beginning in the early 1980s, Mr. Lederman was the director of pricing and research for PMI Mortgage Insurance Co., where he was responsible for the pricing of mortgage insurance products. From 1983–85 he was an executive with Sears Mortgage Securities Corp., and from 1985–1989 an executive with Bear Stearns Mortgage Capital Corp. At both, Mr. Lederman helped create some of the first and largest private-label mortgage conduits that competed directly with RFC. In 1989, he formed the Asset–Backed Capital Group, one of the very first investment vehicles to focus on subordinate MBS and grow the secondary market for them. Since 1996, he has run a major wholesale mortgage-banking division for Ohio Savings Bank. *See generally* PX 925.

pects of mortgage-backed securities and the industry that creates them. Mr. Lederman was familiar with RFC, its history, and its operations because he had "done business with and competed against RFC for more than 20 years." Tr. at 1384. As noted above, his expert testimony was very helpful to the court and extremely credible.

The principal goal of Mr. Lederman's testimony was to demonstrate to the court how Anchor could have continued to operate RFC despite FIRREA's risk-based capital restrictions. Furthermore, Mr. Lederman explained to the court how he would have expected Anchor to finance and operate RFC in the "but for" world, and compared that model to RFC's actual performance under GMAC during the 1990–97 period.

*Risk–Based Capital Provisions Revisited*

A primary concern or hurdle that Anchor would have faced, had it owned RFC past March 1990, was the risk-based capital regulation that required a thrift to hold capital commensurate with its risk exposure. Generally speaking, all of a thrift's on-balance sheet assets were "risk weighted" based on the relative risk of loss inherent in each. For example, securities backed by the United States government (such a Ginnie Mae MBS) and cash reserves had a "zero" percent risk weight because they were stable, no-risk assets. High quality, "AAA" MBS were weighted at 20% of their value. Qualifying residential whole loans were weighted at 50%, while some assets such as ordinary securities, mortgage servicing rights, and other loans were weighted at 100% of their value. On this sliding scale of risk conversion, some inherently risky assets, such as repossessed assets or delinquent loans, were risk-weighted at 200%. Once a thrift's assets were risk-weighted, the thrift was then required to hold capital equal to 8% of the converted total risk-weighted assets. *See generally* PX 1046 (demonstrative summarizing risk-weighting of on-balance sheet assets).

Another step in calculating a thrift's risk-based capital requirement involved quantifying any risk that was not captured on the thrift's balance sheet. It was this "low-level recourse rule" that made it prohibitive for a thrift to own and hold an asset like the subordinated security RFC often created to credit enhance its MBS. Because a subordinated MBS bore the risk of loss for the entire pool of mortgages underlying the security (any loss from the pool was disproportionately borne by the subordinate class so that the senior class of the security would have a lesser risk of loss and therefore achieve the coveted "AAA" rating), the low-level recourse rule attempted to capture this off-balance sheet risk exposure for the purpose of calculating a thrift's risk-based capital requirement. Rather than requiring only 8% of the risk-weighted value of the subordinated security asset like other balance sheet items under the risk-based capital guidelines, the low-level recourse rules effectively required a thrift to hold capital on a *dollar-for-dollar* basis for those assets.[42]

The low-level recourse rules also captured letter of credit obligations used to credit enhance subordinate MBS. When Anchor first acquired RFC from Solomon Brothers, it often relied on letters of credit as a primary credit enhancement tool. As a result, Anchor's letter of credit obligations were treated harshly under the FIRREA risk-based capital rules and created a substantial risk-based capital requirement similar to that for subordinated securities. Under Anchor,

---

**42.** At trial, defendant's expert Mr. Bankhead presented a helpful illustration of this rule in practice. *See* DX 4001, 4002. If a hypothetical thrift held $100 in subordinated securities that bore the risk of loss from a $2,000 pool of mortgages (so the subordinate security represented 5% of the pool), the low-level recourse rule would allow the thrift to base its capital requirement on the lesser of either 8% of the risk-weighting for the entire *pool* of mortgages or a dollar-for-dollar amount on the subordinated security. In Mr. Bankhead's model, the thrift would choose between a $160 capital requirement for the pool of mortgages ($2,000 of mortgages that would be risk-weighted at 100% as non-qualifying loans, multiplied by the 8% risk-based capital requirement, equaling $160) or a $100 capital requirement equaling the dollar-for-dollar amount of the subordinated securities in the portfolio. In that scenario, the thrift would opt for the lower $100 capital requirement. On the other hand, if the MBS issuer created a subordinate class equal to 10% of the underlying pool, or $200 here, then the thrift would choose its $160 capital requirement based on 8% of the entire pool instead of the $200 dollar-for-dollar requirement.

RFC eventually gravitated away from letters of credit as a credit enhancement tool and instead adopted the senior/subordinate structure to credit enhance its MBS and held the subordinate securities in its own portfolio. Under GMAC, RFC continued this practice through 1993. At the time Anchor decided to sell RFC, it had accumulated about $66 million in subordinate securities that carried with them the attendant risk-based capital requirement of nearly a *billion* dollars in additional assets. *See* DX 358. While in the "but for" world this capital requirement would have been comfortably sustainable for a brief time because Anchor would have had the benefit of a considerable capital cushion due to its supervisory goodwill, as RFC continued to issue MBS and retain subordinate securities (as it did under GMAC), the accumulation of subordinated securities would have quickly eroded Anchor's capital and that practice would not have been sustainable.

*RFC's Alternative Credit Enhancement Options*

At trial, Mr. Lederman explained that RFC had alternative credit enhancement strategies at its disposal and that it would have been entirely possible and practical for an Anchor-owned RFC to continue issuing MBS without retaining any recourse in the essential credit enhancement process. As Mr. Lederman discussed, RFC's credit enhancement strategies only triggered the risk-based capital provisions when RFC or Anchor retained some form of recourse on its MBS. That is, they were only a concern when Anchor bore the risk of loss attributable to the underlying pool of mortgages. Under a letter of credit-enhanced MBS, security holders could demand that the issuer of the letter of credit cover losses from the pool up to the face amount of the letter of credit, and that issuer would ultimately seek reimbursement from RFC/Anchor. Under the senior/subordinate structure, the subordinate piece bore the disproportionate risk of loss, so as long as Anchor or RFC owned the subordinated security it would count heavily against Anchor's risk-based capital requirement.

Mr. Lederman testified that RFC could continue to issue MBS without retaining any long-term recourse by either using pool insurance to credit enhance the securities or continuing to create senior and subordinate classes of MBS but selling the subordinate pieces into the secondary market rather than retaining them. By selling the subordinate security, Anchor would pass any recourse off to the buyer.

Mr. Lederman testified that mortgage pool insurance is "[o]ne of the most common forms of external third-party credit enhancement." Tr. at 1424. "Prior to 1987, pool insurance was the dominant credit enhancement vehicle" for MBS. Tr. at 1429. It was only after the Real Estate Mortgage Investment Conduit (REMIC) legislation in the 1986 Tax Reform Act that the senior/subordinate structure RFC later adopted became popular. In Mr. Lederman's expert opinion, RFC could have used pool insurance both to remove Anchor's existing recourse on MBS that had already been issued prior to FIRREA using letters of credit as credit enhancement, and also to credit enhance its post-FIRREA issuances. Indeed, in the months immediately following FIRREA, RFC switched over to pool insurance to credit enhance some of its issuances under Anchor.

In the early 1990s, Mr. Lederman explained that the Mortgage Guarantee Insurance Corporation ("MGIC") was the leading provider of primary mortgage insurance to RFC's customer base, but was not a large provider of mortgage pool insurance. On the other hand, GE Mortgage Insurance Company ("GE") and PMI Mortgage Insurance Company ("PMI") were dominant issuers of pool insurance that "would have worked with RFC enthusiastically" in order to create a symbiotic relationship with RFC and take market share away from MGIC in the primary mortgage insurance market. Tr. at 1465–67. Based on his experience in the market and specific conversations with representatives of GE and PMI, Mr. Lederman believed they "would have leapt at the opportunity to enter into a closer business relationship with RFC to accomplish exactly that." Tr. at 1466–67.

For the MBS that RFC had already issued using letters of credit as credit enhancement,

Mr. Lederman testified that RFC could have retroactively *substituted* pool insurance for the letters of credit, so long as the amount of protection afforded to the security owners remained unchanged. Tr. at 1454–55. The government criticized this opinion and argued at trial that after-the-fact, retroactive substitution of one form of credit enhancement for another was a hypothetical theory that had never actually occurred before in practice. Def.'s Mot. at 14. Mr. Lederman, however, testified about an analogous substitution that thrifts regularly practiced after FIRREA. He noted that throughout the 1980s, thrifts that pooled mortgages for Fannie Mae and Freddie Mac securities would often retain some recourse for the benefit of the agencies, so that the thrifts could obtain preferred status executing the issuance. Tr. at 1455–56. The risk-based capital provisions affected this recourse exposure just the same as if those thrifts had credit enhanced and issued their own MBS like RFC. Therefore, Mr. Lederman noted, "these thrifts turned to the same mortgage insurance industry for insurance to eliminate that recourse and thereby solve their capital problem." Tr. at 1456–67.

This comment seemed to be supported by a survey of the pool insurance market performed by Mr. Lederman. That survey revealed that the total amount of pool insurance issued more than doubled from 1988 to 1989, and nearly doubled again from 1989 to 1990. Tr. at 1455–56; PX 1027; *see also* PX 818 at 21 (Lederman Expert Report) ("[I]ssuance of mortgage pool insurance increased from approximately $0.5 billion per quarter in 1988 and the first half of 1989 to $4.8 billion in the fourth quarter of 1989 immediately following the passage of FIRREA. Pool insurance policies issued continued to increase on an annual basis through 1993, when approximately $50 billion of coverage was sold."). In all of these years, the total pool insurance issued far exceeded the pool insurance issued to credit enhance new issuances of private-label MBS, suggesting that considerable pool insurance was issued to insure pre-existing mortgage pools. This analogous practice does not show that any thrift had ever substituted one form of credit enhancement for another on its *own* MBS

issuances, but the market appears to have had the capacity and the mechanism by which such a practice *could* have realistically and practically occurred.

Similarly, Mr. Korell testified that securities issued through a "shelf," or ongoing, registration contained provisions "that would allow different types of credit enhancement to be substituted, as long as the investors are protected in essentially the same way" as they would be under the original enhancement. Tr. at 1350. The goal was to provide the security holder with protections comparable to those he bargained for when the security was acquired. So long as that protection would be afforded by a substitute enhancement, "exchangeability" would be permitted. *Id.*

For the securities that RFC issued after FIRREA, Mr. Lederman believed Anchor could have avoided future recourse exposure by credit enhancing with a combination of pool insurance and subordinate security sales without recourse in the secondary market. Tr. at 1457–58. He estimated that if Anchor had adopted such a strategy, the overall mix of pool insurance versus subordinate security sales would be a 50/50 split during 1990–1993, with RFC initially relying slightly more on pool insurance as the secondary market for subordinate MBS developed greater liquidity. Tr. at 1458.

The government challenged this opinion on the ground that Mr. Lederman never demonstrated that the mortgage pool insurance market could accommodate such an increase in capacity that would be created by RFC's hypothetical demand. According to defendant, Mr. Lederman's model assumes that RFC would have purchased as much or more pool insurance in 1990–91 as the market provided to all issuers of private-label MBS combined. *See* Def.'s Br. at 23; DX 1508; Tr. at 4297–99 (Test. of Dr. Carron). While not inaccurate, this assertion was somewhat misleading, as Mr. Lederman demonstrated that the overall market for pool insurance was not limited to private-label MBS issuances. In any given year the total amount of pool insurance issued far exceeded the amount covering private-label MBS. *See* PX 1027.

Furthermore, just as the total market for pool insurance (not limited to private-label MBS pool insurance) doubled from 1988 to 1989, and again from 1989 to 1990, it also doubled from 1991 to 1992. In all, from 1988 to 1992, the market for mortgage pool insurance increased by a factor of more than ten, from just over $3 billion per year in 1988 to more than $40 billion in 1992. *Id.* This fact alone demonstrates that over this period the market had considerable elasticity. It is not unreasonable, therefore, to conclude that the market could have absorbed the excess demand for mortgage pool insurance that RFC's entry into the market would have created. While RFC's demand would have been a substantial portion of the overall market—*see, e.g.,* PX 1028 and Tr. at 1463–64—it would not have overwhelmed the market's capacity, as defendant suggested. *See also* Tr. at 4299–301 (Test. of Dr. Carron).

Mr. Lederman believed that RFC would have issued senior/subordinate MBS in tandem with pool insurance and sold the subordinate security without recourse in the secondary market. He described a market for just these kinds of securities that emerged in 1990, spearheaded in part by Mr. Lederman's own partnership, the Asset Backed Capital Group. Shortly before Anchor sold RFC to GMAC, Mr. Lederman's partnership purchased from RFC subordinate securities backed by a billion dollars in mortgage collateral. Tr. at 1459. Over the course of the next three years, the market for these securities developed rapidly, so that by 1993 RFC (under GMAC) sold all of its subordinate securities and no longer retained recourse in its regular course of business. Not only did Mr. Lederman believe that the market could have absorbed RFC's sale of subordinate securities beginning in 1990, but also that RFC's earlier entry into the market would have hastened its development:

> The market for subordinate securities was beginning to develop in 1990, there were transactions that were occurring. And in fact ... RFC, as a regular provider of supply into the market, would have been a big help in helping to more rapidly develop the secondary market for subordinate mortgage-backed securities. A key part of

developing liquidity is simply having supply.

Tr. at 1458. The development of the market is consistent with Mr. Lederman's opinion that RFC would have relied more on pool insurance earlier, while gradually relying more on a senior/subordinate structure as the secondary market for subordinate securities evolved.

One criticism that defendant's expert, Dr. Carron, made of Mr. Lederman's model was not that so many of these alternatives were not available to Anchor or RFC, but rather, that they would have limited RFC's operational flexibility, potentially undermining profitability. Along these same lines, he was critical of the fact that Mr. Lederman's model seems to anticipate that pools of mortgages on RFC's balance sheet would be securitized and sold in a moment, with no apparent cushion built in to the model to allow pools and securities to "season" or for RFC to hold those securities for a short period to optimally time their sale. According to Dr. Carron, RFC's alleged inability to retain even a transactional inventory of subordinate securities for limited periods would make it "uneconomic" for Anchor to operate. *See generally* Tr. at 4242–52.

Dr. Carron keyed on a statement in a September 1989 internal review of RFC presented to Anchor's board of directors, in which Anchor stated:

> [I]t is essential to have flexibility in security structuring and credit enhancements so as to avoid more costly and inefficient executions, compared to key competitors. The ability to hold ARM loans and fixed and adjustable subordinated securities for seasoning and market timing is a strategic necessity.

PX 587 at 1. Dr. Carron testified that this statement reflected market realities, in that the most successful conduit firms were those that took advantage of the most effective execution of their securities, dealing at precisely the right moment to obtain the highest price possible. Tr. at 4245–46. Successful firms had the flexibility to consider a range of different security configurations to maximize its investor appeal in an ever-changing market. *Id.* Dr. Carron believed that "the

successful firm is going to, at each occasion of issuing a new security, identify the structure that has the most effective execution . . . that's going to give them the most amount of proceeds . . . for issuing that security, based on those current market conditions." Tr. at 4246. Firms that were unable to operate with adequate flexibility would "end up on occasion with more costly execution, and that's going to take money out of your pocket." Tr. at 4247. Under Anchor, Dr. Carron believed that RFC would have had only limited flexibility because it could not structure its MBS in a manner in which RFC retained any recourse. Tr. at 4251–52. As a result, RFC's "competitors are able to do some things that [it is] not able to do, and that is going to lead to [RFC] being less profitable than [its] competitors." Tr. at 4252.

In addition to this flexibility in execution, Dr. Carron testified that flexibility in "seasoning" and "market timing" were also essential to maximize a conduit's profitability. "Seasoning" refers to the practice of holding a pool of mortgages in a conduit's portfolio for several months before issuing the security so that bad mortgages—those that default within the seasoning period or fall out of the pool due to substandard underwriting—are weeded out and the investor has assurance that the pool will perform as promised. Tr. at 4248. "Market timing" allows the issuer to hold securities until a buyer is willing to pay an optimal price, or to combine smaller subordinated securities into a larger, more diversified pool that reduces risk and makes them more attractive to investors. *Id.*

One of the rubs in Mr. Lederman's model, according to Dr. Carron, is that the model fails to take into account any type of transactional inventory that would provide RFC with the necessary flexibility to tailor the structure of its securities, season its mortgage pools, or execute its securities at optimal times. This failure would impact plaintiff's regulatory model (discussed below) because a transactional inventory sufficient to satisfy RFC's needs "requires a substantial amount of capital . . . tens or hundreds of millions of dollars of capital, just to hold that transactional inventory." Tr. at 4250.

Neither of these criticisms, however, takes anything away from Mr. Lederman's opinion that RFC *could* have operated under Anchor's risk-based capital restrictions and issue MBS without recourse. Dr. Carron did not dispute the viability of the alternatives Mr. Lederman presented, but merely the profitability of those alternatives relative to what competitors in the market might have been able to accomplish. The court therefore concludes that reasonable alternative credit enhancement mechanisms were, in fact, available to RFC that could have allowed Anchor to continue operating the subsidiary in a no-breach world in which Anchor retained its supervisory goodwill. Dr. Carron's criticisms do, however, have merit. Most importantly, they call in to question whether Anchor would have had enough capital to sustain RFC's transactional inventory so that RFC's MBS issuance could take place on economic terms comparable to those under GMAC. That discussion is taken up below.

*Pricing of Credit Enhancement Alternatives*

Having demonstrated to the court's satisfaction that RFC could have avoided accumulating long-term recourse, Mr. Lederman also testified that RFC could have operated just as profitably—if not more so—using these alternatives. In reaching this opinion, Mr. Lederman estimated the costs RFC would have incurred using his proposed alternative credit enhancement strategies. He compared those costs to the $300 million RFC reserved for losses on the subordinate securities it held in portfolio, and ultimately concluded that the alternative methods would have resulted in a net *savings* of more than $100 million if RFC had used them instead of retaining recourse from 1990 to 1993. *See* Tr. at 1471–72.

Although Mr. Lederman believed that RFC would have used a mix of mortgage pool insurance and senior/subordinated securities in the "but for" world, he calculated the overall cost of the alternative credit enhancement mechanisms based on the hypothetical cost of pool insuring all of the mortgages. That is, specifically for developing his pricing model, Mr. Lederman used the cost of pool insurance, alone, as a proxy for the cost of all

of RFC's credit enhancement during this time period (even though some—as much as half—of those securities would be credit enhanced using a senior/subordinate structure). Tr. at 1459. He adopted this assumption because "there is more publicly available information about the cost of pool insurance." Tr. at 1459. Furthermore, he believed that pool insurance is generally *more expensive*

than the all-in costs of a senior/subordinate structure, so his pricing model would be somewhat conservative since it applied a higher-cost credit enhancement mechanism across the board for all of RFC's MBS issuances, even though as much as half of the issuances would have used the lower-cost mechanism.[43] *Id.*

---

43. The "costs" of credit enhancement can be borne by the issuer in one of several ways. When RFC held subordinate securities in portfolio and retained recourse, there was no up-front "cost" of the credit enhancement. Rather, as the subordinate securities slowly absorbed losses from the underlying mortgage pool, RFC would book those as losses on its balance sheet. From 1990 to 1997, RFC booked approximately $300 million in loss-reserves—effectively its "cost" of credit enhancement. Alternatively, if RFC were to sell the subordinate securities in the secondary market (and pass recourse on to the buyer), it would sell the securities at a discount from their par value, representing the risk of the investment. That discount would be the effective cost of credit enhancing through subordinate security sales. Finally, to credit enhance through pool insurance, the cost would arise in the form of annual insurance premiums RFC would pay to the insurance provider, based on the size and relative risk of the underlying pool of insured mortgages.

One factor making comparisons of these relative costs somewhat confusing is that they are expressed in different terms. For example, pool insurance costs are expressed as an annual percentage rate charged for the entire pool of underlying securities, and the cost is incurred annually. By contrast, the cost of a subordinate security structure is expressed in terms of the discount on sale, a percentage of *the subordinate security*, only, and not the entire mortgage pool. At trial, Mr. Lederman walked the court through a helpful example that compared these relative costs in like terms: the all-in, up-front costs.

Between 1990 and 1993, Mr. Lederman testified that a conservative annual cost of pool insurance in the "but for" world would be 20 to 28 basis points, or 0.20–0.28%, of the underlying pool of mortgages, and that a standard average life of a security was five years. A simplified present-value of that insurance over the life of a security would be 100 to 140 basis points, or 1–1.4% (number of basis points per year multiplied by five years). Tr. at 1460–61. If one were to calculate the up-front, all-in cost of pool insuring a $100 million pool of mortgages, then, total costs would be $1.0–$1.4 million.

To express the same overall cost of pool insurance in terms of the discount on a subordinate security sale, the costs attributable to the entire pool must be converted to a percentage of the subordinate security's par value. Mr. Lederman testified that an average subordinate security was roughly 7% of the total amount of the pool (*i.e.*,

for the $100 million pool, the senior securities would aggregate $93 million and the subordinate securities $7 million). Therefore, in real terms, the same cost represented by 1–1.4% of the entire underlying pool ($1.0–$1.4 million) would be expressed as 14–20% of the subordinated security (the subordinate security is $7 million; $1.0 million is 14% of $7 million; $1.4 million is 20% of $7 million). In other words, in Mr. Lederman's model, a subordinate security could be sold at a discount of 14–20% and still be consistent with the annual pool insurance costs of 20–28 basis points.

Mr. Lederman based his conclusion that the all-in, up-front cost of pool insurance was more than the cost of subordinate security sales based, in part, on the transaction in 1990 in which he purchased RFC's subordinate securities. In that transaction, Mr. Lederman testified that he obtained the securities at a 16% discount. Using the model described above, that same discount could be expressed in pool insurance cost terms as an annualized cost of 22.4 basis points, and would be within the lower range of the average annual pool insurance costs of 20–28 basis points that Mr. Lederman assumed in his pricing model. Tr. at 1460.

Although defendant's expert, Dr. Carron, criticized Mr. Lederman's pricing model because he believed a market duopoly would have driven pool insurance costs higher, in general (discussed below), Mr. Lederman's assumption that pool insurance is generally more expensive on an all-in basis than selling subordinate securities was unrebutted by any of defendant's experts. Moreover, none of defendant's experts raised any questions or criticisms of the explanation Mr. Lederman gave at trial for why he believed pool insurance would be more expensive, and why he thought it was therefore a "conservative" pricing component for his model.

Nevertheless, the court notes a potential error in the calculation Mr. Lederman employed that is outlined above in this footnote. Using his example, the all-in cost of pool insurance would average 1.0–1.4% of the original balance of the pool of mortgages underlying the securities, presuming annual premiums of 20–28 basis points. *See* Tr. at 1460–61. In the but for model Mr. Lederman created for trial, however, the all-in costs of pool insurance for "but for" RFC's MBS issuances in 1990–93 total only about half that amount. In other words, the possibility exists that Mr. Lederman's assumption overstates the cost of pool insurance relative to selling dis-

Mr. Lederman believed that RFC could have obtained mortgage pool insurance for between 20 and 28 basis points per year in the "but for" world. According to Mr. Lederman, this was a conservative assumption based upon insurance pricing sheets and his own discussions with GE and PMI representatives, who Mr. Lederman believed would have been anxious to provide RFC with competitively priced products. Tr. at 1466–68. This estimate substantially exceeded some actual pool insurance premiums from the same time period that Mr. Lederman summarized in a demonstrative exhibit, see PX 1022, an added cushion Mr. Lederman built in "to reflect the fact that RFC, as still a substantial issuer, would have been adding demand that could conceivably ultimately drive pricing up." Tr. at 1468. Between that assumption and a general "up-trend in the cost of credit enhancement" after 1990 as overall demand increased, Mr. Lederman assumed that RFC would have obtained pool insurance at 20 basis points for all its MBS

issued in or before 1990, 25 basis points in 1991, 26 basis points in 1992, and 28 basis points in 1993. Compare with PX 1022 (demonstrative exhibit noting pool insurance annual premiums for 30–year fixed rate MBS ranging from 8 to 11 basis points in 1990 to 17 basis points in 1992 and 1993).

Armed with his assumptions about the annual premiums RFC would have had to pay to credit enhance its MBS issuances, Mr. Lederman calculated the overall cost for RFC to credit enhance its 1990–93 issuances without recourse, and to remove any outstanding recourse obligations that remained on pre–1990 issuances. See PX 1023 (demonstrative summarizing Mr. Lederman's credit enhancement calculation). All told, Mr. Lederman opined that RFC's credit enhancement costs under Anchor would have been in the neighborhood of $130 million, although as the court noted above, that figure may have deservedly been as high as

counted subordinate securities. Consequently, his pricing model estimating what it would have cost RFC to credit enhance in the "but for" world might be understated.

The best explanation the court can find for this discrepancy is that during Mr. Lederman's testimony in which he outlined the root calculations that guided his assumption about these relative costs, he may have erred. When he calculated the up-front costs of pool insurance he seemed to hold the dollar amount of the insured underlying pool of mortgages static from one year to the next. See Tr. at 1460–61. That is, he assumed that in each of years one through five the issuer would be insuring $100 million of mortgages. By contrast, in his "but for" model, Mr. Lederman notes that RFC's annual balance of mortgages underlying its MBS declines every year (likely as the result of prepayments), so that from one year to the next the collateral requiring insurance declines by nearly half. See PX 1023. Over the life of the security, this mortgage collateral "half life" results in upfront, all-in credit enhancement costs far less than 1.0–1.4% of the pool's original balance. See PX 1023 (noting total RFC MBS issuance from 1990 to 1993 of $22,276,691,000 and total estimated pool insurance costs corresponding to those issuances (and excluding any pre–1990 issuances) of $120,961,-000—or 0.54% of the original balance of each year's MBS issuances).

Since defendant never challenged the base assumption Mr. Lederman derived from his hypothetical calculations—that pool insurance premiums are more expensive over the life of a security than the one-time discount on a subordinate security sale—the court is not in the po-

sition to determine whether Mr. Lederman's in-court analysis was a mistake or merely an over-simplification employed to demonstrate his ultimate assumption.

Regardless of whether Mr. Lederman's base assumption is misleading or not, the court can resolve this ultimately minor conflict in the record by stepping back and looking at the bigger picture. In so doing, the court finds that whatever error Mr. Lederman may have made is a harmless one. This is because even though his model may underestimate the cost of credit enhancing RFC's securities in the "but for" world by as much as $70 million (if, for example, a full 50% of RFC's 1990–93 MBS issuances were credit enhanced using a senior/subordinate (93%/7%) structure, with RFC selling the subordinate securities at a discount of as much as 20%), a large number in and of itself, the "but for" RFC's credit enhancement costs in Mr. Lederman's model would still total only $200 million. This figure is still considerably less than the $300 million RFC actually reserved for credit enhancement losses under GMAC. Because Mr. Dooley's accounting model specifically relied on RFC's actual credit enhancement costs and not Mr. Lederman's "but for" model, see Tr. at 1865–66 (Test. of Daniel Dooley), and plaintiff's subsequent experts modeled their own opinions after Mr. Dooley's accounting model, Mr. Lederman's modeling of "but for" RFC's credit enhancement costs remains conservative so long as his projected hypothetical costs remain less than RFC's actual costs. The court concludes this to be the case as a matter of fact, and therefore concludes that the error in Mr. Lederman's pricing assumption, if any, is harmless.

106

$200 million. He contrasted this with RFC's *actual* credit enhancement costs for MBS issued over this same period and concluded that RFC would have been better off had it relied on pool insurance and subordinate security sales without recourse from 1990–1993. Instead, RFC held its subordinated securities in portfolio and reserved nearly $300 million over a seven year period to cover losses sustained on those securities. In effect, then, RFC would have experienced up to $150 million *less* in credit enhancement costs if it had actually adopted the credit enhancement techniques Mr. Lederman believed RFC *would* have used if Anchor continued to operate it. So not only could Anchor have continued to operate RFC in a non-breach scenario, but according to Mr. Lederman RFC would have potentially been more profitable had it done so.

Dr. Carron responded to Mr. Lederman's pricing model by questioning whether RFC would have obtained competitive pool insurance rates in a market dominated by just one or two providers of that necessary coverage, and at a time when it was well-known that RFC would have had few other options for credit enhancement alternatives. Since pool insurance rates were typically subject to negotiation, Dr. Carron believed that pool insurance companies would have substantially marked up the cost of any pool insurance offered to RFC simply because they knew that RFC would have limited alternative credit enhancement options. In other words, they would take advantage of a sellers' market to exact higher profits. Tr. at 4254–55; *see also* Tr. at 4256 (Test. of Jess Lederman) ("Q: And generally speaking, in the market where buyers have fewer suitable alternatives, sellers have more pricing power, right? A: If you're referring to the basic laws of supply and demand, certainly I agree with that.").

None of that testimony, however, seems to be at odds with Mr. Lederman's concession that RFC's entry into the mortgage pool insurance market in 1990 would have had a substantial impact on pricing. *See* Tr. at 1468. The annual pool insurance rates that he built in to his model were nearly *doubled* to account for this very same law of supply

and demand. *Compare* PX 1022 (identifying actual annual policy costs of between 8 and 11 basis points for 30–year fixed-rate MBS in 1990 and 16 to 17 basis points in 1992. to 1993) *with* PX 1023 (identifying annual policy costs assumed in Mr. Lederman's pricing model between 20 basis points in 1990 and 28 basis points in 1993). While Dr. Carron's opinions that pool insurers might exact a premium from RFC given its dependence on their insurance products, the court finds that Mr. Lederman's pricing increases designed to accommodate for that increase are reasonable.

*Operations*

Mr. Lederman also discussed RFC's operations under GMAC and compared them to what he expected RFC's operations under Anchor would have been. In large part, Mr. Lederman attributed RFC's overwhelming success in the 1990s to its performance and reputation developed in the 1980s:

> [RFC] was really tremendously well-positioned to take advantage of the wonderful growth of the mortgage market in the 1990s. And the foundation for that was its success in the '80s. It was the dominant private conduit. It had a very, very strong brand identity. It was clearly recognized as the leading private sector equivalent to Fannie Mae and Freddie Mac. It had demonstrated creativity. It had demonstrated a tremendous competence at all the processes involved with buying loans from mortgage originators.

Tr. at 1438. All of these attributes, of course, would have inhered to RFC regardless of whether its parent company were GMAC or Anchor. It's reputation as a leader and performer in the marketplace were traditions that belonged to RFC's management team due to the manner in which they ran the company.

Under GMAC, the line of services and products that RFC offered its customers expanded, and was in part responsible for some of the earnings RFC generated after 1990. Under GMAC, RFC expanded into the warehouse lending business, in which it extended credit to mortgage-banking customers so that those customers could, in turn, originate mortgages to homeowners. Tr. at 1343;

1326–67. RFC also engaged in sub-prime lending (involving mortgages that are non-conforming because of some underwriting criteria other than size of the loan), construction lending, and securitization of home equity lines of credit. Tr. at 1343. For the most part, these ventures were profitable for RFC because they were high-yield, higher-margin businesses in markets that were rapidly expanding in the 1990s. *See* Tr. at 1440 (Test. of Jess Lederman).

The fact that RFC's management team remained in place after the sale to GMAC is significant here because the business model that RFC followed under GMAC, including all of the new lines of business it entered, was developed while Anchor owned RFC. In other words, this business model was not attributable to RFC's new ownership, but rather to the management team and corporate direction Anchor provided in 1989. In 1989, at Mr. Large's direction, Mr. Korell and the RFC management team developed a five-year plan that evaluated "what [RFC] would do in the future to build and expand and create a more successful business." Tr. at 1209–10; *see* PX 791 (RFC "Future Strategic Opportunities and Financial Development" Report). That report captured each of the new lines of business into which RFC eventually entered in the 1990s. For the most part, RFC was interested in harnessing its "basic core competency of securitization, of aggregating assets, hedging those assets, [and] being able to securitize those . . . in a way that they would be attractive to the institutional investor market" and applying those skills to new asset types beyond residential mortgages. Tr. at 1211. For its projected warehouse lending facility, RFC would rely primarily on its strong multi-dependent relationships with retail mortgage originators, who needed financing to extend mortgages anyway, to become more of a "one-stop" business partner with those mortgage bankers. Tr. at 1211–12. According to Mr. Korell's testimony at trial, RFC could have and would have developed those same lines of business if Anchor had continued to own RFC. Mr. Lederman called RFC's 1989 report "such an impressive document, because they had correctly anticipated so many

of the [market] trends that emerged in the 1990s." Tr. at 1440.

At trial, defendant challenged whether an Anchor-owned RFC could have been as large and successful of a provider of warehouse lending as RFC was under GMAC. *See* Def.'s Mot. at 16. Under GMAC, RFC became the number one warehouse lender in the nation. Tr. at 1327. It extended lines of credit to some customers into the hundreds of millions of dollars. *Id.* Mr. Korell was confident that RFC could and would have successfully participated in this line of business under Anchor, even though Anchor was under OTS regulation, because there was a natural warehouse lending synergy between RFC and its customers. Tr. at 1332–33. As Mr. Korell pointed out, many of the leading warehouse lending institutions were similarly regulated institutions. *Id.* However, Mr. Korell conceded that under Anchor RFC may not have had the resources to extend such large lines of credit to some customers, and may have been forced to operate in the warehouse lending market on a more governed basis:

> I think we would [have been able to extend lines of credits in the hundreds of millions of dollars] if the institution were well-capitalized and large enough, just as the other large regulated institutions [such as Bank of America or Chase Manhattan] did. We wouldn't have gone to that level, obviously, if we were remaining with Anchor, because they would not be of the size of a Bank of America or a Chase. So we would have limited the business.

Tr. at 1334. While defendant quibbles that this fact, in and of itself, renders RFC's 1990–97 profits an inappropriate yardstick for plaintiff's own lost profits, or even undermines the notion that Anchor suffered any lost profits at all—*see generally* Def.'s Mot. at 16—this is really a consideration the court must take into account in its lost profits calculus, in light of all of the facts before it. While this fact very clearly signals that RFC's actual profits, on a dollar-for-dollar basis, are not a perfect proxy for plaintiff's own lost profits, the model itself remains compelling and provides the court with a concrete, reasonable and appropriate model by which it can develop a damages award

that is, in the court's discretion, sound and appropriate.

*Funding*

To perform its core business and each of its additional lines of business, RFC required financing from a third party because it did not, itself, have sufficient capital or access to deposits to fund its own transactional portfolio or the warehouse lending it eventually extended to its customers. *See* Tr. at 1216. At trial, Mr. Lederman noted that Anchor would not have had any problem funding RFC on its own, and that RFC would have had easy access to third-party lending in the event that RFC's business outstripped Anchor's lending capacity. *See* Tr. at 1448–52. To the extent that Anchor would have funded RFC's operations, Mr. Lederman believed that Anchor would have relied in primary part on borrowings from the Federal Home Loan Bank. Tr. at 1448. He noted that these were typically "very low cost" funds that were among "the most attractive sources of funding for a conduit" because of their flexible maturities and collateral requirements. *Id.* The goal of his testimony was to demonstrate that it would have been no more expensive for Anchor to fund RFC than it was for GMAC, and refute assertions made by defendant at trial that one of the reasons RFC was enormously successful in the 1990s was because it had the backing of GMAC's then-considerable financial might.

Mr. Lederman testified that the cost of funds from the Federal Home Loan Bank were "typically some small spread" on top of the federal funds rate, "perhaps 10 basis points." Tr. at 1449. He noted that RFC under GMAC would have borrowed from its parent at the going market rate for commercial paper, with some additional small transfer pricing. According to Mr. Lederman, based on a study he conducted of the federal funds rate and the commercial paper market rates throughout the 1990s he determined that there was "no evidence of any meaningful difference [in price] between highly-rated commercial paper and borrowing at a small spread over the federal funds rate." Tr. at 1450; *see also* PX 1019 (demonstrative summarizing comparison of short-term commercial paper and federal funds borrowing rates

from 1989 to 1997). Mr. Lederman conceded that Anchor's ability to borrow from the FHLB was not unlimited—it would have been constrained by its asset size and acceptable collateral levels so that "[u]ltimately, if RFC had grown large enough, there could be some amount, some size of the warehouse which Anchor conceivably wouldn't have been able to provide [lending] above. They certainly were nowhere close to that in the early '90s." Tr. at 1451.

Nevertheless, Mr. Lederman's second main point about RFC's funding was that there was "no necessity for RFC to borrow from Anchor." Tr. at 1451. RFC had a variety of other financing mechanisms available, including borrowings from commercial banks, short-term borrowings on Wall Street, or potentially a special purpose corporation created to hold RFC's collateral and issue its own commercial paper. Tr. at 1451–52. Mr. Korell confirmed that RFC "had banks constantly asking us" for its financing business, especially because RFC's borrowings could all be secured by first liens on jumbo residential mortgages—it was extremely low-risk lending for the banks. Tr. at 1355.

At trial, defendant made much of a comment contained in Mr. Large's November 9, 1989 memorandum advocating RFC's sale, in which he addressed RFC's funding:

> Anchor provides warehousing lines at 35 basis points over the federal funds rate. Much of the competition is financed at costs that are 50 to 150 basis points less due to their access to high grade commercial paper and other similar instruments. Absorbing this additional cost increases RFC's pricing and reduces its profitability.

DX 358 at 2. Although the gap between commercial paper and federal funds rates decreased to negligible amounts in future years (and federal funds were, in fact, cheaper in several of them), in 1989 when Mr. Large wrote his memorandum the difference between commercial paper and federal funds rates was more than 20 basis points. *See* PX 1019. Therefore, because Anchor was charging RFC nearly 35 basis points above the federal funds rate, Mr. Large's comment that some of RFC's competitors were financed

with cheaper borrowings through the commercial paper market is accurate.

His comment does not, however, mean that Anchor could not fund RFC competitively or that RFC obtained any great benefit from access to GMAC's commercial paper-based funding. As Mr. Korell pointed out, Anchor's financing never hindered RFC from becoming one of the leading conduits in the nation, or prevented it from posting strong profits and a remarkable return on Anchor's equity. Tr. at 1358. While RFC might have had cheaper financing than some competitors, or more expensive than others, it was still the leading enterprise in the market. Tr. at 1358-59. And as Mr. Lederman testified, whether Anchor charged RFC points above the federal funds rate made no difference to *Anchor's* overall profitability—whether the profit was reflected on RFC or Anchor's balance sheet was of no moment. Tr. at 1449 (noting that focusing on the 35 basis point spread can get one "easily ... sidetracked in an issue of internal transfer pricing"). Therefore, when the federal funds rate became more balanced with the commercial paper rate, as it did in 1990 and beyond, any material funding differences between GMAC and Anchor were eliminated. *See* PX at 1019.

In conclusion, then, it appears that Anchor could have operated RFC and produced results on par with RFC's performance under GMAC, despite the implications of the risk-based capital provisions. Those provisions would not have prevented RFC from engaging in a high volume of MBS business and generating remarkable profits as it did under GMAC. While it is reasonable to assume that RFC would have extended its business model into new lines of business under Anchor just as it did from 1990 to 1997, it is unlikely that Anchor would have been able to sustain quite the level of warehouse lending that GMAC was able to tolerate. As a result, a damages

award based on RFC's actual profits might need to be adjusted accordingly. Similarly, any regulatory model must take into account RFC's need to maintain a temporary transactional inventory of loans and subordinate securities to facilitate its securitization process and subordinate security sales.

### 2. Testimony of P. Allan Schott and Anchor's "but for" Capital Model

Plaintiff next presented the opinion of P. Allan Schott, an expert in regulatory capital requirements and their application to thrifts.[44] Relying in principal part on Mr. Dooley's financial model and Mr. Lederman's expert opinions regarding RFC's credit enhancement options, Mr. Schott explained to the court that, in his expert opinion, Anchor could have operated consistent with Mr. Lederman's model and not run afoul of FIRREA's risk-based capital requirements, with the exception of 1997, a year in which RFC's actual asset base increased substantially and in which Anchor acquired NAMCO—a double whammy that would have forced a "but for" Anchor to fail its risk-based capital requirements.

Mr. Schott's regulatory capital model for the "but for" Anchor relied on similar assumptions underlying Mr. Dooley's financial model. Namely, he assumed that "but for" Anchor would not have sold fifty of its geographically diverse branches and continued to benefit from that deposit base. He also assumed that RFC would not have been sold and would have performed under Anchor just as it did for GMAC, subject to the changes Mr. Lederman suggested would be needed. He assumed that Anchor would continue to have the full complement of its regulatory capital, including its supervisory goodwill and preferred stock. Tr. at 2007. Finally, and in addition to Mr. Dooley's assumptions, Mr.

---

44. Mr. Schott was uniquely qualified to offer his expert opinions on thrift capital requirements and the risk-based capital provisions. As the chief counsel to the Comptroller of the Currency ("OCC") in the late 1980s, Mr. Schott was actively involved in drafting the risk-based capital provisions that applied to commercial banks. Tr. at 1984. Mr. Schott later participated in an "interagency" working group that created the risk-

based capital provisions that eventually applied to thrifts. Tr. at 1988-89. As defendant's expert, Mr. Bankhead, testified, the provisions applicable to thrifts were modelled after, and essentially identical to those that applied to banks. Tr. at 3702. After Mr. Schott left the OCC, he developed substantial practical experience advising thrifts on risk-based capital compliance and reporting. Tr. at 1991-96.

Schott assumed that in 1993 Anchor would have generated an additional $42 million in equity capital when it issued public shares of stock, consistent with the opinion of plaintiff's damages expert, Dr. Nevins Baxter.

The risk-based capital requirement was calculated by dividing a thrift's leveraged, or "core," capital (which included qualifying goodwill) by the thrift's total risk-weighted assets. FIRREA phased in a minimum risk-based capital requirement of 6.4% in 1990, increasing to 7.2% in 1991 and 8% in 1993. In 1993, FDICIA instituted a new "well-capitalized" classification for thrifts that satisfied a 10% risk-based capital standard; thrifts with 8% risk-based capital were then considered "adequately capitalized." Based upon his calculations of the "but for" Anchor's leveraged "core" capital and its mix of risk-weighted assets, Mr. Schott concluded that from 1990 to 1997 Anchor's risk-based capital position would have resembled the figures in the following table:

| Year | FIRREA RBC Ratio | FDICIA "Well-Capitalized" Standard | "But For" Anchor RBC Ratio | RBC Capital Excess (Deficiency) (in Thousands) | "Well-Capitalized" Capital Excess (Deficiency) (in Thousands) |
|------|------|------|------|------|------|
| 1990 | 6.4% | N/A | 10.0% | $ 185,453 | N/A |
| 1991 | 7.2% | N/A | 11.4% | $ 219,151 | N/A |
| 1992 | 7.2% | 10.0% | 12.9% | $ 297,763 | $ 151,027 |
| 1993 | 8.0% | 10.0% | 14.7% | $ 332,170 | $ 232,634 |
| 1994 | 8.0% | 10.0% | 11.6% | $ 196,964 | $ 98,351 |
| 1995 | 8.0% | 10.0% | 10.4% | $ 310,644 | $ 54,013 |
| 1996 | 8.0% | 10.0% | 10.2% | $ 316,115 | $ 33,115 |
| 1997 | 8.0% | 10.0% | 6.5% | $(290,888) | $(681,352) |

*See* PX 1049 (Schott demonstrative summarizing calculations). These calculations led Mr. Schott to the ultimate opinion that Anchor could have operated RFC, and at performance levels commensurate with GMAC's own operations, without violating the risk-based capital requirements from 1990 to 1996, and that Anchor would have been "well capitalized" under FDICIA through 1996.

Defendant's expert, Mr. Bankhead, criticized several aspects of Mr. Schott's regulatory model, including both his underlying assumptions and his application of the risk-based capital provisions. Some of Mr. Bankhead's criticisms were unquantifiable, while others were quantifiable and subjected Mr. Schott's model to potential revision. Each of Mr. Bankhead's criticisms are taken up below, but if each of the quantifiable adjustments were to be compounded into Mr. Schott's model, Mr. Bankhead testified that the "but for" Anchor's risk-based capital calculations might more accurately be reflected by the figures in the following table:

| Year | FIRREA RBC Ratio | FDICIA "Well-Capitalized" Standard | "But For" Anchor RBC Ratio | RBC Capital Excess (Deficiency) (in Thousands) | "Well-Capitalized" Capital Excess (Deficiency) (in Thousands) |
|------|------|------|------|------|------|
| 1990 | 6.4% | N/A | 5.51% | $(107,925) | N/A |
| 1991 | 7.2% | N/A | 6.44% | $ (56,790) | N/A |
| 1992 | 7.2% | 10.0% | 6.76% | $ (35,866) | $ (265,911) |
| 1993 | 8.0% | 10.0% | 8.76% | $ 59,457 | $ (97,688) |
| 1994 | 8.0% | 10.0% | 7.74% | $ (20,562) | $ (180,355) |
| 1995 | 8.0% | 10.0% | 8.44% | $ 67,852 | $ (239,804) |
| 1996 | 8.0% | 10.0% | 8.79% | $ 61,386 | $ (268,310) |

| 1997 | 8.0% | 10.0% | 5.72% | $(562,073) | $(1,009,445) |
|------|------|-------|-------|------------|--------------|

*See* Tr. at 3884–87; DX 1188, Ex. D (Bankhead Expert Report); DX 4013 (Bankhead Demonstrative). Notably, according to Mr. Bankhead's projections, he believed the "but for" bank would have failed its risk-based capital requirement in all but two years and would never have satisfied the FDICIA "well-capitalized" requirement.

*"But for" Bank Asset Sales, Asset Mix, and Equity Capital*

Among the challenged assumptions in Mr. Schott's model, Mr. Bankhead noted that Anchor's capital plan contemplated the sale of nearly $100 million in mortgage servicing and MBS that produced a gain-on-sale and incremental increase to capital on Anchor's balance sheet. *See* Tr. at 3720–23; PX 679 at 6332. Mr. Bankhead noted that Anchor attributed most of these asset sales to the breach, but that Mr. Schott's regulatory model did not reverse the effects of those sales in the "but for" world. The implication is that in the "but for" world, Anchor would not have sold these assets if it had no imminent need for capital, and that capital gains attributable to the sales should have been eliminated from any calculation of "but for" Anchor's capital compliance, or at least delayed until later years in the model when Anchor could have generated gains over the life of the assets absent a sale. Tr. at 2723.

Similarly, Mr. Bankhead noted that as a result of FIRREA, Anchor ended up holding a larger concentration of MBS relative to whole mortgages. Tr. at 3724. Under the risk-based capital requirements, MBS are typically risk-weighted at 20%, whereas mortgages are risk-weighted at 50%. The cumulative effect, according to Mr. Bankhead, was for Anchor's actual mix of assets after the breach to require less risk-based capital than the "but for" bank's would have. The Schott model, however, made no attempt to adjust for these concerns and assumed that the "but for" bank's mix of assets mirrored that of the actual Anchor, capital plan and all.

A third criticism of Mr. Schott's assumptions swirled around his decision to attribute $142 million equity capital to Anchor beginning in 1993, the result of Anchor's actual equity raising that year ($100 million) and an assumed increased price for the actual stock offering that Dr. Baxter testified Anchor would have commanded at the time had it continued to hold RFC ($42 million). *See* Tr. at 2007 (Test. of P. Allan Schott). Mr. Bankhead opined that it was speculative to assume that "but for" Anchor would have raised *any* capital in 1993, and that therefore Mr. Schott's model overstated capital by $142 million. At trial, Mr. Bankhead explained his criticism:

> The secondary offering [in 1993] was required by the FDIC to get Anchor up to a well-capitalized status before they would agree to the swap of the preferred stock. In ... the "but for" Anchor modeled [by Mr. Schott], the bank ... meets its well-capitalized ratio, so presumably, there is not a necessity for the FDIC requirement to do the secondary offering to get to well-capitalized. If there's not that requirement to do the secondary offering, to me, it's at least speculative ... that they would have done an offering at all.

Tr. at 3730.

Each of these three criticisms raises a legitimate question about what Anchor might have looked like in a non-breach world. None of them are unfounded. And while each criticism tugs at the court's general aversion to "speculation" in a plaintiff's damage model (particularly so in these *Winstar* cases) none of them identify an assumption that is manifestly unreasonable. Every expectancy damages or lost-profits model involves some degree of speculation or estimation inherent in the model's underlying assumptions. The court's duty is to evaluate these assumptions and determine whether they are so unreasonable—or possibly overly-speculative—as to be unreliable. *See, e.g., Nat'l Australia Bank v. United States,* 452 F.3d 1321, 1325–29 (Fed.Cir. 2006).

Each of Mr. Bankhead's three criticisms here involve general business decisions and asset management opportunities that would have been available to Anchor's managers in the "but for" world. Mr. Bankhead is correct to point out that in the "but for" world Anchor may *not* have sold servicing and MBS assets, or might have tended towards a higher portfolio concentration of whole loans relative to MBS. Nevertheless, the fact that Anchor actually did adopt these measures in the real world guarantees that these were strategic business opportunities and decisions that management could have adopted as needed to enable Anchor to preserve its capital compliance. Moreover, since these decisions were actually made, and historical information about those decisions is available to compound into plaintiff's models, it strikes the court as *less* speculative and inherently *more* reliable, to model those actual figures, rather than try and manipulate the model to account for decisions that may or may not have come to pass in a "but for" scenario. While the breach did cause Anchor to adjust its asset mix, the court finds no fault in Mr. Schott's model because he did not unwind those transactions. Even if he had, the impact on Mr. Schott's model would have been minimal.

As for the 1993 stock offering, Mr. Bankhead is again correct to point out that the offering may not have been required by the FDIC if Anchor had been well-capitalized. Lost in this criticism, however, is the fact that equity raising was a viable tool that would have been available to Anchor had it required additional capital to maintain operations. The fact that a breach-wounded Anchor could successfully secure $100 million of equity in 1993 proves that after that time a "but for" Anchor—more healthy and profitable than its wounded counterpart—could have successfully raised at least as much, or more capital. Again, this was a tool that Anchor's management would have had at its disposal in the event its capital margin ever thinned in the "but for" world. Therefore, Anchor's *actual* results in the capital market in 1993, adjusted to reflect the value of RFC, are a reasonable proxy for what Anchor's capital position might have looked like in the "but for" world. Mr. Schott's regulatory model is not rendered unreasonable or unreliable for taking Anchor's ability to raise equity capital into account. *See, e.g., Nat'l Australia Bank* at 1326 ("We disagree. Contrary to the government's assertions, the trial court did not 'assume' that the tax basis of the covered assets was equal to the book basis. The use of book basis as a proxy for tax basis was simply an estimate based upon substantial evidence, including the analysis and testimony of outside tax experts.").

*No Quarterly Calculations*

Mr. Bankhead questioned the integrity of Mr. Schott's model because it did not include quarterly risk-based capital compliance projections—his projections were all annual—even though OTS regulations required quarterly filings and capital compliance. Tr. at 3736. According to Mr. Bankhead, Mr. Schott "simply assumed that because the bank met the capital compliance as he modeled it at each of the December year-ends, that it would have met the capital compliance requirements at each of those quarter-ends between the year-ends." Tr. at 3736–37.

Mr. Schott explained that the single reason he was unable to generate a quarterly compliance schedule was because RFC did not produce audited quarterly financial information under GMAC, and therefore there was no way to obtain the type of information he would have needed to build a quarter-by-quarter model. Tr. at 2049–51. Mr. Schott did testify, however, that he looked at some un-audited "gross" financial figures from RFC that Anchor was able to obtain in order to confirm that there were no "wild gyrations" in RFC's asset base that might cause quarterly capital requirements to fluctuate materially from the year-end numbers his model captured. Tr. at 2050.

Mr. Bankhead agreed that the only available quarterly information from RFC was "very condensed" and "very limited" but he nevertheless tried to draw inferences from that information to rebut Mr. Schott's opinion. Tr. at 3738. Mr. Bankhead noted that there appeared to be some volatility in RFC's asset base, particularly in 1992 and 1993. For example, in June 1993, it appeared that RFC's asset base was $1.1 billion

greater than it was at the end of that year when Mr. Schott calculated "but for" Anchor's capital compliance. Tr. at 3740–41; PX 842. However, that fluctuation—though large in absolute dollar figures—did little to disrupt Mr. Schott's opinion or his model. For one thing, the particular fluctuation Mr. Bankhead pointed to was a marked *decline* in RFC's asset base, not a steep *increase* that would cause a sudden upward shock or spike to "but for" Anchor's quarterly capital requirement. In other words, downward volatility on a quarter-by-quarter basis would not increase Anchor's risk-based capital requirement and would not undermine Mr. Schott's model. Of the information available on RFC's quarterly performance, there did not appear to be any "wild gyrations" upward from any one quarter to the next that would materially impact Anchor's capital requirement or that were materially different from the year-end calculations Mr. Schott modeled. Similarly, Mr. Schott testified that even a one-billion-dollar-upward swing in RFC's quarterly assets would not materially alter his regulatory model because the "but for" Anchor would have had a sufficient capital cushion to absorb a fluctuation of even such a large amount. Tr. at 2108.

Therefore, since audited, quarterly information on RFC's performance could not be obtained, there is no error in Mr. Schott's model merely because it makes only annual projections. It does not appear that defendant is prejudiced by this assumption because even the "very condensed" information about RFC that was available at trial indicates that there was no material quarterly increase in RFC's assets that would negatively affect Mr. Schott's model enough to render it unreliable. For the court to assume anything more about RFC's quarterly financial position, with no affirmative evidence of any material differences from the annual material available, would be speculative.

*The Role of Non–Contractual Goodwill*

In defining core capital, a component of risk-based capital, FIRREA largely disallowed unidentifiable intangible assets, or goodwill, to be included in capital. Effectively, this was the government's breach. The regulations did, however, allow a thrift to include goodwill as capital in limited amounts—up to 1.5% of the thrift's assets, phased out over five years. Tr. at 3837. Mr. Schott assumed for his model that "but for" Anchor would be able to fully count all of its contractual supervisory goodwill—the entire amount the court previously concluded was the subject of breached supervisory agreements—as capital, and could also count as capital any remaining, non-contractual goodwill that Anchor had acquired in other acquisitions, up to the phased-out 1.5% limit. Mr. Bankhead criticized that assumption as "speculative and implausible" because he believed that fully counting the contractual goodwill per the court's ruling would completely displace the opportunity to also include any non-contractual goodwill within the 1.5% phase-out limits. Tr. at 3839. Consequently, Mr. Bankhead testified that he thought Mr. Schott's model overstated capital by the amount of non-contractual goodwill he included as regulatory capital, between $30 and $55 million between 1990 and 1994. *See* DX 4013A (demonstrative summarizing Bankhead modifications).

The court finds that Mr. Schott made no error in fully including as capital both Anchor's "contractual" goodwill in full, plus other goodwill up to the phase-out limitations. The contractual goodwill, of course, is not subject to any limitation in the non-breach world, otherwise the limitation would constitute a breach. We are left, then, with a regulation that has no force, relevance or application unless the limitation on goodwill that Congress envisioned is applied to the remainder of Anchor's intangible assets. In other words, the court concludes that for the purposes of dealing with a hypothetical situation that Congress could not have foreseen—namely, the existence of judicially created "contractual" goodwill that is not subject to limitation—it is more appropriate to treat that contractual goodwill as a separate and distinct capital asset that is not subject to, nor impacts, the statutory phase-out limitations.

Regardless, from 1990 to 1994, Mr. Schott's regulatory model had ample excess capital cushioning that could handily absorb

the loss of any non-contractual goodwill advocated in Mr. Bankhead's model. *See* PX 1049.

### Risk–Weighting Supervisory Goodwill

In calculating Anchor's total risk-weighted assets for the risk-based capital calculations, Mr. Schott risk-weighted all of Anchor's goodwill at 100%. That risk-weighting was consistent with the OTS regulations applicable to Anchor. Mr. Bankhead, however, testified that he was familiar with a proposal being considered by the FHLBB prior to FIRREA that would have permitted thrifts to include goodwill as capital without limitation (in other words, the breaching provisions of FIRREA would not have been adopted), but required thrifts to "super-weight" goodwill as a 200% risk-weighted asset for calculating risk-based capital compliance. Tr. at 3841–42. This treatment of goodwill was less severe than that ultimately adopted in FIRREA, and Mr. Bankhead believed it would have come to pass if the goodwill treatment adopted in FIRREA had not preempted the proposed regulations. According to Mr. Bankhead, this change to Anchor's capital structure in the "but for" world would have required approximately $25 million per year in additional risk-based capital over and above what Mr. Schott modeled. *See* DX 4013A.

This criticism of Mr. Schott's model is far too speculative for the court to consider. As Mr. Bankhead, himself, conceded, the 200% super-weighting of goodwill was just one of "various types of accounting for goodwill" that was considered by the FHLBB as a potential alternative to addressing regulatory capital issues prior to FIRREA. Tr. at 3842. The regulation, however, never came to pass. Indeed, defendant presented no evidence or testimony about the proposed regulation except for Mr. Bankhead's second-hand revelation of conversations he had with FHLBB staff members about proposed treatments of goodwill prior to FIRREA. It is not that the court doubts Mr. Bankhead's veracity, but merely that the court finds his suggestion that the 200% risk-weighting for goodwill would have come to pass far too speculative to render Mr. Schott's model unreliable.

### RFC's Mandatory Loan Purchase Commitments

As part of its regular course of business acquiring mortgages from correspondents, RFC entered into "forward commitments" to purchase mortgages from these correspondents. According to Mr. Bankhead, the forward commitment was an "optional commitment" that was like a "master contract" under which RFC agreed to do business with the sellers. Tr. at 3864. Essentially, the forward commitments were tentative agreements under which RFC organized the purchase of a set dollar amount of mortgages that conformed to its underwriting standards.

In the life-cycle of the long-term forward commitment, the commitment would be "converted to mandatory commitments at which time price and rate is established for the purchase of the loans" as well as a delivery date for the sale, usually within 30, 60 or 90 days. Tr. at 3864; PX 259 at 7; PX 260 at 8. Once the forward commitment became a "mandatory commitment" RFC was obligated to purchase the mortgage from the correspondent unless the underwriting did not meet RFC's standards, in which case the mortgage could be returned to the correspondent.

At trial, Mr. Bankhead testified that he believed the mandatory purchase commitment represented risk to RFC that Mr. Schott should have accounted for in his regulatory model under the risk-based capital low-level recourse rules. He noted that Mr. Schott credit converted those purchase commitments at 0%, which meant that no regulatory capital would need to be held to support them. By contrast, Mr. Bankhead believed that the mandatory commitments should have been credit converted at 100%.

Mr. Bankhead based his opinion on his interpretation of the Thrift Financial Report ("TFR") Instruction Manual, PX 850, which provides direction for complying with OTS reporting requirements. The TFR manual identifies RFC's mandatory commitments as a "Forward Commitment Contract," which it defines as "an agreement between buyer and seller to purchase or sell a specified amount of mortgages or securities at an agreed-upon

price, and at a specified date in the future." PX 850 at 296. In turn, Mr. Bankhead pointed to the manual's instructions for converting off-balance sheet items to on-balance sheet equivalents for the purpose of measuring a thrifts' risk-weighted assets. He argued that RFC's forward commitment contracts to purchase mortgages would fall in the category for 100% credit conversion, because that category includes "[f]orward agreements and other contingent obligations with a specified draw down (*e.g.*, legally-binding agreements to purchase assets at a specified future date)." PX 850 at 164; Tr. at 3869.

Mr. Schott, on the other hand, testified that the forward commitments should be credit converted at 0% because they were short-term (30, 60 or 90 days) and conditional in nature, primarily because RFC retained the right to refuse purchase of any mortgage that failed to satisfy its underwriting criteria. He pointed to the same TFR instruction manual that permitted "[u]nused commitments with an original maturity of one year or less" to be credit converted at 0%. PX 850 at 162.

The court finds that RFC's forward purchase agreements may be credit converted at 0% because the commitments were short-term and because RFC was not obligated to take substandard loans that had not been properly underwritten to conform to its requirements. The court's conclusion is buttressed by the fact that an OTS interpretive memorandum reached this same conclusion. On June 24, 1991, the OTS general counsel's office issued a memorandum on "The Credit Conversion Factor Applicable to Agreements to Purchase Loans" and concluded that "the zero percent conversion factor applies to such agreements, if they are premised on the fulfilment of certain conditions and mature within one year." PX 930 at 1. In the memorandum, OTS addressed the identical interpretive battle that Mr. Schott and Mr.

Bankhead engaged in at trial.[45] The memorandum explained that the 100% conversion category was intended to apply to "an irrevocable off-balance sheet obligation." *Id.* In RFC's case, however, the purchase commitment was conditioned upon satisfaction of certain underwriting criteria and was not "irrevocable." As both this court and the OTS find, "[s]uch conditional agreements would not be subject to the capital requirement." *Id.* at 2.

Accordingly, Mr. Schott's model is not deficient because it credit converted RFC's off-balance sheet loan purchase commitments at 0% instead of 100%.

*Recourse Obligations in 1996 and 1997*

> The "notes" portions of RFC's 1996 and 1997 annual financial statements reveal that: RFC has a contingent obligation related to the sale of certain mortgage related securities held for trading. The obligation requires payment of remaining principal upon maturity of a senior class of issued securities and is capped at $90 [million], which will decrease as the underlying securities pay down.

PX 265 at 12 (1997 RFC Consolidated Financial Statement); *see also* PX 264 at 16 (1996 RFC Consolidated Financial Statement) (noting separate obligation capped at $81 million). Essentially, these two off-balance sheet obligations required RFC to make up principal losses that might attach to the pool of mortgages underlying the securities RFC issued. Although RFC's maximum loss under these obligations was capped at $81 and $90 million, the risk of loss was attributable to the entire pool of mortgages. Since RFC retained a limited form of recourse for the securities collateralized by those mortgages, risk-based capital for RFC's contingent obligations in those two years had to be calculated under the low-level recourse rules in the

---

**45.** The interpretive memorandum framed the conflict as follows:

> We understand that this question has arisen because the definition of "commitment" at 12 C.F.R. § 567.1 includes any arrangement that obligates a savings association to purchase loans. As a result, you have been asked whether an agreement to purchase loans could be considered an unused commitment with a ma-
>
> turity date of less than one year. If so, then the agreement would be subject to the zero percent credit conversion factor rather than subject to the one hundred percent credit conversion factor applicable to forward agreements and other contingent obligations. 12 C.F.R. § 567.6(a)(2)(iv)(A).
>
> PX 930 at 1.

"but for" Anchor model. The exposure was functionally the same as if RFC had obtained a letter of credit to additionally credit enhance those securities.

Mr. Schott's model, however, did not treat the obligations under the low-level recourse rules. Instead, he credit-converted the obligations at 100% and then risk-weighted the asset equivalent at 100%. Anchor's "well-capitalized" risk-based capital requirement for those assets in Mr. Schott's model was then 10% of that risk-weighted number, or $17.1 million. Mr. Schott tried to explain why he treated these off-balance sheet obligations, which he called "guarantees," as he did, but never fully articulated why he chose not to treat them under the low-level recourse rules. *See* Tr. at 2131–34 (noting that Mr. Schott's "staff had discussions with RFC" about the nature of these obligations and concluding that "there wasn't a need to gross that up" under the low-level recourse rules).

On this issue, the court found Mr. Bankhead's treatment of the two recourse obligations more persuasive. Based on testimony at trial from both parties' experts on the risk-based capital low-level recourse rules, the court sees no reason why the $81 and $90 million "guarantee" obligations would not be treated under those rules. Even though Anchor's maximum out-of-pocket loss exposure was capped at $81 and $90 million, the guarantees bore the risk of loss from the entire pool of mortgages underlying the securities that RFC guaranteed, and it was specifically that latter risk exposure that the low-level recourse rules attempted to capture. With no better explanation from Mr. Schott about why the guarantees would not fall under the low-level recourse rule, the court finds that its application to the 1996 and 1997 obligations is appropriate.

Mr. Bankhead adjusted Mr. Schott's model for this treatment. In 1996, he deducted $62.72 million from Anchor's capital surplus and in 1997, he deducted $45.183 million. DX 4013A. He explained these adjustments at trial and described how he made a dollar-for-dollar capital deduction under the low-level recourse rules, taking into account whatever portion of the guarantees RFC had already recognized as a loss, which decreased the actual balance of RFC's outstanding guarantees. Tr. at 3876–78. This testimony was persuasive and the court adopts these adjustments to Mr. Schott's model.

*1990 to 1993 Credit Enhancement Strategies*

Finally, Mr. Bankhead criticized Mr. Schott's model for failing to account for any recourse that would have remained on Anchor's balance sheet temporarily, as it tried to sell subordinate securities from 1990 to 1993 consistent with Mr. Lederman's alternative credit enhancement model. Mr. Schott testified that his model was based on Mr. Lederman's opinion and testimony, but conceded that his model "assumes that [RFC] would have used mortgage pool insurance for the entire amount" of credit enhancement from 1990 to 1993. *See* Tr. at 2115–18. Even though Mr. Lederman testified that there would have been a mix of pool insurance and subordinate security sales, Mr. Schott believed that it did not matter in his regulatory model because both alternative credit enhancements eliminate recourse (and, hence, require no additional regulatory capital):

> It made no difference for purposes of my analysis whether you would have used ... a combination of mortgage pool insurance and senior subordinated security mix. Once you've eliminated the recourse, for purposes of risk-based capital, that settles the matter. It doesn't matter which particular method you use. And ... it didn't matter what particular mix you used, whether it was 50/50 or 25/75.

Tr. at 2117 (Test. of P. Allan Schott).

The rub on that conclusion—that it makes no difference to Anchor's risk-based capital whether mortgage pool insurance or subordinate security sales are used—is that a subordinate security sale strategy would not *immediately* remove all recourse from Anchor's balance sheet like pool insurance would, as Mr. Schott assumed. Even if RFC was selling subordinate securities in the market, at any time it would be likely for RFC to have a temporary, transactional inventory of those securities as it held them for seasoning and market timing purposes. The transactional inventory would be far smaller than RFC's

cumulative issuances—newly created securities would be added to the inventory as seasoned ones would be sold off—but their presence on RFC's balance sheet, in some residual quantity, would be persistent.

This fact is confirmed by RFC's actual annual reports from 1994 to 1997. During that time, RFC sold subordinate securities much as Mr. Lederman suggested they would have during 1990 to 1993 in the "but for" world. At each of those end-of-year financial reconciliations, however, RFC carried a material transactional inventory of subordinate securities. At year-end 1994, RFC carried $188.1 million in subordinate securities. $202.1 million in 1995; 4139.8 million in 1996; and $550.2 million in 1997. *See* PX 262 at 8 (1994 Audit Report); PX 263 at 10 (1995 Audit Report); PX 264 at 10 (1996 Audit Report); PX 265 at 12 (1997 Audit Report). In fact, for each of these years Mr. Schott applied the low-level recourse rule to each of these balances in his "but for" model, and the model deducts capital from Anchor's balance sheet on a dollar-for-dollar basis for each of the year-end subordinate security balances from 1994–97. *See* PX 816 at 15, 18, 21, 24.

The problem with Mr. Schott's model is that if one is to assume that an Anchor-owned RFC would sell subordinate securities from 1990 to 1993 to credit enhance some of its MBS, consistent with Mr. Lederman's testimony, then one must also assume that at any given time Anchor would have some transactional inventory of subordinate securities, as well. Mr. Schott assumed the former, but failed to account for the latter. *See* Tr. at 2116 (Test. of P. Allan Schott) (COURT: "Mr. Schott, you relied on the Lederman model?" WITNESS: "That is correct." COURT: "Nothing else?" WIT-NESS: "That's correct, your Honor."); Tr. at 3798 (Test. of W. Barefoot Bankhead) ("Mr. Schott assumes they don't hold subordinate securities up through 1992. He assumes that all of those go away also, either with mortgage pool insurance, or that they would have immediately sold them and there wouldn't have been any risk-based capital compliance implication. He assumes that those obligations would be replaced with mortgage pool insurance.").

To correct Mr. Schott's model, one would have to make a reasonable assumption about the amount of subordinate securities that would have been part of RFC's transactional inventory and on Anchor's books at any one time, and then deduct that amount on a dollar-for-dollar basis from "but for" Anchor's capital under the low-level recourse rules. This step would have to be repeated for each year from 1990 to 1993.

In Mr. Bankhead's model, he assumed that if RFC had been unable to displace *any* recourse for *any* of its MBS issuances in 1990 to 1993, then the *total* amount of risk-based capital that Anchor would have been required to hold in each of those years would have been $68.526 million in 1990, $117.414 million in 1991, $176.76 million in 1992, and $160.4 million in 1993. *See* DX 1188 Ex. D at 3, 5, 7, 9, 18 (Bankhead Expert Report).[46]

However, comparing these numbers to Mr. Schott's model reveals that even though adjustments to the model are required, none of those adjustments would have a material affect on Mr. Schott's risk-based capital assumptions and conclusions. Even if Anchor were unable to displace *any* of RFC's recourse from 1990 to 1993, then Mr. Schott's regulatory model would resemble the table below:

---

46. In each year, the footnotes in RFC's audit reports disclosed the total amount of recourse RFC retained in those years. *See* PX 258 at 7 ($380.7 million in 1990); PX 259 at 7 ($652.3 million in 1991); PX 260 at 7 ($978 million in 1992); PX 261 at 7 ($580 million in 1993). Mr. Bankhead assumed that in each of these years, RFC's credit enhancements averaged 8%, so he divided each year's retained recourse by .08 to obtain a rough estimate of the total value of the securities RFC issued each year that gave rise to RFC's recourse—an essential input for applying the low-level recourse rule to RFC's off-balance sheet exposures. *See* DX 1188 Ex. D at 18 n.H. He then risk-weighted those securities at 20% in his expert report. *Id.* "But for" Anchor's risk-based capital requirement in Mr. Bankhead's model was then determined by the FIRREA risk-based capital ratio: 7.2% in 1990–92, and 8% in 1993. *See* DX 1188 Ex. D at 3, 5, 7, 9 (line CCR80). This calculation yields the risk-based capital requirement figures identified in the body of the opinion above.

| Year | Schott Model RBC Capital Excess (Deficiency) (in Thousands) | Schott Model "Well–Capitalized" Capital Excess (Deficiency) (in Thousands) | RBC Adjustment Per Bankhead Model (in Thousands) | Adjusted RBC Excess (Deficiency) (in Thousands) | Adjusted "Well Capitalized" Excess (Deficiency) (in Thousands) |
|---|---|---|---|---|---|
| 1990 | $ 185,453 | N/A | ($ 68,526) | $116,927 | N/A |
| 1991 | $ 219,151 | N/A | ($117,114) | $102,037 | N/A |
| 1992 | $ 297,763 | $ 151,027 | ($176,760) | $121,003 | ($ 25,733) |
| 1993 | $ 332,170 | $ 232,634 | ($160,400) | $171,770 | $ 72,234 |
| 1994 | $ 196,964 | $ 98,351 | | | |
| 1995 | $ 310,644 | $ 54,013 | | | |
| 1996 | $ 316,115 | $ 33,115 | ($ 62,720)[47] | $253,395 | ($ 29,605) |
| 1997 | $(290,888) | $(681,352) | ($ 45,183) | ($336,071) | ($726,535) |

However, those results are extreme and inconsistent with the court's findings of what would be possible in the "but for" world. In keeping with the court's findings of fact above, pool insurance and subordinate security sales would eliminate nearly all of RFC's recourse, and at any given time Anchor would require risk-based capital to support *only* RFC's transactional inventory of subordinate securities. The capital required to support that transactional inventory *would only be a small fraction of the risk-based capital called for in Mr. Bankhead's expert report and reflected in the table above.* Even in 1992, the year in which "but-for Anchor" has the leanest capital cushion above its "well capitalized" standard, Anchor still has enough excess capital to absorb a transactional inventory of subordinate securities of over $150 million. That is nearly as much of a transactional inventory as RFC actually carried in 1994 through 1996, when it was using subordinate security sales to credit enhance *all* of its MBS (instead of a mix of pool insurance and subordinate security sales).

In conclusion, then, the court finds that Mr. Schott's regulatory model shows credibly and reliably that the "but for" Anchor presented by plaintiff's experts would meet its FIRREA minimum risk-based capital requirements in all years from 1990 through 1995. Given the adjustments required in 1996 and 1997 for RFC's other recourse obligations that Mr. Schott incorrectly accounted for, Anchor would meet the FDICIA "well capitalized" standard in 1992 through 1995, but would be nearly $10 million short in 1996. In 1997, Anchor would fail to meet either the FIRREA or the FDICIA risk-based capital requirements.

### iii. Quantum of Lost Profit Damages

Plaintiff reliably and credibly demonstrated that, but for the breach, it would have continue to own and operate RFC throughout the 1990s. It would have used the subsidiary to originate mortgages for the thrift, accumulate a substantial servicing portfolio, and generate profits from the lucrative secondary mortgage market. Taking advantage of RFC's positions as one of the dominant players in its industry, RFC would have continued to implement the long-term business plan that its managers put in place under Anchor. As late as July 1989, Anchor was already planning to double RFC's volume, *see* DX 308 at 4, and RFC would have expanded into the market for commercial loans, home equity loans, and warehouse lending just as it did under GMAC. The models presented by plaintiff demonstrate with reasonable certainty that Anchor could have maintained RFC's growing level of output, all the while remaining comfortably capitalized and free of intolerable risks—at least at output levels consistent with RFC's actual output from 1990 through 1995.

RFC's profitability under Anchor was undeniable. In the first year under Anchor,

47. Alterations in 1996 an 1997 reflect the changes required for the $81 and $90 million recourse obligations in those two years, discussed above.

RFC generated net profits of $10.6 million, *see* PX 826 at 415, and it was on pace to generate between $10 and $13 million in FY 1990. *See* DX 400 at 28. As noted above, the pace of these annual profits, and the enormous inherent long-term profit potential that RFC carried outstripped the sale proceeds Anchor generated in 1990. Faced with a quintessential "buyer's market" because of its capital woes and the short-term capital demands of RFC's transactional portfolio, Anchor was forced to accede to Mr. Korell's suggested "[f]ast and quiet cash sale." PX 597.

The evidence of harm sustained by Anchor as a result of the breach and subsequent divestiture of RFC is overwhelming. The thrift sacrificed both a substantial revenue stream and its primary source of mortgage originations for an opportunity to regain capital compliance. It also gave up a preferred relationship with a business that could help Anchor restructure its mortgage and MBS portfolio as dictated by market forces.

At trial, plaintiff presented the expert testimony of Dr. Nevins Baxter to quantify its damages.[48] Dr. Baxter testified that damages from the sale of RFC could be measured in three overlapping ways. First, he believed the foregone earnings, or "lost profits," that could be attributed to RFC in the years following its sale to GMAC were a reasonably certain measure of Anchor's damages. Based on the expert opinions that suggested Anchor could have operated RFC at output levels similar to RFC's actual performance under GMAC, Dr. Baxter used the actual profits that RFC generated for GMAC as a proxy for what he believed Anchor's lost profits would have been. *See* Tr. at 3057–61. He calculated these lost profits from 1990 through 1997, when Anchor/Dime acquired NAMCO and effectively replaced both the earning stream and the operational benefits lost in the RFC sale. He offset his lost profit estimate by RFC's sale price in 1990, adjusted forward to 1997 value. Second,

based on the price to earnings ratio from Anchor's stock offering in 1993, Dr. Baxter testified that Anchor would have fetched additional equity capital due to increased earnings that RFC would have generated up until that time in the "but for" world. *See* Tr. at 3103–06. Third, Dr. Baxter testified that but for the breach, Anchor would not have purchased NAMCO because it would have had no need to replace RFC's operational capacity. Therefore, he attributed the alleged replacement cost of NAMCO as a component of damages. Finally, relying on the Federal Circuit's opinion in *Home Savings of America v. United States,* Dr. Baxter testified that the damages measured by the additional equity proceeds and the NAMCO purchase price should be "grossed up" to account for tax implications. *See* 399 F.3d 1341, 1356 (Fed.Cir.2005) ("We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable.").

*RFC's Lost Profits from 1990 to 1995*

Dr. Baxter compiled RFC's actual profits from 1990 to 1997 based on its reported financial statements. *See* PX 258 to 265. Relying on Mr. Schott's regulatory capital compliance projections, Dr. Baxter testified that Anchor would have been able to reproduce those same profits from 1990 to 1996. In 1997, Dr. Baxter believed that RFC's increase in volume of business would have been too severe for Anchor to replicate without running a severe risk-based capital deficiency. *See* Tr. at 3057–59. In 1997, Dr. Baxter noted that RFC's balance sheet grew substantially because RFC was holding securities in its transactional portfolio for longer periods than previous years. He believed that this practice was inconsistent with "what Dime's strategy was then," and that Anchor would not have been able to manage RFC in such a manner. Tr. at 3059 ("[RFC] grew from total assets of between $3 and $5 billion [in 1996] to over $7 billion [in 1997], which

---

**48.** Dr. Baxter has a PhD in economics from Princeton University, where he specialized in banking and finance. Tr. at 2893. He is a former professor at the Wharton School of Finance at the University of Pennsylvania, during which time he performed consulting work for the

Federal Reserve Bank of Philadelphia and the Controller of the Currency. Tr. at 2895–96. He has extensive experience as an advisor and consultant to the financial services industry, and he was a very informed, knowledgeable and credible witness.

was not consistent with [RFC's] previous operations or the way I believe that Dime would have operated."). As a result, Dr. Baxter's damages model eliminated RFC's actual profits in 1997 and replaced them with a profit projection reflecting RFC's 1996 performance. Tr. at 3059. He "assumed that 1997 would look like 1996" from an operational and profit perspective and that 1996 earnings could serve as a proxy for 1997 earnings in his model.

Therefore, Dr. Baxter testified that he believed Anchor's "but for" profits from 1990 to 1997 would have been $328,934,000 on a gross, pre-tax basis. *See* PX 971 (Baxter demonstrative summarizing RFC earnings).[49]

For the years 1990 to 1995, plaintiff's model—culminating with Dr. Baxter's testimony about his damages calculations—is sound. The overwhelming weight of evidence suggests that Anchor could have operated RFC at a similar capacity and with similar results as GMAC did, but for the breach. Theoretically, no damages model quantifying consequential "lost profit" damages is airtight, because a degree of speculation is inherent in the exercise. In this case, however, plaintiff's ability to demonstrate what RFC's actual profits were over this period, and then credibly demonstrate that Anchor, itself, could have achieved those results, leads to a model that measures those lost profits with reasonable and reliable certainty. Here, RFC's performance provides a bellwether or yardstick by which "the fact that there would have been a profit is definitely established, and there is [also] some basis on which a reasonable estimate of the amount of profit can be made." *Neely*, 285 F.2d at 443.

This is not a case in which the plaintiff's damages model relies on an open-ended, hypothetical leveraging model that portends to extrapolate damages calculations from an overly-rosy assumption about the thrift's ability to attract deposit funds and profitably invest them. *See, e.g., Citizens Financial Servs., FSB v. United States*, 64 Fed.Cl. 498,

510–15 (2005); *Standard Federal Bank v. United States*, 62 Fed.Cl. 265, 275–89 (2004); *Fifth Third Bank of Western Ohio v. United States*, 55 Fed.Cl. 223, 228–41 (2003); *S. Nat'l Corp. v. United States*, 57 Fed.Cl. 294, 301 (2003). Those models, which have been a hallmark of many *Winstar* cases, have drawn the ire of both this court and the Federal Circuit primarily because they "do[ ] not identify any business opportunities that [the thrifts] would have pursued, or the markets that [they] would exploit as a 'but for' Bank, or the allocation of assets in any particular type of investment." *Standard Federal*, 62 Fed.Cl. at 280 (quoting *Fifth Third*, 55 Fed. Cl. at 240–41). "As judges of this court previously have found in the *Winstar* context, a reduction in a thrift's leverage capacity does not immediately and directly result in lost profits." *Id.* at 281 (quoting *Bank United of Tex. FSB v. United States*, 50 Fed.Cl. 645, 654 (2001)). Instead, "the volume of any leverage is ultimately dependant upon the identification of specific, profitable opportunities through which one can effectively deploy one's capital." *Id.* Without the ability to pinpoint a specific investment opportunity or asset in which the plaintiff's capital would have been deployed but for the breach, a lost profits claim appears to be speculative as a matter of law. *See Columbia First Bank, FSB v. United States*, 60 Fed.Cl. 97, 119–20, 125 (2004).

But here we have a different case entirely, with a more refined lost profits calculus that focuses on the profitability of a lone use of Anchor's capital. This is not a case of speculation regarding the vehicle Anchor would have used to deploy its capital. The focus is on an asset that the thrift already *owned* and *operated profitably* up until the breach. There is a demonstrated causal effect between the breach and the loss of the asset, and there is a tight proximate relationship between the contract and the harm, giving rise to sufficient foreseeability. Finally, there is "a book of wisdom" created by RFC's actual performance under GMAC that

---

49. RFC's gross profits from 1996 to 1997 totaled $275,598,000. In 1996, RFC's gross profits were $71,114,000. Since Anchor/Dime purchased NAMCO in early October, 1997, Dr. Baxter extrapolated the 1996 profits over three quarters as a proxy for what he believed a "but for" RFC's profits would be. That extrapolation of the 1996 profits came to $53,336,000, providing the total of $328,934,000 in his model. *See* PX 971.

this court "may not neglect." *Sinclair Ref.'g Co.*, 289 U.S. at 698, 53 S.Ct. 736. RFC's historical performance from 1990 to 1995 helps to "bring out and expose to light the elements of [its] value that were there from the beginning" but were not likely captured in RFC's 1990 sale price, given the circumstances of that sale. *Fishman*, 807 F.2d at 553. The history of that performance here "furnish[es] some basis for a fairly reliable estimate of what [Anchor's] profits would have been," and that evidence is "the best available proof on which to base an estimate of [Anchor's] loss." *Neely*, 285 F.2d at 443.

Accordingly, for the reasons above and subject to an offset discussed below, the court finds that plaintiff's lost profits for the period 1990 to 1995 total $230,460,000.

*Plaintiff Has Not Proven Its Lost Profits for 1996 and 1997 with Reasonable Certainty*

Although plaintiff's model is sound for 1990 to 1995, it breaks down for quantification of Anchor's lost profits in 1996 and 1997. This is primarily because Mr. Schott's regulatory model, adjusted for the recourse obligations identified by Mr. Bankhead, projects that Anchor would fail to meet the FDICIA "well capitalized" standard for each of those years.

Anchor's managers testified that they preferred to operate the thrift with a sufficient capital "cushion" to protect against unexpected losses. For each of the years 1990 to 1995, Mr. Schott's model projected that "but for" Anchor would meet the "well-capitalized" standard and have a cushion that the court finds Anchor would have deemed acceptable. In 1995, when that cushion was smallest, Anchor's projected risk-based capital cushion was still in excess of $54 million. For those six years, RFC's asset base was at its largest in 1995.

In 1996, however, RFC's asset base increased nearly 40%—from $2,517,842,000 to $3,49,044,000—above the 1995 high. The adjusted risk-based capital model in the table above, in turn, demonstrates that Anchor's $54 million surplus in 1995 would evaporate and turn into a $30 million *deficiency* in 1996. Under these circumstances, with RFC's asset base increasing and Anchor's risk-based capital cushion waning, it is not reasonable to

expect that Anchor's management would have permitted RFC's operations to reach the capacity they did in 1996. Furthermore, RFC's warehouse lending business eventually exceeded Anchor's potential capacity and by 1996 could have artificially inflated RFC's earnings beyond what Anchor could have achieved. RFC's actual 1996 earnings, therefore, would not be a useful yardstick to measure Anchor's lost profits in this case because they are the product of operations that were inconsistent with the weight of testimony regarding how Anchor would have expected to operate RFC. As a result, RFC's profits for 1996 are not a reasonable proxy for what Anchor's lost profits might have been. *A fortiori*, Dr. Baxter's 1997 adjustment, which relied on RFC's 1996 profits, is similarly unreasonable.

The court finds that the portion of plaintiff's damages model purporting to measure lost profits from the loss of RFC's operations in 1996 and 1997 is unreliable. Therefore, plaintiff has not proven that component of its damages with reasonable certainty. While the court believes that Anchor's breach-related harm extends to 1996 and beyond, it does not have a reliable model on which any appropriate calculations could be made for that period. Therefore, only plaintiff's lost profits model relying on damage calculations from 1990 to 1995 withstands scrutiny.

*Offset for RFC's 1990 Sale Price*

Dr. Baxter adjusted his lost profits calculus by subtracting out "the value of the cash received" by Anchor when it sold RFC in 1990. Tr. at 3075; PX 980 (demonstrative summarizing Baxter offset). This calculation attempted to capture the cumulative benefit Anchor obtained from the RFC sale price. Dr. Baxter assumed that Anchor netted approximately $63 million, after expenses, from the 1990 sale. Tr. at 3079. He assumed in his damages model "that this cash was a way of funding the bank" and that the cash took the place of borrowings or deposits for which Anchor would have otherwise paid interest. *Id.* Accordingly, Dr. Baxter calculated Anchor's quarterly earnings on the $63 million for each quarter beginning in March, 1990 and ending December 1997. He assumed the

funds would earn a return equal to the quarterly average rate on federal funds. Tr. at 3079; PX 980. Dr. Baxter calculated that over that period Anchor generated $24,611,000 in value from the $63 million sale proceeds, and that Anchor's lost profits damages should be adjusted by the $87,611,000 total.

Defendant did not challenge Dr. Baxter's offset calculation, but the court perceives one significant flaw that must be remedied. In generating his offset model, Dr. Baxter does not appear to have taken into consideration the "compounding" effect of earned interest. In each of his quarterly calculations from 1990 to 1997, he used $63 million as the principal for his calculations, instead of $63 million plus whatever interest had previously accrued on the initial principal. Factoring this correction into Dr. Baxter's offset model, the total earnings on Anchor's $63 million would be $29,865,000, and the total offset should be $92,865,000. See Appendix A.

Plaintiff's lost profit damages attributable to the forced sale of RFC are therefore $230,460,000, offset by $92,865,000 for the 1990 sale proceeds, resulting in a total of $137,595,000.

#### iv. Reduced Stock Proceeds

■ In July 1993, Anchor issued 10,500,-000 shares of public stock at $13.00 per share. See, e.g., PX 974 (Baxter demonstrative summarizing stock sale proceeds).[50] In total, the offering raised $136,500,000 for Anchor and the government, directly increasing Anchor's capital by $67 million. See PX 23 at 5 (1994 Anchor Annual Report). At trial, Dr. Baxter testified that he believed Anchor would have been able to raise more equity capital than it did in 1993 by selling its shares for more money in the "but for" world. Since the "but for" bank would have had the benefit of RFC's earnings history when Anchor issued its stock, it would have been viewed by investors as "a less risky institution" and would have "had a better track record than it actually had and [been] a more powerful earner," according to Dr. Baxter. Tr. at 3103–04.

To quantify the effect that RFC might have had on Anchor's share price at the time, Dr. Baxter turned to Anchor's price-earnings ratio. He noted that if RFC's earnings over the 12 months prior to the stock offering were added to the actual bank's balance sheet, then Anchor's total earnings over that same period would have been increased by 31.7%. Tr. at 3105; see PX 974 (summarizing Anchor's earnings for the 12 months ending 6/30/93 as $59,071,000, and RFC's earnings over the same period as $18,696,000). In order to keep the price-earnings ratio that Anchor actually achieved in its 1993 offering static, and therefore best approximate the impact of RFC's earnings on Anchor's share price, Dr. Baxter testified that he multiplied Anchor's actual $13.00 share price by the percentage of the "but for" bank's earnings increase (31.7%). Id. According to Dr. Baxter, this calculation yielded a $4.11 increase in the "but for" Anchor's share price, for a total offering price of $17.11. Dr. Baxter rounded his share price estimate down to $17 and testified that such a price was a reasonable approximation of the price a "but for" Anchor's shares would have fetched in a non-breach world. Tr. at 3105–06. In Dr. Baxter's opinion, the additional proceeds that "but for" Anchor's shares would have received in the market would have accrued in their entirety to Anchor. Therefore, he multiplied the $4–estimated–share–price increase by the total number of shares Anchor sold, and concluded that "but for" the breach Anchor would have been able to raise an additional $42 million in equity capital. Id.

In response, defendant's expert, Dr. Carron, did not seem to argue with Dr. Baxter's methodology, nor the calculations he put before the court to reach the $42 million damages figure for reduced stock proceeds. As a "theoretical matter," Dr. Carron agreed that a reduced stock proceeds calculation could be one of the ways a plaintiff could calculate lost profits in a case like Anchor's. Tr. at 4366. Instead, Dr. Carron took issue with what he perceived to be a "double counting" of damages, as Dr. Baxter measured damages by

---

50. Anchor issued 4,750,000 warrants to the FDIC as part of the transaction to eliminate the FDIC's cumulative preferred stock interest in Anchor, and 5,750,000 shares directly to the public. Tr. at 3103.

both Anchor's lost profits from 1990–97 *and* the increased value of its stock that would have resulted from those increased earnings. *See* Tr. at 4368 (Court: "So your point is not that [Dr. Baxter's method] is an improper way of [calculating damages]. You just can't have [both]." Dr. Carron: "Precisely."). Dr. Carron also suggested that Dr. Baxter should have somehow accounted for what Dr. Carron perceived to be the "cost" of issuing stock:

> Capital is not free. If [Anchor] had sold stock for a higher price, it would be because those investors expected a higher return.... [W]hen a thrift must issue stock in order to come into compliance, there's a benefit, but there's also a cost to that. So that's the company issuing more stock than it preferred to do. Here, it issued less stock than it preferred to do.

*See* Tr. at 4368–69.

Turning first to the issue of whether a reduced stock proceeds component of a damages claim "double counts" damages in conjunction with a traditional lost profits component, the court finds that while the two components are certainly related, they do not overlap and, hence, do not "double count" or otherwise result in a windfall to the plaintiff. It is clear that plaintiff's reduced stock proceeds claim is intertwined with its lost profits claim. If the court had concluded that plaintiff's earnings model during the 1990–93 period was unreasonable or unreliable, then the same facts undermining that model would cut against the reduced stock proceeds model. The reduced stock proceeds damage model relies on the singular fact that Anchor's earnings would have been greater from 1990 to 1993 had it held RFC, and assumes the RFC lost profits as the quantum of that earnings increase.

But that is not to say that the two forms of damages overlap. According to Dr. Baxter's model, in the non-breach world Anchor would have retained RFC from 1990 to 1993 and received the accumulated benefit of RFC's actual earnings over that period. Then, in 1993, he believed that Anchor would have gone to the equity market and raised an additional $42 million based on the additional earnings attributable to RFC that it already

held. At that time, then, Anchor would have had *both* the benefit of RFC's earnings *and* a greater net capital infusion resulting from an increased share price. Neither the accumulating profits from RFC or the additional stock proceeds would have subsumed the other in the "but for" world; they would have each been separate and distinct sources of cash that Anchor would have received, but for the breach. As events actually unfolded due to the breach, however, Anchor had neither. Therefore, both are the proper subject of a lost profit damages calculus, and the court discerns no cogent rationale for how or why the two would somehow subsume or overlap one another in a damages model. *See also Fifth Third Bank v. United States,* 71 Fed.Cl. 56, 85 (2006) ("The facts demonstrate that there was no double-counting of assets.").

Second, the court turns to Dr. Carron's argument that Dr. Baxter should have somehow accounted for the "cost" associated with issuing its stock. This argument echoes a defense raised by defendant in *Fifth Third* to an analogous reduced stock proceeds claim in that case:

> Defendant views the sale of stock much like a loan from the shareholders to the corporation, for which the shareholders are repaid with dividends. Because higher proceeds entail higher obligations to the providers of capital, reduced conversion proceeds do not injure the thrift and therefore are not a form of expectancy damages.

*Id.* at 92 (quotation omitted). This court, however, agrees with the conclusion reached in *Fifth Third* that reduced stock proceeds can be the proper root of an expectation damages claim.

In issuing stock to the public, the thrift "is selling to its shareholders an ownership interest in the corporation .... [and] [t]hese assets have value, as does the shareholders' control over them." *Id.* at 93. While Dr. Carron is absolutely correct to speculate that a shareholder paying more money for an interest in the corporation would "expect[ ] a higher return," there is no attendant obligation on the issuing company to deliver those higher returns. In the case of Anchor's 1993 issuance, there was no obligation

for the bank to pay dividends. When a share of stock was sold to a shareholder, that shareholder obtained an undivided interest in the success—or failures—of Anchor. In the event Anchor made a distribution to shareholders, or in the event Anchor failed and was liquidated among shareholders, the shareholder's interest in the company relative to every other share of stock issued would remain unchanged, regardless of the price paid to acquire the share.

Dr. Baxter's model did not contemplate a scenario in which Anchor would have sold *more shares* of stock to obtain a greater capital infusion. In that case, Dr. Carron's "cost" criticism might have held some sway because the relative ownership interests of all shareholders would have then been diluted or diminished, as Anchor would have then sold more *pro rata* ownership interests in the company. Maybe in that case it could be argued that Anchor would have "given up more of itself" in order to obtain enhanced proceeds from the sale. Instead, however, Dr. Baxter assumed the issuance of the *same number* of shares. In effect, Anchor would have sold the exact same relative ownership interest in its operations, but simply would have obtained more money in exchange for that ownership interest. In such a scenario, Anchor would be exchanging nothing more than it did in the actual 1993 stock offering, so there is no need for Dr. Baxter's model to discount any additional "costs" associated with the offering. Simply put, had Anchor been bigger and better, it could have reaped a bigger and better price when it sold itself to the public in 1993. Therefore, the court perceives no theoretical flaw in Dr. Baxter's reduced stock proceeds model, as challenged by Dr. Carron and defendant. *See* Def.'s Br. at 55 n. 16 (relying on Dr. Carron's testimony to challenge reduced stock proceeds damages); *Fifth Third*, at 92–94 ("Reduced conversion proceeds are appropriate as damages.").

As for Dr. Baxter's appraisal, relying on a static price-earnings ratio to drive his calculations about a "but for" Anchor's share price, the court finds that it is a reasonable and reliable approximation of what Anchor's "but for" offering proceeds would have been.

The model is notable primarily for the simplicity of its assumptions and for the fact that defendant did not offer any evidence or expert opinion at trial that calls the calculations into question. *See, e.g.,* DX 1187 at 5 (Dr. Carron Supplemental Expert Report); Tr. at 4364–71.

As the court noted in *Fifth Third,*

The courtroom process for determining damages necessarily lacks "real world" checks on the appraisal value. On the other hand, [the expert's] appraisal was not conducted in a vacuum, but under the close scrutiny of defendant's experts and the able cross-examination of its counsel.

*Fifth Third,* at 84. Here, after Dr. Baxter presented a reliable model that projected a reasonable approximation of Anchor's reduced stock offering proceeds, and after that model withstood theoretical scrutiny from defendant's expert economist, it was incumbent upon defendant to call the mechanics of plaintiff's model into question. However, defendant did not do so, relying instead on its all-or-nothing theoretical challenge. Therefore, the court must find that plaintiff's model, which appears to be firmly cast from both reliable assumptions and a reliable theory, presents a reasonably certain measure of plaintiff's expectation damages in the form of reduced stock proceeds. Accordingly, for that harm plaintiff is awarded $42 million in damages.

### v. Damages Attributable to the Acquisition of NAMCO

■ The final chapter of Anchor's RFC-related damage claims deals with Anchor's 1997 purchase of NAMCO. According to plaintiff, NAMCO replaced the origination capacity and servicing build-up that was sacrificed in the RFC sale, and was therefore an effective mitigative substitute for RFC. As a consequence, Anchor seeks the $351 million purchase price of NAMCO as a recoverable cost of mitigation or as substitution-cost damages.

The law of mitigation, or the rule of avoidable consequences, is hornbook law. It operates as both a sword and a shield for the plaintiff. On one hand, a plaintiff is precluded from recovering consequential damages

that either were or could have been avoided or minimized through reasonable effort and expense. *See* RESTATEMENT § 350; DOBBS § 3.9 at 270–71; 3 FARNSWORTH § 12.12. On the other hand, if the plaintiff *does* take steps to minimize consequential damages then he is entitled to recover the reasonable costs of so doing.

If the plaintiff obtains substitute performance or a substitute good, then the measure of his mitigation costs would fall under the rubric of what Dobbs calls a "substitution cost" damage:

> Substitution cost damages share characteristics with market or general damages on the one hand and with consequential damages on the other. Like market damages, substitution cost damages are normally measured by an objective standard; this is not market value of the plaintiff's entitlement, but it is market costs of repair, replacement or other substitution. By adverting to a market, we have some guarantee that the costs are genuine and not a subjective measure the plaintiff might adopt. Substitution damages resemble consequential damages in that they lack a firm closing date for the accounting between the parties and also in that they are usually invoked because the plaintiff claims some special or idiosyncratic value that cannot be compensated by a market measure.

DOBBS, § 3.3 at 230. The Federal Circuit has likened such substitution cost damages to the Uniform Commercial Code ("UCC") concept of "cover" that obtains in the context of a contract for the sale of goods. *See Hughes Comms.*, 271 F.3d at 1066 ("While the cover remedy of the Uniform Commercial Code does not govern this analogous remedy under the [service contract], the Uniform Commercial Code provides useful guidance in applying general contract principles."). As for the types of goods or services that satisfy the concept of "cover" or its analogues in non-sale-of-goods scenarios,

> The substitute goods or services involved in cover need not be identical to those involved in the contract, but they must be "commercially usable as reasonable substitutes under the circumstances." Whether

cover provides a reasonable substitute under the circumstances is a question of fact. *Id.* (quoting U.C.C. § 2–712 and citing *Bigelow–Sanford, Inc. v. Gunny Corp.*, 649 F.2d 1060, 1065 (5th Cir.1981)).

The scenario here is a bit different from a UCC sale-of-goods or an analogous services-type contract because there is an abstraction between the subject matter of the contract and the asset or service that was substituted. In other words, the specific focus of the breached contract in this case was the preferential treatment of supervisory goodwill. Plaintiff effectively "lost" its supervisory goodwill. It did not, however, substitute something else for the goodwill, itself. If that were the case, then the concept of cover or substitution would apply directly and there would be little for the court to analyze in this case beyond the facts. This is not to say, however, that the legal concept of mitigation cannot come into play in this case. As the court discussed above, the weight of precedent in *Winstar*-related cases is that the purpose and the focus of the goodwill contracts was designed to encourage asset growth so that thrifts could grow their balance sheets. Here, it was beyond peradventure that RFC was one of the assets that Anchor obtained in reliance on the goodwill contracts and that it was one of the types or kinds of assets that a thrift had been expected to place on its balance sheet to generate profits and strengthen the long-term viability of the merged thrifts. As a consequence of the breach, then, Anchor incurred harm that manifested itself in the form of consequential damages that the thrift had a duty mitigate, lest its failure to do so be weighed against its opportunity to recover damages attributable to the breach. "The most common forms of minimizing damages are to repair harm done that would otherwise cause consequential losses, to locate property that has been taken, or to procure a substitute for performance owed by the defendant." DOBBS, § 3.9 at 271. As Professor Dobbs' treatise notes:

> This is the affirmative side of avoidable consequences. If the plaintiff actually expends funds in a reasonable effort to minimize damages, the expenditures are recoverable under the . . . rule as a form of

consequential damages. The key requirement is reasonableness. So the recovery for reasonable costs is appropriate, even if the effort to minimize was not successful and even if the costs incurred outran the savings.

*Id.* at 273. Therefore, plaintiff may recover under the rubric of mitigation for its costs incurred when it took steps to limit or eliminate *the harm* incurred because of the breach, provided that the harm was proximately caused by the breach.

The costs associated with mitigation are not consequential. *Hughes,* 271 F.3d at 1068. As the Federal Circuit has instructed, they are "direct" costs and may be awarded "*together with* any incidental and consequential damages." *Id.* (quoting U.C.C. § 2–712) (emphasis in original). Therefore, plaintiff's appropriate costs of mitigation may be awarded in addition to any actual consequential damages attributable to the breach.

The plaintiff's theory of mitigation here is that, but for the acquisition of NAMCO, Anchor's cumulative harm—including lost profits—from the forced disposition of RFC would have continued to mount *ad infinitum.* By acquiring NAMCO, Anchor claims that it not only stanched the loss of RFC's profitability, but it also replaced many of the operational benefits jettisoned in the sale, such as mortgage origination and servicing acquisition capacities.

At trial and in the parties' briefs, considerable attention was focused on whether or not NAMCO really was an appropriate functional substitute for RFC. Defendant largely attempted to portray NAMCO as a completely different business than RFC that operated without any of the risks inherent to RFC's practice of issuing private-label MBS. *See* Def.'s Br. at 57–59. Essentially, it argued that Anchor's purchase of NAMCO was in no way a "substitute" for RFC or in any way mitigated harm arising from the loss of RFC.

For the reasons discussed below, the court finds that NAMCO was an appropriate mitigative substitute for RFC and the benefits that Anchor derived from RFC. Although defendant's criticisms that there are differences between NAMCO and RFC's core businesses are valid to an extent, those criticisms overlook the facts that the two companies are functionally similar, operate in the same market, require similar skills to effectively operate, and provide many similar operational benefits. Consequently, the court finds that the NAMCO acquisition did, in fact, mitigate much of the harm caused to Anchor by the breach, and therefore the costs of acquiring NAMCO are properly the subject of Anchor's damages claim. However, due to a double-counting concern raised by defendant's expert, Anchor is entitled to far less than the full $351 million acquisition cost.

As noted in the background portion of this opinion, from the days that Donald Thomas helmed Anchor, the bank sought diversity among both its operations and its geographic concentrations of deposits and assets. Mr. Thomas was acutely aware of the risks Anchor faced by investing primarily in assets sensitive to interest rate fluctuation (like long-term, fixed-rate mortgages) and overwhelmingly concentrated in one geographic region. As early as the 1970s, he realized that "mortgage banking" could provide Anchor both access to geographic diversity and non-interest income by way of transactional fees.

In 1979, Anchor first became involved in the secondary mortgage market (other than as an end-purchaser of early issues of GSE MBS) when it acquired a small mortgage-banking enterprise. Tr. at 2640 (Test. of George Schneider). At the time, "Anchor was trying to become more than just a typical thrift lender. It was looking much more towards a larger presence in the mortgage market in different areas ... looking at fee income as the source of income." Tr. at 2640. It signaled Anchor's entree into what the bank's managers predicted would be a new era of thrift operations:

> In future years, a savings bank may better serve the housing credit needs of its communities by becoming a major factor in short-term credit financing. Long-term credit requirements can be more effectively met through the active use of the secondary mortgage market. Savings banks, acting as conduits, can originate mortgages

for direct sale into the open market. Long-term interest rate risk can, thus, be passed on to those institutions, such as insurance companies and pension funds, which are better able to assume such risk due to the stability and long-term nature of their source of funds.

PX 1 at 21 (Anchor 1980 Annual Report). In this new order of mortgage financing, "the thrifts would be the intermediary," rather than the source, of capital. Tr. at 2654 (Test. of George Schneider).

Anchor's managers believed that "to begin a mortgage-banking company from scratch would [have been] very, very difficult." Tr. at 2641 (Test. of George Schneider). Consequently, Anchor eagerly acquired Suburban's mortgage-banking unit (later AMS) in 1983, giving Anchor a substantial foothold in the secondary mortgage market. Tr. at 2677–80 (Test. of George Schneider) (discussing appeal of Suburban's mortgage-banking enterprise). Anchor captured the allure of a business like AMS in a 1986 letter to its regulators outlining the bank's business plans. *See* PX 502 (Dec. 30, 1986 letter to FHLBB). Under the heading "Diversification of Operations & Reducing Interest Rate Risk," Anchor hailed AMS:

> Anchor has developed significant sources of income less sensitive to fluctuations in interest rates in order to enhance its long-term profitability potential. The cornerstone of this strategy is mortgage banking—an activity developed initially by acquisition and subsequently expanded by internal growth.

PX 502 at 5.

That disclosure captured the primary benefits that Anchor hoped to exact from AMS, which were entirely consistent with Mr. Thomas' vision. First, AMS would provide "a substantial servicing fee income base" that is "relatively stable and which is not directly and immediately affected by fluctuation in interest rates." *Id.* Anchor planned to build this servicing portfolio to increase the ongoing income stream and enable the bank to sell some servicing rights if the need arose. *Id.* Second, AMS provided loan fee income in the form of origination and commitment fees. *Id.* Third, AMS enabled An-

chor to engage in secondary mortgage market activities by packaging mortgages into GSE MBS. *Id.* With AMS operating in that capacity, Anchor could also extend warehouse lines of credit to AMS. Fourth, AMS "provided relatively interest free funding" to the bank in connection with loan servicing payments, escrow deposits, and "float" balances maintained by AMS in deposits with Anchor. *Id.* Fifth, AMS contributed to Anchor's long-term profitability "by originating loans for portfolio retention by the bank." *Id.* Finally, AMS provided Anchor a presence in "multiple [geographic] markets." *Id.*; Tr. at 2645.

But, in time, Anchor discovered that AMS was not the tremendous engine of mortgage originations that Anchor hoped it would be. Anchor did not succeed ultimately in obtaining the quality loans or volume of business that it desired from AMS. Tr. at 2336 (Test. of John Brull); Tr. at 2737 (Test. of George Schneider). AMS eventually began to move away from retail origination and gravitate towards wholesale originations. It developed a correspondent relationship with about twenty retail originators and began to secure loans through wholesale channels. Tr. at 2307 (Test. of John Brull). Anchor realized that a wholesale approach "was a cheaper way of securing loans." *Id.* So while Anchor continued to rely on AMS for its sophisticated and efficient servicing capacity, it turned in 1988 to RFC to provide the bank with the quality and volume of mortgage originations that Anchor needed. Tr. at 2324–27 (servicing), 2336(RFC). As John Brull, Anchor's senior vice president and CFO noted at trial:

> [W]e had never been fully successful in restarting AMS to the engine it was [before it deteriorated prior to the Suburban acquisition]. We were not getting the loans we expected. They were not at the origination levels we wanted. And we found RFC's supply of loans to us to be much superior at this point, and it's less costly, because they don't have to pay for the bricks, the mortar, the telephones, the rental, all that, and all the people processing the loans. So we were closing up some of the less efficient [retail origination] offices of AMS to just get rid of that ex-

pense, because we could buy loans from RFC.

Tr. at 2336 (Test. of John Brull).

As noted above, RFC's performance exceeded Anchor's expectations. Tr. at 2337. RFC was a prominent mortgage-banking enterprise that brought much of the same operational and geographic diversity to Anchor that Donald Thomas had first sought a decade earlier when he moved Anchor towards mortgage banking. Like AMS five years earlier, RFC brought to Anchor a substantial servicing fee income base, although through RFC that income was primarily through master servicing (of the MBS) rather than primary servicing (of the mortgages). *See, e.g.,* DX 3012 (Forster demonstrative summarizing business activities); PX 1109 (Baxter demonstrative summarizing business activities). RFC did not generate loan fee income like AMS, but did generate a transactional income by marking up the sale of its securities. *See* Tr. at 1205–06 (Test. of Mark Korell). Like AMS, RFC provided interest-free funding through its master servicing escrows, or "floats," that it kept on deposit with Anchor. *Compare* PX 502 at 5 *with* Tr. at 1156–57 (Test. of Mark Korell). RFC contributed to Anchor's future profitability by originating mortgages that Anchor could hold in portfolio, and provided a national scope of originations that diversified the bank's geographic operations. *See* Tr. at 2706 (Test. of George Schneider). In short, RFC provided Anchor with a very sophisticated mortgage-banking enterprise that generated substantial "mortgage banking income" for the bank that was tied not to the profitability of any individual mortgage loan, but rather the overall volume of loans it originated. *See* Tr. at 2338–40 (Test. of John Brull).

RFC had been so good and efficient at satisfying Anchor's mortgage-banking needs that to the extent RFC's operational capacity overlapped with AMS's, Anchor allowed AMS to wither. Tr. at 2336. After Anchor sold RFC in 1990, Mr. Large testified that the thrift had a relatively insignificant mortgage-banking presence:

> RFC's overwhelming importance to [Anchor] was that it was the source of the mortgages that we needed—mortgage volume that we needed to both build the balance sheet and to also adjust the rate sensitivity in the balance sheet. And we had become, if I can put it this way, dependent upon that source, because it seemed so good, it seemed so cheap, and there seemed to be no reason why it could not continue forever. So we had, to some degree, allowed originations through the branches, originations even through [AMS], to atrophy in favor of what we were getting out of RFC.... [Anchor attempted] to bring other origination capabilities back in order to achieve balance. But the unfortunate reality was that either we had RFC to generate mortgages or we didn't have any mortgages.... [M]ortgage volume went from, if I recall, $960 million in one year to $167 [million] ... in the year we lost RFC. It was that damaging.

Tr. at 264–65, 345 ("[RFC], that engine of production that we had placed all of our hopes on was now no longer available to us.") (explaining DX 74 at 16, Anchor's third quarter 1990 10–Q report, detailing Anchor's decline in loan production).

The absence of a sophisticated mortgage-banking enterprise in Anchor's fleet after RFC was jettisoned was a problem that would plague Anchor well into the future. Especially as Anchor was forced to consolidate its branch structure closer and closer to the core New York metropolitan area to raise capital after FIRREA, the bank largely lacked the ability to originate new mortgages in any substantial capacity like it did with RFC. Moreover, its operational footprint lacked the geographic diversity of before. *See* Tr. at 375–76 (Test. of James Large) (discussing Anchor's "corporate thrust" for 1992 to revitalize its "ability to generate mortgages"); 379–81 (discussing Anchor's efforts to revitalize its origination capacity by "launch[ing] an effective wholesale mortgage correspondent operation").

This state of affairs remained after Anchor merged with Dime in 1995. Dime did not bring sophisticated mortgage-banking enterprise to the merger. Lawrence Toal, who succeeded James Large as Dime's CEO following Mr. Large's retirement at the end of

1996, *see* Tr. at 1671, testified that Dime acquired small mortgage-banking outfits in Fairfax, VA and Griffin, GA that had retail origination presence in Virginia, Georgia, North Carolina, and South Carolina. Although the combined Dime enterprise began to demonstrate improvement in retail originations, achieving annual loan production of $1.8 billion in 1995, *see* Tr. at 1640, Dime was "unable to operate on a national basis" and its mortgage business was therefore "very compact and . . . did not have balance." Tr. at 1640–41, 1657 (Test. of Lawrence Toal). With this limited geographic exposure, Mr. Toal noted concerns that echoed the same themes for which Donald Thomas expressed concern two decades earlier at Anchor:

> We were primarily overly dependent on mortgage brokers in the greater New York area, and to some extent on correspondents, but we didn't have very much in the way of direct origination, except for the two recent acquisitions we had made [in Virginia and Georgia]. . . . We needed to get broader in geographic coverage. We didn't want to be focused only in the middle Atlantic or New York and Northeast area, because that was of greater risk being concentrated in any one area. And then we certainly needed to expand our secondary market activity.

Tr. at 1658.

Beyond geographic limitations, Dime also struggled with low origination levels, overall. Dime lacked what Mr. Toal believed to be sufficient loan production capability. Tr. at 1657 ("[W]e really did not have very much of a presence in the mortgage origination side."), 1739. As a result, Dime lacked the volume it needed to operate an efficient mortgage servicing enterprise. Even though Dime had a sophisticated servicing operation, Mr. Toal testified that servicing was "very much a business of scale" and that "you needed to drive a lot of volume through it to make it really efficient," but Dime did not have that critical mass of originations volume. Tr. at 1662.

Dime's leaders decided that the bank had to "rapidly expand" its mortgage-banking business and increase its geographic coverage. Tr. at 1663. Dime's 1996 annual report laid out a corporate strategic plan that called on the bank to improve its mortgage-banking operations. PX 25 at 1431; Tr. at 1669. Accordingly, the bank began to build the managerial infrastructure it would need to support a much larger mortgage-banking enterprise. Tr. at 1669–73.

At this same time, however, Dime realized that the mortgage-banking industry was rapidly consolidating and that size would be a key to success. Tr. at 1674–75 (Test. of Lawrence Toal) ("We believed that to be successful in that market, we had to be a top–10–place–originator and a top 20–place–servicer."). To achieve the critical mass necessary to be a significant player again in the mortgage-banking industry, Mr. Toal testified that "it would have taken [Dime] five to seven years to do it on an organic basis . . . during which time the market would also be moving away from us." Tr. at 1678–79. As a result, in October 1997, Dime turned to NAMCO, an established mortgage-banking enterprise that presented Dime sufficient size, scope and sophistication to enable the bank to return to prominence as a mortgage banker.

In a press release announcing the acquisition agreement, Dime hailed NAMCO as a major building block that would accelerate its growth as a "high performance mortgage banking and consumer financial services company in selected national markets." PX 784 at 2 (June 23, 1997 press release). Specifically, the press release stated:

> The acquisition provides Dime with a geographically diverse, multi-channel, multi-product originations network generating loans both for our portfolio and for sale in the secondary market. In addition, we believe that the combined companies' $30 billion mortgage servicing portfolio will help us achieve scale economies while generating higher levels of recurring fee income.

*Id.* Mr. Toal testified that NAMCO had a geographic presence in about 30 states, which Anchor found attractive. It originated loans through both a retail presence (about 40% of its originations) and a wholesale network (about 60% of its originations). Tr. at 1679, 1690; PX 785 at 9.

Just like RFC and AMS before it, NAMCO brought non-interest revenue streams and operational strengths to the bank that were symbiotic with Dimes business. In addition to mortgage fees and servicing fee income, NAMCO retained substantial escrow funds on deposit with Dime. Tr. at 1679. Dime could finance NAMCO as a portfolio lender, generating loan fees and interest income. Tr. at 1681. Dime could acquire whole mortgages for its portfolio through NAMCO, cherry-picking primarily ARM loans that best fit the bank's particular needs. Tr. at 1681. The remainder of NAMCO's product was sold into the secondary market, often as agency MBS. Tr. at 1732. NAMCO also originated jumbo loans, on occasion, which it sold as whole loans on the secondary market. In Dime's first full year owning NAMCO, its mortgage originations increased nearly ten-fold to $30.5 billion. PX 27 at 2 (1998 Dime Annual Report); Tr. at 1704. Mr. Toal attributed that increase solely to NAMCO. Tr. at 1704 ("[W]e would not have been able to capture that kind of volume without the geographic distribution that [NAMCO] gave us.").

From Dime's perspective, then, NAMCO provided a similar operational capacity to what RFC had provided Anchor. Both originated mortgages nationally and in tremendous volume. Both sold the vast majority of their mortgages into the secondary market, but provided Anchor/Dime the opportunity to select its preferred few to be held in portfolio. Both generated servicing rights that accrued over time and led to substantial servicing fee incomes. Both were a source of interest-free financing for the bank through escrow deposits, and at the same time were a destination for the bank's own warehouse lending.

Dr. Baxter testified at trial that RFC and NAMCO were also remarkably similar in terms of the volume of their originations and their earnings. From 1990 to 1996, RFC and NAMCO were "remarkably similar in scale." Tr. at 3071 (Test. of Dr. Baxter). The two companies' cumulative pretax earnings over that period were virtually identical. See PX 911 (Baxter demonstrative summarizing RFC's 1990–96 cumulative pre-tax earnings as $275,598,000 and NAMCO's as $275,362,000). On an annual basis, NAMCO's profits were more susceptible to interest rate fluctuations, primarily because it had higher overhead expenses than RFC that eroded profit in rising interest rate environments in which there are fewer mortgage originations. Tr. at 3072; PX 912 (Baxter demonstrative summarizing RFC and NAMCO annual pre-tax earnings 1990–97). Perhaps most relevant is that throughout this period NAMCO's loan originations and purchases were similar to RFC's, as well. The volume of business that RFC conducted was consistently within 2% to 20% of NAMCO's origination volume. See PX 914 (Baxter demonstrative summarizing NAMCO and RFC originations volume, 1990–97). In terms of mortgage servicing, RFC's annual master servicing volume (in terms of dollar value of mortgages serviced) was consistently greater than NAMCO's primary servicing portfolio. See PX 915 (Baxter demonstrative summarizing NAMCO and RFC annual servicing portfolios).

Every one of these functional and operational similarities points toward NAMCO as a suitable, commercially reasonable functional substitute for RFC. From Anchor/Dime's perspective, the attributes of both resolved the bank's needs for substantial origination volume, a diverse geographic footprint, a sophisticated mortgage-banking operation, and a reliable source of non-interest fee income.

But defendant is critical of the mitigation claim because of what it perceives to be monumental differences between NAMCO and RFC. According to defendant, NAMCO and RFC are "completely different enterprises." Def.'s Br. at 57. First, defendant emphasizes that NAMCO and RFC originated mortgages in different ways. "NAMCO originates loans; it lends money to borrowers. In contrast, RFC did not originate *any* loans when it was owned by Anchor; and it was not in the business of lending money to any individual for any purpose." Def.'s Br. at 58 (citations to record omitted). This assertion is not entirely accurate, however, and the distinction is not material to comparing the two companies. The majority of NAMCO's originations—60% of them—were

wholesale originations conducted through brokers and correspondents, just like all of RFC's. But even then, with NAMCO conducting retail operations 40% of the time, it was still a business focused entirely on volume of originations, rather than the investment value of a given mortgage, just like RFC. With the exception of loans absorbed into Anchor's portfolio, none of NAMCO or RFC's product was held for investment. Instead, it was sold in its entirety into the secondary market. Even in those cases where NAMCO conducted retail originations—or "lends money to borrowers," as defendant characterizes it—NAMCO was not "lending" any of its own money to the borrower in the traditional sense. It was not operating as a portfolio lender. Instead, it was operating merely as a middle-man, facilitating the extension of credit from the capital markets to the borrower. Functionally, this was no different from the role that RFC played for Anchor.

Second, the government emphasized that, under Anchor, "the only thing [RFC] did was issue private-label mortgage backed securities. That was the one product it produced and sold. Unlike RFC, NAMCO did not issue private-label MBS." Def.'s Br. at 58. This distinction, however, is merely one of product focus. It is true that NAMCO did not issue its own private-label MBS, and therefore did not have to deal with the additional pressures and risks associated with credit enhancing its product like RFC did. But that does not, in and of itself, lead to the conclusion that the two businesses are so dissimilar that their functional similarity (from Anchor's perspective) ought to be overlooked. NAMCO did not focus on originating jumbo loans like RFC did. As a consequence, the vast majority of NAMCO's originations could be pooled together as GSE MBS. With the agencies issuing the securities, there was no need for NAMCO to engage in in-house credit enhancement because the GSE's role in the issuance *was* the *de facto* enhancement. Similarly, because the GSEs are far more cost efficient than private-label issuers (since they do not pay for any additional credit enhancement), there would be no benefit to NAMCO to issue its *own* MBS, instead of GSE MBS, from the

pools of conforming and unconventional (FHA- or VA-insured) mortgages it originated. Similarly, since NAMCO did not focus exclusively on jumbo loans like RFC did, it did not have the concentration of those mortgages that would have allowed it to be an efficient issuer of its own jumbo MBS. Although Mr. Lederman testified that he had seen documents suggesting that NAMCO considered issuing its own jumbo MBS, NAMCO settled for reselling its non-conforming originations to other mortgage bankers, like RFC, that did focus on non-conforming products, including jumbo loans. But this distinction between the product focus of RFC and NAMCO does not diminish their broad operational similarities or the similar functional benefits that each conferred on Anchor/Dime.

The third distinction defendant emphasized is that "NAMCO *sells* a high percentage of the loans it originates. RFC does not sell loans; it *buys* loans from wholesale originators and distributors." Def.'s Br. at 58. The court is not persuaded by this alleged distinction and does not find it to be an accurate characterization of the two businesses. First, both companies *sold* effectively all of their originations. Both were nothing more than mortgage bankers, intermediaries in the flow of capital from investor to home-buyer. The majority of each company's product ended up in MBS product—NAMCO's in GSE MBS, RFC's in its own private-label MBS. From time to time RFC sold whole-loan packages to institutional investors instead of packaging MBS, and NAMCO often did the same. Tr. at 4468 (Test. of Dr. Carron). As for the distinction that RFC "*buys* loans from wholesale originators and distributors," as much as 60% of NAMCO's product was acquired in exactly the same manner. RFC was not at all unique in that sense, just more dependent on its correspondent network than NAMCO was.

Finally, defendant points out that "NAMCO maintains direct contact with borrowers because it services the loans it originates. RFC maintains no direct contact with any borrower. Relatedly, NAMCO did only primary servicing (with borrowers); it did not

do master servicing, as RFC does." Def.'s Br. at 58. This, again, is a distinction of product focus that strikes the court as an inconsequential difference in practical terms. The two companies did focus on different ends of the servicing spectrum. In conducting primary servicing, NAMCO serviced the individual mortgages. Since most of its origination product was packaged into GSE MBS, NAMCO remitted payments to the GSE's, themselves, who performed the master servicing. RFC, in its master servicing, serviced the MBS, not the individual mortgages. It collected payments from the primary servicer and remitted them to the MBS holder. When Anchor owned RFC, RFC routinely acquired primary servicing rights and passed them on to AMS. While the primary and master servicing functions are, in the narrowest sense, distinct, they are really just different halves of the same mortgage-banking whole. Both are essential fee-generating services in the MBS life-cycle in which both NAMCO and RFC were engaged. And again, from Anchor/Dime's perspective, there was no distinction in the benefits that the bank derived from either NAMCO or RFC's servicing operations.

Accordingly, the court finds that it would be improper to distinguish RFC's operations from NAMCO's merely because the two had slightly different product focuses within the greater mortgage-banking spectrum. While defendant properly points out that there were, indeed, differences between the two companies, in the bigger picture they are all distinctions without a difference. In this case, that bigger picture is the perspective from which Anchor and Dime viewed the mortgage-banking industry and the specific benefits that the bank derived from NAMCO and RFC. Through that lense, it is plain to the court that both NAMCO and RFC

brought the same functional attributes and benefits to the bank and served the same needs. Defendant's own exert, Dr. Carron, conceded as much:

Q: NAMCO and RFC generated fee income, didn't they?

Dr. Carron: Correct.

Q: NAMCO and RFC generated income from the spread, correct?

Dr. Carron: Yes.

Q: NAMCO and RFC generated commitment fee income, correct?

Dr. Carron: Correct.

Q: NAMCO and RFC generated loan volumes, correct?

Dr. Carron: I'm sorry, what do you mean by "loan volumes"?

Q: They generated—they created whole loans into the portfolio which could then be cherry-picked or sold to someone else, right?

Dr. Carron: Correct.

Q: Okay. And both NAMCO and RFC made money on the sale of loans or MBSs, right?

Dr. Carron: To—well, yes, but here I have to qualify. NAMCO made gains on the sale of loans. It made gains on the sale of MBS, but only agency MBS, because it didn't issue private-label MBS. RFC sold some loans, but it predominantly issued private-label MBS as its exit strategy. So there's some overlap, but there's less that overlaps than doesn't overlap in that category.

Tr. at 4467–68. Therefore, the conclusion follows that the NAMCO acquisition effectively mitigated the operational loss and harm that plaintiff incurred when it was forced to sell RFC due to the breach.[51]

---

51. Defendant also raised the argument that plaintiff "never re-entered the mortgage conduit business of RFC" after the bank returned to a comfortable capital position. Def.'s Mot. at 18. Defendant pointed out that plaintiff repurchased more than $850 million of its own stock from 1996–2001, implying that if it had desired to re-enter that market, it could have done so. As the discussion above makes clear, however, Dime had no need to extend its business to the private-label MBS end of the mortgage-banking spectrum after it acquired NAMCO. By then, its

mortgage-banking needs were satisfied and it had already replaced the stream of benefits Anchor lost when it sold RFC.

To the extent that defendant's argument might be interpreted to imply that plaintiff could have mitigated its harm sooner, see id. ("In 1996, Dime repurchased more than $270 million of its own stock, with which it could have added more than $5.4 billion in assets."), there was no indication in the record that plaintiff ever had an opportunity to mitigate any sooner than it actually did. See, e.g., Tr. at 1678 (Test. of Lawrence

The court finds that plaintiff should be entitled to its costs in mitigating that harm. *See Hughes,* 271 F.3d at 1068. Plaintiff's damages expert, Dr. Baxter, testified that the best way to measure that cost of mitigation would be to return to plaintiff the full cost of the NAMCO acquisition, $351 million. *See* Tr. at 3066–76 (Test. of Dr. Baxter); PX 48 at F–10 n. 2 (1997 Dime Annual Report) (summarizing NAMCO purchase cost). At trial, defendant's expert, Dr. Carron, criticized that full $351 million claim as being partially duplicative of Anchor's 1990 to 1997 lost profits claim. *See* Tr. at 4364–65. Dr. Carron noted that a considerable portion of NAMCO's value was comprised of the company's retained earnings.

NAMCO traditionally paid very little of its profits to shareholders in the form of dividends. *See, e.g.,* PX 267 at 19 (1996 NAMCO Annual Report) (noting annual dividends per share of $.21 and .24 from 1992 to 1996, ranging from 6% to 45% of annual profits per share). Consequently, the amount of shareholders' equity consisting of retained earnings increased each year. *Compare* PX 267 at 19 (noting a dividend of $.24 per share out of a net profit of $2.30 per share, or 10.43%) *with* PX 267 at 30 (noting an annual increase in retained earnings of $29,516,000, or 89.57% of that year's net profits). As Dr. Carron noted, the "terminal sales price" that Dime paid for NAMCO was, itself, largely comprised of shareholder equity that had increased over the prior years due to those retained earnings. Therefore, Dr. Carron concluded that if the court were to award plaintiff damages based on RFC's lost profits from 1990 to 1997, it would be duplicative to also reimburse the full purchase price of NAMCO since much of that purchase price simply liquidated the shareholder equity (including retained earnings) that built up over the same 1990–97 period. Tr. at 4365, 4522–23. In other words, such a damage award would provide plaintiff with RFC's profits *and* NAMCO's profits over the same period. Because the court has concluded that it is appropriate to award plaintiff lost profits in

this case, it would be improper to also reimburse plaintiff for the costs it incurred in liquidating NAMCO's cumulative retained earnings to shareholders. It would be a windfall for plaintiff.

While Dr. Carron conceded that retained earnings did not comprise the *entire* NAMCO purchase price, and that part of what DIME paid for NAMCO reflected the company's going concern value, he was not prepared to testify about what NAMCO's cumulative retained earnings might have been at the time of sale. Tr. at 4478. Plaintiff's expert, Dr. Baxter, conceded that NAMCO did have some "book capital" when it was acquired, *see* Tr. at 4517, but he did not place a dollar value on that amount. Notwithstanding the absence of testimony about a proper offset, the court is convinced that Dr. Carron's theoretical approach to this issue is sound, and that if the court is to award damages to plaintiff based on both RFC's lost profits and the costs attributable to later mitigation, then the award must discount NAMCO's acquisition price by "the amount by which shareholders' equity increased due to the retention of earnings." Tr. at 4522 (Test. of Dr. Carron).

As late as December 31, 1996, NAMCO's Annual Report indicated that shareholder equity included $131,425,000 in retained earnings, up $29,516,000 from the year before. PX 267 at 30. The NAMCO purchase price must therefore be adjusted by at least this amount. But Dime did not acquire NAMCO until the end of the third quarter of 1997, nine months after the 1996 annual report last specified NAMCO's retained earnings. Unfortunately, neither party presented evidence at trial revealing what NAMCO's retained earnings during that nine month period may have been. Alternatively, in its post-trial brief, plaintiff suggested the court could reduce the purchase price by the amount of book capital accounted for in the transaction. This approach would comport with Dr. Baxter's trial testimony, which conceded NAMCO did have a degree of "book capital." Tr.

Toal) (noting that it would have taken as long as five to seven years to grow a sophisticated mortgage-banking enterprise from the ground, up); Tr. at 3038 ("[S]ignificant mortgage banking

firms are ... not easily acquired. There aren't that many of them with a national presence like NAMCO that are for sale at any point in time.") (Test. of Dr. Baxter); Tr. at 3035–43.

at 3075, 4517; Pl.'s Br. at 66. Dime's 1997 Annual Report indicated that the bank paid a $185.9 million premium for NAMCO, accounted for as goodwill, meaning that it paid $165.1 million for NAMCO's consolidated assets, including retained earnings. PX 48 at F–10. Absent more, this strikes the court as a conservative best estimate of NAMCO's cumulative retained earnings, and therefore the proper offset to the NAMCO purchase price to avoid any duplicative award.

Plaintiff is therefore awarded $185.9 million in mitigation costs required to reimburse plaintiff for its costs in replacing the benefits it lost when the breach forced Anchor to sell RFC.

### vi. Tax Gross–Up Award

At trial, Dr. Baxter also testified that, in order to make the award tax-neutral, an adjustment to plaintiff's damage award was required to offset the income tax implications of any damages award representing income (or future income). Dr. Baxter noted that stock sale proceeds are not a taxable event in the normal course. Tr. at 3110. Similarly, he noted that Dime was entitled to no income tax deduction for the NAMCO acquisition in 1997. Tr. at 3109. Therefore, if plaintiff were required to pay income taxes on its damages award compensating plaintiff for these two losses, plaintiff argued that it would be made less-than-whole unless an adjustment is made to the award to "zero out" the ultimate tax liability attributable to those two portions of the damages award.

■ The Federal Circuit has embraced this concept, called the "tax gross-up," as a means of ensuring that a damage award effectively compensates the plaintiff for harm. In *Home Savings of America, FSB v. United States,* the Circuit resolved any ambiguity regarding the applicability of a tax gross-up award in the Court of Federal Claims when it concluded: "We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff

for lost monies that would not have been taxable." 399 F.3d 1341, 1356 (Fed.Cir.2005) (citations omitted). Moreover, the Federal Circuit approved the trial court's implementation of the gross-up despite defendant's argument on appeal that "future tax rates are unknown, so adjusting damages based on projected rates of taxation is speculative." *Id.* at 1355–56.

At trial, plaintiff presented the testimony of Mr. Robert Miles. Mr. Miles is the controller and a senior vice president of Washington Mutual Bank, the parent company to the successor in interest of Anchor, and the putative plaintiff in this case. Mr. Miles testified that Washington Mutual Bank would be the entity that would receive any damages awarded to plaintiff, and that it would be the entity paying taxes on that award. Tr. at 2850. Mr. Miles is a CPA, and has previously worked on the tax staff at Peat Marwick Mitchell (now KPMG) and at the South Boston Savings Bank, a $2 billion savings and loan institution. In each of these professional engagements, Mr. Miles had extensive experience providing tax analysis and advice and preparing tax accounting for financial statement purposes. Tr. at 2840–43. At Washington Mutual Bank, Mr. Miles had responsibility for filing all federal and state income tax returns, preparing income tax accounting for financial statements, planning and implementing federal and state tax planning strategies, and representing the bank before various taxation authorities. Tr. at 2844–45. In 2003, Mr. Miles relinquished his responsibilities for day-to-day management of the bank's tax issues to focus on his role as controller, but in the latter capacity he regularly meets with the new tax director to review tax calculations and projections. Tr. at 2845–46. The court found Mr. Miles' testimony to be very credible and informed.

Mr. Miles reviewed Washington Mutual Bank's historical marginal tax rate [52] information and noted that over the prior nine years, the bank's rate was consistently be-

---

52. The marginal tax rate "is the rate at which your next dollar of taxable income will be taxed at." Tr. at 2853. It is different from the "effective tax rate" that is reported in a company's financial disclosures, which adjusts for deductions and tax credits. Tr. at 2854. Mr. Miles testified about the bank's marginal tax rate instead of its effective rate because "[i]n the event that an award is granted, that will be income to Washington Mutual Bank and will be taxed at its marginal tax rate." *Id.*

tween 38% and 39%. Tr. at 2852; PX 825 at 2 (Declaration of Robert Miles). The marginal tax rate comprised Washington Mutual's federal income tax rate plus the state marginal tax rate. Tr. at 2854. Based on projections for both 2005 and 2006, Mr. Miles testified that Washington Mutual's federal tax rate would almost certainly be 35%. He noted that any corporation earning more than $18 million was subject to that tax rate, and that Washington Mutual's projected income over that period was between $5.5 and $6 billion dollars. Tr. at 2855–57. At that time, Mr. Miles was unaware of any external factors that might wipe out virtually all of the bank's income and drop it into a lower federal income tax bracket. Mr. Miles projected that Washington Mutual's federal income tax rate for 2006 will, in fact, be 35% and concluded that this rate has been proven with near-absolute certainty.

Mr. Miles did concede that there is some degree of variability in projecting the bank's marginal state tax rate, which is "a fairly involved calculation." Tr. at 2858. Washington Mutual Bank does business in most of the fifty states, and must therefore apportion or allocate its income to each of those various states, which often have different methods of apportionment. *Id.* Nonetheless, the calculations and projections of state marginal tax rates are something that Mr. Miles and Washington Mutual Bank routinely perform in the normal course of business, and he believed that reliable projections could be made for 2006 based upon information then available. Tr. at 2858–60. To the extent that any variability remained in the actual calculations, Mr. Miles believed that the margin of error to his projections would be no more than 20 to 30 basis points, or 0.2–0.3%. In a February, 2005 declaration, Mr. Miles projected Washington Mutual Bank's state marginal tax rate to be 3.5%. Five months later, at trial, he had revised that projection downward to 3.3%. Tr. at 2860–61. Based on

Washington Mutual Bank's projected business activities for 2006, Mr. Miles testified that a 3% state tax rate "would be about as low a rate as we could ever derive on a marginal basis." Tr. at 2862. Since Washington Mutual Bank had expanded in the early 1990s to operate in nearly all fifty states, Mr. Miles testified that the bank had never paid taxes at a marginal composite rate lower than 38% (35% federal, plus 3% state marginal rates). Tr. at 2863. Accordingly, the court concludes that a 3% state marginal tax rate is a reasonably certain conservative estimate of Washington Mutual Bank's absolute lowest 2006 state marginal tax rate. While Mr. Miles testified that he projected the actual rate to be 3.3%, Tr. at 2863, the court's conservative adoption of a 3% rate, instead, avoids even the slightest risk of overcompensating plaintiff and awarding a windfall.

Nevertheless, while the court finds Mr. Miles' testimony and Dr. Baxter's calculations concerning the gross-up award credible (*see* Tr. at 3108–12),[53] there is no evidence in the record concerning how and what factors the court should consider in determining the gross-up for the current tax year of 2008. This evidence still must be adduced.

**D. Damages Attributable to Anchor's Branch Sales in Georgia, New Jersey and New York**

The second alleged effect of the breach for which plaintiff seeks damages involves Anchor's sale of branches in Georgia, New York and New Jersey between 1990 and 1994. *See* Pl.'s Proposed Findings of Fact and Concs. of Law at 25–28. According to plaintiff, these branch sales were caused by Anchor's immediate need for capital. Branch sales generated a modest "premium" that contributed to capital, and also eliminated branch-related operating expenses, which enhanced Anchor's profitability. *Id.* at 25.

---

53. Relying on a 38% composite marginal tax rate, Dr. Baxter added the damage awards attributable to both the NAMCO acquisition and the reduced stock proceeds—here $227.9 million—and reduced that total by the effective sale price of RFC in 1990, $63 million, to obtain the damage award that should be subject to the tax gross-up: $164.9 million. He then divided $164.9 million by 0.62 (1 minus the marginal tax rate—38%, or 0.38) to obtain a total damage award that, if taxed at the marginal tax rate, would yield the original damage award requiring a gross-up, $164.9 million. However, these figures were based on the gross-up for the projected tax year of 2006.

Although the branch sales were the result of arms-length transactions, Anchor contends that it was harmed by these sales because the market for branch deposits was artificially depressed at the time by the government's role in glutting the market with cheap branches. *Id.* at 26. Throughout the 1990s, the federally chartered RTC routinely dumped the seized branch structures of failed thrifts on to the open market, and this purportedly weighed down the premiums (the effective sale price) that Anchor was able to obtain for its own branches.

In response, the government argues that the branch sales, even the immediate sales contemplated in Anchor's capital plan, were not caused by the breach but instead were driven by Anchor's independent business decision-making. It contends that Anchor's managers realized that the bank would be more profitable if it focused on the New York metropolitan core franchise, and that less profitable branches outside the core should be shed.

Like seemingly all of the issues in this case, the factually supported truth seems to lie somewhere in the middle of the parties' arguments. For the reasons below, the court concludes that the sale of Anchor's Atlanta franchise was, in fact, caused by the breach. In the years that followed, however, Anchor's business strategy changed substantially and its fringe-market branches—which no longer fit in the new strategy—became expendable. Although the strategic change to focus on the New York metropolitan core was, itself, caused by the breach, the attenuation between the breach and the remaining branch sales convinces the court that those sales were not, in fact, caused by Anchor's capital needs and were not proximately caused by the breach.

### 1. Anchor's Pre–Breach Branch Philosophy

As noted above, Anchor's interest in the markets it entered through the 1980s was primarily long-term. Tr. at 844–45 (Test. of Cody Sickle). When Mr. Large arrived as Anchor's new CEO in 1989, he found that long-term potential and Anchor's unique multi-state franchise "fascinating," and considered them one of the bank's best attributes. Tr. at 129, 563.

Nevertheless, Mr. Large conceded that he found Anchor to have a "sloppy" branch structure with troubles he believed he had been hired to correct. Tr. at 516. Mr. Large embarked on his "gardening" approach to Anchor's branch franchise, and encouraged the bank to withdraw from regions he did not feel served Anchor's long-term objectives. Specifically, Mr. Large advocated exiting the rural markets of northern Florida and southern Georgia. Anchor quickly had agreements in place to sell those extraneous branches, but those agreements fell through as FIRREA loomed. *See* PX 543. As late as July 27, 1989, Mr. Large publicly hailed Anchor's enthusiasm for its Atlanta, southern Florida, and northern New York branch franchises. DX 308 (Memorandum to all Anchor Bankers). Atlanta, in particular, was a "terrific market" that Anchor "could have thrived in." Tr. at 897 (Test. of Cody Sickle).

As was the case with most of Anchor's peripheral market branches, the branch deposit base in Georgia was considerably smaller than Anchor's core branches. Traditionally, the economics of banking dictate that a larger branch will be more profitable than a smaller counterpart, due to economies of scale and overhead expenses. *See* Tr. at 962–63. Anchor's acquisitions in the 1980s had netted the bank a handful of branches that were too small to ever deliver real efficiencies to the organization. *See* PX 236 at 45 (1988 examination report) (noting that Anchor's branch divisions in Florida, Georgia and upstate New York were "hampered by higher cost of funds and smaller deposit bases," resulting in "high operating expenses" in those divisions). By June 1989, it had already closed or sold ten Georgia branches with minimal deposits. *See* DX 284 at 4 (noting that 7 of the 10 branches had less than $10 million of deposits; the average branch size was only $10.65 million). The next round of planned rural Georgia branches included nine more branches with $13.1 million in average deposits.

But Anchor's witnesses testified that the branch structure in Atlanta was different.

*See* Tr. at 2470 (Test. of John Brull). While the average branch size was not large, about $21.8 million per branch, Anchor remained committed to its long-term plan to grow the Atlanta franchise through the summer of 1989. It was similarly committed to remaining engaged in southern Florida and upstate New York. *See* DX 308.

## 2. The Immediate Impact of FIRREA

Because of the blow dealt by the breach to Anchor's regulatory capital, the bank was forced to forego long-term growth and profit potential in favor of immediate capital development and improved earnings, so as to satisfy the capital plan benchmarks. While Anchor once had the luxury of committing resources to its fringe markets as part of its long-term growth strategy and without the expectation of an immediate profit return, the breach brought on a paradigm shift geared exclusively toward near-term improvement.

Anchor's managers reacted quickly to the breach to identify capital-raising measures that would not detract from the current operations or vitality of its core New York metropolitan franchise. As early as July 1989, Mr. Large had anticipated the imminent breach and reported in his 90–day status report to the board of directors that the proposed bill would leave Anchor severely undercapitalized, a problem that would require "extensive asset sales" to mitigate. PX 572 at 4, 17. With Anchor's anticipated capital deficit driving his analysis of the bank, *see id.* at 17, Mr. Large outlined the posture the bank would pursue:

> Anchor will be a focused savings bank concentrating on building a consumer franchise in the greater New York, Long Island, and northern New Jersey markets while maintaining a viable presence in northern New York and southern Florida.

*Id.* at 45. He noted that this geographic posture was framed by the plain fact that "[s]ubstantial branch sales are mandated by the new capital requirement." *Id.* Among the branch sales specifically identified, Mr.

Large anticipated that Anchor would sell its branches in northeast Florida and Tallahassee, while aiming to "hold, possibly expand southern Florida." *Id.* In Georgia, Anchor expected to "sell branches outside of Atlanta," while it would "evaluate/probably sell Atlanta" branches. The report indicated that the geographic restructuring plans were "consistent with Anchor's strategic thinking and would be recommended in any event." *Id.*

Immediately after the FIRREA implementing regulations issued, Mr. Sickle wrote a memorandum to Mr. Large advocating the consolidation of Anchor's branch network, in part to contribute capital to the flagging enterprise. DX 359. Mr. Sickle's memo was more direct than Mr. Large's July report, and more sweeping in scale. He noted that the bank's strategic approach now included selling *all* of its branches in both Florida and Georgia.[54] In explaining why, of all its regional divisions Georgia should be shed, Mr. Sickle's memo was blunt: "Anchor has not been successful in Georgia and our near term prospects are not positive enough to warrant continued allocation of existing resources." DX 359 at 3. At trial, Mr. Sickle explained his memo and the bank's changed position from just months earlier with regard to southern Florida and Atlanta, noting that Anchor no longer had the luxury of developing under-performing markets such as Atlanta for long-term benefit. Tr. at 1037–39 ("There is no long-term value in the context of November 8. . . . We were fighting for the survival of the company."). In his memo, he further explained that Anchor "do[es] not have the resources to make the required commitment to success in Georgia. Even if we did, we could better use them elsewhere." DX 359 at 3. The "elsewhere," of course, was Anchor's core market where it stood to realize much greater immediate gain than the bank could in its higher-expense fringe-market branches. Tr. at 1037–39.

Consistent with Mr. Sickle's memorandum, the capital plan that Anchor filed with regulators committed Anchor to sell branches to

---

54. The plan actually contemplated retaining one small branch in each state, because Anchor was under the belief that doing so would permit the bank to reenter those states at a later date if its situation improved.

raise capital. PX 621 at 6–9. In short, Anchor would be conquistador no more. The plan contemplated that Anchor would exit Florida and Georgia immediately. *Id.* at 7. The plan also specifically called on Anchor to sell five branches in southern New Jersey (outside Philadelphia) and ten others in northern New Jersey and New York that were "less efficient or less strategic." PX 621 at 8; DX 343 at 463, 466; Tr. at 1045–46 (Test. of Cody Sickle). One year later, Anchor effected the sale of its entire Georgia franchise, completing the first of the capital-raising branch sale strategies outlined in the plan.

### 3. The Breach Caused the Atlanta Branch Sales

The weight of the evidence presented at trial demonstrates that Anchor would not have sold the branches in Atlanta but for the breach. Prior to FIRREA, Anchor planned to sell its non-urban Georgia branches to shed smaller, less efficient deposit bases. The Atlanta cluster of branches, however, was a different story. Despite only modest deposits in the Atlanta branches, only two (out of fifteen) of which had deposits in excess of $30 million, Anchor was committed to long-term growth in Atlanta. The bank was willing to tolerate higher operating expenses in Atlanta relative to peer branches, measured as a percentage of deposits, because Atlanta presented a unique long-term opportunity that Anchor's managers believed was worth the expense. Moreover, so long as supervisory goodwill continued to have substantial value to Anchor's operations because it counted as regulatory capital, the bank would have been unwilling to sell all of the branches in Georgia because it would have triggered a write-down of whatever goodwill remained from the Peachtree/Crisp acquisitions. *See* Tr. at 3084–85 (Test. of Dr. Baxter). Only after the FIRREA legislation loomed did Anchor begin to survey its assets and deposit structure to evaluate where the bank might be able to squeeze capital. When it did turn to that evaluation, however, the Atlanta branches became high on the list of expendable pieces specifically because the region provided only long-term potential. Holding the branches after FIRREA would have done little to help Anchor correct its capital imbalance, so the bank quickly made the decision to sell the Atlanta branches, and did sell them. If Anchor had to eat its young because of the breach, the entire Georgia franchise would be first to go.

Defendant's argument to the contrary is not persuasive. Defendant argues that Anchor sold the Atlanta branches for independent business reasons, specifically because they were high cost branches that provided Anchor only slight market share in Atlanta, preventing efficient development of that region. It pointed out that many of the justifications for exiting Atlanta in Mr. Sickle's November 8 memorandum echoed criticisms raised in a pre-FIRREA internal research and planning memorandum. In that June 2, 1989 document, an Anchor executive raised "objective reasons that should be explored" in later deciding "whether or not [Anchor] should exit the Georgia market area." DX 284 (Santangelo Memorandum). Among others, that memorandum doubted Anchor's long-term prospects in Georgia because of fierce banking competition, the lack of any thrift consolidation in the region resulting in traditionally small and numerous branches, and the inability to advertise efficiently in Georgia. *See id.* Defendant also pointed out that Mr. Large's July 1989 90–day report to the board of directors indicated that Anchor would "evaluate/probably sell" Atlanta branches and that those actions "would be recommended in any event." PX 572 at 45. The government argues that those comments are a tacit admission that Anchor would have sold the Atlanta branches "in any event," or regardless of the breach.

The problem that the government's argument fails to overcome is that it disregards the context in which these documents came about. First, the June 1989 memorandum appears to have been drafted with the prospect of some branch sales being contemplated as a result of FIRREA. While the memorandum, itself, makes no reference to pending legislation or capital constraints, it was drafted at Mr. Large's request during a time in which the immediacy of FIRREA was a constant backdrop to all of the bank's decision-making. Tr. at 616–17 (Test. of

James Large) ("It hung over our head like a cloud."). Moreover, many of the objective reasons identified in the June 1989 memorandum involved problems that affected Anchor's operations in Georgia statewide, not just in Atlanta. To the extent that the memorandum's criticisms of non-Atlanta branches rang true, Anchor soon decided to sell those branches independent of the breach. Since the memorandum does not single out Atlanta branches, it can hardly be interpreted to be the smoking gun calling for the sale of those urban branches. *See* DX 284 at 1 ("Georgia is 'over-banked' ...; however, Metro–Atlanta has some promising characteristics.").

As for Mr. Large's July 1989 report, it was obviously written with FIRREA in mind. PX 572 at 47 ("Substantial branch sales are mandated by the new capital requirements."). Defendant places tremendous emphasis on the fact that the report advocated Anchor to "evaluate/probably sell Atlanta branch," and that the report conceded that the recommended sales "are consistent with Anchor's strategic thinking and would be recommended in any event." *Id.*; Def.'s Proposed Concs. of Law at 29. At trial, however, Mr. Large explained that the branches that would have been sold "in any event" were the northern Florida and rural Georgia branches that Anchor planned to sell all along, notwithstanding the breach. As for the Atlanta branches, Mr. Large noted that:

> The ... decision was not to sell, but to evaluate, and [the report] does say "probably sell" because even now we were coming to the conclusion we were going to need more capital than could be achieved by "gardening" and getting rid of stuff in the country.

Tr. at 184. Mr. Large's testimony was credible, and contradicts the government's interpretation of the July 1989 memorandum.

The court therefore finds that Anchor sold its 15 branches in Atlanta as a result of the breach. But for the breach, Anchor would have continued to follow its long-term plan for Atlanta and pursued growth in that market.

### 4. Strategic Changes to Anchor's Capital Development and Branch Franchise Led to Sales of Remaining Branches

Plaintiff also claims that the sale of branches in New Jersey and New York were caused by the breach and that this sale was a response to Anchor's capital needs. The record, however, tells a slightly different story. In the years following the breach, Anchor developed a new branch strategy that called for more focused attention on its New York metropolitan core. As part of this refocusing, Anchor subsequently sold the remainder of its branches for which it seeks damages here. At the time of those sales, there was no immediate pressure for Anchor to achieve capital plan benchmarks or capital compliance like there was when Anchor sold the Atlanta branches, even though there was constant pressure from Anchor's regulators to improve its capital position.

When Anchor tried to sell its Atlanta branches in 1990, it found the market and demand for branches in shambles. The capital plan indicated sales contracts would be in place for those branch sales by September 1990 at an average 4.6% premium. However, the sales were slower (closings were delayed until the end of 1990) and the premiums lower (by about 3.4%) than anticipated. PX 968. Moreover, Anchor's immediate efforts to sell the Florida branches consistent with the capital plan were wholly unsuccessful. In fact, Anchor would not succeed in selling any material portion of the Florida franchise until October 1993. *See, e.g.*, PX 968.

The slow-down in sales was attributable primarily to the RTC's role at the time, in which it flooded the market with branch sales that competed directly with Anchor's intended sales. *See* PX 19 (1990 Anchor Annual Report) ("Since [1989], the Resolution Trust Corp. has been selling failed savings associations and their branches for premiums as low as 0.5%. This has driven prices down, particularly in the New York/New Jersey areas where a large number of such branches may be coming on the market."); PX 241 at 1 (July 1991 FDIC Examination Report of Anchor) ("This shortfall occurred because of the market glut of branches for sale through the

[RTC] at low premiums compounded by the scarcity of buyers as the industry down-sizes."). Anchor managed to keep pace with its capital plan targets, despite weak branch sale premiums, by selling additional fixed assets and security investments. *See* PX 197, Attachment A at 4–5 (Jan. 1991 Capital Plan Review & Outlook). By January 1991, however, Anchor had realized that its branch sale strategy would be ineffective to bring Anchor back into capital compliance as the capital plan projected:

> The Capital Plan identified a substantial cushion of additional gains that could be taken in the event such a shortfall occurred. It included further branch and earning asset sales. Given the market, the branch component is no longer a viable alternative, however, profits in our earning assets are now greater than expected due to fortuitous buying and improving market conditions.

PX 197, Attachment A at 4. Instead, Anchor expected to rely on substantial securities sales and improving core earnings to return the bank to capital compliance.

At the same time, Anchor recognized that its retrenchment to the core New York/New Jersey market improved short-term earnings. *See id.* at 5 ("[A]s the branch sales are consummated core earnings improve."). In March 1991, Anchor sold one of its "less efficient or less strategic offices" in Toms River, New Jersey. DX 343 at 463; PX 968; PX 621 at 8. The capital plan identified Toms River as a "high cost" branch, and its sale raised only $1.28 million in capital, *see* PX 621 at 0010, and was not the subject of any specific testimony or documentary evidence produced at trial. The court is therefore unable to conclude that the Toms River branch was sold because of capital constraints, or if it was sold because it was "less efficient."

The court's unwillingness to link the Toms River branch sale in 1991 to the breach 18 months prior is also attributable to the fact that Anchor seems to have undergone a substantial sea-change in the way it approached its branch structure around this same time. Once FIRREA became effective, Anchor made a strategic decision to focus on its core markets. After that, Anchor no longer committed resources to growing its outlying branches because those resources were focused on generating immediate growth and income in the core markets. No doubt this strategic decision was an immediate reaction to the breach, but the fact remains that once Anchor adopted this strategic plan, it began to implement branch sales based on whether or not those branches made strategic sense in light of the new focus on the core, instead of whether those branch sales would contribute to capital. Plaintiff's expert, Dr. Baxter, summarized this effect:

> [B]ecause of the breach . . . [Anchor] made a strategic decision, they decided to get out of those other markets and focus on a narrower core market. . . . And once that decision was done and they cut back . . . once they made that decision and operated the bank accordingly . . . they were committed to that road.

Tr. at 3289–90. Mr. Large echoed this analysis, as he described Anchor's strategic approach to branches following the decision to vacate Georgia, Florida, and the fringe markets to focus on the core:

> [T]he core had to be protected, and . . . once you have a trivial amount of branches in an area, it no longer is self-sustaining, and . . . it becomes inappropriate to hold a single branch or even a handful of branches in an entire state, because all the economies of scale and all the economies of marketing and all that sort of stuff begin to dissipate. . . . [Y]ou're either in or out. And when we came to the conclusion we had to start selling branches, the necessary conclusion was you got to get all the way out.

Tr. at 658.

Going forward, the strategic plan that refocused energy on Anchor's core markets also enabled Anchor to raise capital. *See* Tr. at 3017 (Baxter) ("[T]hey sold these branches, first to accumulate capital, and then part of the strategy which enabled them to accumulate capital was to refocus on a narrower geographic area. . . ."). Shortly after the Toms River branch sale, Anchor succeeded in returning to capital compliance. Beginning with the quarter ending September 1991,

Anchor satisfied FIRREA's minimum core capital requirement for the first time since the breach. *See* DX 851 at 19 (1992 Anchor Annual Report); DX 5014 (Carron demonstrative summarizing time line of Anchor capital compliance). It was only after Anchor had returned to capital compliance that it sold six branches in "downstate" New York (in March 1992) and one in the western, "upstate" New York division (in January 1992). *See* PX 968. None of these branch sales were contemplated in the initial capital plan strategies. *Compare* PX 621 at 6–9 (Capital Plan) *with* DX 343 (Potential Branch Sale Strategies). One of these branches, Dag Hammarskjold, had been identified as a "high cost" branch like Toms River. *See* PX 621 at 0010. At trial, Mr. Sickle conceded that Anchor might have sold the Dag Hammarskjold branch even without the changes brought on by FIRREA because "while it was in a good market, it was not a particularly good location within the market." Tr. at 1045–46. He noted that the branch was routinely discussed as one to be sold regardless of its impact on capital ratios.

As for the other branches Anchor sold in 1992, there is a deafening silence in the record as to *why* those specific branches were sold. It is clear that even after Anchor regained capital compliance in September 1991, its regulators routinely pressured the bank to maintain an adequate capital cushion to absorb unexpected losses and to tolerate annual phase-outs of the limited goodwill that FIRREA allowed to count toward regulatory capital. *See* Tr. at 392–400 (Large); PX 241; PX 711. There is, therefore, some justification for why Anchor would sell those branches to raise capital even though it was already capital compliant, and potentially some causal connection between FIRREA and the sales. The record before the court, however, is simply too silent and ambiguous for the court to find that plaintiff has affirmatively carried its burden of proof that the breach was the "but for" cause of the 1992 branch sales.

In June 1992, Anchor satisfied the conditions for termination of its capital plan— including three consecutive quarters of capital compliance—and was released from the plan. PX 706 (Letter from Angelo Vigna); DX 1194 at 16 (1993 Stock Offering Prospectus). Around that same time, Anchor created a "Fiscal 1993 Plan Book" that outlined the bank's strategic thrusts for the year.[55] *See* PX 718. The strategic plan seemed to signal that many of the capital pressures brought on by FIRREA had receded: "Anchor's need for immediate capital increases to meet its quarterly capital targets has abated." *Id.* at 3.33. Furthermore, the strategic plan suggested that Anchor was through selling branches for capital gain, but would instead pursue future branch sales with an eye toward improving strategic efficiencies among its branch system:

> While branch sales for capital gains are essentially complete, Anchor will continue to investigate the strategic repositioning of its branch structure in order to improve its immediate and long term performance.

*Id.* In the same report, Anchor speculated that the time had finally arrived at which the institution might again succeed raising external capital. *See id.* at 3.38 ("Anchor believes that external capital is or will soon be available to it."). In such an environment, Anchor hoped it might finally resolve issues with the FDIC regarding the $157 million preferred stock the FDIC held that was still not includable in Anchor's regulatory goodwill. *Id.* at 3.38–3.40. While Anchor was not yet convinced that the capital plan strategic objectives could "be considered complete," it was optimistic that Anchor could soon resume some limited growth, and that "within a relatively brief period of time [Anchor] could consider . . . . [s]teps to improve [its] branch structure through the purchase of branches from others or possibly *de novo* opportunities." *Id.* at 3.40.

In November 1992, Mr. Sickle wrote another thorough memorandum to Mr. Large providing an overview and strategic approach to Anchor's branch franchise, which at the time still included branches in Florida, southern New Jersey (near Philadelphia), and upstate New York, in addition to its core New York metropolitan area. *See* DX 837 (Nov. 3, 1992 Memorandum). Mr. Sickle's memorandum speculated that Anchor's core

---

55. The fiscal year ran from June 1992 to May 1993.

branches would continue to demonstrate better profitability than its other branches "into the foreseeable future." *Id.* at 1. In light of that and the fact that Anchor had "far too many (37) non-core branches representing over $1.5 billion, or 25%, of deposits," Mr. Sickle concluded that "[c]onsolidation into and expansion within [Anchor's] core markets will be more efficient than maintaining the outlying market branches." *Id.* Mr. Sickle recommended selling those peripheral branches without delay, and regardless of the premiums received in return. *Id.* Mr. Sickle's analysis was driven by his conclusion that Anchor would "perform better" without its southern New Jersey, Florida, and upstate New York branches, even if it received only a "modest premium" for them. *Id.* at 5. After disposing of the non-core branches, Mr. Sickle advocated that Anchor seek to expand its presence within its core market, either through whole-bank or branch purchases or, less appealingly, on a *de novo* basis. *Id.*

None of Mr. Sickle's suggestions or analysis appear to have been made with capital concerns in mind. *See* Tr. at 1082–83 (Test. of Cody Sickle) (noting that the November 1992 memo was written with "pure business reasons" and not capital concerns in mind). Instead, Mr. Sickle testified that Anchor had ceased to develop its non-core branch structures after FIRREA, so that it could focus resources on the core market instead, and therefore it made practical sense to finish extricating the bank from those markets. Tr. at 1083–84 ("We had lost the momentum. We . . . determined in the short term [that] it didn't make sense to go back into areas which we had been for years now saying we were exiting.") ("We had already virtually abandoned those areas, so we were going to continue [to exit the markets], finish it and start fresh.").

For the quarter ending December 1992, Anchor was capital compliant, but effective January 1, 1993, FDICIA raised Anchor's minimum core capital requirement from 3% to 4% of assets. Since Anchor would not have satisfied the higher 4% standard on January 1, it opted to file a Capital Restoration Plan with OTS in February 1993. *See* DX 870 (Capital Restoration Plan). At this same time, Anchor had pending the sale of its entire upstate New York branch network. At trial, Dr. Baxter directly attributed the sale of these branches to Anchor's increasing capital requirement, *see* Tr. at 2986, but Anchor's fact witnesses were not quite so convincing on the issue. *See, e.g.,* Tr. at 2452 (Test. of John Brull) ("And upstate New York, which we subsequently, I believe, had to sell because we were not successful in those areas."). Instead, Mr. Large's cover letter to OTS accompanying the Capital Restoration Plan explicitly stated that the bank expected to meet the 4% capital requirement by March 31, 1993 (*i.e.,* the end of the first full quarter for which it applied) *without* any capital the upstate New York branch sales might produce:

> If [the branch sale] does not close by March 31st we would, nevertheless, expect to be in compliance on that date as the result of our earnings for the remainder of the quarter and the planned sale of certain securities now in the "held-for-sale" category.

DX 870. Mr. Large also wrote, in a post script of that same cover letter, that "[w]e will beat the 4% without [the upstate New York branch sale], but we would like to show as much capital above that level as possible so that we are not just 'sneaking through.'" *Id.*

There is no doubt that the capital Anchor raised from the northern New York sales was an important element of Anchor's capital compliance efforts. Even if the capital was not needed to meet minimum requirements, as Mr. Large's contemporaneous letter suggested, it provided a cushion above those minimum levels that helped satisfy regulators and enhanced Anchor's operational flexibility. Nevertheless, especially in light of Mr. Sickle's memorandum four months earlier that encouraged the sale of the upstate New York branches for other business reasons and rationalized that Anchor "will perform better without these branches," *see* DX 837, the court is unable to find a causal link between the breach and the sales that satisfies the proximate causation standard for lost profits. Instead, while the phase out of supervisory goodwill may have triggered a

fundamental shift in Anchor's branch strategy, it appears that the new strategy was the driving causal force behind Anchor's decision to sell its northern New York franchise.

In May 1993, Anchor was released from its Capital Restoration Plan because it satisfied the FDICIA "adequately capitalized" standard. PX 739 (May 4, 1993 Letter from Angelo Vigna). The next month, consistent with Anchor's FY1993 Strategic Plan discussed above, Anchor returned to the capital market and raised external investor capital in conjunction with Anchor's plans to exchange the FDIC's preferred stock with qualifying capital. See PX 35 (Prospectus). Anchor hailed its stock offering as a "highly successful" one that added $67 million to Anchor's capital. PX 22 at 673 (1993 Anchor Annual Report). The external capital infusion allowed Anchor to satisfy the FDICIA "well capitalized" standard. Id.

Anchor's stock offering closed July 8, 1993. One week later, it closed the sale of four branches in southern New Jersey, near Philadelphia. See PX 968. Plaintiff, again, maintains that these branch sales were caused by Anchor's breach-induced need for capital, but the time line of Anchor's recovery from the breach, including its demonstrated ability to raise external capital, suggests otherwise. These branches were among those that Mr. Sickle's November 1992 memorandum suggested Anchor might perform better without. See DX 837 at 5. Moreover, the next month, Anchor made a substantial bid to acquire Crossland Federal Savings Bank, a large thrift within Anchor's core market that had been placed in OTS receivership. See DX 937 (Anchor's Bid to Acquire Crossland). It is difficult for the court to find that Anchor's capital needs caused these July 1993 New Jersey branch sales when just one month later Anchor tried to add a large, sophisticated branch system in an acquisition that would have substantially and negatively affected Anchor's regulatory capital position. See Tr. at 4372 (Test. of Dr. Carron) ("So if [Anchor] was prepared to add branches [via the Crossland bid], and

that is inherently a capital-reducing activity in the short run, it is implausible to think that they subsequently sold branches to come into capital compliance."). Instead, it looks more like Anchor was implementing the suggestions in Mr. Sickle's branch strategy memorandum to a "T"—selling less-efficient, peripheral, non-core branches and applying those proceeds towards in-market wholebank acquisitions. See DX 837.

This same logic militates against plaintiff's causation argument for the last of the branch sales for which it claims damages, the Willingboro branch in southern New Jersey in March 1994. See PX 968. Less than five months later, Anchor spent nearly $80 million to acquire Lincoln Savings Bank, a large, metropolitan New York institution that fit Mr. Sickle's strategic recommendations perfectly. See, e.g., DX 1264 (outline of Lincoln acquisition benefits to Anchor).

In summary, while the Atlanta branch sales were, in fact, an immediate and direct response to the breach, the remaining Anchor branch sales do not appear to have the same direct causal link. Instead, there is an attenuation of both time and strategic approach that interrupts the proximate relationship between the breach and the sales. At some point after the Atlanta sales, but before the rest, Anchor realized both that branch sales would contribute little more than a drop in the bucket to Anchor's capital structure and that a narrower geographic presence would improve short-term earnings. There is no doubt that the breach caused this radical strategic change, and without the breach triggering that change the court believes that Anchor would have retained its multi-state branch franchise and pursued its long-term goal of becoming an "East Coast bank."[56] Nevertheless, once Anchor committed to its strategic refocusing on the New York metropolitan core market, its decisions to later sell peripheral branches flowed primarily from the new strategic approach, not the immediate need for capital. Because of this attenuation, the court is unable to find

[56]. For this reason, the court's conclusions with respect to the branch sales are entirely consistent with the assumptions underlying plaintiff's expert's various models supporting its RFC-related damage claims, which contemplate Anchor retaining all of the branches it sold in Atlanta, Florida, New York and New Jersey.

that the breach proximately caused the branch sales in New York and New Jersey from 1991 to 1994.

### 5. Calculating Damages for the Georgia Branch Sales

Among the 15 Atlanta branches whose sale the court finds was caused by the breach,[57] those branches had total deposits of $327,615,000. *See* PX 978 (Baxter demonstrative summarizing calculations). Thirteen of the branches (with average branch deposits of $21,115,000) were sold together, fetching a 3.41% sale premium. One branch (with $28,414,000 in deposits) was sold for a 4.80% premium, and the last (with $24,706,000 in deposits) for a 4.50% premium. *See* PX 968. In total, Anchor received $11,829,000 in premiums for these 15 branches, or 3.61% of the deposit total. All were sold within a five month window between November 1990 and March 1991.

The bulk of the Atlanta sales—the thirteen that closed in December 1990—involved only the sale of Anchor's deposits to an established, in-market competitor. Tr. at 3088–89. Anchor was thus left with the additional burden of separately disposing of its fixed assets and leases for those branches. *Id.* Dr. Baxter speculated that an out-of-market buyer might have viewed the entire branch framework—fixed assets and all—more favorably and paid a slightly higher premium.

Nevertheless, the consistent testimony at trial and the overwhelming weight of evidence in this case suggest that branch sale premiums, in general, were artificially low during this time period because the RTC was flooding the market with branches. *See* Tr. at 3092 (Test. of Dr. Baxter). Defendant's expert, Dr. Carron, conceded that "premiums were clearly higher in the second half of the nineties than they were in the first half of the nineties." Tr. at 4379, 4382 ("It's true that branch premiums were low during this time period that we're talking about, low in a historical sense. They had been higher in

the eighties, they were higher again in the late nineties."). At trial, Dr. Baxter testified that Anchor was harmed by the branch sales because of the lower premiums it received. According to his damages model, if Anchor had continued to hold the branches through 1997—the year he selected to measure damages to coincide with the recovery of the branch market and the NAMCO acquisition—the same branches could have been sold for a considerably higher premium. Or, in other terms, if Anchor had tried to replace those deposits in 1997, the cost of replacing them would have been materially greater than what Anchor received. *See* Tr. at 3095–96.

This approach is functionally similar to the one embraced by this court in *Globe Savings Bank, F.S.B. v. United States,* 65 Fed.Cl. 330, 357–61 (2005), *aff'd in relevant part,* 189 Fed.Appx. 964 (Fed.Cir.2006). In *Globe Savings,* the court awarded plaintiff the "residual value" of its branch franchise based on average deposit premiums the plaintiff's branches might have obtained in 1999, the year the expert modeled damages.

Here, Dr. Baxter reviewed data from branch and whole-bank transactions between 1997 and 1999. *See* PX 977. The sales information on which he focused included 70 transactions from Georgia, Florida, New York and New Jersey over this time period, so as to reflect Anchor's own branch structure. Based on the cross-section of sale information Dr. Baxter surveyed, he testified that he believed branch sale transactions like Anchor's would have obtained a 12% premium in a fair market not burdened by the RTC's artificial role. *See* Tr. at 3095–101. In theory, Dr. Baxter testified that Anchor's damages from the branch sales could therefore be calculated by applying the 12% premium to Anchor's total deposits sold, and then subtracting the premiums it actually received for the Atlanta branches, along with an offset to account for the use-value Anchor may have derived from the actual premiums.

---

57. Specifically, those branches include all of Anchor's Georgia branches listed on PX 968 (Baxter demonstrative) that did not have a sale pending prior to FIRREA. They are the branches in: Northside Parkway; Buckhead; Sandy Springs; Executive Park; Hapeville; Fairburn; Gwinnett Place; Five Points; Greenbriar; Corporate Square; Druid Hills; North Decatur; Hairston Redan; Snapfinger; and Roswell.

The primary criticism defendant's experts raised against Dr. Baxter's methodology that requires resolution involves the cross-section of sales data on which Dr. Baxter relied. As Dr. Carron pointed out, of the 70 transactions whose premiums Dr. Baxter compounded to determine his 12% average premium, only eight involved the sale of only *branches,* as did Anchor's Atlanta transactions. The others all involved the sale of an *entire institution,* goodwill and all. *See* Tr. at 4377–78; PX 977. Dr. Carron noted that in the sale of an entire institution, "what one is acquiring is not just the depositors and their deposits [as may be the case in a branch acquisition], but the bricks and mortar, the reputation, the brand name and so forth." Tr. at 4377–78. As a consequence, premiums for whole-bank acquisitions tend to be greater than for a mere branch acquisition.

This criticism was borne out in Dr. Baxter's own data. *See* PX 977. For example, the median premium for whole-bank sales in New York among Dr. Baxter's cross-section was 13.37%, but the median premium for just New York thrift *branch* sales was only 9.54%, a difference of 3.83%. *Id.* Similarly, the median premium for whole-bank sales in Florida was 6.87%, but the branch-only median in Florida was 6.33%, a difference of 0.54%. *Id.* Dr. Baxter did not compile information from branch sale transactions in Georgia. Since the Atlanta branch sales involved only the sale of deposits, *see* Tr. at 3088–89, the court finds that the 12% premium calculated by Dr. Baxter is overstated because it was derived primarily from an analysis of whole-bank sales.

Instead, the court concludes that damages attributable to the Atlanta branch sales should be calculated using a lower estimate of what a fair premium might have been between 1997 and 1999. The Federal Circuit has instructed that, in the *Winstar* context, "[t]he ascertainment of damages is not an exact science, and where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.' " *Bluebon-*

*net Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (quoting *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969)). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521 (1960).

Here, the presence of harm is clear. The waning premiums that branch sales attracted in the early 1990s was attributable largely to the government's own role in the market. It was not until the end of the decade that the market for branch sales appears to have recovered. But for the breach, Anchor would not have sold its Atlanta branches in a depressed market. Damages stemming from the hurried sale of those branches must therefore take into account the depressed sale premium and estimate a fair premium. Based on the information presented to the court at trial, including Dr. Baxter's survey of thrift branch sales, *see* PX 977 at 3; DX 5016 (Carron Demonstrative), the court finds that a 7.5% premium is an appropriate, conservative estimate of what Anchor's Atlanta branches might have sold for in a market that was not depressed by the RTC's influential presence. This conclusion is buttressed by the concessions Dr. Baxter made that some of Anchor's Florida branches, which sold for premiums of nearly 7.25% in 1995, were sold for premiums that "approximate the market value as of the end of 1997." *See* PX 1075; Tr. at 3085–86.

Applying this premium to Anchor's Atlanta branch sales, Anchor would have obtained $24,571,125 in premiums. This is $12,742,125 more than the premium Anchor actually received. According to Dr. Baxter, this figure must be adjusted to account for any earnings or savings Anchor may have derived from use of the original premiums, just as the earnings for RFC had to be offset. Again, the court finds that a compounding of the interest earning is appropriate. The offset calculation is contained in Appendix B, and establishes an earnings offset of $4,596,000. Accordingly, the court finds that plaintiff is entitled to $12,742,125, offset by $4,596,000,

for a total damage award of $8,146,125 related to the sale of the Atlanta branches.

### 6. The Lincoln Acquisition Did Not Mitigate Damages from the Atlanta Branch Sales

Finally, defendant argues that any damages incurred from plaintiff's branch sales were mitigated by its August 1994 Lincoln Savings Bank acquisition. *See* Def.'s Br. at 59–61. In Lincoln, Anchor obtained $1.8 billion in deposits for $80 million, or less than a one percent premium. *See* Tr. at 1091, 1095 (Test. of Cody Sickle); Def.'s Mot. at 24. According to defendant, in this one transaction Anchor was able to substitute all of the deposits it sold in the wake of FIRREA, and acquired those replacements at a lower premium than Anchor received for any of its branch sales. Tr. at 1091–92; Def.'s Mot. at 24.

As Mr. Large testified, the Lincoln transaction was tremendously beneficial to Anchor, particularly as the bank refocused on energizing its core market operations, because all of the Lincoln branches overlapped with Anchor's in Brooklyn. *See* Tr. at 456–58. Anchor was therefore able to increase the deposits in its branches by consolidating existing Anchor and Lincoln branches, creating greater efficiencies and improved economies of scale. *Id.*; Tr. at 953 (Test. of Cody Sickle) ("There were [Lincoln] branches that were in the same markets that Anchor was in, which offered opportunity for consolidation, and there were offices that filled in in neighborhoods that Anchor would like to be in. So it was very good from that standpoint.").

The $80 million purchase price Anchor paid for Lincoln was deceptive, according to Anchor's witnesses, especially if compared to the premium in a branch transaction. As Mr. Brull testified, Anchor bought not only all of Lincoln's deposits, but it also acquired Lincoln's assets, including its "bad assets [and] reserves" that artificially depressed any sales price. Tr. at 2485. Nevertheless, the transaction "was a very good deal for Anchor." Tr. at 2486 (Test. of John Brull); *see also* DX 1264 (memorandum summarizing Lincoln acquisition).

In fact, the Lincoln acquisition was so beneficial to Anchor that plaintiff's witnesses agreed the transaction would have been consummated whether or not Anchor needed to replenish its deposit base. While Mr. Sickle's November 1992 memorandum advocated repositioning Anchor in its core market through a whole-bank acquisition, and the Lincoln acquisition most certainly fit that strategic goal, *see* Tr. at 2488–92 (Test. of John Brull), the real appeal of Lincoln appeared to be the synergies it brought to Anchor, regardless of the bank's branch sales in the previous four years:

> We bought Lincoln because of the synergies between the two banks and the significant cost savings we could generate by merging the two banks, eliminating one accounting department, one marketing department, one of everything administratively. . . . [T]heir performing loan portfolio had very nice yields, and we felt that really would add to our overall results, and it was extremely accretive to earnings.

Tr. at 2488 (Test. of John Brull). Therefore, in light of the overarching benefit to the bank from this acquisition, Anchor's managers testified that even if the breach had not occurred, and even if Anchor retained its diverse franchise, it would nonetheless have pursued Lincoln, anyway, because it made Anchor a stronger bank. Tr. at 2491 (Test. of John Brull) ("We would have done [the Lincoln acquisition] if we were never damaged."); Tr. at 954 (Test. of Cody Sickle) ("Q: Mr. Sickle, is Lincoln the type of institution that Anchor would have been interested in acquiring if it still had its Georgia and Florida franchise? A: Yes, absolutely. Q: And is Lincoln the type of institution that Anchor would have been interested in acquiring if it had not lost its capital as a result of FIRREA? A: Absolutely we would have been interested in it.").

Ultimately, the court finds that the deposits Anchor obtained in the Lincoln acquisition in 1994 did not mitigate the harm Anchor incurred from the Atlanta branch sales in 1990. The Lincoln acquisition appears to have been born purely out of the appreciation that Anchor would operate better in its core markets with Lincoln's deposits and assets in

the bank. The acquisition was entirely consistent with Anchor's established strategic objectives that Mr. Sickle laid out in his November 1992 memorandum, and appears to have resulted from the logic embodied in that opinion. The force of the outlined strategic objective was to improve Anchor's branch efficiency in the core market, rather than merely replacing or adding deposits to the bank's base. Had the court found above that the New York and New Jersey branch sales were, in fact, caused by the breach, the Lincoln transaction might give it more pause now as mitigation for those sales—after all, those branches seem to have been sold with the lingering expectation that they would one day be replaced by a deposit structure closer to Anchor's New York metropolitan core. See DX 837. But when Anchor sold the Atlanta branches in the shadow of FIRREA in 1990, there was no such expectation or hope, and those branch sales appear to have had little, if any bearing on Anchor's decision in 1994 to acquire Lincoln. Accordingly, the court finds that Lincoln was *not* a mitigative substitute for any harm Anchor incurred in 1990 when it sold the Atlanta branches.

## E. Wounded Bank Expenses

█ The final component of plaintiff's expectancy damage claim includes its out-of-pocket expenses that allegedly resulted from the breach. These so-called "wounded bank" damages may include transaction costs incurred by the bank that it would not have encountered but for the breach, as well as increases to plaintiff's operating expenses that are attributable to the breach. *See, e.g., Glendale Fed. Bank, FSB v. United States,* 378 F.3d 1308, 1311–12 (Fed.Cir.2004).

Here, plaintiff has claimed incidental damages associated with the sale of RFC, the sale of its branches, and the formation of a holding company and subsequent conversion of the FDIC's preferred stock into a capital-contributing asset. Plaintiff also claimed that the breach caused the bank to incur higher FDIC insurance costs than it would

have as a well-capitalized bank. For most of its wounded bank damage claims, plaintiff relied on the testimony of Gene C. Brooks, Anchor's general counsel from 1989 through 2000. Tr. at 2510–12. The court found Mr. Brooks to be a credible witness,[58] and relied on his testimony and trial exhibits as the primary support for Anchor's claims. As to the incidental transactional costs Anchor incurred, the government largely did not challenge the calculation of costs, but merely relied on its causation arguments articulated above, *i.e.,* that if the breach did not cause either the sale of RFC or the branches, then there could be no incidental damages associated with their sale. *See, e.g.,* Tr. at 2603–09; Tr. at 4191 (Test. of Dr. Carron) ("Some of [the wounded bank claims] go hand-in-hand with the sale of RFC and the sale of the branches. They rise or fall with the Court's determination on those."). Accordingly, the court will resolve most of plaintiff's wounded bank damage claims according to the causation analyses above.

### 1. Costs Associated with the Sale of RFC and Other Assets

Plaintiff claimed that it incurred transaction costs associated with the sale of RFC. Mr. Brooks testified that Anchor paid Morgan Stanley $911,234 for investment banking services rendered between January and February 1990 related to the sale. *See* Tr. at 2550; PX 883 (engagement letter and Anchor accounting purge report); PX 876–A at 142 (Brooks summary of alleged wounded bank expenses). Plaintiff also incurred legal fees associated with the sale. Mr. Brooks testified that Anchor retained Simpson Thacher & Bartlett to represent the bank in the sale transaction and paid that law firm $522,661 for its services, and that while Simpson Thacher provided other, unrelated services to Anchor, the claimed fees represented *only* work that the law firm performed in conjunction with the RFC sale. *See* Tr. at 2561–63; PX 888 (Anchor accounting purge report); PX 876–A at 147. Since the court found

---

58. Mr. Brooks received his MBA from NYU and his JD from New York Law School. He worked with the Federal Reserve Bank of New York and then the New York State Banking Department before joining the law firm of Davis, Polk & Wardwell. He worked briefly with the Bank of Tokyo in New York before joining Anchor. *See* Tr. at 2510–11. Mr. Brooks was not called, nor certified, as an expert witness, but rather testified as to Anchor's expenses.

above that the RFC sale was caused by the breach, plaintiff is entitled to recover these incidental expenses.

Plaintiff also claimed damages related to its unexpected sale of whole mortgages and mortgage servicing immediately following the breach. As noted above, as the branch sale strategy captured in Anchor's capital plan underperformed because of weak demand and low premiums, the bank kept pace with the capital plan targets by selling substantial volumes of mortgages and servicing. In the years leading up to the breach, Anchor had been actively *acquiring* both mortgages and servicing, so it was apparent to the court that the capital requirements drove much of the post-breach sell-off of these assets. According to Mr. Brooks, Anchor paid $512,557.32 in fees to Principal Portfolio Services in connection with these sales. *See* Tr. at 2550–51; PX 884 (engagement letter, invoices, and check copies); PX 876–A at 143. Principal Portfolio Services scrubbed the loan files for every mortgage and servicing right that Anchor sold to ensure that the files were complete and "in commercially reasonable sales form." Tr. at 2551. Since Anchor would not have incurred these expenses but for the breach, it is entitled to recoup the costs as incidental damages.

### 2. Costs Associated with the Sale of Branches

Mr. Brooks testified that Anchor incurred transaction costs associated with the sale of its Georgia branches in 1990. Among them, Anchor paid the Atlanta law firm Alston & Bird $91,596.23 for legal services between 1990 and 1992. Tr. at 2535–37; PX 878 (Alston & Bird invoices); PX 876–A at 129. It also obtained the services of T. Stephen Johnson Associates, a broker that helped Anchor search for potential buyers for its branches. Tr. at 2563; PX 889 (invoices); PX 876–A at 148. In 1990, Anchor paid that firm $107,967.20 for its Georgia-related services. Anchor also paid Landauer Associates $246,951.57 for its services, which included selling or disposing of Anchor's fixed assets (including leases and real estate holdings) after it sold the deposits from each Georgia branch. Tr. at 2548–49; PX 882 (invoices);

PX 876–A at 141. Mr. Brooks testified that each of these fees was associated not only with Anchor's 15 breach-related Atlanta branch sales, but also with the sale of the 9 other Georgia branches Anchor planned to sell before the breach. Accordingly, Mr. Brooks testified that, in his estimate, only 60–65% of the total fees would associated solely with Anchor's breach-related sales. *See* Tr. at 2536, 2549, 2564. This is a reasonable, conservative estimate that Mr. Brooks seemed to base on his own experience overseeing Anchor's expenses, and it was not challenged by defendant. The court therefore finds that Anchor is entitled to 60% of the above described fees, or $267,909.

Anchor hired Peat Marwick to assist it in implementing FASB 109 (permitting the retroactive write down of goodwill, discussed above) and providing necessary accounting comfort letters in association with the sale of several of its branches. Tr. at 2544; PX 881 (invoices); PX 876–A at 140. The three invoices for services related to FASB 109 total $108,700, and but for the breach Anchor would not have adopted FASB 109 on a retroactive basis nor incurred these expenses. *See* PX 881 at 2, 4, 8. Plaintiff is therefore entitled to recover those fees as incidental damages. The remainder of the fees were incurred in 1992 and 1993 in association with Anchor's branch sales outside of Georgia, however, and are not recoverable because Anchor has failed to prove that those specific branch sales resulted from the breach or because those sales were initially pending before the breach. *See* PX 881 at 3 (MacClenny branch), 6 (Tallahassee branch, January 1993), 7 (upstate New York branches), 10 (Tallahassee branch, June 1993), 11 (Florida branches, July 1993), 14 (Florida and Willingboro branches, December 1993); *compare with* PX 572 (noting failed Tallahassee branch sales as of July 1989) *and* PX 968 (noting MacClenny branch sale pending prior to breach).

Finally, Mr. Brooks testified that Anchor paid fees to both Kaplan Smith and T. Stephen Johnson to broker branch sales after 1990. *See* Tr. at 2543; PX 879 (invoice); PX 876–A at 139. However, these fees were associated with branch sales that the court

has been unable to conclude were caused by the breach. Since these branch sales were attributable primarily to Anchor's changed strategic business focus and not the breach, they are not recoverable as incidental expenses.

### 3. Costs Associated with the Formation of a Holding Company and the Negotiated Exchange of the FDIC's Preferred Stock

In 1990 and 1991, Anchor retained Prudential–Bache to engage the FDIC in negotiations that might lead to the conversion of the preferred stock that the FDIC held in Anchor into some substitute instrument that might qualify as regulatory capital. *See* Tr. at 2552–58; PX 885 (invoices); PX 876–A at 144. When it became clear that the only acceptable solution to the FDIC would involve the formation of a holding company, Anchor obtained the financial advisory services of Bankers Trust to help set up the holding company. *See* Tr. at 2537–39; PX 880 (Anchor accounting purge report); PX 876–A at 130. Mr. Brooks testified at trial that even though the formation of the holding company was a direct result of the FDIC's requirement for conversion of the preferred stock, there was a possibility that at some future point Anchor might have chosen to form a holding company for its own reasons. Tr. at 2537–39, 2553–54. Therefore, rather than claiming the entire amount of these invoices as damages in this case, Mr. Brooks estimated that the amount of the fees that were attributable to the fact that the breach disallowed the preferred stock as regulatory capital was conservatively measured as 70% of the total fees. This estimate was not challenged by defendant, and seems reasonable in light of the fact that the breach hastened the need for an immediate solution

to the preferred stock problem and might have forced Anchor to adopt a holding company strategy sooner or under more exigent circumstances that it might have otherwise done, potentially contributing to greater expenses. Accordingly, the court finds that Anchor is entitled to 70% of the costs associated with the above-described services, or $494,637.24. *See* Tr. at 2540, 2558.[59]

Anchor also obtained legal advice from Jones Day, which Mr. Brooks testified "represented and advised [Anchor] on how to deal with the loss of capital coming from FIRREA." Tr. at 2540. Jones Day's undertaking included advice and counsel in connection with the formation of the holding company, some asset and branch sale issues, and the restructuring of the FDIC's preferred stock. Tr. at 2540–43. To the extent Jones Day's services pertained to holding company issues, Mr. Brooks adjusted those fees to 70% of the full amount. For Jones Day's services related to branch sale issues in Georgia, he adjusted them to 60% of the full amount, as he had done with other Georgia branch sale-related issues. Finally, for issues that Jones Day advised on in 1993 as Anchor came closer to capital compliance, Mr. Brooks adjusted the totals by 50%, in recognition of the fact that not all of the law firm's services in 1993 were breach related. Tr. at 2542. The government did not dispute any of Mr. Brooks' calculations. All told, Anchor paid Jones Day $1,120,662.22 for services that Mr. Brooks testified were related to the breach,[60] and it is entitled to recover these incidental expenses. *See* PX 876–A at 136–38.

Finally, Anchor claimed reimbursement of fees it incurred making SEC filings required by the holding company transaction. First, it hired Peat Marwick to prepare a registra-

---

**59.** At trial, and in his summary exhibit PX 876–A at 144, Mr. Brooks testified that 70% of the fees payable to Prudential–Bache would total $294,747.07. Tr. at 2558; PX 876–A at 144. However, Mr. Brooks conceded that some of his entries on PX 876–A contained arithmetic errors. *See* Tr. at 2556. Mr. Brooks testified that for months that Prudential–Bache did not perform substantive work on Anchor's behalf, it's monthly retainer was $10,000. *See* Tr. at 2555–56; PX 885 at 7. Therefore, the 70% adjustment for those invoices should have resulted in entries of $7,000

to Mr. Brooks' summary. Instead, they were entered as $7,500. *See* PX 876–A at 144. Accordingly, the court subtracted $500 from each of plaintiff's five miscalculated entries, resulting in an adjusted Prudential–Bache fee of $292,247.07.

**60.** Mr. Brooks testified that none of the fees for Jones Day's litigation services were included in any claims in this case.

tion statement that had to be submitted to the SEC. Tr. at 2546–48. Mr. Brooks testified that both he, his accountants, and KPMG were unable to locate invoices related to this specific undertaking. However, he "knew it was a six-figure amount," Tr. at 2547, and in 1993 Anchor hired KPMG to perform the same task before it sold stock on the open market. In 1993, Anchor paid KPMG $120,000 to file its registration statement, see PX 881 at 12, so based on that amount Mr. Brooks estimated that in 1991 Anchor's fees for the same services were at least $80,000. Tr. at 2547 (noting that he estimated $80,000 to be "an appropriate amount"). Defendant did not challenge this estimate. Anchor incurred an SEC filing fee of $6,103.13. Tr. at 2561; PX 887. Plaintiff also incurred substantial printing costs associated with preparing a shareholder prospectus in advance of gaining shareholder approval of the holding company formation. For these services, Anchor paid R.R. Donnelly $108,762.60. Tr. at 2558; PX 876–A at 145; PX 886 (invoice). For these three expenses, Mr. Brooks testified that he did not make any adjustments to the overall fees because these fees would not have been incurred but for the breach. Absent the breach, Mr. Brooks testified that Anchor likely would have organized the holding company through a "reorganization" and that such an activity would not have required shareholder activity. See Tr. at 2608. In that event, Anchor would not have been required to file a shareholder prospectus with the SEC, and it would not have been required to file the S–4 "longer form" with the SEC as part of the registration. Tr. at 2609. Defendant did not dispute these assumptions. Therefore, the court finds that plaintiff is entitled to recover the transaction costs associated with the SEC registration, which total $194,865.73.

In sum, plaintiff's "wounded bank" damages for the transactional fees and professional services fees discussed above amount to $4,133,226.51.

## 4. Increased FDIC Insurance Premiums

■ Finally, plaintiff claimed damages for the FDIC insurance premiums it paid on deposits in 1993 and 1994, under the premise that Anchor's insurance premiums would have been lower if it had been a better capitalized institution. Prior to the FDICIA legislation effective in 1993, deposit insurance premiums were standard and all savings institutions paid a flat rate per $100 of insured deposits. Tr. at 2571. FDICIA instituted a new risk-based deposit assessment rate, under which each institution's insurance premium was based on a composite calculation of the thrift's capital position and its ultimate threat to the FDIC's contingent insurance liability. Tr. at 2555–58. According to Mr. Brooks, Anchor paid deposit premiums of 0.30, 0.29 and 0.26% for each of the six-month intervals beginning January 1, 1993. See PX 876–B (Brooks summary). According to plaintiff, however, if it had been able to include supervisory goodwill against its regulatory capital requirement its insurance premiums over this same 18–month period would have been only 0.23%.

Under FDICIA's risk based deposit assessment system, thrifts were grouped according to both their capital position and their supervisory rating. "Capital groups" were determined by a thrift's FDICIA capital requirement, and thrifts were scored on a scale of 1 to 3, with "well-capitalized" thrifts receiving a 1, "adequately capitalized" thrifts receiving a 2, and "undercapitalized" thrifts receiving a 3. See, e.g., PX 714 at 2 (FDIC rate notification). Within each capital group, thrifts were divided among three "supervisory subgroups," in which a thrift was classified on a scale of A to C based upon the MACRO or CAMEL rating the thrift received during its previous bank examination, and this rating reflected the bank examiner's assessment of the institution's risk to the deposit insurance fund. See Tr. at 2568–70; PX 714 at 9. Thrifts receiving a MACRO or CAMEL rating of 1 or 2 received a supervisory subgroup rating of A; thrifts receiving a rating of 3 received a supervisory subgroup rating of B; and thrifts receiving a rating of 4 or 5 received a supervisory subgroup rating of C. See Tr. at 2569; PX 714 at 9. Based upon a thrift's capital group and supervisory subgroup, it's deposit insurance premiums were determined by where the thrift fell in

the following matrix, which assigned rates measured as cents per $100 of deposits:

| Capital Group | Supervisory Subgroup | | |
|---|---|---|---|
| | A | B | C |
| 1 (Well–Capitalized) | 23 | 26 | 29 |
| 2 (Adequately–Capitalized) | 26 | 29 | 30 |
| 3 (Under–Capitalized) | 29 | 30 | 31 |

*See* PX 714 at 2; PX 741 at 4. Beginning in January 1993, Anchor was assigned a "3B" composite rating. PX 714. Six months later, its capital position had improved and it achieved a "2B" composite rating. PX 741. Six months later, it improved to a "2A" composite rating, before finally achieving a "1A" rating for the second half of 1994. *See* PX 762; Tr. at 2572.

But for the breach, Anchor's regulatory capital position would have earned the bank a "well-capitalized" designation that would have moved the bank into capital group "1." At trial, plaintiff also argued that its supervisory subgroup rating would have improved from a "B" to an "A" if the bank had been better capitalized than it actually was during the relevant thrift examinations. As a result, according to plaintiff, its deposit insurance premiums for all of 1993 and 1994 should have been based on the bank's qualification as a "1A" institution. According to Mr. Brooks, if Anchor had been classified as a "1A" institution from January 1993—June 1994, it would have paid deposit insurance premiums of just 23 cents per $100 of deposits. Over the course of the eighteen months after FDICIA's new standards were effective and before Anchor actually did achieve a "1A" classification, Anchor paid FDIC insurance premiums totaling $23,476,959.02. *See* PX 876–B at 2–4 (Anchor FDIC insurance premium assessments). According to Mr. Brooks, and based on the FDIC insurance premium assessments outlined in the table above, as a "1A" institution paying just 23 cents per $100 of deposits, Anchor's total assessments over this same time would have been $4,656,559.40 *less* than what it actually paid. *See* PX 876–B at 1 (Brooks summary of insurance assessments).

Defendant raised very little argument in response. In its pre-trial proposed findings of fact, defendant claimed that "[g]oodwill is an accounting entry that does nothing to reduce the risk of loss to the FDIC. Thus, the presence of goodwill would not have altered the deposit premiums Anchor was required to pay." Def.'s Proposed Findings of Fact at 45–46; *see also* Def.'s Proposed Conc. of Law at 31; Def.'s Mot. for J. at 25 ("Anchor's additional assertion that it paid higher FDIC insurance premiums in 1993 and 1994 is speculative and meritless. The presence of goodwill on Anchor's balance sheet would not in any way reduce the economic risk to the FDIC, and the premium charged to reflect the risk would not have been any lower."). At trial, defendant's treatment of this issue was equally brief. *See* Tr. at 4387–88. Dr. Carron was asked about Anchor's claim, and his entire testimony on the issue echoed defendant's pre-trial filings:

> I also looked at the claim for excess FDIC assessments based on the assumption that absent the breach, Anchor would have had a higher rating by the rating agency-by the regulators, and because premiums were risk-based, they would have paid a lower premium. But since goodwill doesn't improve the quality of the institution, it doesn't provide any protection to the FDIC in the event of a liquidation, I just think it's speculative to assume that in the "but for" world, they would have accorded them a lower risk-based premium.

Tr. at 4388.

Defendant's argument, however, neglects the salient fact that although FDICIA brought a thrift's deposit insurance premiums more in line with the "risk" the institution posed to the insurance fund, a thrift's risk was measured largely by its regulatory capital position. In other words, while there may be several ways to quantify the risk of failure that any one thrift posed, the predominant indicia of risk that the FDICIA regulations relied on in that quantification was capital. Therefore, while defendant perhaps correctly points out that supervisory goodwill—the kind of regulatory capital that the breach in this case excluded from capital—may do very little to improve the relative risk an institution poses to the insurance fund, the fact remains that absent the breach Anchor would have continued to count its supervisory goodwill as regulatory capital.

In that scenario, Anchor would have been well-capitalized.

As a well-capitalized institution, the court finds that Anchor would have satisfied the requirement for capital group "1." The sole qualifying factor in the capital group determination was a thrift's capital ratio. *See* PX 714 at 003. As a result of the breach, Anchor's capital group ranking dropped to a "2" and a "3" during the first months after FDICIA.

As for Anchor's supervisory subgroup rating, the government's argument might carry more force because the subgroup ranking was based on the composite score of a thrift's most recent bank examination. *See* PX 714 at 009. Among the factors that were considered in a supervisory subgroup classification were:

- Results of the last examination accepted by the [thrift's] primary federal regulator.
- Time elapsed since the last examination.
- Results of offsite statistical analysis of reported financial statements.
- Analysis of other pertinent information.

*Id.* According to the guidelines for establishing the supervisory subgroup ratings, the "Subgroup A" classification that Anchor claims it would have achieved but for the breach *"generally* corresponds to the primary federal regulator's composite rating of 1 or 2, [and] consists of financially sound institutions with only a few minor weaknesses." *Id.* Therefore, since the subgroup classification depended on more than just a thrift's capital position, an argument could be made that Anchor would not have improved from a "B" institution to an "A" institution merely because it had a stronger regulatory capital position.

Plaintiff presented evidence at trial, however, that tended to suggest that it would have received a higher composite rating following its examinations if it had, indeed, been better capitalized. With a higher composite rating, in turn, plaintiff argues it would have received a more favorable supervisory subgroup designation. Anchor was only designated as "B" institution during the two six-month periods in 1993; by 1994, it achieved an "A" rating. In January 1993, Anchor's "B" designation was primarily attributable to its most recent examinations of September 1990 by the OTS and March 1992 by the FDIC. At that time, Anchor was given a composite rating of "3" in its OTS examination and "4" in its FDIC examination, which generally corresponded to the supervisory subgroup "B" or "C" ratings. *See* PX 714 at 009.

In a letter to Anchor, Mr. Vigna (the regional director of OTS) explained that Anchor's OTS composite rating of "3" was "due primarily to its low capital position and lack of current earnings." PX 658. Mr. Vigna expressed that OTS was of the judgment that "Anchor is a viable institution" and that "[w]hile certain deficiencies do exist, we believe that the deficiencies are within the scope of Anchor's management to remedy." *Id.* Mr. Vigna's explanation of Anchor's composite score certainly suggests that Anchor would have received a "2" or better in its 1990 OTS examination if it had been better capitalized. Furthermore, by 1993 Anchor was posting quarterly earnings that would have remedied the OTS's concerns on that issue three years earlier.

As for the 1992 FDIC examination, Mr. Brooks testified that the FDIC's primary concern in its regulatory review was a thrift's capital position. *See* Tr. at 2576–78. The FDIC's letter explaining its examination report confirmed this, noting that Anchor's earnings were positive, but its capital position at the time was "wholly inadequate":

While earnings from basic operations have improved significantly in the most recent operating quarters, the ability of the institution to augment capital from basic operations has not been demonstrated over an adequate period of time nor during a rising or stable interest rate environment. Therefore, significant uncertainties remain as to the institution's ability to augment capital from basic operations.

In light of the bank's very marginal tangible capital position and the significant uncertainty as to the bank's ability to replace supervisory goodwill and further augment capital from earnings, a composite rating of "4" is continued ..., reflecting the con-

tinued need for close supervisory attention and surveillance.

PX 949. As the letter makes clear, it appears that Anchor would have obtained a substantially better FDIC rating if it had been better capitalized. The letter bears out the fact that Anchor's FDIC regulators appeared primarily concerned with the thrift's inadequate capital position and the fact that, despite Anchor's improved earnings, there was little hope that the thrift would soon move into a stronger capital position. But for the breach, however, none of these capital concerns would have plagued Anchor.

Therefore, the court finds that it is more likely than not that Anchor would have achieved a supervisory subgroup "A" classification in 1993, but for the breach. It appears that the primary reason Anchor fell into the "B" classification for that year can be attributed to the thrift's weak capital position. If Anchor had been permitted to continue counting its supervisory goodwill toward regulatory capital requirements, its capital position at the time of each of the regulatory examinations and at the time of its FDIC insurance premium assessments would have been markedly improved.

For the foregoing reasons, the court finds that Anchor was damaged by virtue of having to pay in 1993 and 1994 higher FDIC insurance premiums than it would have if the supervisory goodwill contracts had not been breached. Rather than paying premiums of 30, 29 and 26 cents per $100 of deposits over the 18-month period at issue, Anchor would have instead been required to pay 23 cents per $100. As a consequence of the breach, its premiums were $4,656,559.40 more than they would have been but for the breach, and Anchor is entitled to recover these additional fees.

## IV. CONCLUSION

Consistent with the explanations provided above, the court that plaintiff is entitled to the following:

Lost Profit damages attributable to forced sale of RFC$137,595,000.

Expectation damages from reduced stock proceeds$42,000,000.

Mitigation costs of lost benefit from forced sale of RFC$185,900,000.

Damages attributable to Anchor's branch sales$8,146,125.

"Wounded bank" damages$4,133,226.51

Increased FDIC Insurance premiums$4,656,559.40

Gross–Up amount to be determined.

In sum, the total Anchor is entitled to recover, before the addition of the gross-up figure, is **$382,430,910.91.** Further, the parties are ordered to meet to determine the appropriate final calculation of the gross-up amount. The parties shall report back to the court by May 1, 2008, at which time the final determination of the gross-up will be determined and added to Anchor's recovery. All other ·figures awarded in this opinion are final.

**IT IS SO ORDERED.**

### Appendix A
### Calculation of Offset for Cumulative Benefit from Sale of RFC
### (Dollar Amounts in Thousands)

| Quarter | Quarterly Principal Balance (1) | Earnings Rate (2) | Quarterly Earnings on Benefit | Principal Plus Quarterly Earnings |
|---|---|---|---|---|
| Jun 90 | 63,000 | 8.24% | 1,298 | 64,298 |
| Sep 90 | 64,298 | 8.16% | 1,312 | 65,609 |
| Dec 90 | 65,609 | 7.74% | 1,270 | 66,879 |
| Mar 91 | 66,879 | 6.43% | 1,075 | 67,954 |
| Jun 91 | 67,954 | 5.86% | 996 | 68,950 |
| Sep 91 | 68,950 | 5.64% | 972 | 69,922 |
| Dec 91 | 69,922 | 4.82% | 843 | 70,764 |

| | | | | |
|---|---|---|---|---|
| Mar 92 | 70,764 | 4.02% | 711 | 71,476 |
| Jun 92 | 71,476 | 3.77% | 674 | 72,149 |
| Sep 92 | 72,149 | 3.26% | 588 | 72,737 |
| Dec 92 | 72,737 | 3.04% | 553 | 73,290 |
| Mar 93 | 73,290 | 3.04% | 557 | 73,847 |
| Jun 93 | 73,847 | 3.00% | 554 | 74,401 |
| Sep 93 | 74,401 | 3.06% | 569 | 74,970 |
| Dec 93 | 74,970 | 2.99% | 560 | 75,530 |
| Mar 94 | 75,530 | 3.21% | 606 | 76,137 |
| Jun 94 | 76,137 | 3.94% | 750 | 76,887 |
| Sep 94 | 76,887 | 4.49% | 863 | 77,750 |
| Dec 94 | 77,750 | 5.17% | 1,005 | 78,754 |
| Mar 95 | 78,754 | 5.81% | 1,144 | 79,898 |
| Jun 95 | 79,898 | 6.02% | 1,202 | 81,101 |
| Sep 95 | 81,101 | 5.80% | 1,176 | 82,277 |
| Dec 95 | 82,277 | 5.72% | 1,177 | 83,453 |
| Mar 96 | 83,453 | 5.36% | 1,118 | 84,572 |
| Jun 96 | 84,572 | 5.24% | 1,108 | 85,680 |
| Sep 96 | 85,680 | 5.31% | 1,137 | 86,817 |
| Dec 96 | 86,817 | 5.28% | 1,146 | 87,963 |
| Mar 97 | 87,963 | 5.28% | 1,161 | 89,124 |
| Jun 97 | 89,124 | 5.52% | 1,230 | 90,354 |
| Sep 97 | 90,354 | 5.53% | 1,249 | 91,603 |
| Dec 97 | 91,603 | 5.51% | 1,262 | 92,865 |
| | | | 29,865 | |

**Total Benefit** $92,865

(1) Purchase price of $64.4 million less estimated expenses of $1.4 million, for total initial
(2) Quarterly average rate on federal funds

Dooley–Kaylor Report (PX 805 at p. 12, fn 16); Federal Reserve Board of Governors,

## Appendix B
### Calculation of Offset for Cumulative Benefit from Sale of Atlanta Branches
### (Dollar Amounts in Thousands)

| Quarter | Quarterly Principal Balance (1) | Earnings Rate (2) | Quarterly Earnings on Benefit | Principal Plus Quarterly Earnings |
|---|---|---|---|---|
| Dec 90 | 10,716 | 7.74% | | 10,716 |
| Mar 91 | 11,829 | 6.43% | 190 | 12,019 |
| Jun 91 | 12,019 | 5.86% | 176 | 12,195 |
| Sep 91 | 12,195 | 5.64% | 172 | 12,367 |
| Dec 91 | 12,367 | 4.82% | 149 | 12,516 |
| Mar 92 | 12,516 | 4.02% | 126 | 12,642 |
| Jun 92 | 12,642 | 3.77% | 119 | 12,761 |
| Sep 92 | 12,761 | 3.26% | 104 | 12,865 |
| Dec 92 | 12,865 | 3.04% | 98 | 12,963 |
| Mar 93 | 12,963 | 3.04% | 99 | 13,061 |
| Jun 93 | 13,061 | 3.00% | 98 | 13,159 |
| Sep 93 | 13,159 | 3.06% | 101 | 13,260 |
| Dec 93 | 13,260 | 2.99% | 99 | 13,359 |
| Mar 94 | 13,359 | 3.21% | 107 | 13,466 |
| Jun 94 | 13,466 | 3.94% | 133 | 13,599 |
| Sep 94 | 13,599 | 4.49% | 153 | 13,752 |
| Dec 94 | 13,752 | 5.17% | 178 | 13,929 |
| Mar 95 | 13,929 | 5.81% | 202 | 14,132 |
| Jun 95 | 14,132 | 6.02% | 213 | 14,344 |
| Sep 95 | 14,344 | 5.80% | 208 | 14,552 |

| | | | | |
|---|---|---|---|---|
| Dec 95 | 14,552 | 5.72% | 208 | 14,761 |
| Mar 96 | 14,761 | 5.36% | 198 | 14,958 |
| Jun 96 | 14,958 | 5.24% | 196 | 15,154 |
| Sep 96 | 15,154 | 5.31% | 201 | 15,355 |
| Dec 96 | 15,355 | 5.28% | 203 | 15,558 |
| Mar 97 | 15,558 | 5.28% | 205 | 15,764 |
| Jun 97 | 15,764 | 5.52% | 218 | 15,981 |
| Sep 97 | 15,981 | 5.53% | 221 | 16,202 |
| Dec 97 | 16,202 | 5.51% | 223 | 16,425 |
| | | | 4,596 | |

**Total Earnings Benefit**        **$4,596**

(1) Assumes $10,716,000 in premiums from November and December 1990 sales, and $1,113,000 in premiums from March 1991 sale.
(2) Quarterly average rate on federal funds